David M. Goodrich, State Bar No. 208675
dgoodrich@go2.law
Sonja M. Hourany, State Bar No. 323457
shourany@go2.law
**GOLDEN GOODRICH LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Telephone   714-966-1000
Facsimile   714-966-1002

Proposed Counsel for Debtor and
Debtor-In-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:22-bk-11383-SC |
| HERO NUTRITIONALS, LLC, a California limited liability company, | Chapter 11 |
| Debtor and Debtor-in-Possession. | **MOTION FOR ORDER:** |

**(1) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS PURSUANT TO 11 U.S.C. § 363(b) AND (f); (2) ASSUMING AND ASSIGNING CERTAIN OBLIGATIONS; (3) APPROVING BUYER, SUCCESSFUL BIDDER, AND ANY BACK-UP BIDDER, AS GOOD-FAITH PURCHASER PURSUANT TO 11 U.S.C. § 363(m); AND (4) AUTHORIZING PAYMENT OF LIENS AND OTHER ORDINARY COSTS OF SALE**

**MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS JENNIFER HODGES, DAVID M. GOODRICH, KENNETH A. MILLER IN SUPPORT**

Hearing Date, Time and Location:
Date:        October 26, 2022
Time:        1:30 p.m.
Location:    Courtroom 5C (via ZoomGov)

**TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL PARTIES IN INTEREST:**

# **TABLE OF CONTENTS**

**Page**

I.      BACKGROUND ..................................................................................3

     A.     Jurisdiction and Venue ..........................................................3

     B.     The Chapter 11 Filing ...........................................................3

     C.     The Debtor ...........................................................................3

II.     PRELIMINARY STATEMENT ...........................................................4

III.    RELIEF REQUESTED .......................................................................5

IV.     PROPOSED SALE .............................................................................5

V.      BIDDING PROCEDURES AND STALKING HORSE BID
     PROTECTIONS ...............................................................................8

VI.     MARKETING AND VALUE OF THE ASSETS ..................................10

VII.    LIENS, CLAIMS, AND INTERESTS AND PROPOSED
     DISTRIBUTION TO LIENHOLDERS...............................................10

          1.     McCormick 107, LLC Lien ............................................10

          2.     Winkler Dunnebier Claim ..............................................10

          3.     U.S. Small Business Administration...............................11

VIII.   TAX CONSEQUENCES OF THE PROPOSED SALE .......................11

IX.     RESERVATION OF RIGHTS .............................................................11

X.      LEGAL BASIS FOR RELIEF REQUESTED......................................11

     A.     The Proposed Sale is in the Best Interest of the Debtor's
        Creditors and Estate and Should be Approved .........................11

     B.     The Sale Is Made in Good Faith.............................................12

     C.     The Debtor May Sell the Assets Free and Clear of Liens,
        Claims and Interests................................................................13

          1.     The Sale Should Be Free and Clear Under §363(f)(1)....14

          2.     The Sale Should Be Free and Clear Under §363(f)(2)....14

          3.     The Sale Should Be Free and Clear Under §363(f)(4)....15

     D.     Adequate Notice of the Sale is Proposed ................................15

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

i

## TABLE OF CONTENTS (cont.)

**Page**

E.   The Court Should Authorize the Debtor to Assume and Assign
     the Assumed Obligations.............................................................................16

F.   The Buyer Should be Deemed a "Good Faith Purchaser"
     Pursuant to 11 U.S.C. § 363(m) ..................................................................16

G.   The Broker Commission Should Be Approved ...........................................17

H.   The Debtor Should be Authorized to Make Distributions of the
     Sales Proceeds to the Brokers and Creditors with Allowed,
     Undisputed Claims .......................................................................................18

I.   The Waiver of the Stay is Appropriate........................................................18

XI.  CONCLUSION ......................................................................................................19

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

MOTION  FOR SALE OF DEBTOR'S
ASSETS

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Community Thrift & Loan v. Suchy (In re Suchy),* 786 F.2d 900, 902 (9th Cir. 1985).............................................................................................. 17

*Ewell v. Diebert (In re Ewell),* 958 F.2d 276, 281 (9th Cir. 1992) ...................................... 17

*In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 147 (3d Cir. 1986).................. 17

*In re AEG Acquisition Corp.*, 127 B.R. 34, 44 (Bankr. C.D. Cal. 1991) ............................. 16

*In re AEG Acquisition Corp.*, *aff'd* 161 B.R. 50 (B.A.P. 9th Cir. 1993) ............................. 16

*In re America West Airlines*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) ............................ 11

*In re Baldwin United Corp.*, 43 B.R. 888, 905 (Bankr. S.D. Ohio 1984) ........................... 12

*In re Busick*, 831 F.2d 745, 750 (7th Cir. 1987) ................................................................ 15

*In re Cummins*, 15 B.R. 893, 895 (B.A.P. 9th Cir. 1981)................................................... 17

*In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987) .......................................................... 13

*In re Lionel Corp.*, 722 F.2d 1063, 1071 (2nd Cir. 1983) ................................................ 11

*In re Pomona Valley Medical Grp., Inc.*, 476 F.3d 665, 670 (9th Cir. 2007)..................... 16

*In re Shary*, 152 B.R. 724 (Bankr. N.D. Ohio 1993) ......................................................... 14

*In re Tabore, Inc.*, 175 B.R. 855 (Bankr. D. N.J. 1994) .................................................... 14

*In re Walter*, 83 B.R. 14, 19 (B.A.P. 9th Cir. 1988) ................................................... 11, 12

*In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 842 (Bankr. C.D. Cal. 1991)............................................................................................. 12

*In re WPRV-TV*, 983 F.2d 336, 340 (1st Cir. 1993) .......................................................... 11

*Liberty Tool v. Vortex Fishing Sys. (in Re Vortex Fishing Sys.)*, 277 F.3d 1057, 1065 (9th Cir. 2002) ........................................................ 15

*Lionel*, 722 F.2d at 1069 ................................................................................................ 11

*New Haven Radio, Inc. v. Meister (In re Martin-Trigona)*, 760 F.2d 1334, 1346 (2nd Cir. 1985) ...................................................... 11

*Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390-91 (6th Cir. 1986) ........................ 11

*Stephens Indus., Inc.*, 789 F.2d at 390 ........................................................................... 12

MOTION FOR SALE OF DEBTOR'S ASSETS

1

<div align="center">

## <u>TABLE OF AUTHORITIES (cont.)</u>

</div>

2                                                                                    <u>**Page(s)**</u>

3   *Veltman v. Whetzal*, 93 F.3d 517 (8th Cir. 1996) .............................................................. 14

4   <u>**Statutes**</u>

5   11 U.S. C. § 105(a) ................................................................................................................ 2

6   11 U.S. C. § 363 ...................................................................................................................... 2

7   11 U.S. C. § 365 ...................................................................................................................... 2

8   11 U.S. C. § 1107 .................................................................................................................... 2

9   11 U.S. C. § 1107(a) ............................................................................................................... 3

10  11 U.S. C. § 1108 .................................................................................................................... 3

11  11 U.S.C. § 102(1) ................................................................................................................ 15

12  11 U.S.C. §303 ...................................................................................................................... 15

13  11 U.S.C. § 363 ..................................................................................................................... 15

14  11 U.S.C. § 363(b) ..................................................................................................... 5, 11, 12

15  11 U.S.C. § 363(f) ...................................................................................................... 5, 13, 15

16  11 U.S.C. § 363(f)(1) ............................................................................................................ 14

17  11 U.S.C. § 363(f)(4) ............................................................................................................ 15

18  11 U.S.C. § 363(m) .................................................................................................... 5, 16, 17

19  11 U.S.C. § 365 ..................................................................................................................... 15

20  11 U.S.C. § 365(b)(l) ............................................................................................................ 16

21  11U.S.C. § 363(f)(2) ............................................................................................................ 14

22  28 U.S.C. § 157 ....................................................................................................................... 3

23  28 U.S.C. § 157(b)(2) ............................................................................................................. 3

24  28 U.S.C. § 1334 ..................................................................................................................... 3

25  28 U.S.C. § 1408 ..................................................................................................................... 3

26  28 U.S.C. § 1409 ..................................................................................................................... 3

27  <u>**Rules**</u>

28  LBR 9013-1 .............................................................................................................................. 2

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

MOTION  FOR SALE OF DEBTOR'S
                                                        ASSETS

## <u>TABLE OF AUTHORITIES (cont.)</u>

<u>Page(s)</u>

LBR 6004-1 .................................................................................................................. 2

Fed. R. Bankr. P. 9014 ........................................................................................... 2, 15

Fed. R. Bankr. P. 9007 ........................................................................................... 2, 15

Fed. R. Bankr. P. 6006 ........................................................................................... 2, 15

Fed. R. Bankr. P. 6004(h) ........................................................................................... 18

Fed. R. Bankr. P. 6004(g) ........................................................................................... 18

Fed. R. Bankr. P. 6004 ............................................................................................... 15

Fed. R. Bankr. P. 2002 ........................................................................................... 2, 15

LBR 6004-1(b)(3) ....................................................................................................... 15

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

v

MOTION FOR SALE OF DEBTOR'S
ASSETS

1  Hero Nutritionals, LLC, the debtor and debtor-in-possession ("Hero" or "Debtor") in

2  the above-captioned case ("Case"), hereby moves this Court ("Motion")[1]  pursuant to §§

3  105(a), 363, 365 and 1107 of Title 11 of the United States Code ("Bankruptcy Code"),

4  Rules  2002, 6004,  6006,  9007, and  9014 of the Federal Rules of Bankruptcy Procedure

5  (as amended from time to time, "Bankruptcy Rules"), and Rule  6004-1 and  9013-1 of the

6  Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of

7  California ("LBR" or "Local Rules") for entry of an order substantially in in the form

8  attached hereto as **Exhibit 1** ("Sale Order"),

9  a.  approving the sale ("Sale") of certain of the Debtor's hard assets

10  including, but not limited to, all equipment identified in Seller's

11  bankruptcy schedules ("Assets") free and clear of all liens, claims and

12  interests, encumbrances and interests ("Encumbrances") to Vytalogy

13  Wellness, L.L.C. or its nominee ("Buyer") pursuant to the Asset

14  Purchase Agreement by and between the Debtor and Buyer dated

15  October __, 2022 ("Asset Purchase Agreement"), an executed copy

16  of which is attached hereto as **Exhibit 2**,  or, alternatively, to the other

17  successful bidder(s) pursuant to the applicable agreement(s) with

18  such other successful bidder(s) entered into in accordance with the

19  Bid Procedures, free and clear of all liens, claims, encumbrances or

20  other interests pursuant to §§ 363(b), (f) and (m) of the Bankruptcy

21  Code;

22  b.  authorizing assumption and assignment of the Debtor's obligations

23  identified in Schedule 1.3 of the Asset Purchase Agreement

24  ("Assumed Obligations"); and

25  c.  authorizing payment of liens and other ordinary costs of sale.

[1]  Capitalized terms used herein and not defined in the Motion shall have the meaning ascribed to them in the Bidding Procedure Motion (defined below).

MOTION  FOR SALE OF DEBTOR'S ASSETS

Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1    In support of the Motion, the Debtor submits the following memorandum of points

2  and authorities and the Declarations of Jennifer Hodges ("Hodges Dec."), David M.

3  Goodrich ("Goodrich Dec"), and Kenneth A. Miller ("Miller Dec").**²**

4    I.    BACKGROUND

5        A.    Jurisdiction and Venue.

6    This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and

7  1334.  Venue of this case and this Motion is proper in this district pursuant to 28 U.S.C.

8  §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. § 157(b)(2).  The Debtor

9  consents to the entry of a final order by the Court in connection with this Motion to the

10 extent it is later determined that the Court, absent consent of the parties, cannot enter

11 final orders or judgments consistent with Article III of the United States Constitution.

12       B.    The Chapter 11 Filing.

13   On August 17, 2022 ("Petition Date"), the Debtor filed a voluntary petition for relief

14 under chapter 11 of the title 11 of the United States Code ("Bankruptcy Code") in the

15 United States Bankruptcy Court for the Central District of California, Santa Ana Division

16 ("Court").  The Debtor continues to manage its affairs as debtor and debtor-in-possession

17 pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtor is not

18 currently operating, but plans to license its intellectual property rights and/or sell its

19 inventory to generate additional funds for a chapter 11 plan of reorganization.  No party

20 has requested the appointment of a trustee or examiner.

21       C.    The Debtor.

22   In 1997, the Debtor became the first company to introduce a nutrient-rich, all-

23 natural gummy bear for children called Yummi Bears®.  The inspiration for these "yummi

24 gummies" came from its founder and CEO Jennifer Hodges' nieces and nephews.  After

25 nearly 25 years, Debtor continues to innovate in the natural and organic gummy vitamin

26 space, creating products to fit every dietary and lifestyle need while still maintaining its

27

28   **²** A declaration of an agent for Vytalogy will be submitted separately.

Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

MOTION  FOR SALE OF DEBTOR'S
ASSETS

1  amazing taste.  Along the way, the Debtor created America's #1 children's gummy vitamin

2  in the natural products industry.  Notwithstanding its many successes, and like too many

3  businesses, the Debtor was hit particularly hard by the Covid-19 pandemic.

4         The Debtor owns valuable assets which the Debtor believes have a total value that

5  exceeds all debts of the Debtor.  The Debtor intends to sell the Assets to the Buyer or to a

6  successful overbidder at the Auction and entertain offers for the use of its intellectual

7  property rights (such as trademarks, copyrights, patents, trade secrets and formulas for its

8  "Yummi Gummies," among other things) in order to pay all creditors in full under an "earn

9  out" plan of reorganization.

10        II.    PRELIMINARY STATEMENT.

11        Following a review of strategic alternatives for its business, the Debtor, in

12  consultation with its advisors, determined that maximizing the value of its estate is best

13  accomplished through an orderly sale of the Assets, which do not include inventory or

14  intellectual property rights which will be used or sold to fund a chapter 11 plan, free and

15  clear of all Encumbrances.  Since July 2022, the Debtor, its brokers[3] and its advisors have

16  been engaged in a marketing effort designed to encourage bids for a transaction pursuant

17  to which the Assets will be sold so that significant funds are available to pay creditors and

18  in an effort to swiftly and efficiently vacate the premises.[4]

19        To date, several parties have expressed an interest in purchasing the Assets.  In

20  the exercise of its business judgment, the Debtor has entered into the Asset Purchase

21  Agreement with the Buyer for the sale of the Assets.  The Asset Purchase Agreement is a

22  "stalking horse" purchase offer subject to higher and better bids pursuant to the

23

24

25  _____

       [3] Whipstitch and Guardian Capital ("Brokers").  Employment applications will be filed shortly.

26     [4] The Debtor's landlord obtained a judgment for unlawful detainer pre-petition and that judgment has
    been stayed as a result of the Debtor's bankruptcy case filing, but the landlord has filed a relief from stay
27  motion which is scheduled to be heard by the Court on October 26, 2022.  McCormick 107, LLC, a secured
    creditor of the Debtor, has also filed a relief from stay motion and scheduled it to be heard by the Court at
28  the same hearing date and time.

Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

4                          MOTION  FOR SALE OF DEBTOR'S
                                          ASSETS

1  procedures set forth herein and in the proposed Bidding Procedures Order attached to the

2  concurrently filed Bid Procedures Motion.

3      On October 5, 2022, the Debtor filed the *Motion for Order Approving Bidding*

4  *Procedures, Stalking Horse Bidder Protections, and Form of Asset Purchase Agreement;*

5  *Declaration of Jennifer Hodges in Support* ("Bid Procedures Motion") which will be heard

6  on October 12, 2022 at 1:30 p.m.  *See* Goodrich Dec.

7      The Debtor believes the sale of the Assets pursuant to the procedures set forth

8  herein and in the proposed Bidding Procedures Order and on the timeline proposed

9  herein presents the best opportunity for the Debtor to maximize value for its estate, its

10  stakeholders, and parties in interest and to provide the Debtor with a solid basis to defeat

11  the pending relief from stay motions if either or both moving parties refuses to consent to

12  any continuance.

13      III.    <u>RELIEF REQUESTED</u>

14      The Debtor requests entry of an order (1) approving the Sale free and clear of any

15  and all Encumbrances to the Buyer pursuant to the Asset Purchase Agreement or,

16  alternatively, to the other successful bidder(s) pursuant to the applicable agreement(s)

17  with such other successful bidder(s) entered into in accordance with the Bid Procedures,

18  free and clear of all liens, claims, encumbrances or other interests pursuant to § 363(b), (f)

19  and (m) of the Bankruptcy Code with such liens, claims and interests attaching to the Sale

20  proceeds, (2) assuming and assigning the Assumed Obligations, (3) authorizing payment

21  of certain encumbrances, and (4) authorizing payment of ordinary costs in connection with

22  the Sale.

23      IV.    <u>PROPOSED SALE</u>

24      The following are the material terms[5] of the Sale under the Asset Purchase

25  Agreement:

26

27  _____

28  **5**    Capitalized terms used in Article IV. of the Motion and not defined in the Motion shall have the meaning ascribed to them in the Asset Purchase Agreement.

MOTION  FOR SALE OF DEBTOR'S
                                    ASSETS

Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1       1.    <u>Purchase Price</u>: The consideration to be paid at the Closing for the Assets

2  consists of (i) an amount equal to $5,500,000 ("<u>Purchase Price</u>") (*minus* the $500,000

3  deposit); and (ii) the Assumed Obligations.  *See* Asset Purchase Agreement, Art. II. § 2.1.

4       2.    <u>Purchased Assets</u>:  Subject to the Asset Purchase Agreement, the Buyer

5  agrees to purchase from the Debtor and the Debtor agrees to sell, convey, transfer and

6  assign to the Buyer, on the Closing Date, all of the following ("<u>Assets</u>").  The Debtor's

7  right, title and interest in certain hard assets including, but not limited to, (i) all equipment

8  identified in Debtor's bankruptcy schedules, (ii) all cold storage for flavoring and coloring,

9  (iii) all refrigerators and dishwashers in the lab, (iii) all office equipment (chairs, desks,

10  tables, etc.); (ii) all of Debtor's rights, title, interest and benefits under the agreements,

11  contracts, leases, instruments, commitments and understandings that are related to the

12  Assets and that Buyer desires to have Debtor assume and assign to Buyer as listed in

13  Schedule 1.1(b) attached hereto ("<u>Assigned Contracts</u>"), (iii) to the extent transferable, all

14  of Debtor's licenses, permits or other authorizations of governmental or regulatory entities

15  that are required under any laws, rules and regulations applicable to or affecting the

16  Assets, including those identified on Schedule 1.1(c) attached hereto, (iv) all corporate

17  records and documents that relate to the Assets or which would assist Buyer to maintain

18  and to operate any of the Assets, (v) a list of Debtor's employees that operated the Assets

19  for the period of 2017 through 2022, (vi) all of Debtor's insurance recovery rights as they

20  related to the Assets, and (vii) all goodwill associated with the Assets.  *See* Asset

21  Purchase Agreement, Art. I. § 1.1.

22       3.    <u>Excluded Assets</u>:  The Buyer shall not acquire, and the Debtor shall retain,

23  all of the following assets, properties and rights owned by the Debtor ("<u>Excluded Assets</u>").

24  The Debtor's rights, title and interest in (i) all contracts and leases of Debtor that are not

25  Assigned Contracts, (ii) all intellectual property rights, including, but not limited to

26  trademarks, copyrights, patents, patents pending, trade secrets, recipes, formulas and

27  any other intangibles related to Debtor's products and trade names, (iii) all notes

28  receivable and any other debt instruments providing for money owing to Debtor, (iv) all

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

MOTION  FOR SALE OF DEBTOR'S
ASSETS

1  cash and cash equivalents of Debtor, (v) the corporate seals, minute books, stock books,

2  tax returns and other similar records relating to Debtor's corporate organizations, and all

3  employee related or employee benefit related files or records, (vi) except as to the Assets,

4  all insurance recovery rights of Debtor and all tax refunds owing to Debtor, (vii) all rights to

5  all claims, causes of action, choses in action, rights of recovery and rights of set-off

6  (whether choate or inchoate, known or unknown, contingent or non-contingent) in favor of

7  Debtor, and all avoidance causes of action existing under any of sections 544-553,

8  inclusive, of the Bankruptcy Code, (viii) all of Debtor's raw material, packaging materials,

9  labels, supplies, work in process inventory and finished goods inventory, (ix) all assets

10  scheduled by Debtor in its bankruptcy schedules that are included as Assets in section 1.1

11  of this Agreement, and (x) all other assets identified in Schedule 1.2.  *See* Asset Purchase

12  Agreement, Art. I. § 1.2.

13        4.    <u>Third Party Consents</u>.  Winkler Dunnebier ("<u>Winkler</u>") is title holder to a

14  Starch Mogul machine ("<u>Mogul</u>").  Winkler claims to be owed $275,000.  Winkler has

15  consented to the sale of the Mogul conditioned upon payment from the sale to Winkler of

16  all amounts due to Winkler.  The Debtor proposes to sell the Mogul and pay Winkler in full

17  from the sale proceeds.

18        5.    <u>Buyer's Employment of Debtor's Current or Former Employees</u>.  Provided

19  Buyer is deemed to be the winning bidder at the Auction (or if there is no Auction because

20  no qualified bid has been submitted), Buyer shall have the right, but not the obligation, in

21  Buyer's sole and absolute discretion, to offer employment to any of Debtor's current or

22  former employees, and Debtor shall provide Buyer or make available to Buyer copies of

23  all of Debtor's employment records of all of its current and former employees as requested

24  by Buyer.

25        6.    <u>Payment of Cure Costs Under Assigned Contracts</u>.  As promptly as

26  practicable following the execution of this Agreement, Buyer and Debtor shall use

27  commercially reasonable efforts to cooperate and determine an estimate of the amounts

28  required to cure all defaults under each Assigned Contract so as to permit the assumption

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

MOTION  FOR SALE OF DEBTOR'S
ASSETS

1 and assignment of each such Assigned Contract pursuant to Section 365 of the

2 Bankruptcy Code (as ultimately determined by the Bankruptcy Court, "Cure Costs").  In

3 connection with the assignment and assumption of the Assigned Contracts, Debtor shall

4 pay all Cure Costs on or before the Closing.

5      7.    Sale Order.  Provided that Buyer is deemed to be the successful bidder at

6 the Auction (or no Auction occurs because no qualified overbid is timely submitted),

7 Debtor will request the Bankruptcy Court to approve the sale of the Assets to Buyer at the

8 Sale Hearing.  The Bankruptcy Court order approving Debtor's sale of the Assets to Buyer

9 (the "Sale Order") must be acceptable to Buyer in Buyer's sole discretion and must be

10 entered by the Bankruptcy Court by not later than November 2, 2022, and the Closing

11 must occur by the Outside Closing Date, which Outside Closing Date may be extended by

12 the mutual consent of Buyer and Debtor.

13      The description above only summarizes certain provisions of the Asset Purchase

14 Agreement, and the terms of the Asset Purchase Agreement control in the event of any

15 inconsistency.  The complete terms of the Asset Purchase Agreement are set out in

16 **Exhibit 2**, attached hereto.[6]

17      V.    BIDDING PROCEDURES AND STALKING HORSE BID PROTECTIONS.

18      The Debtor has filed with the Court a motion for approval of bidding procedures

19 and stalking horse protections for Buyer ("Bid Procedures Motion").[7]  The Bid Procedures

20 Motion seek the entry of an order by the Court ("Bid Procedures Order") that approves

21 Buyer to serve as a stalking horse bidder with a cash purchase price of $5.5 million for the

22 Assets and contain other terms that are reasonably acceptable to Buyer and consistent

23 with other terms of this Agreement.

24

25

26

---

27     [6] Parties are advised to consult the Asset Purchase Agreement for all terms and conditions.

28     [7] The Debtor requests the Court take judicial notice of its docket, including the Bid Procedures Motion filed on October 5, 2022.

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

MOTION  FOR SALE OF DEBTOR'S ASSETS

1    If the Bid Procedures Motion is granted, the Auction and the Sale Hearing will be

2  held before the Bankruptcy Court on October 26, 2022, at 1:30 p.m.  The proposed bid

3  procedures require:

4    a. the minimum overbid be at least $5.75 million, with a break-up fee of

5       $150,000 to be paid to Buyer in the event that Buyer is not deemed to

6       be the successful bidder at the Auction.

7    b. Subsequent bidding in increments of $50,000 or higher figures that are

8       wholly divisible by $50,000.

9    The Bid Procedures Motion also request the Court order that in order for any

10  potential overbidder to be eligible to participate in the Auction, at least one business day

11  prior to the Auction, overbidders must (1) deliver to Debtor a signed asset purchase

12  agreement in a form that is not less favorable for Debtor than this Agreement; (2) deliver

13  to Debtor's bankruptcy counsel a deposit in the amount of $500,000, which deposit will be

14  deemed to be non-refundable and forfeited to Debtor's bankruptcy estate/Debtor as

15  liquidated damages if the overbidder is deemed to be the winning bidder at the Auction

16  and fails to close its purchase by the Outside Closing Date (defined below); and (3)

17  demonstrate to Debtor that the overbidder has the ability to close its purchase, including

18  proof of a binding financing commitment and/or sufficient cash on hand.  Debtor shall be

19  required to provide Buyer with copies of all overbids submitted along with all supporting

20  documentation of the overbidders.

21    Finally, the Bid Procedures Motion requests the Court enter an order that finds the

22  Buyer shall automatically be deemed to have an allowed administrative claim against

23  Debtor's bankruptcy estate in the amount of $150,000 if Debtor fails to proceed with its

24  sale of the Assets to Buyer or to a successful overbidder in accordance with the terms of

25  this Agreement.  Buyer shall file a proof of claim with the Bankruptcy Court should it hold

26  an administrative claim against Debtor's bankruptcy estate.

27

28

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

MOTION  FOR SALE OF DEBTOR'S
ASSETS

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

## VI.   MARKETING AND VALUE OF THE ASSETS

The Debtor and its Brokers have been engaged in a marketing effort which has generated interest by several parties.  Based on the nature of the Debtor's business and the marketing efforts, the Debtor believes that the proposed Sale to the Buyer, with the opportunity for overbidding, is in the best interest of the Debtor's creditors and will result in the highest and best recovery for the Estate.  See Miller Dec.

## VII.   LIENS, CLAIMS, AND INTERESTS AND PROPOSED DISTRIBUTION TO LIENHOLDERS

The Debtor seeks to sell the Assets free and clear of any and all liens, claims, and interests, including the following:

### 1.   McCormick 107, LLC Lien

McCormick 107, LLC ("McCormick") contends that as of the Petition Date, the Debtor was indebted to McCormick in the principal amount of $2,312,667.10, together with all accrued interest. late fees, costs and attorneys' fees ("Prepetition Indebtedness").   By virtue of a first priority UCC-1, McCormick[8] asserts a first priority lien on the Debtor's personal property along with the rents, issues and profits generated by same ("Prepetition Collateral").  McCormick asserts that all the Debtor's cash and proceeds generated by the Prepetition Collateral are McCormick's "cash collateral" within the meaning of Bankruptcy Code Section 363(a).  On September 27, 2022, McCormick filed a proof of claim in the amount of $2,621,866.81, as a secured claim against the Debtor's assets, designated as Claim 9-1 in the Court's register of Claims.  The Debtor disputes the total amount claimed by McCormick.

### 2.   Winkler Dunnebier Claim

The Debtor scheduled a general unsecured obligation owing to Winkler Dunnebier ("Winkler"), the current title holder to the Debtor's Starch Mogue machine, in the amount of $212,143.87.

---

[8] McCormick acquired the rights of Bank of Manhattan, Pacific Premier Bank, and Plaza Bank.

MOTION  FOR SALE OF DEBTOR'S
ASSETS

1  / / /

2          3.    U.S. Small Business Administration

3          On September 29, 2022, the U.S. Small Business Administration ("SBA") filed a

4  proof of claim in the amount of $525,869.86, as a secured claim against the Debtor's

5  tangible and intangible personal property, designated as Claim 10-1 in the Court's register

6  of Claims.

7          VIII.   TAX CONSEQUENCES OF THE PROPOSED SALE

8          The Debtor does not expect there to be any capital gains taxes from the proposed

9  Sales because the Purchase Price is less than the Debtor paid for the Assets.  *See*

10  Hodges Dec.

11         IX.    RESERVATION OF RIGHTS

12         Except as set forth in the Asset Purchase Agreement, the Debtor reserves the right

13  to object to all or any portion of each and every claim or encumbrance that has been or

14  will be asserted against the Assets.

15         X.     LEGAL BASIS FOR RELIEF REQUESTED

16         A.     The Proposed Sale is in the Best Interest of the Debtor's Creditors

17                and Estate and Should be Approved

18         Pursuant to 11 U.S.C. § 363(b), a trustee may, with court approval, sell property of

19  the estate outside the ordinary course of business.  A proposed sale of estate property will

20  be approved if it is in the best interests of the estate, based on the facts and history of the

21  case.  *In re America West Airlines*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994), citing *In re*

22  *Lionel Corp.*, 722 F.2d 1063, 1071 (2nd Cir. 1983).  A court has broad discretion to

23  authorize a sale under 11 U.S.C. § 363(b).  *See In re Walter*, 83 B.R. 14, 19 (B.A.P. 9th

24  Cir. 1988); *See also In re WPRV-TV*, 983 F.2d 336, 340 (1st Cir. 1993); *New Haven*

25  *Radio, Inc. v. Meister (In re Martin-Trigona)*, 760 F.2d 1334, 1346 (2nd Cir. 1985); *Lionel*,

26  722 F.2d at 1069; *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390-91 (6th Cir. 1986).

27  Generally, courts will find that a proposed sale is in the best interests of the estate where

28  the trustee or debtor-in-possession has a valid "business justification" for the proposed

Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

11                                          MOTION  FOR SALE OF DEBTOR'S
                                            ASSETS

1  sale.  *See, e.g.*, *Stephens Indus., Inc.*, 789 F.2d at 390; *In re Baldwin United Corp.*, 43

2  B.R. 888, 905 (Bankr. S.D. Ohio 1984).  A bankruptcy court's power to authorize a sale

3  under  § 363(b) is reviewed for abuse of discretion. *See In re Walter*, 83 B.R. 14, 19

4  (B.A.P. 9th Cir. 1988).

5          The proposed Sale is the culmination of a marketing process for the Assets that

6  began pre-petition.  It is the Debtor's business judgment that, after considering potential

7  alternatives, the proposed Sale is in the best interest of the Debtor, the Estate and its

8  creditors and stakeholders. The Debtor believes the consideration to be paid by the Buyer

9  represents a fair and reasonable offer in light of all the terms of the proposed Sale, and as

10  a result of the Debtor's pre- and post-petition marketing efforts, the offer (or any higher

11  and better offer obtained through the proposed Bid Procedures and Auction) will provide

12  maximum value to the Debtor under the current circumstances. The proposed Sale will

13  generate proceeds for the benefit of the creditors of the Estate in the form of cash and

14  assumed obligations and will provide the possibility of continued employment of the

15  Debtor's current or former employees.

16          The proposed purchase price represents the fair market value for the Assets which

17  was achieved after more than three months of marketing of the Assets.  As discussed

18  above, the Brokers canvased the market of potential buyers, spent hours providing

19  information and documents to prospective buyers and engaged in a series of negotiations

20  with the Buyer and other interested parties.  The Debtor received ___ letters of intent and

21  the proposed Sale to the Buyer represents the highest and best terms and conditions

22  received by the Debtor.  *See* Miller Dec.

23          B.    The Sale Is Made in Good Faith

24          "Good faith encompasses fair value, and further speaks to the integrity of the

25  transaction." *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 842 (Bankr. C.D. Cal.

26  1991) internal quotation marks omitted).  Bad faith includes collusion between buyer and

27  seller or otherwise taking unfair advantage of other potential purchasers, such as a

28

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

MOTION  FOR SALE OF DEBTOR'S
ASSETS

1  collusive insider transaction.; *id.*; *see also In re Indus. Valley Refrigeration & Air*

2  *Conditioning Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987).

3     The Sale was negotiated at arms' length.  There is no fraud, collusion, or insider

4  transactions present here, and the proposed buyer received no special treatment or

5  consideration.  Moreover, the Assets have been actively marketed, the Sale will be

6  properly publicized on the Bankruptcy Court's website, and the Debtor has accepted the

7  highest and best offer for the Assets and will be subjecting the Buyer's bid to higher and

8  better offers through the Bidding Procedures Motion. As a result, the Sale is made in good

9  faith.

10     C.     <u>The Debtor May Sell the Assets Free and Clear of Liens, Claims and</u>

11          <u>Interests</u>

12     The Debtor seeks authority to sell the Assets free and clear of all liens and

13  encumbrances pursuant to 11 U.S.C. § 363(f) which provides:

> The Trustee may sell property under subsection (b) or (c) of
> this section free and clear of any interest in such property of an
> entity other than the estate, only if –
>
> (1)     applicable nonbankruptcy law permits sale of
> such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such
> property is to be sold is greater than the aggregate value of all
> liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or
> equitable proceeding, to accept a money satisfaction of such
> interest.

24     Because subsections (1) through (5) of 11 U.S.C. § 363(f) are written in the

25  disjunctive, authority to sell the Assets, excluding the Excluded Assets, free and clear of

26  any and all interests should be granted if, with respect to the lienholder, any of the

27  conditions are met.

28  / / /

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

MOTION  FOR SALE OF DEBTOR'S
ASSETS

1  / / /

2            1.    <u>The Sale Should Be Free and Clear Under §363(f)(1)</u>

3       Under § 363(f)(1), the Debtor's property may be sold free and clear of certain liens,

4  claims and interest if applicable nonbankruptcy law permits a sale free and clear of such

5  interest.  § 363(f)(1).

6       Here, the SBA lien will be paid in full.  Because the SBA lien will be satisfied in full,

7  the proposed Sale should be approved free and clear of these liens.  Winkler does not

8  hold a lien against the Mogul, but claims to own the Mogul.  The Debtor will satisfy

9  Winkler's claim to the Mogul by paying the remaining debt due to Winkler from the Sale.

10  Accordingly, Section 363(f)(1) is satisfied as to these liens, claims and interests.

11            2.    <u>The Sale Should Be Free and Clear Under §363(f)(2)</u>

12       As noted above, a proposed sale of estate property can be approved by the Court

13  under § 363(f)(2) where an entity consents.  § 363(f)(2).

14       As noted above, the Debtor has secured Winkler's consent to a sale based upon

15  the payment to Winkler from the Sale proceeds the total amount due to Winkler.

16       In addition, the Debtor intends to notify all interested parties through the notice of

17  the motion. Any party objecting to either sale may file their objection and be heard at the

18  hearing on the Motion. If there is no objection, the parties failing to object will be deemed

19  to have consented to the sale notwithstanding any adverse impact the sale or sales may

20  have on their liens. *See Veltman v. Whetzal*, 93 F.3d 517 (8th Cir. 1996) (failure to object

21  to proposed sale, coupled with agreement authorizing sale free of interest, constituted

22  consent); *In re Tabore, Inc.*, 175 B.R. 855 (Bankr. D. N.J. 1994) (failure to object to notice

23  of sale or attend hearing deemed consent to sale for purposes of § 363); *In re Shary*, 152

24  B.R. 724 (Bankr. N.D. Ohio 1993) (state's failure to object to transfer of liquor license

25  constituted consent to sale).

26       Thus, pursuant to § 363(f)(2), the Debtor may sell the Assets free and clear of any

27  lien, claim or interest of entities who fail to object to the proposed Sale.

28

Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

MOTION  FOR SALE OF DEBTOR'S ASSETS

3.     The Sale Should Be Free and Clear Under §363(f)(4)

Section 363(f)(4) permits a sale free and clear of certain liens, claims and interests where a bona fide dispute exists in connection with a lien, claim or interest.  § 363(f)(4). The Bankruptcy Code does not define the phrase "bona fide dispute."   In adopting the Seventh Circuit's standard regarding the phrase "bona fide dispute" as it is used in §303, the Ninth Circuit reasoned that a "bona fide dispute" lies where there is "an objective basis for either a factual or a legal dispute" regarding liability or the amount of a debt. *Liberty Tool v. Vortex Fishing Sys. (in Re Vortex Fishing Sys.)*, 277 F.3d 1057, 1065 (9th Cir. 2002); *In re Busick*, 831 F.2d 745, 750 (7th Cir. 1987).

The Debtor contends that McCormick's secured claim is overstated and is, therefore, disputed.  The Debtor will employ an accountant to investigate McCormick's application of interests, fees and charges and seek to reduce McCormick's secured claim consensually or through a claim objection.  The Debtor will pay the undisputed portion of the McCormick secured claim from the Sale proceeds and hold the disputed portion in the Debtor's counsel's client trust account pending a resolution of the Debtor's challenge to McCormick's secured claim.  Because a bona fide dispute exists and McCormick's lien will be adequately protected by the reserved portion of sale proceeds, the Court should allow the Sale to close free and clear of McCormick's lien pursuant to § 363(f)(4).

D.     Adequate Notice of the Sale is Proposed

Notice of the Sale will be provided in accordance with §§ 102(1), 363, and  365 of the Bankruptcy Code, Bankruptcy Rules  2002,  6004,  6006,  9007, and  9014 and LBR 6004-1(b)(3).  Accordingly, the Debtor believes that the foregoing notice was good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Auction, the Sale Hearing, the Asset Purchase Agreement, or the Sale is required.

Based on the foregoing, the Debtor requests that the Court authorize the Sale free and clear of any liens, claims, interests and encumbrances in accordance with § 363(f), subject to such liens, claims, interests, and encumbrances attaching to the proceeds

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

MOTION  FOR SALE OF DEBTOR'S ASSETS

1  thereof in the same order of relative priority, with the same validity, force and effect as

2  prior to such Sale.

3          E.        The Court Should Authorize the Debtor to Assume and Assign the

4                    Assumed Obligations

5          Section 365(a) authorizes a trustee or debtor-in-possession "'[to] assume or reject

6  any executory contract or unexpired lease of the debtor."  A decision whether to assume

7  or reject is judged by the "business judgment test," which generally requires the trustee or

8  debtor-in-possession to have acted in good faith and with the honest belief that such

9  actions were in the best interests of the estate.  *See In re Pomona Valley Medical Grp.,*

10 *Inc.*, 476 F.3d 665, 670 (9th Cir. 2007).  The Court "need engage in 'only a cursory review

11 of the [trustee]'s decision…'" and should approve the decision unless it finds that the

12 decision is "so manifestly unreasonable that it could not be based on sound business

13 judgment, but only on bad faith, or whim or caprice."  *Id.*

14        Pursuant to § 365(f)(2) of the Bankruptcy Code, a debtor-in-possession may assign

15 its executory contracts and unexpired leases, provided it first assumes those agreements

16 in accordance with § 365(b)(1), and provides adequate assurance of future performance

17 by the assignee. § 365(b)(1), in turn, requires a debtor-in-possession to: (a) cure any

18 existing defaults under such agreements; (b) compensate all non-debtor parties to such

19 agreements for any actual pecuniary loss resulting from the defaults; and (c) provide

20 adequate assurance of future performance under the contract or lease. 11 U.S.C. §

21 365(b)(l); *In re AEG Acquisition Corp.*, 127 B.R. 34, 44 (Bankr. C.D. Cal. 1991), *aff'd* 161

22 B.R. 50 (B.A.P. 9th Cir. 1993).

23        The Buyer may identify certain executory contracts related to the Assets that the

24 Debtor will assume and assign to the Buyer.  Upon entry of an order approving the Sale,

25 any such contracts shall be assumed and assigned to the Buyer.

26          F.        The Buyer Should be Deemed a "Good Faith Purchaser" Pursuant to

27                    11 U.S.C. § 363(m)

28        Section  363(m) of the Bankruptcy Code provides:

16

MOTION  FOR SALE OF DEBTOR'S
ASSETS

Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000    Fax 714-966-1002

1
2
3
4

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

5   A good faith buyer "is one who buys 'in good faith' and 'for value.'" *Ewell v. Diebert*

6  *(In re Ewell),* 958 F.2d 276, 281 (9th Cir. 1992) (citing *In re Abbotts Dairies of*

7  *Pennsylvania, Inc.,* 788 F.2d 143, 147 (3d Cir. 1986)). "[L]ack of good faith is [typically]

8  shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an

9  attempt to take grossly unfair advantage of other bidders.'" *Id.* (quoting *Community Thrift*

10  *& Loan v. Suchy (In re Suchy),* 786 F.2d 900, 902 (9th Cir. 1985)).

11   In the instant case, the Buyer is buying in good faith and has offered fair value for

12  the Assets.  Both the consideration to be paid and the terms and conditions of the

13  proposed Sale were the subject of extensive negotiations between the Debtor and

14  counsel for the Buyer.  *See* Miller Dec.  Based on such facts and circumstances, the

15  Debtor believes this Court can properly determine the Buyer, the Successful Bidder, and

16  the Back-Up Bidder as a "good faith purchaser" pursuant to 11 U.S.C. § 363(m).

17   Additionally, the Debtor requests that the Sale Order provide that the Sale shall

18  survive the entry of an order which may be entered converting the Debtor's case from

19  Chapter 11 to a case under Chapter 7 of the Bankruptcy Code, appointing a chapter 11

20  trustee, or dismissal of the case, and is not subject to avoidance pursuant to § 363(n) of

21  the Bankruptcy Code.

22        G.    The Broker Commission Should Be Approved

23   Real estate brokers are "professionals" for purposes of section § 327 of the

24  Bankruptcy Code and, as such, their employment must be approved by the court. *In re*

25  *Cummins*, 15 B.R. 893, 895 (B.A.P. 9th Cir. 1981).

26   By separate application, the employment of the Brokers will be sought under §328,

27  with compensation to be a minimum of $400,000 or 4.5% of the total sale proceeds.  If the

28  Sale is consummated, the Brokers will have performed a valuable service for the Estate.

17                                    MOTION  FOR SALE OF DEBTOR'S
                                      ASSETS

1    Accordingly, payment should be authorized from the Sale proceeds in lieu of the

2    requirement of a fee application so long as the Broker's employment is approved by the

3    Court.

4              H.    <u>The Debtor Should be Authorized to Make Distributions of the Sales</u>

5                    <u>Proceeds to the Brokers and Creditors with Allowed, Undisputed</u>

6                    <u>Claims</u>

7          The Debtor proposes the pay the following from the sale proceeds:

| McCormick | $2,054,537.76[9] | This amount will be paid to McCormick from the sale proceeds with any additional amount held in trust by counsel for Hero pending further court order or an agreement between Hero and McCormick. |
|---|---|---|
| SBA | $525,869.86 | To be paid in full from sale proceeds |
| Whipstitch and Guardian Capital | $400,000 minimum or 4.5% of sale proceeds | To be paid in full from sale proceeds (or upon entry of an order of the Court approving the Brokers' employment) |
| Winkler | Up to $275,000 | To be paid the remaining sale proceeds after payment to McCormick and SBA |

16         The Debtor believes it is appropriate to pay these lienholders in in part or in full, as

17   noted above, from the Sales proceeds.  As such, the Debtor requests the Court authorize

18   payments of these liens after the Sale closes and without the need for further order of the

19   Court.

20             I.    <u>The Waiver of the Stay is Appropriate</u>

21         Under Rule 6004(h) an order authorizing the use or sale of property is stayed for 14

22   days after the entry of the order, *unless the court orders otherwise.*  Fed. R. Bankr. P.

23   6004(h).  The Advisory Committee Note states that the court may, in its discretion, order

24   that the stay is inapplicable so that the sale or assumption may take place immediately

25   upon entry of the order.  Fed. R. Bankr. P. 6004(g) Advisory Committee's Note.

26

---

27         [9] $2,500,000 scheduled by the Debtor in Schedule D, minus $445,462.24 received from the sale of
Jennifer Hodge's "Ranch" property by Mark Sharf (case no. 8:21-11662 SC) pursuant to an agreement
28   between McCormick and Mr. Sharf.  *See* Exhibit D to the Goodrich Dec.

MOTION  FOR SALE OF DEBTOR'S
                                              ASSETS

Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1    Here, the waiver of the stay imposed by Rule 6004(h) is appropriate.  In light of the

2  pending relief from stay motions and the Buyer's preference for closing the Sale as soon

3  as possible, as well as the need for the Court's order granting this Motion to become a

4  final order before the proposed Sale can close, the Debtor requests that the Court waive

5  the stay imposed by Rule 6004(h).

6        XI.    <u>CONCLUSION</u>

7         WHEREFORE, the Debtor requests (i) entry of an order, substantially in in the form

8  attached hereto as **<u>Exhibit 1</u>**, (a) approving the Sale free and clear of any and all

9  Encumbrances to the Buyer pursuant to the Asset Purchase Agreement or, alternatively,

10  to the other successful bidder(s) pursuant to the applicable agreement(s) with such other

11  successful bidder(s) entered into in accordance with the Bid Procedures, free and clear of

12  all liens, claims, encumbrances or other interests pursuant to §§ 363(b), (f) and (m) of the

13  Bankruptcy Code, (b) assuming and assigning the Assumed Obligations; (c) authorizing

14  payment of undisputed liens and any other ordinary cost in connection with the Sale, and

15  (d) authorizing payment of the Brokers' commission up entry of an order of the Court

16  approving their employment on the terms and conditions outlined in the Debtors'

17  application to employ the Brokers.

18                        Respectfully submitted,

19  Dated:  October 5, 2022           GOLDEN GOODRICH LLP

20

21                        By:   */s/ David M. Goodrich*_____
                              David M. Goodrich
22                              Proposed Counsel for Hero Nutritionals,
                              LLC, Debtor and Debtor-in-Possession
23

24

25

26

27

28

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

MOTION  FOR SALE OF DEBTOR'S
                                                    ASSETS

## DECLARATION OF JENNIFER HODGES[10]

I, Jennifer Hodges, declare as follows:

1.      I am the CEO of Hero Nutritionals Inc., Managing Member of the Debtor.   I know each of the following facts to be true of my own personal knowledge, except as otherwise stated and, if called as a witness, I could and would competently testify with respect thereto.  I make this declaration in support of the Application.

2.      In 1997, Debtor became the first company to introduce a nutrient-rich, all-natural gummy bear for children called Yummi Bears®.  The inspiration for these "yummi gummies" came from my nieces and nephews.  After nearly 25 years, Hero continues to innovate in the natural and organic gummy vitamin space, creating products to fit every dietary and lifestyle need while still maintaining its amazing taste.  Along the way, Hero has created America's #1 children's gummy vitamin in the natural products industry.

3.      Notwithstanding its many successes, and like too many businesses, Hero was hit particularly hard by the Covid-19 pandemic.  Hero recently restarted its operations, but filed a chapter 11 bankruptcy case in July 2022, which case was ultimately dismissed. An eviction was scheduled for August 18, 2022 following an unlawful detainer judgment entered in favor of Hero's landlord.  As a result, on August 17, 2022 ("Petition Date"), Hero filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California ("Court").

4.      Since July 2022, the Debtor, its broker and its advisors have been engaged in a marketing efforts designed to encourage bids for a transaction pursuant to which all or a portion of the Debtor's assets would be sold generating funds for creditors of the estate.

5.      To date, several parties have expressed an interest in purchasing the Debtor's Assets.  In the exercise of its business judgment, the Debtor has entered into the Asset Purchase Agreement with the Buyer for the sale of the Assets.  A true and correct copy of the proposed Asset Purchase Agreement is attached hereto as **Exhibit 2**.

---

[10] All capitalized terms have the same meaning or definition as the capitalized terms in the Application.

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

MOTION  FOR SALE OF DEBTOR'S ASSETS

6.    The Debtor believes the Sale of the Assets presents the best opportunity for the Debtor to maximize value for its estate, its stakeholders, and parties in interest.

7.    I, along with the Debtor's general counsel and the Brokers, negotiated at arm's length with the Buyer for the sale of the Assets.  There was no collusion or sweetheart deal struck with the Buyer.  To my knowledge, I have never met or interacted with the Buyer until now.  The Buyer is buying in good faith and has offered fair value for the Assets.  Both the consideration to be paid and the terms and conditions of the proposed Sale were the subject of extensive negotiations between the Debtor and counsel for the Buyer.

8.    I believe a sale of the Assets pursuant to a public auction and in according with the procedures proposed in the Motion will maximize competitive bidding and ensure the highest and best prices and terms are received for the Assets.  In addition, there is a possibility that the Buyer may offer employment to any of the Debtor's current or former employees.

9.    The Debtor does not expect there to be any capital gains taxes from the proposed Sale because the Purchase Price is less than the Debtor paid for the Assets.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 5th____ day of September, 2022 at Santa Ana_____, California.



DocuSigned by:

*Jennifer Hodges*

2DDC904D01CC4D7...

JENNIFER HODGES

Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

21

MOTION  FOR SALE OF DEBTOR'S ASSETS

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

## DECLARATION OF DAVID M. GOODRICH[11]

I, David M. Goodrich, declare as follows:

1.    I am a partner of Golden Goodrich LLP (the "Firm"), counsel for the Debtor. I know each of the following facts to be true of my own personal knowledge, except as stated otherwise, and, if called as a witness, I could and would competently testify with respect thereto. All terms as defined in the Motion are incorporated herein by this referenced.

2.    Attached hereto as **Exhibit 1** is a true and correct copy of the Sale Order.

3.    Attached hereto as **Exhibit 2** is a true and correct copy of the proposed Asset Purchase Agreement.

4.    Attached hereto as **Exhibit 3** is a true and correct copy of the Debtor's Schedule D.

5.    Attached hereto as **Exhibit 4** is a true and correct copy of the Proof of Claim filed by McCormick in the Debtor's case.

6.    Attached hereto as **Exhibit 5** is a true and correct copy of excerpts from the Sale Motion filed by Mark Sharf, chapter 7 trustee of the bankruptcy estate of Jennifer Hodges, the sole shareholder of Hero Nutritional, Inc., which is the managing member of the Debtor.  According to the Sale Motion, the secured debt of McCormick was cross-collateralized against Ms. Hodge's "Ranch" property along with assets of the Debtor.

7.    Attached hereto as **Exhibit 6** is a true and correct copy of the Proof of Claim filed by the Small Business Administration in the Debtor's case.

8.    If the Court grants the Motion, the disputed portion of the McCormick secured claim will be held in the Golden Goodrich LLP client trust account pending further order of the Court or an agreement between McCormick and the Debtor.

---

[11] All capitalized terms have the same definition or meaning as the capitalized terms in the Motion.

MOTION  FOR SALE OF DEBTOR'S
ASSETS

1   I declare under penalty of perjury that the foregoing is true and correct.

2   Executed on this 5th day of October, 2022, at Costa Mesa, California.

3

4                                            /s/ David M. Goodrich
                                             David M. Goodrich

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR SALE OF DEBTOR'S
ASSETS

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

# EXHIBIT 1

David M. Goodrich, State Bar No. 208675
dgoodrich@go2.law
Sonja M. Hourany, State Bar No. 323457
shourany@go2.law
**GOLDEN GOODRICH LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Telephone    714-966-1000
Facsimile    714-966-1002

Counsel for Debtor and
Debtor-In-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:22-bk-11383-SC |
| HERO NUTRITIONALS, LLC, a California limited liability company, | Chapter 11 |
| Debtor and Debtor-in-Possession. | **ORDER (1) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS PURSUANT TO 11 U.S.C. § 363(b) AND (f); (2) ASSUMING AND ASSIGNING CERTAIN OBLIGATIONS; (3) APPROVING BUYER, SUCCESSFUL BIDDER, AND ANY BACK-UP BIDDER, AS GOOD-FAITH PURCHASER PURSUANT TO 11 U.S.C. § 363(m); AND (4) AUTHORIZING PAYMENT OF LIENS AND OTHER ORDINARY COSTS OF SALE** |
| | <u>Hearing Date, Time and Location</u>:<br>DATE:    October 26, 2022<br>TIME:    1:30 p.m.<br>CTRM:    5C |

*(sidebar, left margin:)* **Golden Goodrich LLP** 650 Town Center Drive, Suite 600 Costa Mesa, California 92626 Tel 714-966-1000 Fax 714-966-1002

EXHIBIT 1    PAGE 24

On October 26, 2022, at 1:30 p.m., the Court held a hearing (the "<u>Sale Hearing</u>") to consider approval of the motion ("<u>Sale Motion</u>") (Doc ____) filed by Hero Nutritionals, LLC, the debtor and debtor-in-possession in the above-captioned case ("<u>Debtor</u>"), seeking the entry of an order of the Court approving the Debtor's sale of certain of the Debtor's hard assets, as defined in the Asset Purchase Agreement ("<u>APA</u>") that was attached as Exhibit 2 to the bid procedures motion filed by the Debtor (Doc ____) (the "<u>Assets</u>"), free and clear of all liens, claims, interests and encumbrances (collectively, "<u>Encumbrances</u>") to _____ ("<u>Buyer</u>") in accordance with the terms of the APA.[1]  Buyer was previously approved by the Court as a stalking horse bidder pursuant to an order entered on October __, 2022 (the "<u>Bid Procedures Order</u>") (Doc __).  The Bid Procedures Order set forth the requirements for how a prospective overbidder could become qualified to participate in an auction that would have taken place before the Court just prior to the Sale Hearing in the event there was one or more qualified overbidders.  However, no party complied with the requirements to be a qualified overbidder so pursuant to the Bid Procedures Order, no auction took place.

In accordance with the Bid Procedures Order, Buyer was approved as a stalking horse bidder for the Assets with a cash purchase price of Five Million Five Hundred Thousand Dollars ($5,500,000) (the "<u>Purchase Price</u>") to be funded in the manner set forth in the APA and this Order.

The Court, having considered the: (1) Sale Motion (Doc __) and all declarations filed in support of the Sale Motion; (2) *Notice of Hearing* ("<u>Sale Notice</u>") (Doc ____) on the Sale Motion; (3) *Notice of Sale Of Estate Property* (Doc ____), (4) *Notice Of: (i) Assumption And Assignment Of Executory Contracts And Unexpired Leases; (ii) Establishment Of Cure Amount In Connection Therewith; (iii) Procedures And Deadlines Regarding Oppositions To Assumption And Assignment, And Cure Amounts; And (iv) Hearing Thereon* (the

---

[1] Terms that are defined in the APA that are not defined in this Order shall be deemed to have the same definitions as set forth in the APA.

2

EXHIBIT 1    PAGE 25

Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1    "<u>Assumption/Assignment And Cure Notice</u>") (Doc ___), (5) good faith declaration of the

2    Buyer (Doc ___); and (6) all other pleadings and papers filed in support of the Sale Motion,

3    any opposition or response filed to the Sale Motion and any reply filed to any such

4    opposition or response; and the statements, arguments and representations of the parties

5    made at the Sale Hearing; and the entire record of this case; and the Court, having

6    determined that the relief sought in the Sale Motion is in the best interests of the Debtor and

7    its estate, and that the legal and factual bases set forth in the Sale Motion and presented at

8    the Sale Hearing establish just cause for the relief granted herein; and all objections to the

9    Sale Motion, if any, having been withdrawn or overruled; and after due deliberation and

10    sufficient good cause appearing therefor,

11    **THE COURT HEREBY FINDS AND CONCLUDES THAT:**

12        A.      <u>Findings and Conclusions</u>. The findings and conclusions set forth herein

13    constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule

14    7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

15        B.      <u>Jurisdiction and Venue</u>.  The Bankruptcy Court has jurisdiction to hear and

16    determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter relates to

17    the administration of the Debtor's bankruptcy estate and is accordingly a core proceeding

18    pursuant to 28 U.S.C. § 157(b) (2) (A), (M), (N) and (O). Venue of this case is proper in this

19    District and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

20        C.      <u>Statutory Predicates</u>. The statutory predicates for the relief requested in the

21    Sale Motion are (i) Sections 105(a) and 363(b), (f), (k), (l) and (m), 365 of Title 11 of the

22    United States Code (the "<u>Bankruptcy Code</u>"), (ii) Rules 2002(a)(2), 2002(c)(1) and (d), 6004

23    (a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9006, 9007, 9013 and 9014 of the Federal

24    Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and (iii) Local Bankruptcy Local

25    Rules 6004-1 and 9013-1.

26        D.      <u>Notice</u>.  The Debtor has provided good and sufficient notice with respect to

27    the following: (i) the Sale Motion and the relief sought therein, including the entry of this

28    Order and the transfer and purchase of the Assets; (ii) the Sale Hearing and opportunity to

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

3

EXHIBIT 1    PAGE 26

1  overbid; and (iii) the assumption and assignment of executory contracts and unexpired
2  leases and proposed cure amounts owing under such executory contracts and unexpired
3  leases ("Cure Amounts").  No further notice of the Sale Motion, the relief requested therein
4  or the Sale Hearing is required.  The Sale Notice, the Assumption/Assignment And Cure
5  Notice, and all other notices provided by the Debtor were in accordance with the Bid
6  Procedures Order, and were appropriate and reasonable and calculated to provide all
7  interested parties with timely and proper notice and no other or further notice is required.
8  Such notice was proper under the Bankruptcy Code, Bankruptcy Rules and Local Rules.  A
9  reasonable opportunity to object and to be heard regarding the relief provided herein has
10 been afforded to all parties-in-interest.

11      E.    Compliance with the Bid Procedures Order.  The sale process was conducted
12 in accordance with and otherwise in compliance with the Bid Procedures Order and was
13 fair, proper and reasonably calculated to result in the best value received for the Assets.
14 The sale process afforded a full, fair and reasonable opportunity for any party to become a
15 qualified bidder and to participate in an auction for a sale of the Assets.  As demonstrated
16 on the record at the Sale Hearing, the Debtor conducted the sale process in good faith,
17 without collusion and in accordance with the Bid Procedures Order.

18      F.    Highest and Best Bid.  The $5,500,000 cash bid of the Buyer constitutes the
19 highest and best offer for the Assets, and will provide a greater recovery for the Debtor's
20 estate and its creditors than would be provided by any other available alternative. The
21 Debtor's determination that the Buyer made the highest and best offer for the Assets
22 constitutes a reasonable, valid and sound exercise of the Debtor's business judgment, and
23 is in the best interests of the Debtor and its estate. The consideration to be paid by the
24 Buyer for the Assets is fair and reasonable, is the highest and best offer therefor, and
25 constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code,
26 the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and the laws
27 of the United States.

28

4

EXHIBIT 1    PAGE 27

G.  <u>Arm's Length Transaction</u>.  The sale of the Assets to the Buyer (the "<u>Transaction</u>") substantially in conformance with the terms of the APA and the consummation thereof were negotiated and entered into by the Debtor and the Buyer without collusion, in good faith and through an arms' length bargaining process.  Neither the Buyer nor any of its representatives engaged in any conduct that would cause or permit the Transaction to be avoided under section 363(n) of the Bankruptcy Code, or have acted in any improper or collusive manner. The terms and conditions of the Transaction, including, without limitation, the consideration provided in respect thereof, are fair and reasonable, and are not avoidable and shall not be avoided, and no damages may be assessed against the Buyer or any other party, as set forth in section 363(n) of the Bankruptcy Code.

H.  <u>Good Faith Purchaser</u>.  The Buyer has proceeded in good faith and without collusion in all respects in connection with the sale process, and is therefore entitled to all of the benefits and protections provided to a good-faith purchaser under section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transaction shall not affect the validity of the Transaction or the Buyer's status as a "good faith" purchaser.  The Buyer is not an "insider" of the Debtor as defined in the Bankruptcy Code.

I.  <u>No Successor Liability</u>. The Buyer is not a successor to the Debtor or its bankruptcy estate and shall not be deemed to be a mere continuation of any of the Debtor's operations by any reason or theory of law or equity, and the Buyer shall not be subject to any successor liability for any assets sold or claims that arose or could have been asserted prior to the closing of the Transaction (the "<u>Closing</u>").

J.  <u>Authority to Consummate the Sale of the Assets</u>.  The Debtor has full corporate power and authority to execute the APA (including all ancillary documents executed in connection therewith), and the sale of the Assets has been duly and validly authorized by all necessary corporate authority by the Debtor to consummate the sale of the Assets to the Buyer.  No further consents or approvals are required by the Debtor to consummate the Debtor's sale of the Assets to the Buyer.

Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

5

EXHIBIT 1    PAGE 28

K.    Justification for Relief. Good and sufficient reasons for approval of the Transaction have been articulated to the Bankruptcy Court in the Sale Motion and at the Sale Hearing, and the relief requested in the Sale Motion and set forth in this Order is in the best interests of the Debtor and its estate. The Debtor has demonstrated through the Sale Motion and other evidence submitted by the Debtor both (i) good, sufficient and sound business purpose and justification and (ii) compelling circumstances for the transfer and sale of the Assets outside the ordinary course of business, and such action is an appropriate exercise of the Debtor's business judgment and is in the best interests of the Debtor and its estate.

L.    Free and Clear.  In accordance with sections 363(b) and 363(f) of the Bankruptcy Code, the consummation of the Transaction will be a legal, valid, and effective transfer and sale of the Assets and will vest in the Buyer, all of the Debtor's right, title, and interest in and to the Assets, free and clear of all Encumbrances.  The Debtor has demonstrated that one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.

M.    Prompt Consummation.  The Debtor has demonstrated good and sufficient cause to waive the stay requirement under Bankruptcy Rules 6004(h) and 6006(d).  Time is of the essence in consummating the Transaction, and it is in the best interests of the Debtor and its estate to consummate the Transaction within the timeline set forth in the Sale Motion, the Bid Procedures Order and the APA.

N.    Assumption of Executory Contracts and Unexpired Leases. The Debtor has demonstrated that it is an exercise of their sound business judgment to assume and assign, subject to the provisions hereof, to the Buyer those executory contracts and unexpired leases designated by the Buyer prior to the Closing (the "Assigned Contracts") in connection with the consummation of the Transaction, and the Debtor's assumption and assignment to the Buyer of the Assigned Contracts is in the best interests of the Debtor and its estate.

O.    Cure/Adequate Assurance. Through the payments to be made by the Debtor, the Debtor will have cured, or will have provided adequate assurance of cure, of any default

Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

6

EXHIBIT 1    PAGE 29

existing under any of the Assigned Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A), by payment of the amounts and in the manner set forth below.  The Buyer has provided or will provide adequate assurance of future performance of and under the Assigned Contracts within the meaning of 11 U.S.C. § 365(b)(1)(C). Pursuant to 11 U.S.C. § 365(f), the Assigned Contracts to be assumed by the Debtor and assigned to the Buyer under the APA shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer notwithstanding any provision in any such Assigned Contract prohibiting their assignment or transfer. The Debtor has demonstrated that no other parties to any of the Assigned Contracts have incurred any actual pecuniary loss resulting from a default prior to the Closing under any of the Assigned Contracts within the meaning of 11 U.S.C. § 365(b)(1)(B).  Pursuant to 11 U.S.C. § 365(f), the Assigned Contracts to be assumed by the Debtor and assigned to the Buyer shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer notwithstanding any provision in such contracts or other restrictions prohibiting their assignment or transfer.

P.    <u>Legal and Factual Basis</u>.  The legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein.

Q.    <u>Findings and Conclusions</u>.  To the extent any of the foregoing findings of fact constitute conclusions of law, they are adopted as such.

**IT IS HEREBY ORDERED AS FOLLOWS:**

1.    The Sale Motion is **GRANTED** as set forth herein.  The sale of the Assets to the Buyer is approved upon the terms and conditions described on the Court's record at the Sale Hearing and as set forth in the APA.

2.    The Debtor is authorized to enter into the APA and to consummate the sale of the Assets to the Buyer in accordance with this Order.  The Debtor and the Buyer are authorized to make any changes to the APA that they deem to be appropriate without any further order of the Court, with the Court to be the arbiter to resolve any outstanding disputes.

<div style="text-align:left; font-size:small;">
<strong>Golden Goodrich LLP</strong><br>
650 Town Center Drive, Suite 600<br>
Costa Mesa, California 92626<br>
Tel 714-966-1000  Fax 714-966-1002
</div>

7

EXHIBIT 1    PAGE 30

3.     All objections and responses to the Sale Motion that have not previously been overruled, withdrawn, waived, settled or resolved, and all reservations of rights included therein, are hereby overruled and denied.

4.     The Buyer's offer for the Assets is the highest and best offer for the Assets and is hereby approved.

5.     Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Transaction, including the transfer and sale of the Assets to the Buyer is approved in all respects, and the Debtor is authorized to consummate the Transaction and enter into the APA, including, without limitation, by executing any other documents reasonably requested by the Buyer and/or necessary to consummate the Transaction ("Transaction Documents") and to take all actions necessary and appropriate to effectuate and consummate the Transaction (including the transfer and sale of the Assets) in consideration of the Purchase Price, including, without limitation, signing the APA and related Bill of Sale and assuming and assigning to the Buyer the Assigned Contracts.

6.     The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full.  Pursuant to sections 105, 363(b), 363(f) and 363(m) of the Bankruptcy Code, the Assets shall be sold and transferred to the Buyer free and clear of all Encumbrances, with any and all such Encumbrances to attach to proceeds of the sale with the same validity (or invalidity), priority, force and effect such Encumbrances had on the Assets immediately prior to the Closing and subject to the rights, claims, defenses, and objections, if any, of the Debtor and all interested parties with respect to any such asserted Encumbrances.

7.     As of the Closing, (i) the Transaction shall effect a legal, valid, enforceable and effective transfer and sale of the Assets to the Buyer free and clear of all Encumbrances; and (ii) the APA, the Transaction and the other Transaction Documents shall be enforceable against and binding upon, and not subject to rejection or avoidance by, any successor thereto including any chapter 7 or chapter 11 trustee or other estate representative appointed in this case, and all other persons and entities.

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

8

EXHIBIT 1     PAGE 31

8.     This Order shall, as of the Closing, be considered and constitute for all purposes a full and complete general assignment, conveyance, and transfer of title to the Assets to the Buyer.  Consistent with, but not in limitation of the foregoing, each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA and approved in this Order.

9.     The Buyer shall not be deemed, as a result of any action taken in connection with, or as a result of the Transaction (including the transfer and sale of the Assets), to: (i) be a successor, continuation or alter ego (or other such similarly situated party) to the Debtor or its estate by reason of any theory of law or equity, including, without limitation, any bulk sales law, doctrine or theory of successor liability, or similar theory or basis of liability; or (ii) have, de facto or otherwise, merged with or into the Debtor; or (iii) be a mere continuation, alter ego, or substantial continuation of the Debtor, and the Buyer shall have no liability whatsoever for any (i) claim against or debt owing by the Debtor or (ii) conduct, action or inaction of the Debtor or with respect to the Assets that arose prior to the Closing.

10.     This Order (i) shall be effective as a determination that, effective as of the Closing, all Encumbrances existing against the Assets before the Closing have been unconditionally released, discharged and terminated, and that the transfers and conveyances described herein have been effected, and (ii) shall be binding upon and shall govern the acts of all persons and entities.  If any person or entity that has filed financing statements or other documents or agreements evidencing any Encumbrances against the Assets shall not have delivered to the Debtor before the closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Encumbrances which the person or entity has with respect to the Assets, then the Buyer is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Assets.

11.     The sale of the Assets is not subject to avoidance by any person or for any reason whatsoever, including, without limitation, pursuant to section 363(n) of the Bankruptcy Code and

Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

EXHIBIT 1    PAGE 32

the Buyer shall not be subject to damages, including any costs, fees, or expenses under section 363(n) of the Bankruptcy Code.

12.     All entities that are presently, or on the Closing may be, in possession of some or all of the Assets to be sold, transferred, or conveyed (wherever located) to the Buyer pursuant to this Sale Order and the APA are hereby directed to surrender possession of the Assets to the Buyer on the Closing Date.

13.     The Buyer shall fund the payment of the $5,500,000 Purchase Price as follows: (A) the $500,000 Deposit previously provided by the Buyer to the Debtor which is in an Escrow Account maintained by bankruptcy counsel to the Debtor shall become property of the Debtor's estate upon the Closing; and (B) the $5,000,000 balance shall be wire transferred by the Buyer as follows: (i) one wire transfer shall be made directly to secured creditor McCormick 107, LLC ("McCormick") in the amount of $2,054,537.76 with the remaining disputed to be paid into the Escrow Account pending further order of the Court; (2) a second wire transfer shall be made directly to Winkler Dunnebier ("Winkler") for the full amount owing by the Debtor to Winkler as of the Closing; (3) a third wire transfer to the U.S. Small Business Administration ("SBA") in the amount of $525,869.86, and (4) a fourth wire transfer shall be made to the Debtor's debtor-in-possession account or, alternatively, the bankruptcy trustee (should a trustee be appointed) for the remaining portion of the $5,000,000 balance after deducting the payments made directly to McCormick, the SBA, and Winkler, with all four payments to be made within three business days following the date when this Order has become a final order not subject to any pending appeal or stay pending appeal (the "Outside Closing Date") unless the Buyer decides to effectuate the Closing earlier, which the Buyer shall have the right to do in the Buyer's sole and absolute discretion.

14.     If this Order has not become a final order by November 18, 2022, the Buyer shall have the unilateral right, at the Buyer's sole and absolute discretion, to extend the Outside Closing Date until the date that is three business days after the date that this Order has become a final order or to terminate the Transaction and receive a return of its $500,000

10

Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

EXHIBIT 1    PAGE 33

1  deposit and have no further obligation to the Debtor.  If the Buyer makes the determination

2  to extend the Outside Closing Date, the Debtor shall be required to work collaboratively with

3  the Debtor to take all reasonable steps to seek to defeat or dismiss any pending appeal of

4  this Order or motion for stay of this Order.

5         15.    In connection with and as part of the Closing, the Debtor shall make all of the

6  Assets available to the Buyer.  The Court hereby finds and orders that in connection with

7  and as part of the Closing, good, clean and marketable title to all of the Assets, including

8  the equipment identified in the Debtor's bankruptcy schedules and in Exhibit "A" to the APA,

9  including, but not limited to, the Starch Mogul machine, is being transferred to the Buyer at

10  the Closing free and clear of all Encumbrances, including any Encumbrance and/or

11  ownership interest asserted by Winkler.  The Court hereby orders that if the Buyer is not

12  able to enter into a mutually acceptable lease with the Debtor's prior or existing landlord for

13  any facility at which any of the Assets are located, including the premises located at 1900

14  Carnegie Ave., Bldg. A, Santa Ana, CA 92705 (the "Premises"), then such landlord must

15  provide the Buyer with reasonable access to all such premises to enable the Buyer to

16  remove all of the Assets from such premises.  The Buyer is authorized to negotiate a new

17  lease with the landlord for the Premises (the "Landlord") and to enter into a new lease for

18  the Premises with the Landlord.  The Buyer's entry into a new lease for the Premises with

19  the Landlord will not require the lifting of the automatic stay or any other relief from the Court

20  or be deemed any violation thereof because the Debtor's lease of the Premises was

21  terminated prior to the Debtor's petition date.  The Debtor shall provide reasonable best

22  efforts to assist the Buyer to negotiate and to enter into a new lease with the Landlord and

23  execute any reasonable documentation presented to the Debtor providing such

24  authorization.

25         16.    Subject to the provisions hereof, all executory contracts and unexpired leases

26  designated by the Buyer prior to the Closing to be assumed and assigned by the Debtor to

27  the Buyer shall be deemed assumed by the Debtor and assigned to the Buyer effective as

28

*Golden Goodrich LLP*
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

11

EXHIBIT 1    PAGE 34

1   of the Closing Date.  The Debtor shall be financially responsible for, and shall timely pay

2   for, all Cure Amounts under all Assigned Contracts.

3        17.      The Buyer's designation of any executory contract or unexpired lease prior to

4   or at the Closing as an Assigned Contract shall be deemed to constitute an assumption and

5   assignment of such Assigned Contract to the Buyer without further order of this Court.  The

6   Debtor's   payment   of   the   Cure   Amounts   in   the   amounts   set   forth   in   the

7   Assumption/Assignment   and   Cure   Notice   in   connection   with   the   assumption   and

8   assignment of the Assigned Contracts is hereby deemed the necessary and sufficient

9   amounts to "cure" all "defaults" with respect to all such Assigned Contracts under section 365(b)

10  of the Bankruptcy Code.   The payment by the Debtor of such Cure Amounts to the

11  corresponding counterparties to such Assigned Contracts shall (i) effect a cure of all defaults

12  existing under all such Assigned Contracts, and (ii) compensate all such counterparties to the

13  Assigned Contracts for any actual pecuniary loss resulting from any such default.  With the

14  payment by the Debtor of the Cure Amounts set forth in the Assumption/Assignment And

15  Cure Notice: (i) the Debtor is hereby deemed to have cured, or have provided adequate

16  assurance of cure, of any default existing or occurring prior to the Closing under any of the

17  Assigned   Contracts,   and   the   Buyer   has   provided   adequate   assurance   of   its   future

18  performance of and under the Assigned Contracts, (ii) the provisions of Section 365(b)(1)(A)

19  of the Bankruptcy Code at the Cure Amounts set forth in the Assumption/Assignment And

20  Cure Notice are hereby deemed satisfied, and (iii) it is hereby deemed that none of the other

21  parties to the Assigned Contracts have suffered any actual pecuniary loss resulting from

22  any default by the Debtor so that no further payments beyond the proposed Cure Amounts

23  are required to enable compliance with the provisions of Section 365(b)(1)(B) of the

24  Bankruptcy Code.   The Debtor shall then have assumed and assigned to the Buyer all of the

25  Assigned Contracts, and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by

26  the Debtor of all such Assigned Contracts to the Buyer shall not be a default thereunder.  After

27  the payment of the Cure Amounts by the Debtor to the counterparties to the Assigned Contracts,

28  neither the Debtor nor the Buyer shall have any further liabilities to any counterparties to the

Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

12

EXHIBIT 1    PAGE 35

Assigned Contracts other than the Buyer's obligations under the Assigned Contracts that accrue and become due and payable on or after the Closing Date. In addition, adequate assurance of future performance has been demonstrated by or on behalf of the Buyer with respect to all of the Assigned Contracts within the meaning of sections 365(b)(1)(c), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

18.    All of the counterparties to the Assigned Contracts are forever barred, estopped, and permanently enjoined from raising or asserting against the Debtor or the Buyer, or any of their property, any assignment fee, acceleration, default, breach, or claim of pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts, existing as of the Closing, or arising by reason of the consummation of the Transaction, including, without limitation, the Transaction and the assumption and assignment of the Assigned Contracts, including any asserted breach relating to or arising out of the change-in-control provisions in such Assigned Contracts, or any purported written or oral modification to the Assigned Contracts.

19.    Any provisions in any Assigned Contract that prohibits or conditions the assignment of such Assigned Contract or allows the counterparty to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assigned Contract constitutes unenforceable anti-assignment provisions that are void and of no force and effect with respect to the Debtor's assumption and assignment of such Assigned Contract to the Buyer.

20.    The terms and provisions of this Order, as well as the rights granted under the Transaction Documents, shall continue in full force and effect and are binding upon any successor to the Debtor, or chapter 7 or chapter 11 trustee applicable to the Debtor, notwithstanding any such conversion, dismissal or order entry. Nothing contained in any chapter 11 plan confirmed in this case or in any order confirming such a plan, nor any order dismissing this case or converting this case to a case under chapter 7 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the APA, any documents or instruments executed in connection therewith, or the terms of this Order. The provisions of this Order and any actions

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

13

EXHIBIT 1    PAGE 36

taken pursuant hereto shall survive any conversion or dismissal of this case and the entry of any other order that may be entered in this case, including any order (i) confirming any plan of reorganization; (ii) converting this case from chapter 11 to chapter 7; (iii) appointing a trustee or examiner in this case; including for the avoidance of doubt a liquidating trustee appointed for the purpose of administering any remaining estate assets for the benefit of this estate or its creditors; or (iv) dismissing this case.

21.    The Transaction and other Transaction Documents are undertaken without collusion and in "good faith," as that term is defined in section 363(m) of the Bankruptcy Code. The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein by this Order to consummate the Transaction shall not affect the validity of the free and clear sale of the Assets to the Buyer.

22.    The failure to specifically include any particular provision of the APA or the other Transaction Documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Transaction, the APA and the other Transaction Documents be authorized and approved in their entirety.    Likewise, all of the provisions of this Order are non-severable and mutually dependent.

23.    Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014, if applicable, or any other Local Bankruptcy Rule or otherwise, this Order shall not be stayed for 14-days after the entry hereof, but shall be effective and enforceable immediately upon entry pursuant to Bankruptcy Rule 6004(h) and 6006(d).    Time is of the essence in approving the Transaction (including the transfer and the sale of the Assets).

24.    The automatic stay pursuant to section 362 is hereby lifted with respect to the Debtor to the extent necessary, without further order of this Court, for the Debtor and the Buyer to take any and all actions permitted under the APA and the Transaction Documents in accordance with the terms and conditions thereof.

**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000    Fax 714-966-1002

14

EXHIBIT 1    PAGE 37

1    25.    Unless otherwise provided in this Order, to the extent any inconsistency exists

2  between the provisions of the APA and this Order, the provisions contained in this Order shall

3  govern.

4    26.    This Court shall retain exclusive jurisdiction to interpret, construe, and enforce the

5  provisions of the APA and this Order in all respects, and further, including, without limitation, to

6  (i) hear and determine all disputes between the Debtor and/or the Buyer, as the case may be,

7  and any other non-Debtor party to, among other things, the Assigned Contracts concerning,

8  among other things, assignment thereof by the Debtor to the Buyer and any dispute between

9  the Buyer and the Debtor as to their respective obligations with respect to any asset, liability, or

10  claim arising hereunder; (ii) compel delivery of the Assets to the Buyer free and clear of all

11  Encumbrances; and (iii) interpret, implement, and enforce the provisions of this Order.

12  IT IS SO ORDERED.

13                                                                # # #

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<div style="writing-mode: vertical-rl">**Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002</div>

15

EXHIBIT 1    PAGE 38

# EXHIBIT 2

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "Agreement") is made as of _____, 2022, by and between Vytalogy Wellness, L.L.C. or its nominee ("Buyer")[1] and Hero Nutritionals, LLC ("Seller"). Buyer and Seller are collectively defined herein as the "Parties" and singularly as a "Party".

## R E C I T A L S :

WHEREAS, Seller is in the business of manufacturing and distributing natural and organic gummy vitamin products (the "Business"); and

WHEREAS, on August 17, 2022 (the "Petition Date"), Seller filed a voluntary petition (the "Bankruptcy Case") under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Bankruptcy Court"), and was assigned Case No.: 8:22-bk-11383-SC

WHEREAS, Buyer desires to purchase and Seller desires to sell to Buyer the Assets, as defined below, subject to the terms and conditions of this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the terms, covenants, and conditions hereinafter set forth, the Parties agree as follows:

## ARTICLE I

## ASSETS BEING PURCHASED

**1.1    Assets.**  Subject to the terms and conditions of this Agreement, Buyer hereby agrees to purchase from Seller, and Seller hereby agrees to sell, convey, transfer and assign to Buyer, on the Closing Date (as hereinafter defined), all of the following (collectively, the "Assets") free and clear of all liens, claims, encumbrances and interests (collectively, "Encumbrances") pursuant to Section 363 of the Bankruptcy Code:

(a)    All of Seller's right, title and interest in and to all of Seller's hard assets including, but not limited to, all equipment identified in Seller's bankruptcy schedules as set forth in Exhibit "A" hereto;

(b)    All of Seller's rights, title, interest and benefits under the agreements, contracts, leases, instruments, commitments and understandings that are related to the Assets and that Buyer desires to have Seller assume and assign to Buyer as listed in Schedule 1.1(b) attached hereto ("Assigned Contracts");

---

[1] Buyer will likely be a newly formed special purpose entity formed for the purpose of serving as Buyer herein.

EXHIBIT 2    PAGE 39

(c) To the extent transferable, all of Seller's licenses, permits or other authorizations of governmental or regulatory entities that are required under any laws, rules and regulations applicable to or affecting the Assets, including those identified on Schedule 1.1(c) attached hereto;

(d) All corporate records and documents that relate to the Assets or which would assist Buyer to maintain and to operate any of the Assets;

(e) A list of Seller's employees that operated the Assets for the period of 2017 through 2022;

(f) All of Seller's insurance recovery rights as they related to the Assets; and

(g) All goodwill associated with the Assets.

**1.2    Excluded Assets.** Purchaser shall not acquire, and Seller shall retain, all of the following assets, properties and rights owned by Seller (collectively, the "Excluded Assets"):

(a) All contracts and leases of Seller that are not Assigned Contracts;

(b) all cold storage for flavoring and coloring, all refrigerators and dishwashers in the lab, all office equipment

(c) All intellectual property rights, including, but not limited to trademarks, copyrights, patents, patents pending, trade secrets, recipes, formulas and any other intangibles related to Seller's products and trade names;

(d) All notes receivable and any other debt instruments providing for money owing to Seller;

(e) All cash and cash equivalents of Seller;

(f) The corporate seals, minute books, stock books, tax returns and other similar records relating to Seller's corporate organizations, and all employee related or employee benefit related files or records;

(g) Except as to the Assets, all insurance recovery rights of Seller and all tax refunds owing to Seller;

(h) All rights to all claims, causes of action, choses in action, rights of recovery and rights of set-off (whether choate or inchoate, known or unknown, contingent or non-contingent) in favor of Seller, and all avoidance causes of action existing under any of sections 544-553, inclusive, of the Bankruptcy Code; and

(i) All of Seller's raw material, packaging materials, labels, supplies, work in process inventory and finished goods inventory;

(j) All assets scheduled by Seller in its bankruptcy schedules that are not included as Assets in section 1.1 of this Agreement; and

EXHIBIT 2    PAGE 40

(k)    All other assets identified in Schedule 1.2.

**1.3    No Assumed Obligations.**    Buyer will not be assuming any of Seller's obligations.

**1.4    Liabilities Not Being Assumed.**    Seller agrees that Buyer shall not be obligated to assume or perform and is not assuming or performing any liabilities or obligations of Seller, whether known or unknown, fixed or contingent, certain or uncertain, and regardless of when such liabilities or obligations may arise or may have arisen or when they are or were asserted.

## ARTICLE II

## PURCHASE PRICE AND BANKRUPTCY MATTERS

**2.1    Purchase Price.**    As consideration for the sale to Buyer of the Assets and the assumption of the Assumed Obligations, Buyer shall pay to Seller a cash payment of Five Million Five Hundred Thousand Dollars ($5,500,000) (the "Purchase Price").  The Purchase Price shall be paid as follows: (A) a $500,000 deposit (the "Deposit"), which Deposit shall be wire transferred to bankruptcy counsel for Seller within three business days following entry of the Bid Procedures Order by the Bankruptcy Court and maintained by bankruptcy counsel for Seller in a segregated trust account (the "Escrow Account") and remain in the Escrow Account and not be commingled with property of Seller's bankruptcy estate and not to constitute property of Seller's bankruptcy estate unless and until the Bankruptcy Court determines that Seller is entitled to such Deposit as part of the Closing, and (B) the $5,000,000 balance shall be wire transferred as follows: (i) one wire transfer shall be made directly to secured creditor McCormick 107, LLC ("McCormick") in the amount of $2,054,537.76 with the remaining disputed to be paid into the Escrow Account pending further order of the Court; (2) a second wire transfer shall be made directly to Winkler Dunnebier ("Winkler") for the full amount owing by the Debtor to Winkler as of the Closing; (3) a third wire transfer to the U.S. Small Business Administration ("SBA") in the amount of $525,869.86; and (4) a four wire transfer shall be made to Seller's debtor-in-possession account or, alternatively, the bankruptcy trustee (should a trustee be appointed) for the remaining portion of the $5,000,000 balance after deducting the payments made directly to Secured Creditor and Winkler, with all three payments to be made within three business days following the date when the order entered by the Bankruptcy Court approving the sale of the Assets to Buyer (the "Sale Order") has become a final order not subject to any pending appeal or stay pending appeal (the "Outside Closing Date").  If Buyer is determined by Seller to be the winning bidder at the Auction and, subject to the entry of the Sale Order by the Bankruptcy Court, Buyer fails to consummate its purchase of the Assets by the Outside Closing Date (unless Buyer and Seller jointly agree to extend the Outside Closing Date) due to the fault of Buyer, Buyer shall be deemed to have permanently forfeited the Deposit to Seller as liquidated damages, and Seller shall have no further remedy against Buyer.

**2.2    Allocation of Purchase Price.**    The Purchase Price shall be allocated among the Assets, in the manner set forth in Exhibit B attached hereto (the "Purchase Price Allocation").  In the event that Exhibit B is not completed prior to Closing, the Parties agree to complete the Purchase Price Allocation within thirty (30) days after the Closing.  In the event of a dispute between Seller and Buyer as to the Purchase Price Allocation, the Bankruptcy Court shall make

EXHIBIT 2    PAGE 41

the determination of the Purchase Price Allocation.  The Parties, when reporting the transactions consummated hereunder in their respective tax returns, shall allocate the Purchase Price paid or received, as the case may be, in a manner that is consistent with the Purchase Price Allocation set forth in Exhibit B hereto.  Additionally, each of the Parties will comply with, and furnish the information required by Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code"), and any regulations thereunder.

**2.3    Third Party Consents.**    Notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute an agreement to assign or transfer any governmental approval, instrument, contract, lease, license, permit or other agreement or arrangement, including the Assigned Contracts, or any claim, right or benefit arising thereunder or resulting therefrom if an assignment or transfer or an attempt to make such an assignment or transfer without the consent of a third party would constitute a breach or violation thereof or affect adversely the rights of Buyer or Seller  thereunder unless such assignment is approved by the Bankruptcy Court; and any transfer or assignment to Buyer by Seller, as applicable, of any interest under any such instrument, contract, lease, license, permit or other agreement or arrangement that requires the consent of a third party shall be made subject to such consent being obtained from the contracting party or approval being obtained from the Bankruptcy Court.  In the event that any such consent or approval is not obtained on or prior to the Closing Date, Seller shall continue to use all commercially reasonable efforts to obtain any such approval or consent after the Closing Date as promptly as possible, and Seller will cooperate with Buyer in any lawful and reasonable arrangement to provide that Buyer shall receive the interest of Seller in the benefits under any such instrument, contract, lease, license or permit or other agreement or arrangement.  However, it shall be the responsibility of Buyer to satisfy the Bankruptcy Code requirements to enable Seller to assume and assign to Buyer any of the Assigned Contracts, including to demonstrate Buyer's adequate assurance of future performance, as required by the Bankruptcy Court, with respect to all of the Assigned Contracts, except that it shall be Seller's sole responsibility to pay any required cure amounts to the respective counter-parties to any such Assigned Contracts.

**2.4    Buyer's Employment of Seller's Current or Former Employees.**    Provided Buyer is deemed to be the winning bidder at the Auction (or if there is no Auction because no qualified bid has been submitted), Buyer shall have the right, but not the obligation, in Buyer's sole and absolute discretion, to offer employment to any of Seller's current or former employees, and Seller shall provide Buyer or make available to Buyer copies of all of Seller's employment records of all of its current and former employees as requested by Buyer.

**2.5    Bankruptcy Matters.**

(a)    **Payment of Cure Costs Under Assigned Contracts.**    As promptly as practicable following the execution of this Agreement, Buyer and Seller shall use commercially reasonable efforts to cooperate and determine an estimate of the amounts required to cure all defaults under each Assigned Contract so as to permit the assumption and assignment of each such Assigned Contract pursuant to Section 365 of the Bankruptcy Code (as ultimately determined by the Bankruptcy Court, the "Cure Costs").  In connection with the assignment and assumption of the Assigned Contracts, Seller shall pay all Cure Costs on or before the Closing.

EXHIBIT 2    PAGE 42

(b) **Bidding Procedures and Stalking Horse Bid Protections.** By not later than October 5, 2022, Seller shall file with the Bankruptcy Court a motion for approval of bidding procedures and stalking horse protections for Buyer (the "Bid Procedures Motion"). The Bid Procedures Motion must seek the entry of an order by the Bankruptcy Court (the "Bid Procedures Order") that approves Buyer to serve as a stalking horse bidder with a cash purchase price of $5.5 million for the Assets and contain other terms that are reasonably acceptable to Buyer and consistent with other terms of this Agreement. Within three business days following the entry of the Bid Procedures Order, Buyer will deliver the Deposit to bankruptcy counsel to Seller. The Parties anticipate that the hearing on the Bid Procedures Motion will be held on October 12, 2022, at 1:30 p.m. The Bid Procedures Order must set forth the timing and procedures for an auction (the "Auction") and sale hearing ("Sale Hearing") to be held before the Bankruptcy Court on or before October 26, 2022. The Parties anticipate that the Auction and the Sale Hearing will be held before the Bankruptcy Court on October 26, 2022, at 1:30 p.m. Seller may not extend the date of the Auction or the Sale Hearing beyond October 26, 2022 with the express written consent of Buyer, which Buyer shall have the right not grant in Buyer's sole and absolute discretion. The Bid Procedures Order must provide that the minimum overbid be at least $5.75 million, with a break-up fee of $150,000 to be paid to Buyer in the event that Buyer is not deemed to be the successful bidder at the Auction. Bidding thereafter will be in increments of $50,000 or higher figures that are wholly divisible by $50,000. The Bid Procedures Order must provide that the highest and best purchase price will be determined to be the bid that results in the highest net price to Seller's bankruptcy estate after taking into account Buyer's $150,000 break-up fee if Buyer is not deemed to be the successful bidder. The Bid Procedures Order must provide that the $150,000 break-up fee will be paid to Buyer if Buyer is not deemed to be the successful bidder at the time of the closing of Seller's sale of the Assets to an alternative bidder directly from the purchase price to be paid by such alternative bidder concurrently with the closing of Seller's sale of the Assets to the alternative bidder, and, if the alternative bidder fails to close its purchase in a timely manner, Seller will pay the $150,000 break-up fee to Buyer out of the $500,000 non-refundable deposit of the alternative bidder. Buyer shall have the right to participate in any overbidding at the Auction. All of the foregoing shall be referred to herein as the "Stalking Horse Protections".

The Bid Procedures Order shall provide that in order for any potential overbidder to be eligible to participate in the Auction, at least one business day prior to the Auction, overbidders must (1) deliver to Seller a signed asset purchase agreement in a form that is not less favorable for Seller than this Agreement; (2) deliver to Seller's bankruptcy counsel a deposit in the amount of $500,000, which deposit will be deemed to be non-refundable and forfeited to Seller's bankruptcy estate/Seller as liquidated damages if the overbidder is deemed to be the winning bidder at the Auction and fails to close its purchase by the Outside Closing Date (defined below); and (3) demonstrate to Seller that the overbidder has the ability to close its purchase, including proof of a binding financing commitment and/or sufficient cash on hand. Seller shall be required to provide Buyer with copies of all overbids submitted along with all supporting documentation of the overbidders.

The Bid Procedures Order shall provide that Buyer shall automatically be deemed to have an allowed administrative claim against Seller's bankruptcy estate in the amount of $150,000 if Seller fails to proceed with its sale of the Assets to Buyer or to a successful overbidder in

EXHIBIT 2    PAGE 43

accordance with the terms of this Agreement.  Buyer shall not be required to file any proof of claim with the Bankruptcy Court with regard to Buyer's allowed administrative claim against Seller's bankruptcy estate.

The Stalking Horse Protections will only be enforceable by Buyer so long as: (i) Buyer is not in default of its obligations under this Agreement; and (ii) the Assets are not sold to Buyer.  The Stalking Horse Protections, if payable, will be the sole and exclusive economic remedy of Buyer if the proposed sale to Buyer is not consummated, provided that the Stalking Horse Protections shall not limit in any way Buyer's right to enforce the Bid Procedures Order or any other order related to Seller's sale of the Assets, including to compel Seller to proceed with its sale of the Assets to Buyer or to a successful overbidder within the timeline set forth in the Bid Procedures Order.

(c)  **Sale Order**.  Provided that Buyer is deemed to be the successful bidder at the Auction (or no Auction occurs because no qualified overbid is timely submitted), Seller will request the Bankruptcy Court to approve the sale of the Assets to Buyer at the Sale Hearing.  The Bankruptcy Court order approving Seller's sale of the Assets to Buyer (the "Sale Order") must be acceptable to Buyer in Buyer's sole discretion and must contain customary terms for a chapter 11 asset sale process and other terms including, but not limited to, (i) providing for Seller's sale of the Assets to Buyer to be free and clear of all Encumbrances; (ii) Buyer being deemed to be a good faith buyer entitled to all of the relevant Bankruptcy Code protections for a good faith buyer and Buyer shall not be subject to any successor liability on account of its purchase of the Assets; (iii) Seller to make all of the Assets available to be delivered to Buyer at the Closing; (iv) making a finding that good, clean and marketable title to all of the equipment identified in Seller's bankruptcy schedules and in Exhibit "A" hereto, including, but not limited to, the Starch Mogul machine (collectively, the "Equipment"), is being transferred to Buyer at the Closing free and clear of all Encumbrances, including any Encumbrance and/or ownership interest asserted by Winkler; and (v) providing and ordering that if Buyer is not able to enter into a mutually acceptable lease with Seller's landlord and is not able to obtain the landlord's consent to Buyer's consensual access to the Premises (defined below) to remove all of the Assets located at the Premises, that Buyer is provided with access to the Premises to enable Buyer to remove all of the Assets from the Premises.

The Sale Order must be entered by the Bankruptcy Court by not later than November 2, 2022, and the Closing must occur by the Outside Closing Date, which Outside Closing Date may be extended by the mutual consent of Buyer and Seller.  Buyer, in its sole and absolute discretion, shall have the right, but not the obligation, to effectuate the Closing at any time after the entry of the Sale Order and before the Outside Closing Date.  If the Sale Order has not become a final order by November 18, 2022, Buyer shall have the unilateral right, at Buyer's sole and absolute discretion, to extend the Outside Closing Date until the date that is three business days after the date that the Sale Order has become a final order or to terminate this transaction and receive a return of the Deposit and have no further obligation to Seller.  If Buyer makes the determination to extend the Outside Closing Date, Seller will work collaboratively with Buyer to take all reasonable steps to seek to defeat or dismiss any pending appeal of the Sale Order or motion for stay of the Sale Order.

EXHIBIT 2    PAGE 44

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Subject to the disclosures and exceptions set forth in the disclosure schedules attached hereto (the "Seller's Disclosure Schedules"), Seller hereby makes the representations and warranties set forth hereinafter in this Section 3 to Buyer:

**3.1    Authority and Binding Effect**.  Subject to the approval of this Agreement by the Bankruptcy Court, Seller has, or will have, the full corporate power and authority to execute and deliver this Agreement and the Bill of Sale (as hereinafter defined).  This Agreement, the Bill of Sale and the consummation by Seller of its obligations contained herein and therein have been duly authorized by all necessary corporate actions of Seller and such agreements have been duly executed and delivered by Seller.  Subject to the approval of the Bankruptcy Court, this Agreement is a valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, and, upon execution and delivery, the Bill of Sale will be a valid and binding agreement of Seller and shall be enforceable against Seller in accordance with its terms.

**3.2    Organization and Standing.**  Seller is a limited liability company formed and organized under, validly existing and in good standing under the laws of the State of California.  Seller has the requisite corporate power and authority to conduct the Business as it is now conducted and to own or lease the Assets, and to use such Assets in the conduct of the Business.

**3.3    Compliance with Other Instruments.**  Subject to the approval of this Agreement by the Bankruptcy Court, the execution and delivery of this Agreement, the Bill of Sale and all other agreements to be entered into in connection herewith and the consummation of the transactions contemplated hereby and thereby will not conflict with or result in any violation of any law, rule, regulation, judgment, order, decree or ordinance applicable to Seller or its properties or assets, or conflict with or result in any breach or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit, under (i) any provision of the Certificate of Incorporation or bylaws of Seller; or (ii) any material agreement, contract, note, mortgage, indenture, lease, instrument, permit, concession, franchise or license or any writ, order or decree to which Seller is a party or by which Seller or any of the Assets is bound.

**3.4    Governmental Consent, etc.**  No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental entity is required by or with respect to Seller in connection with the execution and delivery of this Agreement or the consummation by Seller of the transactions contemplated hereby.

**3.5    Condition and Title to Assets.**

(a)    **Title to Assets**.  Seller represents that other than the Starch Mogul machine, Seller has good and transferable title to all of the Equipment, and Seller will have the ability to deliver good title to all of the Equipment to Buyer at the Closing, including title to the Starch Mogul machine, provided that the current title holder to the Starch Mogul machine is paid the full amount of its outstanding debt, which outstanding debt Seller will pay

EXHIBIT 2    PAGE 45

in full concurrently with and as part of the Closing directly from the proceeds of the Purchase Price.  On the Closing Date as part of the Closing, Seller will convey and transfer to Buyer good, complete and marketable title to all of the Assets, free and clear of all Encumbrances of any nature whatsoever.

(b)  **No Warranties Regarding Assets**.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER MAKE NO REPRESENTATIONS, STATEMENTS OR WARRANTIES, EXPRESS OR IMPLIED, OF ANY KIND OR NATURE WHATSOEVER CONCERNING THE QUALITY OR CONDITION OF THE ASSETS AND ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE DISCLAIMED HEREBY BY SELLER. SELLER IS SELLING THE ASSETS TO BUYER in their "AS IS, WHERE IS" and "WITH ALL FAULTS" condition.  Notwithstanding the foregoing, Seller will provide Buyer with access to its facility upon any reasonable request and regardless of the number of visits so that Buyer can conduct whatever investigations and inspections of the Assets that Buyer deems necessary or appropriate, in Buyer's sole and absolute discretion.

3.6    **Insurance.**  Seller has delivered to Buyer true and correct copies of all policies of fire, general liability, worker's compensation, errors and omissions, malpractice and other forms of insurance maintained by or on behalf of Seller in connection with the Assets as protection for the Assets.  All of such policies are now in full force and effect and will remain in full force and effect until the Closing.  Seller has not received any notice of cancellation or material amendment of any such policies.  No coverage thereunder is being disputed and all material claims thereunder have been filed in a timely fashion.

3.7    **No Broker**.  Other than Whipstitch and Guardian Capital whom Seller has retained as its exclusive investment bankers, Seller has not retained or used the services of any agent, finder or broker in connection with the transactions contemplated by this Agreement. Seller shall be solely responsible for the payment of Seller's investment banking fee and any and all other professional fees incurred by or owing by Seller.

3.8    **Seller's Lease**.  Seller makes no representations or warranties regarding its lease to the premises located at 1900 Carnegie Ave., Bldg. A, Santa Ana, CA 92705 ("Premises"). Seller has advised Buyer that the landlord for the Premises obtained a judgment for unlawful detainer prior to the filing of Seller's current bankruptcy case.  Seller makes no representations or warranties regarding the assignable of the lease for the Premises nor any ability of Buyer to enter into a lease with the landlord for the Premises.

3.9    **Representations and Warranties of Seller.**  The representations and warranties of Seller contained herein do not contain any statement of a material fact that was untrue when made or omits any information necessary to make any such statement contained therein, in light of the circumstances under which such statement was made, not misleading.  The copies of all documents furnished by Seller to Buyer pursuant to the terms of this Agreement are complete and accurate copies of the original documents.

EXHIBIT 2    PAGE 46

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby makes the representations and warranties set forth in this Section 4 to Seller:

**4.1    Authority and Binding Effect**.  Subject to the approval of the Bankruptcy Court, Buyer has the full corporate power and authority to execute and deliver this Agreement.  This Agreement and the consummation by Buyer of its obligations contained herein have been duly authorized by all necessary corporate actions of Buyer and this Agreement has been duly executed and delivered by Buyer.  Subject to the approval of the Bankruptcy Court, this Agreement is a valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms.

**4.2    Organization and Standing.**  Buyer is a limited liability company formed and organized under, validly existing and in good standing under the laws of the State of _____.

**4.3    Compliance with Other Instruments.**  The execution and delivery of this Agreement and all other agreements to be entered into in connection herewith and the consummation of the transactions contemplated hereby and thereby will not conflict with or result in any violation of any law, rule, regulation, judgment, order, decree or ordinance applicable to Buyer or its properties or assets, or conflict with or result in any breach or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit, under (i) any provision of the Certificate of Incorporation or bylaws of Buyer; or (ii) any material agreement, contract, note, mortgage, indenture, lease, instrument, permit, concession, franchise or license or any writ, order or decree to which Buyer is a party or by which Buyer or any of its property is bound.

**4.4    Governmental Consent, etc.**  No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental entity is required by or with respect to Buyer in connection with the execution and delivery of this Agreement or the consummation by Buyer of the transactions contemplated hereby.

**4.5    No Broker.**  Buyer has not retained or used the services of an agent, finder or broker in connection with the transactions contemplated by this Agreement.

**4.6    Investigation.**  Buyer acknowledges and affirms that it has completed its own independent investigation, analysis and evaluation of the Assets, that it has made all such reviews and inspections of the Assets as it deems necessary and appropriate, and that in making its decision to enter into this Agreement, it has relied on its own investigation, analysis, and evaluation with respect to all matters without reliance upon any express or implied representations or warranties other than those expressly set forth in this Agreement, as to which it has relied.  Notwithstanding the foregoing, as set forth above, Buyer must be provided with access to Seller's facility upon any reasonable request and regardless of the number of visits so

EXHIBIT 2    PAGE 47

that Buyer can conduct whatever investigations and inspections of the Assets that Buyer deems necessary or appropriate, in Buyer's sole and absolute discretion.

**4.7    Funding.**   Buyer has all funding available to it to enable it to consummate its purchase of the Assets and to pay all of the other obligations of Buyer, if any, under this Agreement.  Buyer's entry into this Agreement and ability to perform under this Agreement is therefore not subject to any financing contingency.

**4.8    Representations and Warranties of Buyer.**   The representations and warranties of Buyer contained herein do not contain any statement of a material fact that was untrue when made or omits any information necessary to make any such statement contained therein, in light of the circumstances under which such statement was made, not misleading.  The copies of all documents furnished by Buyer to Seller pursuant to the terms of this Agreement are complete and accurate copies of the original documents.

<div align="center">

**ARTICLE V**

**CONDUCT OF BUSINESS PENDING THE CLOSING**

</div>

Between the date hereof and the Closing, and except as otherwise consented to by Buyer in writing, Seller covenant as follows:

**5.1    Access.**   From and after the date of execution of this Agreement by Seller or following the completion of the Auction at which Buyer is determined by Seller to be the winning bidder, whichever occurs first, Seller shall give to Buyer and its representatives access during normal business hours to the premises, employees, agents and consultants of Seller, and such copies of Seller's books and records, contracts and leases and any other documentation, so as to enable Buyer to inspect and evaluate all aspects of the Business and operations, Assets, operating results, financial condition, capitalization, ownership, and legal affairs relating to the Business and the Assets pending the Closing.  Buyer agrees to conduct its review, and to cause its representatives to conduct their review, in a manner designed to minimize any disruption of the Business.  Buyer will hold any confidential information obtained pursuant to this Section 5.1 in accordance with the confidentiality provisions of any post-bankruptcy non-disclosure agreement ("NDA") entered into between the Buyer and Seller.

**5.2    Maintenance of the Assets.**   From and after the date of execution of this Agreement by Seller or following the completion of the Auction at which Buyer is determined by Seller to be the winning bidder, whichever occurs first, Seller shall maintain the Assets in good condition and not alter or modify the Assets, except as otherwise approved or ordered by the Bankruptcy Court.  In furtherance thereof, unless Buyer's prior consent to do otherwise is obtained (which consent shall not be unreasonably withheld or delayed), Seller shall:

(a)    **Insurance.**  Maintain insurance consistent with past practices and not take any action to terminate or modify, or permit the lapse or termination of, the present insurance policies and coverages of Seller;

(b)    **Agreements.**

EXHIBIT 2    PAGE 48

(i)      Observe and perform all of its post-bankruptcy obligations under the Assigned Contracts, except for the lease for the Premises;

(ii)      Except as required by any existing contracts or agreements, not enter into any new agreement that would constitute an Assigned Contract or amend, cancel or terminate any Assigned Contract;

(iii)      Promptly notify Buyer of the occurrence of any post-bankruptcy breach or default of any Assigned Contract known to Seller; and

(c)  **Consents; Compliance with Laws to the Extent Related to the Business.**

(i)      Use reasonable efforts to obtain all required consents to assignments of governmental authorities or other third parties, and maintain all other licenses, permits and franchises and rights to operate the Business granted by, governmental authorities;

(ii)      Not take any action that would be expected to result in a violation of or in the noncompliance with any laws or regulations applicable to the Business; and

(iii)      Cooperate with Buyer and render to Buyer such assistance as Buyer may reasonably request, at Buyer's sole expense, in obtaining such governmental or other third party consents and approvals;

(d)  **Taxes.**  Pay, when due, and prior to the imposition or assessment of any interest, penalties or liens by reason of the nonpayment of, all post-bankruptcy Taxes, due or assessed against Seller, except for any Taxes being contested in good faith; and

(e)  **Representations and Warranties.**  Not take any action that would make any representation and warranty of Seller inaccurate as of the Closing.

**5.3      Notification of Certain Matters.**  Seller shall give prompt notice to Buyer of (i) the occurrence or non-occurrence of any event the occurrence or non-occurrence of which would cause any representation or warranty of Seller contained in this Agreement to be untrue or inaccurate in any material respect at or prior to the Closing and (ii) any failure to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by Seller hereunder; provided, however, that the delivery of any notice pursuant to this Section 5.3 shall not limit or otherwise affect the remedies available hereunder to Buyer.

## ARTICLE VI

## OBLIGATIONS SURVIVING THE CLOSING

**6.1      Further Assurances.**  Each Party shall execute and deliver after the date hereof all such instruments and documents and take such other actions as the other Party may reasonably request in order to carry out the intent of this Agreement or to better evidence or effectuate the transactions contemplated herein.

EXHIBIT 2     PAGE 49

**6.2    Expenses.** Each Party shall pay all of its respective costs and expenses incurred or to be incurred by it in negotiating and preparing this Agreement and in carrying out and closing the transactions contemplated by this Agreement whether or not this Agreement or the transactions contemplated hereby are ever consummated.

**6.3    Taxes.** Seller shall pay all Taxes of any kind or nature arising from the sale and transfer of the Assets to Buyer. Seller shall pay all Taxes of any kind or nature arising from the conduct or operation of the Business up to the Closing Date. If any Taxes required under this Section 6.3 to be borne by Seller are assessed against Buyer or any of the Assets, Buyer shall notify Seller in writing promptly thereafter and Seller shall be entitled to contest, in good faith, such assessment or charge so long as such assessment does not materially adversely affect Buyer or the Assets or Buyer's business. Notwithstanding the foregoing, Buyer may (but shall not be obligated to) pay any such Taxes assessed against it, its business or any of the Assets, but which are payable by Seller pursuant hereto, if the Buyer's failure to do so, in the reasonable judgment of the Buyer, could result in the immediate imposition of an Encumbrance on any of the Assets or any other assets of the Buyer or if Seller fails to contest such assessment or charge diligently and in good faith, with Seller then to have the obligation to promptly reimburse Buyer for the payment of any such Taxes.

<div align="center">

**ARTICLE VII**

**SURVIVAL OF REPRESENTATIONS AND WARRANTIES**

</div>

Except as specifically set forth in Article VI above, all of the respective representations and warranties of Seller and Buyer set forth in this Agreement or in any of such Party's disclosure schedules, or in any certificates delivered by such Party on the Closing Date, shall survive and remain in full force and effect following the Closing.

<div align="center">

**ARTICLE VIII**

**CONDITIONS PRECEDENT TO THE OBLIGATIONS OF BUYER**

</div>

The obligation of Buyer to consummate its purchase of the Assets from Seller is subject to the fulfillment, or the waiver by Buyer, at or prior to the Closing, of each of the following conditions precedent:

**8.1    Representations and Warranties.** The representations and warranties made by Seller in this Agreement shall be true and correct in all material respects, unless modified by materiality in the representation or warranty, in which case they shall be true and correct in all respects, on the date hereof and at and as of the Closing Date, with the same force and effect as if made again at and as of that time.

**8.2    Absence of Stay or Injunction Preventing Sale Closing.** There shall be no order that has been issued by any court or governmental agency having jurisdiction that restrains or prohibits the consummation of the purchase and sale of the Assets hereunder.

EXHIBIT 2    PAGE 50

**8.3     Performance of Obligations.**  Seller shall have performed and complied, in all material respects, with all of the covenants required by this Agreement to have been performed prior to the Closing.

**8.4     Delivery of Additional Instruments.**  On the Closing Date, Seller shall deliver, or cause to be delivered to Buyer, the following documents and instruments, in form and substance satisfactory to Buyer and its counsel, unless waived in writing by Buyer:

(a)    The Bill of Sale in substantially the form of Exhibit "C" hereto, duly executed by Seller (the "Bill of Sale");

(b)    Evidence of the receipt of all third-party consents necessary, if any, to enable Seller to consummate the transactions contemplated herein, except to the extent the Bankruptcy Court enters an order approving of Seller's assumption and assignment to Buyer of the Assigned Contracts and any other relief which would render any such third-party consents unnecessary; and

(c)    Such other documents and instruments as Buyer or Buyer's counsel may reasonably request so as better to evidence or effectuate the transactions contemplated hereby.

**8.5     Sale Order.**  The Bankruptcy Court shall have entered the Sale Order in a form acceptable to Buyer, approving the sale or sale of the Assets on the terms specified in this Agreement, by not later than November 2, 2022, with such Sale Order to contain all of the provisions identified above.  At the time of the Closing, the Sale Order shall not have been reversed, stayed, modified or amended in any manner materially adverse to Buyer.

## ARTICLE IX

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligation of Seller to consummate the sale of the Assets to Buyer is subject to the fulfillment, or the waiver by Seller, at or prior to the Closing, of each of the following conditions precedent:

**9.1     Representations and Warranties.**  The representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects, unless modified by materiality in the representation or warranty, in which case they shall be true and correct in all respects, on the date hereof and at and as of the Closing Date, with the same force and effect as if made again at and as of that time.

**9.2     Absence of Stay or Injunction Preventing Sale Closing.**  There shall be no order that has been issued by any court or governmental agency having jurisdiction that restrains or prohibits the consummation of the purchase and sale of the Assets hereunder.

**9.3     Performance of Obligations.**  Buyer shall have performed and complied in all material respects with all of its covenants required by this Agreement to have been performed by it at or prior to the Closing.

EXHIBIT 2    PAGE 51

**9.4**    **Delivery of Additional Instruments.**  On the Closing Date, Buyer shall deliver, or cause to be delivered to Seller, in form and substance reasonably satisfactory to Seller and its counsel, such other documents and instruments as Seller or Seller's counsel may reasonably request so as better to evidence or effectuate the transactions contemplated hereby.

**9.5**    **Delivery of Consideration.**  At the Closing, Buyer shall deliver to Seller a cash payment in the remaining amount of the Purchase Price beyond the Deposit.

## ARTICLE X

## THE CLOSING

The consummation of the transactions contemplated hereby (the "Closing") shall take place at the offices of Golden Goodrich LLP or at such other place as the parties may agree and shall occur no later than the Outside Closing Date, which Outside Closing Date may be extended by the mutual consent of Buyer and the Company, subject to the satisfaction or waiver of the closing conditions set forth in Section 8 and Section 9 above (the "Closing Date").  Buyer, in its sole and absolute discretion, shall have the right, but not the obligation, to effectuate the Closing at any time after the entry of the Sale Order and before the Outside Closing Date.  If the Sale Order has not become a final order by November 18, 2022, Buyer shall have the unilateral right, at Buyer's sole and absolute discretion, to extend the Outside Closing Date until the date that is three business days after the date that the Sale Order has become a final order or to terminate this transaction and receive a return of its deposit and have no further obligation to the Company.  If the Buyer makes the determination to extend the Outside Closing Date, the Company will work collaboratively with the Buyer to take all reasonable steps to seek to defeat or dismiss any pending appeal of the Sale Order or motion for stay of the Sale Order.

**10.1**    **Closing Deliveries of Seller.**  At the Closing, Seller shall deliver, or cause to be delivered to Buyer, the documents and instruments set forth in Section 8 above, in form and substance reasonably satisfactory to Buyer and its counsel.

**10.2**    **Closing Deliveries of Buyer.**  At the Closing, Buyer shall deliver, or cause to be delivered, the remaining Purchase Price to Seller and the documents and instruments set forth in Section 9 above, in form and substance reasonably satisfactory to Seller and their counsel.

## ARTICLE XI

## TERMINATION

**11.1**    **Termination.**  Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Closing Date:

(a)  by mutual written agreement of Buyer and Seller;

(b)  by Buyer if there has been a material breach by Seller of its representations, warranties or covenants set forth herein which is not or cannot be cured by Seller prior to the Closing or if any material condition to the obligation of Buyer under this

EXHIBIT 2    PAGE 52

Agreement to be complied with or performed by Seller at or before the Closing shall not have been complied with or performed at the time required for such compliance or performance and such noncompliance or nonperformance shall not have been waived by Buyer or cured by Seller prior to the Closing;

(c)  by Buyer if the Sale Order has not become a final order by November 18, 2022 as set forth in Section X above;

(d)  by either Buyer or Seller if any judgment, injunction, order or decree of a court or other governmental entity of competent jurisdiction enjoining Buyer or Seller from consummating the transactions contemplated by this Agreement shall have been entered;

(e)  by Seller if there has been a material breach by Buyer of its representations, warranties or covenants set forth herein which is not or cannot be cured by Buyer prior to the Closing or if any material condition to the obligation of Seller under this Agreement to be complied with or performed by Buyer at or before the Closing shall not have been complied with or performed at the time required for such compliance or performance and such noncompliance or nonperformance shall not have been waived by Seller or cured by Buyer prior to the Closing; or

(f)  by Seller if someone other than Buyer is the Successful Bidder at the Auction in compliance with the terms of the Bid Procedures Order in which case immediately following the conclusion of the Auction bankruptcy counsel to Seller shall return the Deposit to Buyer and concurrently with and as part of the sale closing to such other Successful Bidder Buyer shall be paid its $150,000 break-up fee.

**11.2    Procedure Upon Termination.**  In the event of termination of this Agreement by Buyer or Seller or by both Buyer and Seller pursuant to Section 11.1 hereof, the transactions contemplated herein shall be abandoned without further action by Buyer or Seller.  In addition, if this Agreement is terminated as provided herein:

(a)  Each Party will redeliver all documents, workpapers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

(b)  All information of a confidential nature received by any party hereto with respect to the business of any other party (other than information which is a matter of public knowledge or which has heretofore been or is hereafter published in any publication for public distribution or filed as public information with any governmental authority) shall continue to be subject to any NDA between Buyer and Seller.

(c)  Upon any termination of this Agreement pursuant to this Section 11, the respective obligations of the Parties under this Agreement shall terminate and no Party shall have any liability whatsoever to any other Party by reason of such termination, irrespective of the cause of such termination, except as set forth in this Section.

(d)  If Buyer is not the winning bidder at the Auction or terminates this Agreement pursuant to the provisions of Sections 11.1(a), (b) or (c), bankruptcy counsel to

EXHIBIT 2    PAGE 53

Seller shall immediately return the Deposit to Buyer, and Buyer shall receive its $150,000 break-up fee concurrently with and as part of the sale closing to such other Successful Bidder.

# ARTICLE XII

## MISCELLANEOUS

**12.1    Assignment.**  Neither Seller nor Buyer may assign this Agreement, or assign any of their rights or delegate any of their duties hereunder, without the prior written consent of the other Party except that Buyer may designate an alternative entity to serve as its nominee provided that such alternative entity is either an affiliate of Buyer or is an affiliate of an affiliate of Buyer.  This Agreement will be binding upon, inure to the benefit of, and be enforceable by the Parties and their respective successors and assigns, including any chapter 7 or chapter 11 trustee appointed in the Bankruptcy Case.

**12.2    Severability.**  Any provision of this Agreement which is illegal, invalid or unenforceable shall be ineffective to the extent of such illegality, invalidity or unenforceability, without affecting in any way the remaining provisions hereof.

**12.3    Governing Law.**  This Agreement shall be governed by and construed in accordance with the Bankruptcy Code, to the extent applicable, and, where state law is implicated, the internal laws of the state of California, without giving effect to any principles of conflicts of law.  Without limiting any Party's right to appeal any Order of the Bankruptcy Court, the Parties agree that if any dispute arises out of or in connection with this Agreement or any of the documents executed hereunder or in connection herewith, the Bankruptcy Court shall have exclusive personal and subject matter jurisdiction and shall be the exclusive venue to resolve any and all disputes relating to this Agreement.  The Bankruptcy Court shall have sole jurisdiction over such matters and the parties affected thereby, and Buyer and Seller each hereby consent and submit to such jurisdiction; provided, however, that if the Bankruptcy Case has closed and cannot be reopened, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the district in which the Bankruptcy Court is located and any appellate court thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  In the event any such action, suit or proceeding is commenced, the Parties hereby agree and consent that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 12.8 hereof, unless another address has been designated by such Party in a notice given to the other Party in accordance with the provisions of Section 12.8 hereof.

**12.4    Entire Agreement; Amendment.**  This Agreement and the Exhibits and Schedules hereto, and each additional agreement and document to be executed and delivered

EXHIBIT 2    PAGE 54

pursuant hereto, constitute all of the agreements of the Parties with respect to, and supersede all prior agreements and understandings relating to the subject matter of, this Agreement or the transactions contemplated by this Agreement.  This Agreement may not be modified or amended except by a written instrument specifically referring to this Agreement signed by the Parties.

**12.5    Waiver.**  No waiver by one Party of the other Party's obligations, or of any breach or default hereunder by any other Party, shall be valid or effective, unless such waiver is set forth in writing and is signed by the Party giving such waiver; and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature or any other breach or default by such other Party.

**12.6    Interpretation; Headings.**    This Agreement is the result of arms'-length negotiations between the Parties and no provision hereof, because of any ambiguity found to be contained therein or otherwise, shall be construed against a Party by reason of the fact that such Party or its legal counsel was the draftsman of that provision.  The section, subsection and any paragraph headings contained herein are for the purpose of convenience only and are not intended to define or limit or affect, and shall not be considered in connection with, the interpretation of any of the terms or provisions of this Agreement.

**12.7    Counterparts.**  This Agreement may be executed in separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement shall become effective when counterparts have been signed by each of the Parties and delivered by facsimile or other means to the other Party.   Signatures transmitted by facsimile or electronically shall be deemed to have the same force and effect as original signatures.

**12.8    Notices.**  Any notice shall be in writing and shall be deemed to have been duly given or made when personally delivered, sent by facsimile or when mailed by registered or certified mail, postage prepaid, return receipt requested, addressed or directed as follows, or as may be furnished hereafter by notice, in writing, to the other Party on at least three (3) business days' prior notice, to the following parties. Any Party may from time to time, by written notice to the other Party, designate a different address, which shall be substituted for the one specified below.  In addition to any other means of deliverance provided, all notices provided hereunder must also be delivered by email.

If to Seller:

Hero Nutritionals, LLC
1900 Carnegie Ave. Bldg. A
Santa Ana, CA 92705
Attn:  Jennifer Hodges
Email: jhodges@heronutritionals.com

EXHIBIT 2    PAGE 55

with a copy to (which shall not constitute notice) given in a like manner to:

      David M. Goodrich, Esq.
      Golden Goodrich LLP
      650 Town Center Drive, Suite 600
      Costa Mesa, California 92626
      Email: dgoodrich@go2.law
      Phone:  (714) 966-1000
      Facsimile: (714) 966-1002

If to Buyer, to:

      15233 Ventura Blvd., Ste 900
      Sherman Oaks, CA 91403
      Attn: Legal Department
      Email: legal@vytalogy.com

with a copy to (which shall not constitute notice) given in a like manner to:

      Michael Torkin, Esq.
      Simpson Thacher & Bartlett LLP
      425 Lexington Avenue
      New York, New York 10017
      Email: Michael.Torkin@stblaw.com
      Phone: (917) 680-9700
      Facsimile:

      Ron Bender, Esq.
      Levene, Neale, Bender, Yoo & Golubchik L.L.P.
      2818 La Cienega Ave.
      Los Angeles, California 90034
      Email: RB@LNBYG.COM
      Phone: (310) 229-1234
      Facsimile:  (310) 229-1244

**12.9   Public Announcements.**   Neither Seller nor Buyer will make any public announcements concerning matters set forth in this Agreement or the negotiation thereof without the prior written consent of the other Party unless such disclosure is required by law or court order or the information is otherwise publicly available, including in any filings with the Bankruptcy Court.  Any such disclosure shall be provided for review to the other Party in advance of public release to the extent reasonably practical.

EXHIBIT 2    PAGE 56

**12.10   Attorneys' Fees.**  If any action or proceeding relating to this Agreement or the enforcement of any provision of this Agreement is brought by a Party against any other Party, the prevailing Party shall be entitled to recover reasonable attorneys' fees, costs and disbursements (in addition to any other relief to which the prevailing Party may be entitled). Any attorneys' fees awarded to Buyer shall be payable from Seller's bankruptcy estate, even if Seller's chapter 11 bankruptcy case is converted to chapter 7.

**[SIGNATURES ARE CONTAINED ON THE FOLLOWING PAGE]**

EXHIBIT 2     PAGE 57

IN WITNESS WHEREOF, each of Seller and Buyer has caused a duly authorized representative to execute this Asset Purchase Agreement on the date first written above.


**BUYER:**


By: _____

Name: _____
Title: _____


**SELLER**:

**HERO NUTRITIONALS, LLC**


By: _____

Name: _____
Title: _____

EXHIBIT 2    PAGE 58

**SCHEDULES**

**EXHIBITS**

Exhibit A        Equipment Schedule

Exhibit B        Purchase Price Allocation

Exhibit C        Form of Bill of Sale

EXHIBIT 2    PAGE 59

**EXHIBIT A**

**Equipment Schedule**

| Year | Make | Model | Description | Location |
|---|---|---|---|---|
| 2015 | Bosch | 8-103-448-508 | 2 Hydration Tanks Add H2o/gelatin, pectin | Manufacturing (downstairs kitchen) |
| 2015 | Bosch | BLK2500B | Rapid solver Vaccum | Manufacturing (downstairs kitchen) |
| 2015 | Bosch | 8-103-443-885 | Gravomat Mix Sugar, Syrup | Manufacturing (downstairs kitchen) |
| 2015 | Miura Boiler | LX-50 | Boiler | Manufacturing |
| 2015 | Bosch | 8-103-448-508 | Dosing tank | Manufacturing (upstairs kitchen) |
| 2015 | Bosch | 8-103-443-754 | Dosing Mixing Tanks (3) | Manufacturing (upstairs kitchen) |
| 2015 | Kobelco | KNW Series | Air Compressor | Manufacturing |
| 2020 | Donaldson Torit | DFE28 | Downflow Evolution Dust Collector | Manufacturing |
| 2015 | Bosch | 8-103-448-752 | Holding Tank | Manufacturing (downstairs kitchen) |
| 2015 | Trane | CGAM 070F 2L02 AKB2 A101 B1AX XA1C 1AXA XX8B XAYA 3X1D 1XXL XX | Liquid Chiller | Maunfacturing |
| 2020 | Winkler | 462B/1 | Starch Mogul | Manufacturing |
| 2015 | WINKLER | 462.99 | SUGAR TUMBLER | Manufacturing |
| 2015 | WINKLER | 462.99 | OIL TUMBLER | Manufacturing |
|  | CUSTOM | CUSTOM | 3 AIR HANDLER CONDITION | Manufactuing |
|  | OHLSON |  | FILLER | Packaging |
|  | MARBURG INDUS | M-725-FB-RL-B | AUTO CAP SEALER | Packaging |
|  | CVC TERCHNOL | CVC 430C | LABELER | Packaging |
|  | SUREKAP |  | CAPPER | Packaging |
|  | OSWALD METZE | GF | HORIZONTAL CONVEY0R B | Packaging |
|  | OSWALD METZE | GF | PADDLEWHEEL CONVEYOR | Packaging |
|  | INTERPACK | USA 2024-SB | CARTON SEALER | Packaging |
|  | GARVEY | 9600 | BOTTLE CONVEYOR | Packaging |
|  | Several bottle Conveyors |  |  | Packaging |
|  | ECC |  | CURING ROOMS (2) | Manufacturing |
|  | Nissan | CPJO1A15PV | FORKLIFT | Warehouse |
|  | CROWN | RC 3000 SERIES | FORKLIFT (2) | Warehouse |
|  | HYSTER | N402K-16.5 | FORKLIFT | Warehouse |
|  | Trieber Original | 10-14 | Starch Trays approx 5,000 | Warehouse |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

B-1

EXHIBIT 2    PAGE 60

## EXHIBIT B

### Purchase Price Allocation

[To Be Supplied]

B-2

EXHIBIT 2     PAGE 61

## EXHIBIT C

### Form of Bill of Sale

This Bill of Sale is made as of _____ __, 2022 (the "Effective Date"), by and between Vytalogy Wellness, L.L.C. or its nominee ("Buyer")[2] and Hero Nutritionals, LLC ("Seller"). Seller and Buyer are parties to a certain Asset Purchase Agreement dated as of _____ __, 2022 (the "Asset Purchase Agreement"). Capitalized terms used without definitions herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

1.      **Sale and Assignment of Purchased Assets.** Pursuant to the Asset Purchase Agreement, Buyer has on the date hereof purchased the Assets from Seller. In accordance with and subject to the terms and conditions set forth in the Asset Purchase Agreement, for good and valuable consideration, the receipt of which is hereby acknowledged, Seller does hereby sell, assign, bargain, transfer, convey and deliver unto Buyer all of Seller's right, title and interest in and to the Assets free and clear of all liens, claims, encumbrances and interests (collectively, "Encumbrances") pursuant to and in accordance with the sale order entered by the Bankruptcy Court as Docket No. __.

2.      **No Assumption of Any of Seller's Liabilities.** Buyer does not agree to assume or pay any debts, obligations or liabilities of Seller.

3.      **Cooperation.** Buyer and Seller agree to cooperate with each other to execute and deliver such other documents and instruments and to do such further acts and things as may be reasonably requested by the other to evidence, document or carry out Seller's sale of the Assets to Buyer.

4.      **Effect of Agreement.** Nothing in this Bill of Sale shall, or shall be deemed to, modify or otherwise affect any provisions of the Asset Purchase Agreement or affect the rights of the parties under the Asset Purchase Agreement. In the event of any conflict between the provisions hereof and the provisions of the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

**IN WITNESS WHEREOF**, Seller and Buyer have caused this Bill of Sale Agreement to be executed on the Effective Date.

### BUYER:

By: _____

Name: _____

Title: _____

---

[2] Buyer will likely be a newly formed special purpose entity formed for the purpose of serving as Buyer herein.

EXHIBIT 2    PAGE 62

**SELLER**:

**HERO NUTRITIONALS, LLC**

By: _____

Name: _____
Title: _____

C-4

EXHIBIT 2     PAGE 63

# EXHIBIT 3

**Fill in this information to identify the case:**

Debtor name    **Hero Nutritionals, LLC**

United States Bankruptcy Court for the:    CENTRAL DISTRICT OF CALIFORNIA

Case number (if known)    **8:22-bk-11383-SC**

☐ Check if this is an amended filing

Official Form 206D

## Schedule D: Creditors Who Have Claims Secured by Property    12/15

Be as complete and accurate as possible.

**1. Do any creditors have claims secured by debtor's property?**

☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.

☑ Yes. Fill in all of the information below.

**Part 1:    List Creditors Who Have Secured Claims**

2. **List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

| | | Column A<br>Amount of claim<br>Do not deduct the value of collateral. | Column B<br>Value of collateral that supports this claim |
|---|---|---|---|
| **2.1** **Bank of Manhattan NA**<br>Creditor's Name | Describe debtor's property that is subject to a lien<br>**Notice Only** | **$0.00** | **$0.00** |
| **Attn: Corporation Service Company**<br>**801 Adlai Stevenson Dr.**<br>**Springfield, IL 62703**<br>Creditor's mailing address | Describe the lien | | |
| Creditor's email address, if known | Is the creditor an insider or related party?<br>☑ No<br>☐ Yes<br>Is anyone else liable on this claim?<br>☑ No<br>☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H) | | |
| Date debt was incurred<br>**03/11/2014**<br>Last 4 digits of account number<br>**1306** | | | |
| Do multiple creditors have an interest in the same property?<br>☑ No<br>☐ Yes. Specify each creditor, including this creditor and its relative priority. | As of the petition filing date, the claim is:<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | | |
| **2.2** **Cargo Express Freight**<br>Creditor's Name | Describe debtor's property that is subject to a lien<br>**All Assets** | $5,130.00 | Unknown |
| **Attn: Stephanie Saldivar**<br>**1675 N. Main St.**<br>**Orange, CA 92867**<br>Creditor's mailing address | Describe the lien<br>**Judgment Lien (recorded within 90 days of bankruptcy)** | | |
| Creditor's email address, if known | Is the creditor an insider or related party?<br>☑ No<br>☐ Yes<br>Is anyone else liable on this claim?<br>☑ No<br>☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H) | | |
| Date debt was incurred<br>**06/17/2022**<br>Last 4 digits of account number | | | |
| Do multiple creditors have an interest in the same property? | As of the petition filing date, the claim is:<br>Check all that apply | | |

EXHIBIT 3    PAGE 64

| Debtor | Hero Nutritionals, LLC | Case number (if known) | 8:22-bk-11383-SC |
|---|---|---|---|
| | Name | | |

☑ No
☐ Yes. Specify each creditor, including this creditor and its relative priority.

☐ Contingent
☐ Unliquidated
☑ Disputed because lien is avoidable

---

**2.3** **HYG Financial Services Inc.**
Creditor's Name

**PO Box 35701**
**Attn: President**
**Billings, MT 59107**
Creditor's mailing address

Creditor's email address, if known

**Date debt was incurred**

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**
☑ No
☐ Yes. Specify each creditor, including this creditor and its relative priority.

Describe debtor's property that is subject to a lien
**Notice Only**

Describe the lien

Is the creditor an insider or related party?
☑ No
☐ Yes
Is anyone else liable on this claim?
☑ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H)

As of the petition filing date, the claim is:
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

$0.00      $0.00

---

**2.4** **JPMorgan Chase Bank NA**
Creditor's Name

**Collateral Mgmt Small Business**
**PO Box 33035**
**Louisville, KY 40232**
Creditor's mailing address

Creditor's email address, if known

**Date debt was incurred**
**03/2011**
Last 4 digits of account number

**Do multiple creditors have an interest in the same property?**
☑ No
☐ Yes. Specify each creditor, including this creditor and its relative priority.

Describe debtor's property that is subject to a lien
**Equipment**

Describe the lien
**Financing Statement**
Is the creditor an insider or related party?
☑ No
☐ Yes
Is anyone else liable on this claim?
☑ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H)

As of the petition filing date, the claim is:
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

$0.00      $0.00

---

**2.5** **McCormick 107, LLC**
Creditor's Name

**Attn: Managing Member**
**11350 McCormick Road, #902**
**Hunt Valley, MD 21031**
Creditor's mailing address

Creditor's email address, if known

Describe debtor's property that is subject to a lien
**Blanket Lien**

Describe the lien
**UCC-1 Financing Statement**
Is the creditor an insider or related party?
☑ No
☐ Yes
Is anyone else liable on this claim?

$2,500,000.00      Unknown

---

Official Form 206D      Additional Page of **Schedule D: Creditors Who Have Claims Secured by Property**      page 2 of 5

EXHIBIT 3    PAGE 65

| Debtor | **Hero Nutritionals, LLC** | Case number (if known) | **8:22-bk-11383-SC** |
|---|---|---|---|
| | Name | | |

**Date debt was incurred**
**March 7, 2022**
Last 4 digits of account number

☐ No
☑ Yes. Fill out Schedule H: Codebtors (Official Form 206H)

**Do multiple creditors have an interest in the same property?**
☑ No
☐ Yes. Specify each creditor, including this creditor and its relative priority.

**As of the petition filing date, the claim is:**
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

---

| 2.6 | **NMHG Financial Services Inc.** | Describe debtor's property that is subject to a lien | $0.00 | $0.00 |
|---|---|---|---|---|
| | Creditor's Name | **Notice Only** | | |

**PO Box 35701**
**Billings, MT 59107**
Creditor's mailing address

**Describe the lien**
**Financing Statement**
**Is the creditor an insider or related party?**
☑ No
☐ Yes

Creditor's email address, if known

**Is anyone else liable on this claim?**
☑ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H)

**Date debt was incurred**

Last 4 digits of account number

**Do multiple creditors have an interest in the same property?**
☑ No
☐ Yes. Specify each creditor, including this creditor and its relative priority.

**As of the petition filing date, the claim is:**
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

---

| 2.7 | **US Small Business Administration** | Describe debtor's property that is subject to a lien | $331,000 | $331,000 |
|---|---|---|---|---|
| | Creditor's Name | **Blanket Lien** | | |

**10737 Gateway West #300**
**El Paso, TX 79935**
Creditor's mailing address

**Describe the lien**
**Financing Statement**
**Is the creditor an insider or related party?**
☑ No
☐ Yes

Creditor's email address, if known

**Is anyone else liable on this claim?**
☑ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H)

**Date debt was incurred**
**06/11/2020**
Last 4 digits of account number

**Do multiple creditors have an interest in the same property?**
☑ No
☐ Yes. Specify each creditor, including this creditor and its relative priority.

**As of the petition filing date, the claim is:**
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

---

| 2.8 | **Wells Fargo** | Describe debtor's property that is subject to a lien | Unknown | $5,000 |
|---|---|---|---|---|
| | Creditor's Name | **Koycera Copiers** | | |

**1010 Thomas Edison Blvd SW**
**Attn: President**
**Cedar Rapids, IA 52404**

---

Official Form 206D    Additional Page of **Schedule D: Creditors Who Have Claims Secured by Property**    page 3 of 5

EXHIBIT 3    PAGE 66

| Debtor | **Hero Nutritionals, LLC** | | Case number (if known) | **8:22-bk-11383-SC** |
|---|---|---|---|---|
| | Name | | | |

| | |
|---|---|
| Creditor's mailing address | **Describe the lien**<br>**Secuilrty Interest** |
| | **Is the creditor an insider or related party?**<br>☑ No<br>☐ Yes |
| Creditor's email address, if known | **Is anyone else liable on this claim?**<br>☑ No<br>☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H) |
| **Date debt was incurred** | |
| **Last 4 digits of account number** | |
| **Do multiple creditors have an interest in the same property?**<br>☑ No<br>☐ Yes. Specify each creditor, including this creditor and its relative priority. | **As of the petition filing date, the claim is:**<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed |

---

| 2.9 | **Wolters Kluwer** | **Describe debtor's property that is subject to a lien**<br>**Equipment** | **$120,000** | **Unknown** |
|---|---|---|---|---|

| | |
|---|---|
| Creditor's Name | |
| **Lien Solutions LLC**<br>**PO Box 29071**<br>**Glendale, CA 91209** | |
| Creditor's mailing address | **Describe the lien**<br>**Financing Statement** |
| | **Is the creditor an insider or related party?**<br>☑ No<br>☐ Yes |
| Creditor's email address, if known | **Is anyone else liable on this claim?**<br>☑ No<br>☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H) |
| **Date debt was incurred**<br>**03/2011** | |
| **Last 4 digits of account number**<br>**3415** | |
| **Do multiple creditors have an interest in the same property?**<br>☑ No<br>☐ Yes. Specify each creditor, including this creditor and its relative priority. | **As of the petition filing date, the claim is:**<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☑ Disputed |

---

| 3. | Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any. | **$2,505,130.00** |
|---|---|---|

| **Part 2:** | **List Others to Be Notified for a Debt Already Listed in Part 1** |
|---|---|

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to be notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| **Casey Z. Donoyan, Esq.**<br>**Hemar, Rousso & Heald, LLP**<br>**15910 Ventura Blvd., 12th Floor**<br>**Encino, CA 91436** | Line **2.5** | |
| **US Small Business Administration**<br>**Office of the General Counsel**<br>**312 N. Spring Street, 5th Floor**<br>**Los Angeles, CA 90012** | Line **2.7** | |
| **William R. Edwards, Agent**<br>**8267 E. Merrywesther Lane**<br>**Anaheim, CA 92808** | Line **2.9** | |

Official Form 206D     Additional Page of **Schedule D: Creditors Who Have Claims Secured by Property**     page 4 of 5

EXHIBIT 3     PAGE 67

Debtor    **Hero Nutritionals, LLC**
                Name

Case number (if known)    **8:22-bk-11383-SC**

EXHIBIT 3    PAGE 68

# EXHIBIT 4

| Fill in this information to identify the case: | |
|---|---|
| Debtor 1 | HERO NUTRITIONALS, LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | CENTRAL    District of California (State) |
| Case number | 8:22-bk-11383-SC |

## Official Form 410

# Proof of Claim

04/16

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1:    Identify the Claim

| 1. Who is the current creditor? | McCORMICK 107, LLC |
|---|---|
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor |

| 2. Has this claim been acquired from someone else? | [X] No |
|---|---|
| | [ ] Yes. From whom? |

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Name  Hemar, Rousso & Heald, LLP  Attn: Jennifer Witherell Crastz | Name  McCormick 107, LLC  Attn: Timothy Cathey, Manager |
| 15910 Ventura Blvd., 12th Floor  Number    Street | 11350 McCormick Road, Suite 902  Number    Street |
| Encino    CA    91436  City    State    ZIP Code | Hunt Valley    MD    21031  City    State    ZIP Code |
| Contact phone  (818) 501-3800 | Contact phone  (410) 403-2069 |
| Contact email  jcrastz@hrhlaw.com | Contact email  tcathey@beltwaycapital.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

| 4. Does this claim amend one already filed? | [X] No  [ ] Yes.  Claim number on court claims registry (if known) _____    Filed on _____ MM / DD / YYYY |
|---|---|

| 5. Do you know if anyone else has filed a proof of claim for this claim? | [X] No  [ ] Yes.  Who made the earlier filing? _____ |
|---|---|

| Official Form 410 | Proof of Claim | page 1 |
|---|---|---|

B410

EXHIBIT 4    PAGE 69

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
| --- | --- |

**6. Do you have any number you use to identify the debtor?**

[ X ] No

[ ] Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**     $ 2,621,866.81 _____ . **Does this amount include interest or other charges?**

[ ] No

[ X ] Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

money loaned _____

**9. Is all or part of the claim secured?**

[ ] No

[ X ] Yes.   The claim is secured by a lien on property.

**Nature of property:**

[ ] Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

[ ] Motor vehicle

[ X ] Other. Describe:     debtor's business assets _____

**Basis for perfection:**     UCC-1 financing statement _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**     $ unknown _____

**Amount of the claim that is secured:**     $ 2,621,866.81 _____

**Amount of the claim that is unsecured:**     $ unknown _____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**     $ _____

**Annual Interest Rate** (when case was filed) _____ %

[ ] Fixed
[ ] Variable

**10. Is this claim based on a lease?**

[ X ] No

[ ] Yes. **Amount necessary to cure any default as of the date of the petition.**     $ _____

**11. Is this claim subject to a right of setoff?**

[ X ] No

[ ] Yes. Identify the property: _____

Official Form 410            **Proof of Claim**                                    page 2

EXHIBIT 4     PAGE 70

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

[X] No

[ ] Yes. *Check one:*

**Amount entitled to priority**

[ ] Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

$ _____

[ ] Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

$ _____

[ ] Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

$ _____

[ ] Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

$ _____

[ ] Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

$ _____

[ ] Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies.

$ _____

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:    Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

[ ] I am the creditor.

[X] I am the creditor's attorney or authorized agent.

[ ] I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

[ ] I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date 09/22/2022
                  MM / DD / YYYY

/s/ *Jennifer Witherell Crastz*
Signature

**Print the name of the person who is completing and signing this claim:**

Name        JENNIFER WITHERELL CRASTZ
            First name        Middle name              Last name

Title       Attorneys for creditor, McCormick 107, LLC

Company     HEMAR, ROUSSO & HEALD, LLP
            Identify the corporate servicer as the company if the authorized agent is a servicer.

Address     15910 Ventura Blvd., 12th Floor
            Number        Street

            Encino                              CA      91436
            City                                State   ZIP Code

Contact phone  (818) 501-3800                   Email   jcrastz@hrhlaw.com

EXHIBIT 4    PAGE 71

## SUMMARY OF PROOF OF CLAIM

In re: Hero Nutritionals, LLC ("Debtor")

Case No. 8:22-bk-11383-SC

McCormick 107, LLC ("Claimant") submits this summary of its claim in bankruptcy.

This case involves five commercial loans made by McCormick 107, LLC's predecessor-in-interest, to Debtor Hero Nutritionals, LLC.  Claimant contends that Debtor breached its contractual obligations by failing to pay all sums due and owing on the loans. Claimant contends that as a result of the aforementioned breaches, Debtor owes Claimant over $2.3 million dollars.

As of the Petition Date, Debtor was indebted to Claimant in the principal amount of $2,312,667.10, together with all accrued interest, late fees, costs and attorneys' fees (the "Prepetition Indebtedness").   By virtue of a first priority UCC-1, Claimant asserts a first priority lien on the Debtor's personal property along with the rents, issues and profits generated by same (the "Prepetition Collateral").   Claimant asserts that all of the Debtor's cash and proceeds generated by the Prepetition Collateral are "cash collateral" of Claimant within the meaning of Bankruptcy Code Section 363(a).

True and correct copies of the Loan Documents are attached hereto as **EXHIBITS 1 through 15**, and are incorporated herein by this reference as though set forth in full.

**EXHIBIT 1**    (collectively referred to as the "Loan 703 Documents"):
- Promissory Note dated October 15, 2013 for $2 million ("Note 703")
- Business Loan Agreement dated October 15, 2013 with the Rider thereto
- Business Loan Agreement dated January 15, 2015 with the Rider thereto;
- Bill of Sale and Assignment of Loan Documents (All rights, title and interest in the Loan 703 Documents were subsequently assigned by Pacific Premier Bank, successor-by-merger to Plaza Bank, successor-by-merger to Bank of Manhattan, N.A. to Plaintiff.
- Allonge to the 703 Note
- Multiple Change in Terms Agreements and Loan Modification Agreements

**EXHIBIT 2**
- Commercial Security Agreement dated October 15, 2013 re: Loan 703 Documents

**EXHIBIT 3**
- UCC Financing Statement

**EXHIBIT 4**    (collectively referred to as the "Loan 707 Documents"):
- Promissory Note dated February 25, 2014 (the "707 Note") for $463,009.10
- Allonge to 707 Note

**EXHIBIT 5**
- Commercial Security Agreement (re 707 Note), dated February 25, 2014

**EXHIBIT 6**
- UCC Financing Statement, and Continuation and Assignment thereof

**EXHIBIT 7**    (collectively referred to as the "Loan 706 Documents"):
- Promissory Note dated August 22, 2014 (the "706 Note") for $303,040.63
- Allonge to the 706 Note

EXHIBIT 4    PAGE 72

**EXHIBIT 8**
- Commercial Security Agreement dated August 22, 2014, HERO LLC (re 706 Note)

**EXHIBIT 9**
- UCC Financing Statement and Assignment thereof

**EXHIBIT 10** (collectively referred to as the "Loan 701 Documents"):
- Promissory Note dated October 29, 2014 (the "701 Note") for $833,950.27
- Allonge to the 701 Note

**EXHIBIT 11**
- Commercial Security Agreement (re 701 Note) dated October 29, 2014

**EXHIBIT 12**
- UCC Financing Statement and Assignment thereof

**EXHIBIT 13** (collectively referred to as the "Loan 705 Documents"):
- Promissory Note dated February 19, 2015 (the "705 Note") for $500,000.00
- Allonge to the 705 Note

**EXHIBIT 14**
- Commercial Security Agreement dated February 19, 2015 (re 705 Note)

**EXHIBIT 15**
- UCC Financing Statement, Continuation and Assignment thereof

The total amount due, owing and unpaid from Debtor to Claimant as of September 14, 2022 equals not less than **$2,621,866.81** consisting of principal, interest, and late fees of $2,366,999.88, plus legal fees of $254,866.93:

| | Hero Nutritionals LLC | | | | | | |
|---|---|---|---|---|---|---|---|
| | *Payoffs as of 09-14-22 at Default Rate* | | | | | | |
| Note Number | Principal | Interest | Total | Late Fees | Total w/LC | Per Diem | Legal Fees |
| 701 | $306,715.38 | $2,317.06 | $309,032.44 | $11,399.62 | $320,432.06 | $89.12 | $254,866.93 |
| 703 | $1,661,450.56 | $14,999.21 | $1,676,449.77 | $8,404.29 | $1,684,854.06 | $576.89 | |
| 705 | $201,718.27 | $1,509.30 | $203,227.57 | $6,810.74 | $210,038.31 | $58.05 | |
| 706 | $22,175.76 | $169.65 | $22,345.41 | $1,216.99 | $23,562.40 | $6.52 | |
| 707 | $120,607.22 | $931.16 | $121,538.38 | $6,574.67 | $128,113.05 | $35.81 | |
| TOTALS | $2,312,667.19 | $19,926.38 | $2,332,593.57 | $34,406.31 | $2,366,999.88 | $766.39 | |

Payoff statements and payment histories for each note as of 9/14/2022 are collectively attached hereto as **EXHIBIT 16.** The payment history is behind each payoff statement.

Interest, late charges and fees will continue to accrue so long as Debtor is in default, and claimant reserves the right to amend this proof of claim accordingly. All other rights, remedies, claims and defenses are expressly reserved, and nothing herein constitutes a waiver.

EXHIBIT 4    PAGE 73

# EXHIBIT 1

EXHIBIT 4    PAGE 74



BANK *of* MANHATTAN

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,000,000.00 | 10-15-2013 | 10-15-2014 | [redacted]1239 | | | DW | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Hero Nutritionals, LLC
991 Calle Negocio
San Clemente, CA 92673

**Lender:** Bank of Manhattan, N.A.
Pasadena Office
199 South Los Robles Avenue
Suite 130
Pasadena, CA 91101

**Principal Amount: $2,000,000.00** **Date of Note: October 15, 2013**

**PROMISE TO PAY. Hero Nutritionals, LLC ("Borrower") promises to pay to Bank of Manhattan, N.A. ("Lender"), or order, in lawful money of the United States of America, the principal amount of Two Million & 00/100 Dollars ($2,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.**

**PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on October 15, 2014. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning November 15, 2013, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; then to any unpaid collection costs; and then to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.**

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate, as published in the Western Edition of the Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 3.250% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 2.000 percentage points over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 5.250%. NOTICE: Under no circumstances will the interest rate on this Note be less than 5.250% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.**

**PREPAYMENT; MINIMUM INTEREST CHARGE.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a **minimum interest charge of $100.00.** Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Bank of Manhattan, N.A., 2700 East Foothill Boulevard, Suite 100 Pasadena, CA 91107.**

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged **6.000% of the unpaid portion of the regularly scheduled payment or $25.00, whichever is greater.**

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by adding an additional 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

Loan No: ●1239

**PROMISSORY NOTE**
**(Continued)**

Page 2

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER. To the extent permitted by applicable law, Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.**

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $20.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein: inventory, chattel paper, accounts, equipment and general intangibles described in a Commercial Security Agreement dated October 15, 2013.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. The following person or persons are authorized, except as provided in this paragraph, to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Jennifer L. Hodges, Manager/Member of Hero Nutritionals, LLC. Advances will be made in accordance with the Borrowing Base Certificate. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Bank of Manhattan, N.A., Pasadena Office, 199 South Los Robles Avenue, Suite 130, Pasadena, CA  91101.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

EXHIBIT 4    PAGE 76

Loan No: ███1239

**PROMISSORY NOTE
(Continued)**

Page 3

---

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

HERO NUTRITIONALS, LLC

By: _____
Jennifer L. Hodges, Manager/Member of Hero
Nutritionals, LLC

---

LASER PRO Lending, Ver. 13.2.39.010 Copr. Harland Financial Solutions, Inc. 1997, 2013.  All Rights Reserved.  - CA  C:\APPLICATIONS\HARLAND\CFI\LPL\D20.FC  TR-2109  PR-60

EXHIBIT 4    PAGE 77

BANK of MANHATTAN

# BUSINESS LOAN AGREEMENT (ASSET BASED)

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,000,000.00 | 10-15-2013 | 10-15-2014 | [redacted]1239 | | | DW | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Hero Nutritionals, LLC
991 Calle Negocio
San Clemente, CA 92673

**Lender:** Bank of Manhattan, N.A.
Pasadena Office
199 South Los Robles Avenue
Suite 130
Pasadena, CA 91101

**THIS BUSINESS LOAN AGREEMENT (ASSET BASED) dated October 15, 2013, is made and executed between Hero Nutritionals, LLC ("Borrower") and Bank of Manhattan, N.A. ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.**

**TERM.** This Agreement shall be effective as of October 15, 2013, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person or persons are authorized, except as provided in this paragraph, to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Jennifer L. Hodges, Manager/Member of Hero Nutritionals, LLC. Advances will be made in accordance with the Borrowing Base Certificate.**

**LINE OF CREDIT.** Lender agrees to make Advances to Borrower from time to time from the date of this Agreement to the Expiration Date, provided the aggregate amount of such Advances outstanding at any time does not exceed the Borrowing Base. Within the foregoing limits, Borrower may borrow, partially or wholly prepay, and reborrow under this Agreement as follows:

**Conditions Precedent to Each Advance.** Lender's obligation to make any Advance to or for the account of Borrower under this Agreement is subject to the following conditions precedent, with all documents, instruments, opinions, reports, and other items required under this Agreement to be in form and substance satisfactory to Lender:

(1) Lender shall have received evidence that this Agreement and all Related Documents have been duly authorized, executed, and delivered by Borrower to Lender.

(2) Lender shall have received such opinions of counsel, supplemental opinions, and documents as Lender may request.

(3) The security interests in the Collateral shall have been duly authorized, created, and perfected with first lien priority and shall be in full force and effect.

(4) All guaranties required by Lender for the credit facility(ies) shall have been executed by each Guarantor, delivered to Lender, and be in full force and effect.

(5) Lender, at its option and for its sole benefit, shall have conducted an audit of Borrower's Accounts, books, records, and operations, and Lender shall be satisfied as to their condition.

(6) Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

(7) There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement, and Borrower shall have delivered to Lender the compliance certificate called for in the paragraph below titled "Compliance Certificate."

**Making Loan Advances.** Advances under this credit facility, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by authorized persons. Lender may, but need not, require that all oral requests be confirmed in writing. Each Advance shall be conclusively deemed to have been made at the request of and for the benefit of Borrower (1) when credited to any deposit account of Borrower maintained with Lender or (2) when advanced in accordance with the instructions of an authorized person. Lender, at its option, may set a cutoff time, after which all requests for Advances will be treated as having been requested on the next succeeding Business Day.

**Mandatory Loan Repayments.** If at any time the aggregate principal amount of the outstanding Advances shall exceed the applicable Borrowing Base, Borrower, immediately upon written or oral notice from Lender, shall pay to Lender an amount equal to the difference between the outstanding principal balance of the Advances and the Borrowing Base. On the Expiration Date, Borrower shall pay to Lender in full the aggregate unpaid principal amount of all Advances then outstanding and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, not yet paid.

**Loan Account.** Lender shall maintain on its books a record of account in which Lender shall make entries for each Advance and such other debits and credits as shall be appropriate in connection with the credit facility. Lender shall provide Borrower with periodic statements of Borrower's account, which statements shall be considered to be correct and conclusively binding on Borrower unless Borrower notifies Lender to the contrary within thirty (30) days after Borrower's receipt of any such statement which Borrower deems to be incorrect.

**COLLATERAL.** To secure payment of the Primary Credit Facility and performance of all other Loans, obligations and duties owed by Borrower to Lender, Borrower (and others, if required) shall grant to Lender Security Interests in such property and assets as Lender may require. Lender's Security Interests in the Collateral shall be continuing liens and shall include the proceeds and products of the Collateral, including without limitation the proceeds of any insurance. With respect to the Collateral, Borrower agrees and represents and warrants to Lender:

**Perfection of Security Interests.** Borrower agrees to execute all documents perfecting Lender's Security Interest and to take whatever actions are requested by Lender to perfect and continue Lender's Security Interests in the Collateral. Upon request of Lender, Borrower will

## BUSINESS LOAN AGREEMENT (ASSET BASED)

Loan No: ▮1239                       (Continued)                                      Page 2

deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. Contemporaneous with the execution of this Agreement, Borrower will execute one or more UCC financing statements and any similar statements as may be required by applicable law, and Lender will file such financing statements and all such similar statements in the appropriate location or locations. Borrower hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue any Security Interest. Lender may at any time, and without further authorization from Borrower, file a carbon, photograph, facsimile, or other reproduction of any financing statement for use as a financing statement. Borrower will reimburse Lender for all expenses for the perfection, termination, and the continuation of the perfection of Lender's security interest in the Collateral. Borrower promptly will notify Lender before any change in Borrower's name including any change to the assumed business names of Borrower. Borrower also promptly will notify Lender before any change in Borrower's Social Security Number or Employer Identification Number. Borrower further agrees to notify Lender in writing prior to any change in address or location of Borrower's principal governance office or should Borrower merge or consolidate with any other entity.

**Collateral Records.** Borrower does now, and at all times hereafter shall, keep correct and accurate records of the Collateral, all of which records shall be available to Lender or Lender's representative upon demand for inspection and copying at any reasonable time. With respect to the Accounts, Borrower agrees to keep and maintain such records as Lender may require, including without limitation information concerning Eligible Accounts and Account balances and agings. Records related to Accounts (Receivables) are or will be located at 991 Cal Negocio, San Clemente, CA 92673. The above is an accurate and complete list of all locations at which Borrower keeps or maintains business records concerning Borrower's collateral.

**Collateral Schedules.** Concurrently with the execution and delivery of this Agreement, Borrower shall execute and deliver to Lender schedules of Accounts and schedules of Eligible Accounts in form and substance satisfactory to the Lender. Thereafter supplemental schedules shall be delivered according to the following schedule: With respect to Eligible Accounts, schedules shall be delivered monthly within fifteen (15) days after the end of each month.

**Representations and Warranties Concerning Accounts.** With respect to the Accounts, Borrower represents and warrants to Lender: (1) Each Account represented by Borrower to be an Eligible Account for purposes of this Agreement conforms to the requirements of the definition of an Eligible Account; (2) All Account information listed on schedules delivered to Lender will be true and correct, subject to immaterial variance; and (3) Lender, its assigns, or agents shall have the right at any time and at Borrower's expense to inspect, examine, and audit Borrower's records and to confirm with Account Debtors the accuracy of such Accounts.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Fees and Expenses Under This Agreement.** Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 991 Calle Negocio, San Clemente, CA 92673. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business:  **None.**

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of organization or membership agreements, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

EXHIBIT 4    PAGE 79

## BUSINESS LOAN AGREEMENT (ASSET BASED)
**(Continued)**

Loan No: █1239

Page 3

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

    **Interim Statements.** As soon as available, but in no event later than thirty (30) days after the end of each month, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower.

    **Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Borrower's Federal and other governmental tax returns, prepared by Borrower.

    **Additional Requirements.**

    **Annual Statements.** As soon as available, but in no event later than ninety (90) days after the end of each year, Hero Nutritional, LLC and Hero Nutritionals, Inc. to provide CPA reviewed and consolidated financial statements.

    **Tax Return Schedules.** Tax returns shall include all K-1s and applicable schedules.

    **Tax Return Extension.** In the event an extension for filing tax returns is filed, Borrower will provide copy of extension within thirty (30) days of such filing.

    **Agings.** As soon as available, but in no event later than fifteen (15) days after the end of each month, Borrower's borrowing base certificates, accounts receivable, accounts payable agings, inventory reports, work in process and related reports, which Lender may reasonably require.

    **Audits.** Without in any way limiting Lender's rights under any other provision of this Agreement, Lender shall be entitled to conduct semi-annual audits of Borrower's books during the Borrower's normal business hours. The costs and expenses incurred by Lender in connection with such audits shall be charged to Borrower. Lender will invoice Borrower for such costs and expenses and Borrower shall pay Lender the full amount of such costs and expenses within ten (10) days from the date of invoice

    **Guarantor Financial Requirements:** Furnish Lender with the following:

    **Annual Statements.** As soon as available, but in no event later than one hundred twenty (120) days after the end of each year, Jennifer Hodges to provide financial statement.

EXHIBIT 4    PAGE 80

## BUSINESS LOAN AGREEMENT (ASSET BASED)
Loan No: ●1239    (Continued)    Page 4

**Guarantor Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by Guarantor. Tax returns shall include all K-1s and applicable schedules.

**Guarantor Tax Return Extension.** In the event an extension for filing tax returns is filed, Guarantor will provide copy of extension within thirty (30) days of such filing.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Financial Covenants and Ratios.** Comply with the following covenants and ratios:

**Minimum Income and Cash flow Requirements.** Maintain not less than the following Minimum Net Income level:

**Debt Service Coverage.** Maintain a minimum Debt Service Coverage Ratio of **1.250 to 1.000** on a rolling four (4) quarter basis. The term "Debt Service Coverage Ratio" means Borrower's earnings before income tax plus depreciation and amortization and annual debt payments. The line of credit debt payments will be assumed to be interest only, the term debt will be based on actual debt payments to be tested quarterly.

**Global Debt Service Coverage Requirement.** Borrower and Guarantors to maintain a minimum global Debt Service Coverage of **1.25 to 1.00** to be tested annually. The term "Debt Service Coverage Ratio" is defined as global cash income divided by global annual debt service for the borrower and guarantors. Other Cash Flow requirements are as follows:

**Profitability.** Borrower cannot show two consecutive quarters of an operating loss.

**Tangible Net Worth Requirements.** Other Net Worth requirements are as follows: **Debt to Net Worth Ratio** shall be calculated on a consolidated basis. In addition, Borrower shall comply with the following net worth ratio requirements:

**Debt / Worth Ratio.** Maintain a ratio of Debt / Worth not in excess of **3.000 to 1.000**. The ratio "Debt / Worth" means Borrower's Total Liabilities divided by Borrower's Tangible Net Worth. This leverage ratio will be evaluated as of quarter-end.

**Additional Requirements.**

**Banking Relationship.** Borrower and Guarantors shall maintain a banking relationship with Lender during the term of the Loan.

Except as provided above, all computations made to determine compliance with the requirements contained in this paragraph shall be made in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least twenty-one (21) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
| --- | --- |
| Hero Nutritionals, Inc. | Unlimited |
| Jennifer L. Hodges | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

EXHIBIT 4    PAGE 81

## BUSINESS LOAN AGREEMENT (ASSET BASED)
**Loan No:** 1239                    **(Continued)**                                     **Page 5**

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender at least annually, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will  (A)  be payable on demand;  (B)  be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Additional Financial Restrictions.** Lend funds to affiliates or owners during the term of the loan with Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if:  (A)  Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender;  (B)  Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt;  (C)  there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or  (D)  any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or  (E)  Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement

EXHIBIT 4    PAGE 82

## BUSINESS LOAN AGREEMENT (ASSET BASED)

Loan No: ●●1239                              (Continued)                              Page 6

---

or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.**  Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.**  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.**  The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.**  This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.**  Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.  However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.**  Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.**  A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.**  Lender in good faith believes itself insecure.

**Right to Cure.**  If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default:  (1)  cure the default within fifteen (15) days; or  (2)  if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.**  If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), at, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional.  In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise.  Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently.  Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**RIDER TO BUSINESS LOAN AGREEMENT.**  An exhibit, titled "Rider To Business Loan Agreement," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

**MISCELLANEOUS PROVISIONS.**  The following miscellaneous provisions are a part of this Agreement:

**Amendments.**  This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement.  No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.**  Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement.  Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement.  Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.  Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.**  Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.**  Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender.  Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters.  Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests.  Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests.  Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan.  Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.**  This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the

EXHIBIT 4     PAGE 83

| | BUSINESS LOAN AGREEMENT (ASSET BASED) | |
|---|---|---|
| Loan No: 1239 | (Continued) | Page 7 |

laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Account.** The word "Account" means a trade account, account receivable, other receivable, or other right to payment for goods sold or services rendered owing to Borrower (or to a third party grantor acceptable to Lender).

**Account Debtor.** The words "Account Debtor" mean the person or entity obligated upon an Account.

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement (Asset Based), as this Business Loan Agreement (Asset Based) may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement (Asset Based) from time to time.

**Borrower.** The word "Borrower" means Hero Nutritionals, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Borrowing Base.** The words "Borrowing Base" mean as determined by Lender from time to time, the lesser of (1) **$2,000,000.00** or (2) the sum of (a) **80.000%** of the aggregate amount of Eligible Accounts (not to exceed **$2,000,000.00**), plus (b) **75.00%** of the CalCap Collateral Support Account (not to exceed **$750,000.00**) less (c) Dilution Reserve as recommended by Collateral Auditor

**Business Day.** The words "Business Day" mean a day on which commercial banks are open in the State of California.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise. The word Collateral also includes without limitation all collateral described in the Collateral section of this Agreement.

**Eligible Accounts.** The words "Eligible Accounts" mean at any time, all of Borrower's Accounts which contain selling terms and conditions

EXHIBIT 4    PAGE 84

Case 8:22-bk-11383-SC   Doc 43   Filed 10/05/22   Entered 10/05/22 18:29:04   Desc
Main Document    Page 94 of 358

Case 8:22-bk-11383-SC   Claim 9-1   Filed 09/27/22   Desc Main Document   Page 17
of 225
.

## BUSINESS LOAN AGREEMENT (ASSET BASED)

Loan No: ⬤1239                                     (Continued)                                              Page 8

acceptable to Lender.  The net amount of any Eligible Account against which Borrower may borrow shall exclude all returns, discounts, credits, and offsets of any nature.  Unless otherwise agreed to by Lender in writing, Eligible Accounts do not include:

(1)  Accounts with respect to which the Account Debtor is a member, employee or agent of Borrower.

(2)  Accounts with respect to which the Account Debtor is affiliated with  Borrower.

(3)  Accounts with respect to which goods are placed on consignment, guaranteed sale, or other terms by reason of which the payment by the Account Debtor may be conditional.

(4)  Accounts with respect to which the Account Debtor is not a resident of the United States, except to the extent such Accounts are supported by insurance, bonds or other assurances satisfactory to Lender.

(5)  Accounts with respect to which Borrower is or may become liable to the Account Debtor for goods sold or services rendered by the Account Debtor to Borrower.

(6)  Accounts which are subject to dispute, counterclaim, or setoff.

(7)  Accounts with respect to which the goods have not been shipped or delivered, or the services have not been rendered, to the Account Debtor.

(8)  Accounts with respect to which Lender, in its sole discretion, deems the creditworthiness or financial condition of the Account Debtor to be unsatisfactory.

(9)  Accounts of any Account Debtor who has filed or has had filed against it a petition in bankruptcy or an application for relief under any provision of any state or federal bankruptcy, insolvency, or debtor-in-relief acts; or who has had appointed a trustee, custodian, or receiver for the assets of such Account Debtor; or who has made an assignment for the benefit of creditors or has become insolvent or fails generally to pay its debts (including its payrolls) as such debts become due.

(10)  Accounts with respect to which the Account Debtor is the United States government or any department or agency of the United States.

(11)  Accounts which have not been paid in full within **90 days** from the invoice date.  The entire balance of any Account of any single Account Debtor will be ineligible whenever the portion of the Account which has not been paid within **90 days** from the invoice date is in excess of **25.000%** of the total amount outstanding on the Account.

(12)  That potion of the Accounts of CVS which exceeds **50.000%** of all of Borrower's Accounts, that portion of the Accounts of United Natural Foods which exceeds **35.00%** of all of Borrower's Accounts, and that potion of the Accounts of any other single Account Debtor which exceeds **25.000%** of all of Borrower's Accounts.

**Environmental Laws.**  The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.**  The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Expiration Date.**  The words "Expiration Date" mean the date of termination of Lender's commitment to lend under this Agreement.

**GAAP.**  The word "GAAP" means generally accepted accounting principles.

**Grantor.**  The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.**  The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.**  The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.**  The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled.  The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws.  The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.**  The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.**  The word "Lender" means Bank of Manhattan, N.A., its successors and assigns.

**Loan.**  The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.**  The word "Note" means the Note dated October 15, 2013 and executed by Hero Nutritionals, LLC in the principal amount of $2,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.**  The words "Permitted Liens" mean  (1)  liens and security interests securing Indebtedness owed by Borrower to Lender; (2)  liens for taxes, assessments, or similar charges either not yet due or being contested in good faith;  (3)  liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent;  (4)  purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens";  (5)  liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and  (6)  those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

EXHIBIT 4     PAGE 85

## BUSINESS LOAN AGREEMENT (ASSET BASED)
Loan No: ▮1239                          (Continued)                                    Page 9

**Primary Credit Facility.** The words "Primary Credit Facility" mean the credit facility described in the Line of Credit section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**Tangible Net Worth.** The words "Tangible Net Worth" mean Borrower's total assets excluding all intangible assets (i.e., goodwill, trademarks, patents, copyrights, organizational expenses, and similar intangible items, but including leaseholds and leasehold improvements) less total debt.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT (ASSET BASED) AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT (ASSET BASED) IS DATED OCTOBER 15, 2013.

BORROWER:

HERO NUTRITIONALS, LLC

By: _____
    Jennifer L. Hodges, Manager/Member of Hero
    Nutritionals, LLC

LENDER:

BANK OF MANHATTAN, N.A.

By: _____
    Authorized Signer

LASER PRO Lending, Ver. 13.2.20.010  Copr. Harland Financial Solutions, Inc. 1997, 2013.  All Rights Reserved.  - CA  C:\APPLICATIONS\HARLAND\CFI\LPL\C40.FC  TR-2106  PR-60

EXHIBIT 4    PAGE 86

## RIDER TO BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,000,000.00 | 10-15-2013 | 10-15-2014 | ▮1239 | | | DW | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

| | | |
|---|---|---|
| **Borrower:** | Hero Nutritionals, LLC<br>991 Calle Negocio<br>San Clemente, CA 92673 | **Lender:** Bank of Manhattan, N.A.<br>Pasadena Office<br>199 South Los Robles Avenue<br>Suite 130<br>Pasadena, CA 91101 |

This RIDER TO BUSINESS LOAN AGREEMENT is attached to and by this reference is made a part of the Business Loan Agreement (Asset Based), dated October 15, 2013, and executed in connection with a loan or other financial accommodations between BANK OF MANHATTAN, N.A. and Hero Nutritionals, LLC.

**Failure to Provide Required Financial Information.** Borrower agrees to provide information as requested in the Business Loan Agreement or within forty-five (45) days of the written request of the Lender to permit the Lender, in the Lender's sole and absolute judgment, to verify the Minimum Debt Coverage Ratio as defined in the Business Loan Agreement. The Ratio Information must include, but is not limited to, those required financial items as listed in the Business Loan Agreement. Failure to provide the foregoing required information will result in the Margin, Floor and/or Fixed Note Rate being increased one hundred basis points of a percentage point (1.000%), effective on the 1st of the month following Borrower's failure to provide the required information by the required date. The increase is referred to hereafter as the "Rate Increase". A Rate Increase will only occur once unless a subsequent adjustment as described below occurs, and thereafter the Borrower again fails to comply with this requirement. Upon receipt by the Lender of the required information after a Rate Increase, the Margin, Floor and/or Fixed Note Rate will be reduced to the original Margin, Floor and/or Fixed Note Rate. This reduction will be effective on the 1st day of the calendar month following the later of (i) ninety (90) days after the Rate Increase, or (ii) the 1st day of the month occurring thirty (30) days after the receipt of the required information. However, in no event will the monthly payment amount be adjusted other than on a regular Payment Change Date, as defined in the Note.

**Effect of Rider.** Except as modified by this Rider, the provisions of the Note and Business Loan Agreement shall remain unchanged.

THIS RIDER TO BUSINESS LOAN AGREEMENT IS EXECUTED ON OCTOBER 15, 2013.

BORROWER:

HERO NUTRITIONALS, LLC

By: _____
Jennifer L. Hodges, Manager/Member of Hero
Nutritionals, LLC

LENDER:

BANK OF MANHATTAN, N.A.

By: _____
Authorized Signer

LASER PRO Lending, Ver. 13.2.20.010  Copr. Harland Financial Solutions, Inc. 1997, 2013.   All Rights Reserved.   - CA  C:\APPLICATIONS\HARLAND\CFI\LPL\C40.FC  TR-2159  PR-66

EXHIBIT 4    PAGE 87

# BUSINESS LOAN AGREEMENT (ASSET BASED)

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,000,000.00 | 01-15-2015 | 05-31-2015 | [redacted]1239 | | | DW | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Hero Nutritionals, LLC
1900 Carnegie Avenue, Building A
Santa Ana, CA 92705

**Lender:** Bank of Manhattan, N.A.
Pasadena Office
199 South Los Robles Avenue
Suite 130
Pasadena, CA 91101

**THIS BUSINESS LOAN AGREEMENT (ASSET BASED) dated January 15, 2015, is made and executed between Hero Nutritionals, LLC ("Borrower") and Bank of Manhattan, N.A. ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.**

**TERM.** This Agreement shall be effective as of January 15, 2015, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person or persons are authorized, except as provided in this paragraph, to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Jennifer L. Hodges, Manager/Member of Hero Nutritionals, LLC. Advances will be made in accordance with the Borrowing Base Certificate.**

**LINE OF CREDIT.** Lender agrees to make Advances to Borrower from time to time from the date of this Agreement to the Expiration Date, provided the aggregate amount of such Advances outstanding at any time does not exceed the Borrowing Base. Within the foregoing limits, Borrower may borrow, partially or wholly prepay, and reborrow under this Agreement as follows:

**Conditions Precedent to Each Advance.** Lender's obligation to make any Advance to or for the account of Borrower under this Agreement is subject to the following conditions precedent, with all documents, instruments, opinions, reports, and other items required under this Agreement to be in form and substance satisfactory to Lender:

(1) Lender shall have received evidence that this Agreement and all Related Documents have been duly authorized, executed, and delivered by Borrower to Lender.

(2) Lender shall have received such opinions of counsel, supplemental opinions, and documents as Lender may request.

(3) The security interests in the Collateral shall have been duly authorized, created, and perfected with first lien priority and shall be in full force and effect.

(4) All guaranties required by Lender for the credit facility(ies) shall have been executed by each Guarantor, delivered to Lender, and be in full force and effect.

(5) Lender, at its option and for its sole benefit, shall have conducted an audit of Borrower's Accounts, Inventory, books, records, and operations, and Lender shall be satisfied as to their condition.

(6) Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

(7) There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement, and Borrower shall have delivered to Lender the compliance certificate called for in the paragraph below titled "Compliance Certificate."

**Making Loan Advances.** Advances under this credit facility, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by authorized persons. Lender may, but need not, require that all oral requests be confirmed in writing. Each Advance shall be conclusively deemed to have been made at the request of and for the benefit of Borrower (1) when credited to any deposit account of Borrower maintained with Lender or (2) when advanced in accordance with the instructions of an authorized person. Lender, at its option, may set a cutoff time, after which all requests for Advances will be treated as having been requested on the next succeeding Business Day.

**Mandatory Loan Repayments.** If at any time the aggregate principal amount of the outstanding Advances shall exceed the applicable Borrowing Base, Borrower, immediately upon written or oral notice from Lender, shall pay to Lender an amount equal to the difference between the outstanding principal balance of the Advances and the Borrowing Base. On the Expiration Date, Borrower shall pay to Lender in full the aggregate unpaid principal amount of all Advances then outstanding and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, not yet paid.

**Loan Account.** Lender shall maintain on its books a record of account in which Lender shall make entries for each Advance and such other debits and credits as shall be appropriate in connection with the credit facility. Lender shall provide Borrower with periodic statements of Borrower's account, which statements shall be considered to be correct and conclusively binding on Borrower unless Borrower notifies Lender to the contrary within thirty (30) days after Borrower's receipt of any such statement which Borrower deems to be incorrect.

**COLLATERAL.** To secure payment of the Primary Credit Facility and performance of all other Loans, obligations and duties owed by Borrower to Lender, Borrower (and others, if required) shall grant to Lender Security Interests in such property and assets as Lender may require. Lender's Security Interests in the Collateral shall be continuing liens and shall include the proceeds and products of the Collateral, including without limitation the proceeds of any insurance. With respect to the Collateral, Borrower agrees and represents and warrants to Lender:

**Perfection of Security Interests.** Borrower agrees to execute all documents perfecting Lender's Security Interest and to take whatever actions are requested by Lender to perfect and continue Lender's Security Interests in the Collateral. Upon request of Lender, Borrower will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. Contemporaneous with the execution of this Agreement, Borrower will execute one or more UCC financing statements and any similar statements as may be required by applicable law, and Lender will file such financing statements and all such similar statements in the appropriate location or locations. Borrower hereby

## BUSINESS LOAN AGREEMENT (ASSET BASED)
### (Continued)

Loan No: ●1239                                                                                                Page 2

---

appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue any Security Interest. Lender may at any time, and without further authorization from Borrower, file a carbon, photograph, facsimile, or other reproduction of any financing statement for use as a financing statement. Borrower will reimburse Lender for all expenses for the perfection, termination, and the continuation of the perfection of Lender's security interest in the Collateral. Borrower promptly will notify Lender before any change in Borrower's name including any change to the assumed business names of Borrower. Borrower also promptly will notify Lender before any change in Borrower's Social Security Number or Employer Identification Number. Borrower further agrees to notify Lender in writing prior to any change in address or location of Borrower's principal governance office or should Borrower merge or consolidate with any other entity.

**Collateral Records.** Borrower does now, and at all times hereafter shall, keep correct and accurate records of the Collateral, all of which records shall be available to Lender or Lender's representative upon demand for inspection and copying at any reasonable time. With respect to the Accounts, Borrower agrees to keep and maintain such records as Lender may require, including without limitation information concerning Eligible Accounts and Account balances and agings. Records related to Accounts (Receivables) are or will be located at 1900 Carnegie Avenue, Building A, Santa Ana, CA 92705. With respect to the Inventory, Borrower agrees to keep and maintain such records as Lender may require, including without limitation concerning Eligible Inventory and records itemizing and describing the kind, type, quality, and quantity of Inventory, Borrower's Inventory costs and selling prices, and the daily withdrawals and additions to Inventory. Records related to Inventory are or will be located at 1900 Carnegie Avenue, Building A, Santa Ana, CA 92705. The above is an accurate and complete list of all locations at which Borrower keeps or maintains business records concerning Borrower's collateral.

**Collateral Schedules.** Concurrently with the execution and delivery of this Agreement, Borrower shall execute and deliver to Lender schedules of Accounts and Inventory and schedules of Eligible Accounts and Eligible Inventory in form and substance satisfactory to the Lender. Thereafter supplemental schedules shall be delivered according to the following schedule: With respect to Eligible Accounts, schedules shall be delivered monthly within fifteen (15) days after the end of each month.

**Representations and Warranties Concerning Accounts.** With respect to the Accounts, Borrower represents and warrants to Lender: (1) Each Account represented by Borrower to be an Eligible Account for purposes of this Agreement conforms to the requirements of the definition of an Eligible Account; (2) All Account information listed on schedules delivered to Lender will be true and correct, subject to immaterial variance; and (3) Lender, its assigns, or agents shall have the right at any time and at Borrower's expense to inspect, examine, and audit Borrower's records and to confirm with Account Debtors the accuracy of such Accounts.

**Representations and Warranties Concerning Inventory.** With respect to the Inventory, Borrower represents and warrants to Lender: (1) All Inventory represented by Borrower to be Eligible Inventory for purposes of this Agreement conforms to the requirements of the definition of Eligible Inventory; (2) All Inventory values listed on schedules delivered to Lender will be true and correct, subject to immaterial variance; (3) The value of the Inventory will be determined on a consistent accounting basis; (4) Except as agreed to the contrary by Lender in writing, all Eligible Inventory is now and at all times hereafter will be in Borrower's physical possession and shall not be held by others on consignment, sale on approval, or sale or return; (5) Except as reflected in the Inventory schedules delivered to Lender, all Eligible Inventory is now and at all times hereafter will be of good and merchantable quality, free from defects; (6) Eligible Inventory is not now and will not at any time hereafter be stored with a bailee, warehouseman, or similar party without Lender's prior written consent, and, in such event, Borrower will concurrently at the time of bailment cause any such bailee, warehouseman, or similar party to issue and deliver to Lender, in form acceptable to Lender, warehouse receipts in Lender name evidencing the storage of Inventory; and (7) Lender, its assigns, or agents shall have the right at any time and at Borrower's expense to inspect and examine the Inventory and to check and test the same as to quality, quantity, value, and condition.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Fees and Expenses Under This Agreement.** Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 1900 Carnegie Avenue, Building A, Santa Ana, CA 92705. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

EXHIBIT 4     PAGE 89

## BUSINESS LOAN AGREEMENT (ASSET BASED)
### (Continued)

Loan No: ●1239

Page 3

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of organization or membership agreements, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Interim Statements.** As soon as available, but in no event later than thirty (30) days after the end of each month, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower.

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Borrower's Federal and other governmental tax returns, prepared by Borrower.

**Additional Requirements.**

**Annual Statements.** As soon as available, but in no event later than ninety (90) days after the end of each year, Hero Nutritional, LLC and Hero Nutritionals, Inc. to provide CPA reviewed and consolidated financial statements.

**Tax Return Schedules.** Tax returns shall include all K-1s and applicable schedules.

**Tax Return Extension.** In the event an extension for filing tax returns is filed, Borrower will provide copy of extension within thirty (30) days of such filing.

EXHIBIT 4   PAGE 90

## BUSINESS LOAN AGREEMENT (ASSET BASED)
(Continued)

Loan No: 1239

Page 4

**Agings.** As soon as available, but in no event later than fifteen (15) days after the end of each month, Borrower's borrowing base certificates, accounts receivable, accounts payable agings, inventory reports, work in process and related reports, which Lender may reasonably require.

**Audits and Inspections.** Without in any way limiting Lender's rights under any other provision of this Agreement, Lender shall be entitled to conduct semi-annual audits of Borrower's books and inventory during the Borrower's normal business hours. The costs and expenses incurred by Lender in connection with such audits and inspections shall be charged to Borrower. Lender will invoice Borrower for such costs and expenses and Borrower shall pay Lender the full amount of such costs and expenses within ten (10) days from the date of invoice

**Guarantor Financial Requirements:** Furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than one hundred twenty (120) days after the end of each year, individual Guarantor to provide financial statement.

**Guarantor Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by Guarantor. Tax returns shall include all K-1s and applicable schedules.

**Guarantor Tax Return Extension.** In the event an extension for filing tax returns is filed, Guarantor will provide copy of extension within thirty (30) days of such filing.

**Sale of San Clemente Property.** Individual Guarantor acknowledges and agrees the net proceeds from the sale of the property at 991 Calle Negocio, San Clemente, CA 92673 once sold will be kept available for use by Borrower.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Financial Covenants and Ratios.** Comply with the following covenants and ratios:

**Minimum Income and Cash flow Requirements.** Maintain not less than the following Minimum Net Income level:

**Debt Service Coverage.** Maintain a minimum Debt Service Coverage Ratio of **1.250 to 1.000** on a rolling four (4) quarter basis. The term "Debt Service Coverage Ratio" means Borrower's earnings before income tax plus depreciation and amortization and annual debt payments. The line of credit debt payments will be assumed to be interest only, the term debt will be based on actual debt payments to be tested quarterly.

**Global Debt Service Coverage Requirement.** Borrower and Guarantors to maintain a minimum global Debt Service Coverage of **1.25 to 1.00** to be tested annually. The term "Debt Service Coverage Ratio" is defined as global cash income divided by global annual debt service for the borrower and guarantors. Other Cash Flow requirements are as follows:

**Profitability.** Borrower cannot show two consecutive quarters of an operating loss.

**Tangible Net Worth Requirements.** Other Net Worth requirements are as follows: **Debt to Net Worth Ratio** shall be calculated on a consolidated basis. In addition, Borrower shall comply with the following net worth ratio requirements:

**Debt / Worth Ratio.** Maintain a ratio of Debt / Worth not in excess of **3.000 to 1.000**. The ratio "Debt / Worth" means Borrower's Total Liabilities divided by Borrower's Tangible Net Worth. This leverage ratio will be evaluated as of quarter-end.

**Additional Requirements.**

**Banking Relationship.** Borrower and Guarantors shall maintain a banking relationship with Lender during the term of the Loan.

Except as provided above, all computations made to determine compliance with the requirements contained in this paragraph shall be made in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least twenty-one (21) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Hero Nutritionals, Inc. | Unlimited |
| Jennifer L. Hodges | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's

EXHIBIT 4      PAGE 91

**BUSINESS LOAN AGREEMENT (ASSET BASED)**
**(Continued)**

Loan No: 239

Page 5

properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender at least annually, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Additional Financial Restrictions.** Lend funds to affiliates or owners during the term of the loan with Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with

EXHIBIT 4     PAGE 92

## BUSINESS LOAN AGREEMENT (ASSET BASED)
(Continued)

Loan No: ___1239

Page 6

Lender;  (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt;  (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or  (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or  (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.**  To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account).  This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future.  However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law.  Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.**  Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.**  Borrower fails to make any payment when due under the Loan.

**Other Defaults.**  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.**  Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.**  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.**  The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.**  This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.**  Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan.  This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.  However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.**  Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.**  A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.**  Lender in good faith believes itself insecure.

**Right to Cure.**  If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.**  If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional.  In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise.  Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently.  Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**RIDER TO BUSINESS LOAN AGREEMENT.**  An exhibit, titled "Rider To Business Loan Agreement," is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

**MISCELLANEOUS PROVISIONS.**  The following miscellaneous provisions are a part of this Agreement:

**Amendments.**  This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement.  No alteration or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.**  Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement.  Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement.  Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.  Borrower also shall pay all court costs and such additional fees as may be directed by the court.

EXHIBIT 4     PAGE 93

## BUSINESS LOAN AGREEMENT (ASSET BASED)
(Continued)

Loan No: ●●1239                                                                                                          Page 7

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Account.** The word "Account" means a trade account, account receivable, other receivable, or other right to payment for goods sold or services rendered owing to Borrower (or to a third party grantor acceptable to Lender).

**Account Debtor.** The words "Account Debtor" mean the person or entity obligated upon an Account.

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement (Asset Based), as this Business Loan Agreement (Asset Based) may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement (Asset

EXHIBIT 4     PAGE 94

**BUSINESS LOAN AGREEMENT (ASSET BASED)**
**(Continued)**

Loan No: ⬛1239

Page 8

Based) from time to time.

**Borrower.** The word "Borrower" means Hero Nutritionals, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Borrowing Base.** The words "Borrowing Base" mean as determined by Lender from time to time, the lesser of (1) **$2,000,060.00** or (2) the sum of (a) **80.000%** of the aggregate amount of Eligible Accounts (not to exceed **$2,000,000.00**, plus (b) **25.000%** of the aggregate amount of Eligible Inventory (not to exceed **$500,000.00**) plus (b) **75.00%** of the balance of the CalCap Collateral Support Account (not to exceed **$750,000.00**) less (c) Dilution Reserve as recommended by Collateral Auditor

**Business Day.** The words "Business Day" mean a day on which commercial banks are open in the State of California.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise. The word Collateral also includes without limitation all collateral described in the Collateral section of this Agreement.

**Eligible Accounts.** The words "Eligible Accounts" mean at any time, all of Borrower's Accounts which contain selling terms and conditions acceptable to Lender. The net amount of any Eligible Account against which Borrower may borrow shall exclude all returns, discounts, credits, and offsets of any nature. Unless otherwise agreed to by Lender in writing, Eligible Accounts do not include:

(1) Accounts with respect to which the Account Debtor is a member, employee or agent of Borrower.

(2) Accounts with respect to which the Account Debtor is affiliated with Borrower.

(3) Accounts with respect to which goods are placed on consignment, guaranteed sale, or other terms by reason of which the payment by the Account Debtor may be conditional.

(4) Accounts with respect to which the Account Debtor is not a resident of the United States, except to the extent such Accounts are supported by insurance, bonds or other assurances satisfactory to Lender.

(5) Accounts with respect to which Borrower is or may become liable to the Account Debtor for goods sold or services rendered by the Account Debtor to Borrower.

(6) Accounts which are subject to dispute, counterclaim, or setoff.

(7) Accounts with respect to which the goods have not been shipped or delivered, or the services have not been rendered, to the Account Debtor.

(8) Accounts with respect to which Lender, in its sole discretion, deems the creditworthiness or financial condition of the Account Debtor to be unsatisfactory.

(9) Accounts of any Account Debtor who has filed or has had filed against it a petition in bankruptcy or an application for relief under any provision of any state or federal bankruptcy, insolvency, or debtor-in-relief acts; or who has had appointed a trustee, custodian, or receiver for the assets of such Account Debtor; or who has made an assignment for the benefit of creditors or has become insolvent or fails generally to pay its debts (including its payrolls) as such debts become due.

(10) Accounts with respect to which the Account Debtor is the United States government or any department or agency of the United States.

(11) Accounts which have not been paid in full within **90 days** from the invoice date. The entire balance of any Account of any single Account Debtor will be ineligible whenever the portion of the Account which has not been paid within **90 days** from the invoice date is in excess of **25.000%** of the total amount outstanding on the Account.

(12) That potion of the Accounts of CVS which exceeds **50.000%** of all of Borrower's Accounts, that portion of the Accounts of United Natural Foods which exceeds **35.00%** of all of Borrower's Accounts, and that potion of the Accounts of any other single Account Debtor which exceeds **25.000%** of all of Borrower's Accounts.

**Eligible Inventory.** The words "Eligible Inventory" mean, at any time, all of Borrower's Inventory as defined below, except:

(1) Inventory which is not owned by Borrower free and clear of all security interests, liens, encumbrances, and claims of third parties.

(2) Inventory which Lender, in its sole discretion, deems to be obsolete, unsalable, damaged, defective, or unfit for further processing.

(3) Work in progress.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Expiration Date.** The words "Expiration Date" mean the date of termination of Lender's commitment to lend under this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when

EXHIBIT 4    PAGE 95

**BUSINESS LOAN AGREEMENT (ASSET BASED)**

Loan No: ●●1239                                    (Continued)                                    Page 9

improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled.  The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws.  The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.**  The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Inventory.**  The word "Inventory" means all of Borrower's raw materials, work in process, finished goods, merchandise, parts and supplies, of every kind and description, and goods held for sale or lease or furnished under contracts of service in which Borrower now has or hereafter acquires any right, whether held by Borrower or others, and all documents of title, warehouse receipts, bills of lading, and all other documents of every type covering all or any part of the foregoing.  Inventory includes inventory temporarily out of Borrower's custody or possession and all returns on Accounts.

**Lender.**  The word "Lender" means Bank of Manhattan, N.A., its successors and assigns.

**Loan.**  The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.**  The word "Note" means the Promissory Note dated October 15, 2013 in the original Principal Amount of $2,000,000.00 and all subsequent renewals, extensions or modifications thereof.

**Permitted Liens.**  The words "Permitted Liens" mean  (1)  liens and security interests securing Indebtedness owed by Borrower to Lender;  (2)  liens for taxes, assessments, or similar charges either not yet due or being contested in good faith;  (3)  liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent;  (4)  purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens";  (5)  liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and  (6)  those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Primary Credit Facility.**  The words "Primary Credit Facility" mean the credit facility described in the Line of Credit section of this Agreement.

**Related Documents.**  The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.**  The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.**  The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**Tangible Net Worth.**  The words "Tangible Net Worth" mean Borrower's total assets excluding all intangible assets (i.e., goodwill, trademarks, patents, copyrights, organizational expenses, and similar intangible items, but including leaseholds and leasehold improvements) less total debt.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT (ASSET BASED) AND BORROWER AGREES TO ITS TERMS.  THIS BUSINESS LOAN AGREEMENT (ASSET BASED) IS DATED JANUARY 15, 2015.

BORROWER:

HERO NUTRITIONALS, LLC

By: _____
Jennifer L. / Hodges, Manager/Member of Hero
Nutritionals, LLC

LENDER:

BANK OF MANHATTAN, N.A.

By: _____
Authorized Signer

LaserPro, Ver. 14.5.10.004  Copr. D+H USA Corporation 1997, 2015.  All Rights Reserved.  - CA  C:\HARLAND\CFI\LPL\C40.FC  TR-2109  PR-60

EXHIBIT 4     PAGE 96

# RIDER TO BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,000,000.00 | 01-15-2015 | 05-31-2015 | [redacted]1239 | | | DW | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Hero Nutritionals, LLC
1900 Carnegie Avenue, Building A
Santa Ana, CA 92705

**Lender:** Bank of Manhattan, N.A.
Pasadena Office
199 South Los Robles Avenue
Suite 130
Pasadena, CA 91101

**This RIDER TO BUSINESS LOAN AGREEMENT is attached to and by this reference is made a part of the Business Loan Agreement (Asset Based), dated January 15, 2015, and executed in connection with a loan or other financial accommodations between BANK OF MANHATTAN, N.A. and Hero Nutritionals, LLC.**

**Failure to Provide Required Financial Information.** Borrower agrees to provide information as requested in the Business Loan Agreement or within forty-five (45) days of the written request of the Lender to permit the Lender, in the Lender's sole and absolute judgment, to verify the financial condition and ratios, if any, as defined in the Business Loan Agreement. The Ratio Information must include, but is not limited to, those required financial items as listed in the Business Loan Agreement. Failure to provide the foregoing required information will result in the Margin, Floor and/or Fixed Note Rate being increased one hundred basis points of a percentage point (1.000%), effective on the 1st of the month following Borrower's failure to provide the required information by the required date. The increase is referred to hereafter as the "Rate Increase". A Rate Increase will only occur once unless a subsequent adjustment as described below occurs, and thereafter the Borrower again fails to comply with this requirement. Upon receipt by the Lender of the required information after a Rate Increase, the Margin, Floor and/or Fixed Note Rate will be reduced to the original Margin, Floor and/or Fixed Note Rate. This reduction will be effective on the 1st day of the calendar month following the later of (i) ninety (90) days after the Rate Increase, or (ii) the 1st day of the month occurring thirty (30) days after the receipt of the required information. However, in no event will the monthly payment amount be adjusted other than on a regular Payment Change Date, as defined in the Note.

**Effect of Rider.** Except as modified by this Rider, the provisions of the Note and Business Loan Agreement shall remain unchanged.

**THIS RIDER TO BUSINESS LOAN AGREEMENT IS EXECUTED ON JANUARY 15, 2015.**

**BORROWER:**

**HERO NUTRITIONALS, LLC**

**By:** ________________________
**Jennifer L Hodges, Manager/Member of Hero Nutritionals, LLC**

**LENDER:**

**BANK OF MANHATTAN, N.A.**

**By:** ________________________
**Authorized Signer**

LaserPro, Ver. 14.5.10.004 Copr. D+H USA Corporation 1997, 2015. All Rights Reserved. - CA C:\HARLAND\CFI\LPL\C40.FC TR-2109 PR-60

## BILL OF SALE AND ASSIGNMENT OF LOAN DOCUMENTS

FOR VALUE RECEIVED, PACIFIC PREMIER BANK ("Assignor") hereby grants, assigns, sets over and transfers to MCCORMICK 107, LLC, a Maryland limited liability company ("Assignee"), whose address is 11350 McCormick Road, Suite 902, Hunt Valley, Maryland 21031, all of Assignor's right, title, and interest under those certain Loan Documents as defined on **Exhibits A 1-8** attached hereto and made a part hereof.

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest, all other documents that evidence or secure the obligations under such note or notes, and all rights accrued or to accrue under the Loan Documents.

THIS CONVEYANCE is made without recourse or representation of any kind or nature, except as expressly set forth in that certain Non-Recourse Loan Participation and Sale Agreement, dated as of December 28, 2018, by and between Assignor and Assignee.

IN WITNESS WHEREOF, the undersigned has executed, signed and sealed this Bill of Sale and Assignment of Loan Documents as of the _1st_ day of _March_, 2019.

PACIFIC PREMIER BANK

By: _____
Name: _Donn Jakosky_
Title: _Sr. EVP / CCO_

QB\56287138.1

EXHIBIT 4    PAGE 98

## NOTARY ACKNOWLEDGMENT

A notary public or other officer completing this
certificate verifies only the identity of the
individual who signed the document to which
this certificate is attached, and not the
truthfulness, accuracy, or validity of that
document.

State of California

County of _____ }

On _____ before me _____
Here Insert Name and Title of the Officer

personally appeared _____
Name(s) of Signer(s)

_____

who proved to me on the basis of satisfactory evidence to
be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws
of the State of California that the foregoing paragraph is
true and correct.

WITNESS my hand and official seal.

Signature _____
Signature of Notary Public

Place Notary Seal Above

QB\56287138.1

EXHIBIT 4      PAGE 99

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**    CIVIL CODE § 1189

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

State of California )
County of ORANGE )

On MARCH 1ST, 2019 before me, K. VAN DE BROOKE, NOTARY PUBLIC
_____Date_____    _____Here Insert Name and Title of the Officer_____

personally appeared _____DONN JAKOWSKI_____
_____Name(s) of Signer(s)_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

K. VAN DE BROOKE
Notary Public - California
Orange County
Commission # 2148658
My Comm. Expires May 17, 2020

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
_____Signature of Notary Public_____

_____Place Notary Seal Above_____

―――――――――――――― **OPTIONAL** ――――――――――――――
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: ASSIGNMENT OF D.O.T.   Document Date: _____
Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
| --- | --- |
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Individual ☐ Attorney in Fact | ☐ Individual ☐ Attorney in Fact |
| ☐ Trustee ☐ Guardian or Conservator | ☐ Trustee ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907

EXHIBIT 4    PAGE 100

### EXHIBIT A-1

*Loan No. ████6001*

1.  Promissory Note in the original principal amount of Eight Hundred Thirty-three
    Thousand Nine Hundred Fifty and 27/100 Dollars ($833,950.27) dated October 29,
    2014, (Loan Number ████6001) made by Hero Nutritionals, LLC, and in favor of
    Pacific Premier Bank, successor-by-merger to Plaza Bank, successor-by-merger to
    Bank of Manhattan N.A.

2.  Commercial Security Agreement dated as of October 29, 2014, by and between Hero
    Nutritionals, LLC, and Pacific Premier Bank, successor-by-merger to Plaza Bank,
    successor-by-merger to Bank of Manhattan N.A.

3.  Guarantor Acknowledgement and Consent dated October 29, 2014 executed by Hero
    Nutritionals, Inc. and Jennifer L. Hodges.

4.  UCC Filing Insurance Policy No. 5023200-0000117592 issued by First American Title.

QB\56287138.1

EXHIBIT 4    PAGE 101

**EXHIBIT A-2**

*Loan No.* *9001*

1.  Promissory Note in the original principal amount of One Million and 00/100 Dollars ($1,000,000.00) dated October 27, 2015, made by Hero Nutritionals, LLC, and in favor of Pacific Premier Bank, successor-by-merger to Plaza Bank, as modified by Change in Terms Agreement dated April 22, 2016, as further modified by Change in Terms Agreement dated July 27, 2016, as further modified by Change in Terms Agreement dated October 27, 2016, as further modified by Change in Terms Agreement dated January 27, 2017, as further modified by Change in Terms Agreement dated June 27, 2017, as further modified by Loan Modification Agreement dated January 25, 2018, and as further modified by Loan Modification Agreement dated November 29, 2018.

2.  Business Loan Agreement dated as of October 27, 2015, by and between Hero Nutritionals, LLC, and Pacific Premier Bank, successor-by-merger to Plaza Bank.

3.  Commercial Security Agreement dated as of October 27, 2015, by and between Hero Nutritionals, LLC, and Pacific Premier Bank, successor-by-merger to Plaza Bank.

4.  Assignment of Deposit Accounted dated October 27, 2016, executed by Hero Nutritionals, LLC.

5.  Commercial Guaranty dated October 27, 2015, executed by Jennifer L. Hodges.

6.  Commercial Guaranty dated October 27, 2015, executed by Hero Nutritionals, Inc.

7.  Guarantor Acknowledgements dated April 22, 2016, July 27, 2016, October 27, 2016, January 27, 2017, and June 27, 2017, executed by Hero Nutritionals, Inc. and Jennifer L. Hodges.

.

QB\56287138.1

EXHIBIT 4   PAGE 102

## EXHIBIT A-3

*Loan No. ██████9002*

1.  Promissory Note in the original principal amount of Two Million and 00/100 Dollars ($2,000,000.00) dated October 15, 2013, made by Hero Nutritionals, LLC, and in favor of Pacific Premier Bank, successor-by-merger to Plaza Bank, successor-by-merger to Bank of Manhattan N.A., as modified by Change in Terms Agreement dated October 10, 2014, as further modified by Change in Terms Agreement dated January 15, 2015, as further modified by Change in Terms Agreement dated May 31, 2015, as further modified by Change in Terms Agreement dated October 27, 2015, as further modified by Change in Terms Agreement dated June 1, 2016, as further modified by Change in Terms Agreement dated July 27, 2016, as further modified by Change in Terms Agreement dated October 27, 2016, as further modified by Change in Terms Agreement dated January 27, 2017, as further modified by Change in Terms Agreement dated June 27, 2017, as further modified by Loan Modification Agreement dated January 25, 2018, and as further modified by Loan Modification Agreement dated November 29, 2018.

2.  Business Loan Agreement (Asset Based) dated as of October 15, 2013, by and between Hero Nutritionals, LLC, and Pacific Premier Bank, successor-by-merger to Plaza Bank, successor-by-merger to Bank of Manhattan N.A.

3.  Business Loan Agreement (Asset Based) dated as of January 15, 2015, by and between Hero Nutritionals, LLC, and Pacific Premier Bank, successor-by-merger to Plaza Bank, successor-by-merger to Bank of Manhattan N.A.

4.  Commercial Security Agreement dated as of October 15, 2013, by and between Hero Nutritionals, LLC, and Pacific Premier Bank, successor-by-merger to Plaza Bank, successor-by-merger to Bank of Manhattan N.A.

5.  Assignment of Deposit Accounted dated October 27, 2016, executed by Hero Nutritionals, LLC.

6.  Commercial Guaranty dated October 15, 2013, executed by Jennifer L. Hodges.

7.  Commercial Guaranty dated October 15, 2013, executed by Hero Nutritionals, Inc.

8.  Guarantor Acknowledgements dated October 27, 2015, June 1, 2016, July 27, 2016, October 27, 2016, January 27, 2017, and June 27, 2017, executed by Hero Nutritionals, Inc. and Jennifer L. Hodges.

QB\56287138.1

EXHIBIT 4     PAGE 103

**EXHIBIT A-4**

*Loan No.* ████*3001*

1.  Promissory Note in the original principal amount of Five Hundred Fifty Thousand and
    00/100 Dollars ($550,000.00) dated October 15, 2013, made by Hero Nutritionals,
    LLC, and in favor of Pacific Premier Bank, successor-by-merger to Plaza Bank,
    successor-by-merger to Bank of Manhattan N.A., as modified by Change in Terms
    Agreement dated October 27, 2015.

2.  Business Loan Agreement dated as of October 15, 2013, by and between Hero
    Nutritionals, LLC, and Pacific Premier Bank, successor-by-merger to Plaza Bank,
    successor-by-merger to Bank of Manhattan N.A.

3.  Commercial Security Agreement dated as of October 15, 2013, by and between Hero
    Nutritionals, LLC, and Pacific Premier Bank, successor-by-merger to Plaza Bank,
    successor-by-merger to Bank of Manhattan N.A.

4.  Commercial Guaranty dated October 27, 2015, executed by Jennifer L. Hodges.

5.  Commercial Guaranty dated October 27, 2015, executed by Hero Nutritionals, Inc.

QB\56287138.1

EXHIBIT 4    PAGE 104

**EXHIBIT A-5**

*Loan No.* *8001*

1.    Promissory Note in the original principal amount of Five Hundred Thousand and 00/100 Dollars ($500,000.00) dated February 19, 2015, made by Hero Nutritionals, LLC, and in favor of Pacific Premier Bank, successor-by-merger to Plaza Bank, successor-by-merger to Bank of Manhattan N.A.

2.    Commercial Security Agreement dated as of February 19, 2015, by and between Hero Nutritionals, LLC, and Pacific Premier Bank, successor-by-merger to Plaza Bank, successor-by-merger to Bank of Manhattan N.A.

3.    Guarantor Acknowledgement and Consent dated February 19, 2015, executed by Hero Nutritionals, Inc. and Jennifer L. Hodges.

4.    UCC Filing Insurance Policy No. 5023200-0000125948 issued by First American Title.

QB\56287138.1

EXHIBIT 4    PAGE 105

**EXHIBIT A-6**

*Loan No.* ▇▇▇▇*4001*

1.   Promissory Note in the original principal amount of Three Hundred Three Thousand
     Forty and 63/100 Dollars ($303,040.63) dated August 22, 2014, made by Hero
     Nutritionals, LLC.

2.   Commercial Security Agreement dated as of August 22, 2014, by and between Hero
     Nutritionals, LLC, and Pacific Premier Bank, successor-by-merger to Plaza Bank,
     successor-by-merger to Bank of Manhattan N.A.

3.   Guarantor Acknowledgement and Consent dated August 22, 2014, executed by Hero
     Nutritionals, Inc. and Jennifer L. Hodges.

4.   UCC Filing Insurance Policy No. 5023200-0000113791 issued by First American Title.

QB\56287138.1

EXHIBIT 4     PAGE 106

## EXHIBIT A-7

*Loan No.* ████6001

1.    Promissory Note in the original principal amount of Four Hundred Sixty-three
Thousand Nine and 10/100 Dollars ($463,009.10) dated February 25, 2014, made by
Hero Nutritionals, LLC.

2.    Commercial Security Agreement dated as of February 25, 2014, by and between Hero
Nutritionals, LLC, and Pacific Premier Bank, successor-by-merger to Plaza Bank,
successor-by-merger to Bank of Manhattan N.A.

QB\56287138.1

EXHIBIT 4    PAGE 107

**EXHIBIT A-8**

*Additional Cross Collateralized Documents*

1.    Deed of Trust, dated October 27, 2015 made by Jennifer L. Hodges for the benefit of
Pacific Premier Bank, successor-by-merger to Plaza Bank and recorded on November
17, 2015, in the Official Records of Monterey County, California, as Document No.
2015065977.

2.    Assignment of Rents, dated October 27, 2015 made by Jennifer L. Hodges for the
benefit of Pacific Premier Bank, successor-by-merger to Plaza Bank and recorded on
November 17, 2015, in the Official Records of Monterey County, California, as
Document No. 2015065978.

3.    Hazardous Substances Certificate and Indemnity Agreement dated October 27, 2015
made by Jennifer L. Hodges for the benefit of Pacific Premier Bank, successor-by-
merger to Plaza Bank and recorded on November 17, 2015, in the Official Records of
Monterey County, California, as Document No. 2015065979.

4.    Any and all policies of title insurance regarding the Deed of Trust and Assignment of
Rents described herein.

QB\56287138.1

EXHIBIT 4    PAGE 108

### ALLONGE

ALLONGE to be attached to and made a part of that certain Promissory Note in the original principal amount of Two Million and 00/100 Dollars ($2,000,000.00) dated October 15, 2013, (Loan Number ████9002) made by Hero Nutritionals, LLC, and in favor of Pacific Premier Bank, successor-by-merger to Plaza Bank, successor-by-merger to Bank of Manhattan N.A., as renewed, amended, or modified.

Pay to the order of McCormick 107, LLC, a Maryland limited liability company, without representations, warranties or recourse.

**PACIFIC PREMIER BANK**

By: _____

Name: _____

Title: _____

Date: _____, 2019

EXHIBIT 4      PAGE 109

## CHANGE IN TERMS AGREEMENT

| Principal $2,000,000.00 | Loan Date 01-15-2015 | Maturity 05-31-2015 | Loan No 1239 | Call / Coll | Account | Officer DW | Initials |
|---|---|---|---|---|---|---|---|

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Hero Nutritionals, LLC
1900 Carnegie Avenue, Building A
Santa Ana, CA 92705

**Lender:** Bank of Manhattan, N.A.
Pasadena Office
199 South Los Robles Avenue
Suite 130
Pasadena, CA 91101

**Principal Amount: $2,000,000.00**                    **Date of Agreement: January 15, 2015**

DESCRIPTION OF EXISTING INDEBTEDNESS.

The Promissory Note and Business Loan Agreement (Asset Based) dated October 15, 2013 in the original Principal Amount of $2,000,000.00 and all subsequent renewals, extensions or modifications thereof. The current outstanding Principal Amount of the Note is $1,192,754.29.

DESCRIPTION OF COLLATERAL.

Collateral as described per Commercial Security Agreement dated October 15, 2013.

DESCRIPTION OF CHANGE IN TERMS.

The Maturity of the Note is hereby extended from January 15, 2015 to May 31, 2015.

Concurrently herewith Borrower shall execute a Business Loan Agreement (Asset Based).

PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on May 31, 2015. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning February 15, 2015, with all subsequent interest payments to be due on the same day of each month after that.

VARIABLE INTEREST RATE. The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate, as published in the Western Edition of the Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 3.250% per annum. Interest on the unpaid principal balance of this loan will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 2.000 percentage points over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 5.250%. NOTICE: Under no circumstances will the interest rate on this loan be less than 5.250% per annum or more than the maximum rate allowed by applicable law.

INTEREST CALCULATION METHOD. Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in the loan documents.

CONTINUING VALIDITY. Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

EXHIBIT 4     PAGE 110

**CHANGE IN TERMS AGREEMENT**
**(Continued)**

Loan No: ███1239                                                                    Page 2

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS.  BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

CHANGE IN TERMS SIGNERS:

HERO NUTRITIONALS, LLC

By: _____
Jennifer L. Hodges, Manager/Member of Hero
Nutritionals, LLC

HERO NUTRITIONALS, INC.

By: _____
Jennifer L. Hodges, CEO/CFO/Secretary of Hero
Nutritionals, Inc.

X _____
Jennifer L. Hodges

EXHIBIT 4      PAGE 111

## BANK *of* MANHATTAN

### CHANGE IN TERMS AGREEMENT

| Principal $2,000,000.00 | Loan Date 05-31-2015 | Maturity 06-01-2016 | Loan No ●1239 | Call / Coll | Account | Officer DW | Initials |
|---|---|---|---|---|---|---|---|

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**   Hero Nutritionals, LLC
1900 Carnegie Avenue, Building A
Santa Ana, CA  92705

**Lender:**   Bank of Manhattan, N.A.
Pasadena Office
199 South Los Robles Avenue
Suite 130
Pasadena, CA  91101

**Principal Amount: $2,000,000.00**                    Date of Agreement:  May 31, 2015

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

The Promissory Note dated January 15, 2013 and Business Loan Agreement (Asset Based) dated October 15, 2015 in the original Principal Amount of $2,000,000.00 and all subsequent renewals, extensions or modifications thereof.  The current outstanding Principal Amount of the Note is $1,746,498.98.

**DESCRIPTION OF COLLATERAL.**

Collateral as described per Commercial Security Agreement dated October 15, 2013.

**DESCRIPTION OF CHANGE IN TERMS.**

The Maturity of the Note is hereby extended from May 31, 2015 to June 1, 2016.

**PAYMENT.**  Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on June 1, 2016.  In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning June 30, 2015, with all subsequent interest payments to be due on the same day of each month after that.

**VARIABLE INTEREST RATE.**  The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate, as published in the Western Edition of the Wall Street Journal (the "Index").  The Index is not necessarily the lowest rate charged by Lender on its loans.  If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower.  Lender will tell Borrower the current Index rate upon Borrower's request.  The interest rate change will not occur more often than each day.  Borrower understands that Lender may make loans based on other rates as well.  The Index currently is **3.250%** per annum.  Interest on the unpaid principal balance of this loan will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 2.000 percentage points over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 5.250%.  NOTICE:  Under no circumstances will the interest rate on this loan be less than 5.250% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.**  Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.  All interest payable under this loan is computed using this method.  This calculation method results in a higher effective interest rate than the numeric interest rate stated in the loan documents.

**CONTINUING VALIDITY.**  Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect.  Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms.  Nothing in this Agreement will constitute a satisfaction of the obligation(s).  It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing.  Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement.  If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it.  This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

EXHIBIT 4    PAGE 112

**CHANGE IN TERMS AGREEMENT**
**(Continued)**

Loan No: ███1239                                                          Page 2

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS.  BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

CHANGE IN TERMS SIGNERS:

HERO NUTRITIONALS, LLC

By: _____
    Jennifer L. Hodges, Manager/Member of Hero
    Nutritionals, LLC

HERO NUTRITIONALS, INC.

By: _____
    Jennifer L. Hodges, CEO/CFO/Secretary of Hero
    Nutritionals, Inc.

X _____
    Jennifer L. Hodges

LaserPro, Ver. 15.1.0.023  Copr. D+H USA Corporation 1997, 2015.  All Rights Reserved.  - CA  C:\HARLAND\CFI\LPL\D20E2.FC  TR-2105  PR-60

EXHIBIT 4      PAGE 113



Plaza Bank

## CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,000,000.00 | 10-27-2015 | 06-01-2016 | 1239 | | | KC | |

References in the boxes above are for Lender's use and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

Borrower:  Hero Nutritionals, LLC
           1900 Carnegie Avenue, Building A
           Santa Ana, CA  92705

Lender:  Plaza Bank
         Pasadena Office
         199 South Los Robles Avenue
         Suite 130
         Pasadena, CA  91101

Principal Amount: $2,000,000.00                          Date of Agreement: October 27, 2015

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

The Promissory Note dated January 15, 2013 and Business Loan Agreement (Asset Based) dated October 15, 2015 in the original Principal Amount of $2,000,000.00 and all subsequent renewals, extensions or modifications thereof.  The current outstanding Principal Amount of the Note is $1,746,498.98.

**DESCRIPTION OF COLLATERAL.**

Collateral as described per Commercial Security Agreement dated October 15, 2013.  Additional Collateral as per Deeds of Trust dated October 27, 2015.

**DESCRIPTION OF CHANGE IN TERMS.**

Concurrently herewith,  991 Calle Negocio LLC shall execute a Deed of Trust, Assignment of Leases and Rents and Hazardous Substance Certificate and Indemnity Agreement securing the Note.  In addition, Jennifer Hodges shall execute a Deed of Trust, Assignment of Rents and Hazardous Substances Certificate and Indemnity Agreement securing the Note.

**PAYMENT.**  Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on June 1, 2016.  In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning October 30, 2015, with all subsequent interest payments to be due on the same day of each month after that.

**VARIABLE INTEREST RATE.**  The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate, as published in the Western Edition of the Wall Street Journal (the "Index").  The Index is not necessarily the lowest rate charged by Lender on its loans.  If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower.  Lender will tell Borrower the current index rate upon Borrower's request.  The interest rate change will not occur more often than each day.  Borrower understands that Lender may make loans based on other rates as well.  **The Index currently is 3.250% per annum.**  Interest on the unpaid principal balance of this loan will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 2.000 percentage points over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 5.250%.  NOTICE:  Under no circumstances will the interest rate on this loan be less than 5.250% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.**  Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.  All interest payable under this loan is computed using this method.  This calculation method results in a higher effective interest rate than the numeric interest rate stated in the loan documents.

**CONTINUING VALIDITY.**  Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect.  Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms.  Nothing in this Agreement will constitute a satisfaction of the obligation(s).  It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing.  Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement.  If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it.  This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS.  BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

CHANGE IN TERMS SIGNERS:

HERO NUTRITIONALS, LLC

By: _____
    Jennifer L  Hodges, Manager/Member  of Hero
    Nutritionals, LLC

LaserPro, Ver. 15.4.20.023  Copr. D+H USA Corporation 1997, 2015.  All Rights Reserved.   CA  G:\CASH\RON\RCFN\FL09\CFL  FN-2195  PR-69

EXHIBIT 4      PAGE 114



Plaza Bank

## CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $2,000,000.00 | 07-27-2016 | 10-27-2016 | 1239 | | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

| Borrower: | Hero Nutritionals, LLC<br>1900 Carnegie Avenue, Building A<br>Santa Ana, CA  92705 | Lender: | Plaza Bank<br>Pasadena Office<br>199 South Los Robles Avenue<br>Suite 130<br>Pasadena, CA  91101 |
|---|---|---|---|

**Principal Amount: $2,000,000.00**                                **Date of Agreement: July 27, 2016**

DESCRIPTION OF EXISTING INDEBTEDNESS.

The Promissory Note dated October 15, 2013 and Business Loan Agreement (Asset Based) dated January 15, 2015 in the original Principal Amount of $2,000,000.00 and all subsequent renewals, extensions or modifications thereof. The current outstanding Principal Amount of the Note is $1,693,113.77.

DESCRIPTION OF COLLATERAL.

Collateral as described per Commercial Security Agreement dated October 15, 2013.

Collateral as described per Deed of Trust dated October 27, 2015 and recorded on November 17, 2015 as Instrument No. 2015065977, in the County Recorder's Office of Monterey County, California.

Collateral as described per Deed of Trust dated October 27, 2015 and recorded on November 17, 2015 as Instrument No. 2015000590735, in the County Recorder's Office of Orange County, California.

DESCRIPTION OF CHANGE IN TERMS.

The Maturity of the Note is hereby extended from July 27, 2016 to October 27, 2016.

PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on October 27, 2016. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning August 1, 2016, with all subsequent interest payments to be due on the same day of each month after that.

VARIABLE INTEREST RATE. The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate, as published in the Wall Street Journal (the "Index"). The index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. The index currently is 3.500% per annum. Interest on the unpaid principal balance of this loan will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 2.000 percentage points over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 5.500%. NOTICE: Under no circumstances will the interest rate on this loan be less than 5.250% per annum or more than the maximum rate allowed by applicable law.

INTEREST CALCULATION METHOD. Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in the loan documents.

CONTINUING VALIDITY. Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

CHANGE IN TERMS SIGNERS:

HERO NUTRITIONALS, LLC

By: _____
Jennifer L. Hodges, Manager/Member of Hero
Nutritionals, LLC

EXHIBIT 4    PAGE 115



Plaza Bank

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,000,000.00 | 10-27-2016 | 01-27-2017 | [redacted]1239[redacted] | | | *** | |
| References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations. | | | | | | | |

**Borrower:** Hero Nutritionals, LLC
1900 Carnegie Avenue, Building A
Santa Ana, CA 92705

**Lender:** Plaza Bank
Pasadena Office
199 South Los Robles Avenue
Suite 130
Pasadena, CA 91101

**Principal Amount: $2,000,000.00** **Date of Agreement: October 27, 2016**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

The Promissory Note dated October 15, 2013 in the original Principal Amount of $2,000,000.00 and all subsequent renewals, extensions or modifications thereof. The current outstanding Principal Amount of the Note is $1,893,113.77.

**DESCRIPTION OF COLLATERAL.**

Collateral as described per Commercial Security Agreement dated October 15, 2013.

Collateral as described per Deed of Trust dated October 27, 2015 and recorded on November 17, 2015 as Instrument No. 2015065977, in the County Recorder's Office of Monterey County, California.

Assignment of Deposit Account dated October 27, 2016.

**DESCRIPTION OF CHANGE IN TERMS.**

The Maturity of the Note is hereby extended from October 27, 2016 to January 27, 2017.

The following collateral is hereby deleted from the Loan:

Collateral as described per Deed of Trust dated October 27, 2015 and recorded on November 17, 2015 as Instrument No. 2015000590735, in the County Recorder's Office of Orange County, California.

The following collateral is hereby added to the Loan:

Assignment of Deposit Account dated October 27, 2016.

**PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on January 27, 2017. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning November 27, 2016, with all subsequent interest payments to be due on the same day of each month after that.**

**VARIABLE INTEREST RATE.** The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate, as published in the Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 3.500% per annum.** Interest on the unpaid principal balance of this loan will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 2.000 percentage points over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 5.500%. NOTICE: Under no circumstances will the interest rate on this loan be less than 5.250% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD. Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in the loan documents.**

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

Loan No: ███1239-██

### CHANGE IN TERMS AGREEMENT
### (Continued)

Page 2

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

CHANGE IN TERMS SIGNERS:

HERO NUTRITIONALS, LLC

By: _____
Jennifer L. Hodges, Manager/Member of Hero
Nutritionals, LLC

LaserPro, Ver. 18.3.50.005  Corp. D-H USA Corporation 1997, 2018.  All Rights Reserved.  - CA  ██████████████████  TR-3100  PR-80

EXHIBIT 4    PAGE 117



Plaza Bank

# CHANGE IN TERMS AGREEMENT

| Principal $2,000,000.00 | Loan Date 01-27-2017 | Maturity 06-27-2017 | Loan No ▓1239▓ | Call / Coll | Account | Officer *** | Initials |
|---|---|---|---|---|---|---|---|

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**  Hero Nutritionals, LLC
1900 Carnegie Avenue, Building A
Santa Ana, CA 92705

**Lender:**  Plaza Bank
Pasadena Office
199 South Los Robles Avenue
Suite 130
Pasadena, CA 91101

---

**Principal Amount: $2,000,000.00**                                **Date of Agreement: January 27, 2017**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

The Promissory Note dated as of October 15, 2013 in the original principal amount of Two Million and 00/100 Dollars ($2,000,000.00) and all subsequent renewals, extensions or modifications thereof with a current outstanding principal balance of $1,893,113.77.

**DESCRIPTION OF COLLATERAL.**

The Note is secured by the Collateral as described in the Commercial Security Agreement, dated as of October 15, 2013, executed by Grantor in favor of Lender.

The Note is secured by a Deed of Trust, dated as of October 27, 2015, on property commonly known as 77820 Vineyard Canyon Road and Vacant land, San Miguel, CA 93451, recorded November 17, 2015 as Instrument Number 2015065977 in the Official Records of Monterey County, State of California.

The Note is secured by the Collateral as described in the Assignment of Deposit Account, dated as of October 27, 2016.

**DESCRIPTION OF CHANGE IN TERMS.**

The Maturity of the Note is hereby extended from January 27, 2017 to June 27, 2017.

**CONTINUING VALIDITY.**  Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect.  Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms.  Nothing in this Agreement will constitute a satisfaction of the obligation(s).  It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing.  Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement.  If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it.  This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT.  BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

**CHANGE IN TERMS SIGNERS:**

HERO NUTRITIONALS, LLC

By: _____
Jennifer L. Hodges, Manager/Member of Hero
Nutritionals, LLC

LaserPro, Ver. 16.4.10.004  Copr. D+H USA Corporation 1997, 2017.  All Rights Reserved.  - CA  C:\LASERPRO\BOMCPFL\PL200C FC  TR-2105  PR-60

EXHIBIT 4    PAGE 118



Plaza Bank

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,000,000.00 | 06-27-2017 | 12-27-2017 | [redacted]1239[redacted] | 4A00 / U6 | | JM | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Hero Nutritionals, LLC
1900 Carnegie Avenue, Building A
Santa Ana, CA 92705

**Lender:** Plaza Bank
Pasadena Office
199 South Los Robles Avenue
Suite 130
Pasadena, CA 91101

**Principal Amount: $2,000,000.00** **Date of Agreement: June 27, 2017**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

The Promissory Note dated as of October 15, 2013 in the original principal amount of Two Million and 00/100 Dollars ($2,000,000.00) and all subsequent renewals, extensions or modifications thereof with a current outstanding principal balance of $1,893,113.77.

**DESCRIPTION OF COLLATERAL.**

The Note is secured by the Collateral as described in the Commercial Security Agreement, dated as of October 15, 2013, executed by Grantor in favor of Lender.

The Note is secured by a Deed of Trust, dated as of October 27, 2015, on property commonly known as 77820 Vineyard Canyon Road and Vacant land, San Miguel, CA 93451, recorded November 17, 2015 as Instrument Number 2015065977 in the Official Records of Monterey County, State of California.

The Note is secured by the Collateral as described in the Assignment of Deposit Account, dated as of October 27, 2016.

**DESCRIPTION OF CHANGE IN TERMS.**

The maturity of the Note is hereby extended from June 27, 2017 to December 27, 2017.

**PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on December 27, 2017. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning July 27, 2017, with all subsequent interest payments to be due on the same day of each month after that.**

**VARIABLE INTEREST RATE.** The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate, as published in the Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 4.250% per annum.** Interest on the unpaid principal balance of this loan will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 2.000 percentage points over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 6.250%. NOTICE: Under no circumstances will the interest rate on this loan be less than 5.250% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD. Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in the loan documents.**

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

**CHANGE IN TERMS SIGNERS:**

**HERO NUTRITIONALS, LLC**

By: ______________________________
Jennifer L. Hodges, Manager/Member of Hero Nutritionals, LLC

LaserPro, Ver. 17.2.10.037 Copr. D+H USA Corporation 1997, 2017 All Rights Reserved - CA C:\LASERPRO\BOM\CFI\LPL\D20C.FC TR-2103 PR-80

## LOAN MODIFICATION AGREEMENT
(Short-Term Extension)

| Original Loan Date | Maturity Date | Loan No. | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|
| October 15, 2013 | June 30, 2018 | ...239... | | | | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular ...

Any item above containing "****" has been omitted due to text length limitations.

| Borrower: | Hero Nutritionals, LLC<br>1900 Carnegie Avenue<br>Santa Ana, CA 92705 | Lender: | Pacific Premier Bank<br>17901 Von Karman Avenue<br>Suite 1200<br>Irvine, CA 92614<br>(949) 864-8000 |
|---|---|---|---|

THIS LOAN MODIFICATION AGREEMENT (the "Agreement") is made as of January 25, 2018 by and among Hero Nutritionals, LLC ("Borrower") and Pacific Premier Bank ("Lender"). Borrower entered into a loan (the "Loan") evidenced by a Promissory Note dated October 15, 2013, payable to Bank of Manhattan, N.A., or order, in the original principal amount of $2,500,000.00 (the "Note"). Plaza Bank acquired the Loan by merge with Bank of Manhattan, N.A. and Lender acquired the Loan by merger with Plaza Bank on or about November 1, 2017 and is a ... of Plaza Bank's rights under the Loan Documents

The Note and all other loan documents given to Bank of Manhattan, N.A. or Lender either evidencing the Loan or to induce Bank of Manhattan, N.A. or Lender to make or modify the Loan are referred to collectively as the "Loan Documents"

DESCRIPTION OF LOAN MODIFICATION. As of the date of this Agreement, the Note and other Loan Documents are hereby amended as follows:

Payment Due Date. The due date for Borrower's payments under the Note is hereby changed from the ... to on or about (27) day of each month to the thirtieth (30th) ... of each month.

Maturity Date. The maturity date of the Note is hereby extended to June 30, 2018 (the "Maturity Date"). Borrower shall continue to pay ... monthly payments of all accrued unpaid interest due as of each payment date until the Maturity Date. On the Maturity Date, Borrower shall pay the Loan in one payment of all outstanding principal plus all accrued unpaid interest and all other amounts owed under the Note.

CONTINUING VALIDITY. In all other respects, Borrower acknowledges and agrees that all terms, conditions and provisions of the Loan Documents are continued in full force and effect, except as specifically set forth above, and remain unaffected and unchanged. This Agreement in no way acts as a release or relinquishment of, and in no way affects the liens, security interests and rights created by or arising under the Loan Documents or the priority thereof. Such liens, security interests and rights are hereby ratified, confirmed, renewed and extended in all respects. The Loan Documents any other security for payment of the Note and all rights, remedies, titles, liens and equities securing the Note are hereby modified and the modification, renewal ... represented thereby are hereby recognized, renewed, extended and continued in full force and effect and the Note ... of the Note and the indebtedness evidenced thereby. Borrower in no way acts as a release or relinquishment of, and in no way affects the liens, security interests and rights created by or arising under any security instrument or other Loan Documents that secure the Note or other ... the Documents, or the priority thereof. Such liens, security interests and rights are hereby ratified, confirmed, renewed and extended in all respects ...

WARRANTIES, REPRESENTATIONS AND AGREEMENTS. Borrower hereby ratifies, confirms, and represents and agrees that the Loan Documents represent valid, enforceable and collectible obligations of Borrower and that there are no existing claims, defenses, purchase or otherwise, or right of setoff whatsoever with respect to any of such documents or instruments. Borrower further acknowledges and represents that no event has occurred and no condition exists which would constitute a default under any of the Loan Documents or this Agreement or which with any ... or lapse of time or both.

RELEASE AND WAIVER OF CLAIMS. In consideration of Lender's agreement to enter into this Agreement, Borrower hereby agrees as follows:

Release of All Claims. Borrower, on behalf of itself, its general partners, its members, its officers, its affiliates, and as and their successors and assigns (collectively the "Releasing Parties"), hereby releases and forever discharges Lender and all of its subsidiaries, affiliates, officers, directors, employees, agents, attorneys, advisors, and its and their successors and assigns (collectively the "Released Parties"), from any and all claims, demands, debts, liabilities, contracts, obligations, accounts, torts, causes of action or claims for relief of whatever kind or nature, whether known or unknown, whether suspected or unsuspected, which the Releasing Parties may have or which may hereafter accrue or exist against Released Parties, or any of them, resulting from or in any way relating to any act or omission done or committed by Released Parties or any of them arising directly or indirectly out of the Loan, the Loan Documents, the transactions evidenced or contemplated thereby, the agreement, the origination, the funding and the closing of the Loan, the review, approval, or disapproval of any and all documents, instruments, ... and all other items submitted to Lender in connection with the Loan, the disbursements of funds under the Loan, the modification of the Loan made pursuant to this Agreement, Lender's acts, statements, conduct, representations and omissions made in connection with the identification of this Loan, including without limitation, the terms and conditions of this Agreement, any fact, matter, transaction or event relating to or in relationships existing in transactions or dealings occurring between Lender and Borrower up to and as of the date of this Agreement (the "Claims").

Release Includes Unknown Claims. The release described in the immediately preceding paragraph ... in this paragraph applies to all Claims which the Releasing Parties have or which may hereafter arise against the Released Parties, of any of them ... as a result of acts or omissions occurring before the date of this Agreement, whether or not known or suspected by the Parties hereto. Borrower expressly acknowledges, ... though it may be that ordinarily a general release does not extend to claims which the releasing party does not know or suspect to exist in his favor, which if known by him must have materially affected this settlement and the party released, it has carefully considered and taken into account in determining to enter into the foregoing into this Agreement the possible existence of such unknown losses or Claims.

Without limiting the generality of the foregoing, Borrower expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release or will not extend to claims which the releasing party does not know or suspect to exist in his favor, at the time of executing the release, which if known by the releasing party must have materially affected the releasing party's settlement with the released party, including, without limitation, the following provisions of California Code of Civil Procedure Section 1542:

-1-

EXHIBIT 4    PAGE 120

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW
OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE
WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER
SETTLEMENT WITH THE DEBTOR."

**Complete Defense.** This release by Releasing Parties shall constitute a complete defense to any claim, cause of action, debt, or obligation to any indebtedness, obligation, liability, claim or cause of action exists which is within the scope of those hereby released.

**No Reliance.** Borrower hereby acknowledges that it has not relied upon any representation of any kind made by Lender including the foregoing release.

**GENERAL.** Borrower shall execute such additional documents as Lender may require to fully effectuate the intent of this Agreement. If any action suit or other proceeding is brought to enforce the obligations of the undersigned under this Agreement, the prevailing party shall be entitled to receive all of such party's costs and expenses of suit, including attorneys' fees, incurred in each and every such action suit or other proceeding including any and all appeals or petitions therefrom. As used in this Agreement, attorneys' fees shall mean the full and actual cost of any legal services actually rendered in connection with the matters involved, calculated on the basis of the usual fee charged by the attorneys performing such services and shall not be limited to "reasonable attorneys' fees" as defined in any statute or rule of court. This Agreement shall be governed by, and interpreted in accordance with, the laws of the jurisdiction governing interpretation of the Note (however, not to the exclusion of any applicable Federal law) without regard to state statutes or judicial decisions regarding choice of law questions.

**COUNTERPARTS.** This Agreement may be executed in counterparts, each of which, when so executed shall be deemed an original, but all such counterparts, taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by telefacsimile or electronically shall be equally as effective as delivery of a manually executed counterpart of this Agreement.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT AND
BORROWER AGREES TO THE TERMS OF THIS AGREEMENT.

BORROWER:

Hero Nutritionals, LLC

By: _____
Jennifer L Hodges, Managing Member of
Hero Nutritionals, LLC

LENDER:

PACIFIC PREMIER BANK

By: _____
Authorized Signer
Name: _____
Title: _____

EXHIBIT 4    PAGE 121

DocuSign Envelope ID: 8A57C78E-01FE-4EC0-AD57-A82BD8F2DDD1

# LOAN MODIFICATION AGREEMENT
(Short-Term Extension)

| Original Note Date October 15, 2013 | Maturity Date January 2, 2019 | Loan No. ▇▇2390▇ | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|
| References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. | | | | | | |
| Any item above containing "****" has been omitted due to text length limitations. | | | | | | |

**Borrower:** Hero Nutritionals, LLC
1900 Carnegie Avenue
Santa Ana, CA 92705

**Lender:** Pacific Premier Bank
17901 Von Karman Avenue
Suite 1200
Irvine, CA 92614
(949) 864-8000

THIS LOAN MODIFICATION AGREEMENT (the "Agreement") is made as of November 29, 2018, by and among Hero Nutritionals, LLC ("Borrower") and Pacific Premier Bank ("Lender"). Borrower entered into a loan (the "Loan") evidenced by a Promissory Note dated October 15, 2013, originally payable to Bank of Manhattan, N.A., or order, in the original principal amount of Two Million and No/100 Dollars ($2,000,000.00) (the "Note"). Lender acquired the Loan by merger with Plaza Bank on or about November 1, 2017 and now holds all of Plaza Bank's rights and interest under the Loan Documents.

The Note and all other loan documents given to Plaza Bank or Lender either evidencing the Loan or to induce Plaza Bank or Lender to make or modify the Loan are referred to collectively as the "Loan Documents".

AGREEMENT

NOW, THEREFORE, in consideration of the premises herein contained, the parties hereto agree as follows:

DESCRIPTION OF LOAN MODIFICATION. As of the date of this Agreement, the Note and other Loan Documents are hereby amended as follows:

Maturity Date. The maturity date of the Note is hereby extended to January 2, 2019 (the "Maturity Date"). Borrower shall continue to pay regular monthly payments of all accrued unpaid interest due as of each payment date until the Maturity Date. On the Maturity Date, Borrower shall pay the Loan in one payment of all outstanding principal plus all accrued unpaid interest and all other amounts owed under the Note.

CONTINUING VALIDITY. In all other respects, Borrower acknowledges and agrees that all terms, conditions and provisions of the Loan Documents are continued in full force and effect, except as specifically set forth above, and remain unaffected and unchanged. This Agreement in no way acts as a release or relinquishment of, and in no way affects, the liens, security interests and rights created by or arising under the Loan Documents, or the priority thereof. Such liens, security interests and rights are hereby ratified, confirmed, renewed and extended in all respects. The Loan Documents, any other security for payment of the Note, and all rights, remedies, titles, liens and equities securing the Note are hereby modified and the indebtedness represented thereby are hereby recognized, renewed, extended and continued in full force and effect for the benefit of the holder of the Note and the indebtedness evidenced thereby. This Agreement in no way acts as a release or relinquishment of, and in no way affects, the liens, security interests and rights created by or arising under any security instrument or other Loan Documents that secure the Note or Loan Documents, or the priority thereof. Such liens, security interests and rights are hereby ratified, confirmed, renewed and extended in all respects.

WARRANTIES, REPRESENTATIONS AND AGREEMENTS. Borrower hereby ratifies, confirms, acknowledges and agrees that the Loan Documents represent valid, enforceable and collectible obligations of Borrower and that there are no existing claims, defenses, personal or otherwise, or rights of setoff whatsoever with respect to any of such documents or instruments. Borrower further acknowledges and represents that no event has occurred and no condition exists which would constitute a default under any of the Loan Documents or this Agreement, either with or without notice or lapse of time or both.

RELEASE AND WAIVER OF CLAIMS. In consideration of Lender's agreement to enter into this Agreement, Borrower hereby agrees as follows:

Release of All Claims. Borrower, on behalf of itself, its general partners, its members, its officers, its affiliates and its and their successors and assigns (collectively the "Releasing Parties"), hereby releases and forever discharges Lender and all of its subsidiaries, affiliates, officers, directors, employees, agents, attorneys, advisors, and its and their successors and assigns (collectively the "Released Parties") from any and all claims, demands, debts, liabilities, contracts, obligations, accounts, torts, causes of action or claims for relief of whatever kind or nature, whether known or unknown, whether suspected or unsuspected, which the Releasing Parties may have or which may hereafter be asserted or accrue against Released Parties, or any of them, resulting from or in any way relating to any act or omission done or committed by Released Parties, or any of them, arising directly or indirectly out of the Loan, the Loan Documents, the transactions evidenced or contemplated thereby, the approval, the origination, the funding and the closing of the Loan; the review, approval, or disapproval of any and all documents, instruments, insurance and all other items submitted to Lender in connection with the Loan; the disbursements of funds under the Loan; the modification of the Loan made pursuant to this Agreement; Lender's acts, statements, conduct, representations and omissions made in connection with the modification of the Loan, including, without limitation, the terms and conditions of this Agreement; any fact, matter, transaction or event relating thereto; or the relationships existing or transactions or dealings occurring between Lender and Releasing Parties up to and as of the date of this Agreement (the "Claims").

Release Includes Unknown Claims. The release described in the immediately preceding paragraph and in this paragraph applies to all Claims which the Releasing Parties have or which may hereafter arise against the Released Parties, or any of them, as a result of acts or omissions occurring before the date of this Agreement, whether or not known or suspected by the Parties hereto. Releasing Parties expressly acknowledge that, although it may be that ordinarily a general release does not extend to claims which the releasing party does not know or suspect to exist in his favor, which if known by him must have materially affected his settlement with the party released, it has carefully considered and taken into account in determining to enter into this Agreement the possible existence of such unknown losses or Claims.

Without limiting the generality of the foregoing, Releasing Parties expressly waive any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the releasing party does not know or suspect to exist in the releasing party's favor at the time of executing the release, which if known by the releasing party must have materially affected the releasing party's settlement with the released party, including, without limitation, the following provisions of California Code of Civil Procedure Section 1542:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW
OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH

-1-

EXHIBIT 4    PAGE 122

DocuSign Envelope ID: 8A57C78E-01FE-4EC0-AD57-A82BD8F20DD1

Loan No. ⬛⬛2390⬛

IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH
THE DEBTOR."

**Complete Defense.** This release by Releasing Parties shall constitute a complete defense to any claim, cause of action, defense, contract, liability, indebtedness, obligation, liability, claim or cause of action exists which is within the scope of those hereby released.

**No Reliance.** Releasing Parties hereby acknowledge that it has not relied upon any representation of any kind made by Lender in making the foregoing release.

**GENERAL.** Borrower shall execute such additional documents as Lender may require to fully effectuate the intent of this Agreement. If any action, suit or other proceeding is brought to enforce the obligations of the undersigned under this Agreement, the prevailing party shall be entitled to receive all of such party's costs and expenses of suit, including attorneys' fees, incurred in each and every such action, suit or other proceeding, including any and all appeals or petitions therefrom. As used in this Agreement, attorneys' fees shall mean the full and actual cost of any legal services actually performed in connection with the matters involved, calculated on the basis of the usual fee charged by the attorneys performing such services and shall not be limited to "reasonable attorneys' fees" as defined in any statute or rule of court. This Agreement shall be governed by, and interpreted in accordance with, the laws of the jurisdiction governing interpretation of the Note (however, not to the exclusion of any applicable Federal law), without regard to state statutes or judicial decisions regarding choice of law questions.

**COUNTERPARTS.** This Agreement may be executed in counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts, taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by telefacsimile or electronically shall be equally as effective as delivery of a manually executed counterpart of this Agreement.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT AND
BORROWER AGREES TO THE TERMS OF THIS AGREEMENT.

BORROWER:

HERO NUTRITIONALS, LLC

By: _____
Jennifer L. Hodges, Managing Member of Hero Nutritionals, LLC

LENDER:

PACIFIC PREMIER BANK

By: _____
Authorized Signer
Name: Sharon Garten
Title: Vice President
        Portfolio Manager

-2-

EXHIBIT 4    PAGE 123

## LOAN MODIFICATION AGREEMENT
(Loan No. ████9002)

THIS LOAN MODIFICATION AGREEMENT (this "Agreement") is by and between HERO NUTRITIONALS, LLC, a California limited liability company (the "Borrower"), and MCCORMICK 107, LLC, a Maryland limited liability company (the "Lender"), successor-in-interest to Pacific Premier Bank, successor-by-merger to Plaza Bank, successor-by-merger to Bank of Manhattan N.A., and is made as of the date shown opposite the Lender's signature on the signature page (the "Agreement Date").

### RECITALS:

WHEREAS, the Borrower has executed and delivered to Bank of Manhattan N.A. that certain Promissory Note in the original principal amount of $2,000,000.00 dated October 15, 2013, made by Hero Nutritionals, LLC, and in favor of Pacific Premier Bank, successor-by-merger to Plaza Bank, successor-by-merger to Bank of Manhattan N.A., as modified by Change in Terms Agreement dated October 10, 2014, as further modified by Change in Terms Agreement dated January 15, 2015, as further modified by Change in Terms Agreement dated May 31, 2015, as further modified by Change in Terms Agreement dated October 27, 2015, as further modified by Change in Terms Agreement dated June 1, 2016, as further modified by Change in Terms Agreement dated July 27, 2016, as further modified by Change in Terms Agreement dated October 27, 2016, as further modified by Change in Terms Agreement dated January 27, 2017, as further modified by Change in Terms Agreement dated June 27, 2017, as further modified by Loan Modification Agreement dated January 25, 2018, as further modified by Loan Modification Agreement dated June 20, 2018, and as further modified by Loan Modification Agreement dated November 29, 2018 (as amended from time to time, the "Note"), evidencing a business purpose loan extended to the Borrower (the "Loan");

WHEREAS, the Note is subject to the terms and conditions set forth in that certain Business Loan Agreement (Asset Based) dated as of January 15, 2015 (as amended from time to time, the "Loan Agreement");

WHEREAS, Lender entered into a Non-Recourse Participation and Loan Sale Agreement with Pacific Premier Bank and has become the owner of, among other things, the Loan Documents (as defined below);

WHEREAS, all indebtedness evidenced by the Note, and any extensions, renewals, restatements and modifications thereof and all principal, interest, fees and expenses relating thereto; however arising, whether liquidated or unliquidated, whether absolute or contingent, and of whatever nature, including without limitation, costs and expenses of collection and enforcement of the Loan Documents (as defined below), including without limitation attorneys' fees of both inside and outside counsel, are referred to in this Agreement as the "Obligations";

WHEREAS, the Obligations are secured by the property set forth in the following documents (collectively, as amended from time to time, the "Collateral Documents"):

QB\56245407.2

EXHIBIT 4    PAGE 124

Deed of Trust, dated October 27, 2015, executed by Jennifer L. Hodges and recorded on November 17, 2015, in the Official Records of Monterey County, California, as Document No. 2015065977, as assigned to Lender;

Assignment of Rents, dated October 27, 2015, executed by Jennifer L. Hodges and recorded on November 17, 2015, in the Official Records of Monterey County, California, as Document No. 2015065978, as assigned to Lender;

Commercial Security Agreement dated as of October 15, 2013;

Assignment of Deposit Accounted dated October 27, 2016;

Deposit Account Control Agreement;

(The property described in the Collateral Documents is collectively referred to in this Agreement as the **"Collateral"**);

WHEREAS, the Obligations are guaranteed pursuant to the following guaranties (collectively, the **"Guaranties"**) in favor of Lender:

Commercial Guaranty dated October 15, 2013, executed by Hero Nutritionals, Inc.;

Commercial Guaranty dated October 15, 2013, executed by Jennifer L. Hodges;

(The entity or individuals executing the Guaranties are referred to in this Agreement as the **"Guarantors"**);

WHEREAS, the Note, the Collateral Documents, and the Guaranties, as well as any other loan documents executed by the Borrower or the Guarantors pursuant thereto or in connection therewith, as the same may be amended from time to time, are referred to collectively in this Agreement as the **"Loan Documents"**;

WHEREAS, the Note has matured, and the Obligations have not been paid in full; and

WHEREAS, the Borrower has requested that the Lender modify the terms of the Loan Documents, and the Lender is willing to do so upon the terms and conditions set forth in this Agreement.

## AGREEMENT:

NOW, THEREFORE, in consideration of the above recitals, the agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree:

1. **Recitals; Capitalized Terms**. The Borrower acknowledges that the recitals set forth above are true and correct, and are made a part of this Agreement. Capitalized terms used

QB\56245407.2

EXHIBIT 4    PAGE 125

and not defined in this Agreement have the meanings assigned to such terms in the Loan Documents.

2.    **Unpaid Principal Balance of Note**.  Borrower acknowledges, admits, and agrees that the outstanding principal balance of the Note, as of February 25, 2019 is $1,842,170.80.

3.    **Loan Modifications**.  The Loan Documents are amended and supplemented as follows, with the amendments in this Section to be effective as of the Agreement Date, so long as the conditions to effectiveness set forth in Section 4 are satisfied or waived as provided in Section 4:

a.    <u>Change in Maturity Date</u>.  Notwithstanding anything in the Loan Documents, the Note will mature on June 15, 2019 (the "**Maturity Date**").
b.    <u>Miscellaneous</u>.  All references in the Loan Documents to a "Note" mean that "Note" as modified and supplemented by this Agreement.

4.    **Conditions to Effectiveness of Agreement**.    The Borrower shall deliver (or cause to be delivered) to the Lender each of the following:

a.    an original of this Agreement, duly executed by the Borrower and notarized;

b.    a ratification and consent to this Agreement, in form and content acceptable to the Lender, duly executed by the Guarantors and notarized;

c.    a Demand Account Control Agreement, in form and content acceptable to the Lender, duly executed by the Borrower and Pacific Premier Bank; and

d.    such additional information or documentation as the Lender may require.

The later of (a) the date on which the last of the conditions and requirements in this Section 4 has been satisfied, or waived in writing by the Lender; and (b) the Agreement Date is called the "**Closing Date**."  The provisions of this Section 4 are solely for the Lender's benefit and protection.  If the Lender has not received all of the items stated above in this Section 4 by March 5, 2019 (the "**Closing Deadline**"), then the Lender shall have the right in its sole and absolute discretion either to (y) waive any missing items by giving written notice to the Borrower at any time after the Closing Deadline, or (z) terminate this Agreement by giving written notice to the Borrower not later than 30 days after the Closing Deadline ("**Termination Notice**").  Upon Lender's delivery of a Termination Notice to the Borrower, this Agreement shall have no further force or effect, and the parties' rights and obligations shall continue to be governed by the Loan Documents and the Note as they existed without the modifications contemplated by this Agreement.

5.    **Evidence of Insurance**.  Upon the execution of this Agreement, and as requested by the Lender from time to time, and as otherwise required by the Loan Documents, the Borrower shall deliver to Lender updated evidence of property damage and liability insurance as

3

QB\56245407.2

EXHIBIT 4    PAGE 126

to all Collateral securing the Loan in such form and substance acceptable to Lender in its discretion, with lender loss payable endorsements on all casualty coverages naming Lender, and its successors and/or assigns, as loss payee and mortgagee.

6.   **Acknowledgments**.   The Borrower acknowledges and agrees that as of the Closing Date: (a) the Obligations exist and are owing without offset, defense or counterclaim assertable by the Borrower against the Lender; and (b) the Collateral Documents continue to secure all the Obligations of the Borrower under the Note and all other Loan Documents.

7.   **Ratification of Loan Documents**.   The Borrower represents that on and as of the Closing Date and after giving effect to this Agreement all of the representations and warranties contained in the Loan Documents are true, correct and complete in all respects as of the Closing Date as though made on and as of such date, except for changes expressly permitted by the terms of the Loan Documents. The parties further acknowledge that the Note, as amended and supplemented by this Agreement, and the other Loan Documents remain in full force and effect. Without limiting the generality of the foregoing, the Borrower represents and warrants that the Collateral Document continues to secure the obligations of the Borrower under the Note, as amended and supplemented by this Agreement.

8.   **General Release and Waivers**.

a.   The Borrower, for and on behalf of itself and its legal representatives, successors and assigns, does waive, release, relinquish and forever discharge the Lender, its parents, subsidiaries, and affiliates, its and their respective past, present and future directors, officers, managers, agents, employees, insurers, attorneys, representatives and all of their respective heirs, successors and assigns (collectively, the **"Released Parties"**), of and from any and all manner of action or causes of action, suits, claims, demands, judgments, damages, levies and executions of whatsoever kind, nature or description arising on or before the Closing Date, including, without limitation, any claims, losses, costs or damages, including compensatory and punitive damages, in each case whether known or unknown, asserted or unasserted, liquidated or unliquidated, fixed or contingent, direct or indirect, which the Borrower, or its legal representatives, successors or assigns, ever had or now has or may claim to have against any of the Released Parties, with respect to any matter whatsoever, including, without limitation, the Loan Documents, the administration of the Loan Documents, the negotiations relating to this Agreement and the other Loan Documents executed in connection with this Agreement and any other instruments and agreements executed by the Borrower in connection with the Loan Documents or this Agreement, arising on or before the Closing Date. The Borrower agrees not to sue any Released Party or in any way assist any other person or entity in suing a Released Party with respect to any claim released in this Section. The Borrower acknowledges that it has been informed of its rights under and the provisions of Section 1542 of the Civil Code of the State of California and expressly waives and relinquishes all rights and benefits that it has or may have had under such statute, which reads as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR

4

QB\56245407.2

EXHIBIT 4    PAGE 127

AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR
HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH
THE DEBTOR."

       b.     The Borrower irrevocably waives, to the extent permissible under law, any
and all rights of redemption, the right to notice of any proposed sale of any of the
Collateral constituting personal property (the **"Personal Property Collateral"**), or of any
other disposition of any of the Personal Property Collateral, and any other rights with
respect to the Personal Property Collateral under the Uniform Commercial Code or other
laws of any state.

       c.     The Borrower's failure to repay the Loan in full on or before the maturity
date of January 2, 2019, constitutes defaults under one or more of the Loan Documents
(collectively, the **"Identified Defaults"**). The Borrower has requested that the Lender
waive the Identified Defaults. Effective upon the Closing Date, the Lender waives the
Identified Defaults, <u>provided, however</u>, that the waiver granted in this Agreement is
limited to the Identified Default and is not intended, and will not be construed, to be a
general waiver of any term or provision of any Loan Document or a waiver of any other
existing or future default, including any default similar to the Identified Default.

     9.     **Succession**. The parties acknowledge and agree that McCormick 107, LLC, a
Maryland limited liability company is the successor-in-interest to Pacific Premier Bank,
successor-by-merger to Plaza Bank, successor-by-merger to Bank of Manhattan N.A. and has
succeeded as to all rights as Lender under the Loan Documents.

     10.     **No Duress or Reliance**. The Borrower acknowledges and agrees that the
Borrower has received the advice of independent counsel, appraisers and accountants selected by
the Borrower, or the opportunity to obtain such advice, before entering into this Agreement and
the other Loan Documents referred to in this Agreement, and has not relied upon the Lender or
any of its officers, directors, employees, agents or attorneys concerning any aspect of the
transactions contemplated by this Agreement and the other Loan Documents referred to in this
Agreement. The Borrower executed and delivered this Agreement of the Borrower's own free
will and will execute and deliver the other instruments required by this Agreement of the
Borrower's own free will. The Borrower further acknowledges that the Lender has not taken
advantage of the Borrower by threats, overreaching, unconscionable conduct or other activities
and that the Borrower is proceeding in all transactions contemplated in this Agreement as a
volunteer and in what the Borrower perceives to be the Borrower's own best interest.

     11.     **Notices**. Any notice or other communication to any party in connection with this
Agreement or any Loan Document shall be in writing and shall be sent by manual delivery,
facsimile transmission, overnight courier or United States mail (postage prepaid) addressed to
such party at the address specified below, or at such other or additional address as such party
shall have specified to the other party in writing. All periods of notice (if any) shall be measured
from the date of delivery of the notice if manually delivered, from the date of sending if sent by
facsimile transmission, from the first business day after the date of sending if sent by overnight
courier, or from four days after the date of mailing if mailed. Each notice or other
communication should be addressed as follows:

5

QB\56245407.2

EXHIBIT 4    PAGE 128

| If to Lender: | McCormick 107, LLC |
| | 11350 McCormick Road, Suite 902 |
| | Hunt Valley, MD 21031 |
| | Attn: Sean Schroeder |
| | |
| If to the Borrower: | Hero Nutritionals, LLC |
| | 1900 Carnegie Avenue |
| | Santa Ana, CA 92705 |
| | |
| If to the Guarantors: | Hero Nutritionals, Inc. |
| | 1900 Carnegie Avenue |
| | Santa Ana, CA 92705 |
| | Attn: Jennifer L. Hodges |
| | |
| | Jennifer L. Hodges |
| | 2988 Terry Road |
| | Laguna Beach, CA 92651 |

The parties agree that the notice addresses set forth in this Agreement supersede and replace all prior notice addresses.

12.    **Representations and Warranties**.  The Borrower warrants and represents that (a) on and as of the Closing Date and after giving effect to this Agreement, other than the Identified Defaults, there will exist no default under the Note, as amended by this Agreement, the Collateral Document, or any other instruments executed by the Borrower in connection with this Agreement or the Loan Documents, or circumstances that with the giving of notice, the passage of time or both will constitute an event of default under any Loan Document on such date; (b) the Borrower has the power and legal right and authority to enter into, deliver and perform this Agreement, and any other documents or agreements executed by Borrower in connection with this Agreement, and that neither this Agreement, nor the agreements contained in this Agreement or any documents or agreements executed by Borrower in connection with this Agreement contravene any provision or constitute a default under any agreement, instrument or indenture to which the Borrower is a party or signatory or any provision of the Borrower's constituent documents or any other agreement or requirement of law; (c) this Agreement and all other documents or agreements executed by Borrower in connection with this Agreement have been duly executed and delivered by the Borrower and constitute the legal, valid and binding obligation of the Borrower, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity; and (d) no consent, approval or authorization of or registration or declaration with any party, including but not limited to any governmental authority, is required (except for those which the Borrower has obtained or provided) in connection with the execution and delivery by the Borrower of this Agreement, or any other documents or agreements executed by Borrower in connection with this Agreement, or the performance of the obligations of the Borrower described in this Agreement.

6

QB\56245407.2

EXHIBIT 4      PAGE 129

13.   **Further Assurances.**   The Borrower shall promptly correct any defect or error that may be discovered in any Loan Document or in the execution, acknowledgment or recordation of any Loan Document.   Promptly upon request by the Lender, the Borrower also shall do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register, any and all deeds, conveyances, mortgages, deeds of trust, trust deeds, assignments, estoppel certificates, financing statements and continuations thereof, notices of assignment, transfers, certificates, assurances and other instruments as the Lender may reasonably require from time to time in order: (a) to carry out more effectively the purposes of the Loan Documents; (b) to perfect and maintain the validity, effectiveness and priority of any security interests intended to be created by the Loan Documents; and (c) to better assure, convey, grant, assign, transfer, preserve, protect and confirm unto the Lender the rights granted now or hereafter intended to be granted to the Lender under any Loan Document or under any other instrument executed in connection with any Loan Document or that the Borrower may be or become bound to convey, mortgage or assign to the Lender in order to carry out the intention or facilitate the performance of the provisions of any Loan Document.   The Borrower shall furnish to the Lender evidence satisfactory to the Lender of every such recording, filing or registration.

14.   **Copies; Entire Agreement; Modification.**   The Borrower acknowledges the receipt of a copy of the Note and all other Loan Documents.   The Note and all of the Loan Documents are each a "transferable record" as defined in applicable law relating to electronic transactions.   Therefore, the Lender may, on behalf of the Borrower, create a microfilm or optical disk or other electronic image of the Note and any or all of the Loan Documents that is an authoritative copy as defined in such law.   The Lender may store the authoritative copy of the Note and any or all of the Loan Documents in its electronic form and then destroy the paper original as part of the Lender's normal business practices.   The Lender, on its own behalf, may control and transfer such authoritative copy as permitted by such law.

15.   **Additional Provisions.**   TIME IS OF THE ESSENCE WITH RESPECT TO ALL PROVISIONS OF THIS AGREEMENT.   No amendment, modification or waiver of the provisions of this Agreement or any Loan Document is effective unless the same is in writing and signed by the party against whom it is to be enforced, and then such amendment, modification or waiver shall be effective only in the specific instance and for the specific purpose for which given.   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED UNDER AND IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA.   The Loan Documents as modified by this Agreement, and this Agreement, shall represent the entire agreement between the Borrower and the Lender with respect to the modification of the Note, shall supersede any prior oral negotiations or agreements, and shall be binding upon the parties to this Agreement and their respective legal representatives, successors and assigns.   In the event of any conflict between the provisions of this Agreement and the provisions of any Loan Document, the provisions of this Agreement shall govern.   If any part of this Agreement is held to be illegal, invalid or unenforceable, (a) the remainder of this Agreement shall continue in full force and effect, notwithstanding such illegality, invalidity or unenforceability and (b) the judge or arbiter holding that part illegal, invalid or unenforceable shall attempt to reform that part so as to give effect to the original intent of the parties.   Section headings in this Agreement are for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.   This Agreement may be executed in different

7

QB\56245407.2

EXHIBIT 4    PAGE 130

counterparts with the same effect as if the signatures were on the same instrument, and will be effective upon delivery of all such counterparts to the Lender. Facsimiles or other photocopies or images of executed signature pages to this Agreement shall be considered originals.

16. **No Commitment to Extend, Modify or Forbear**. EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, THE LENDER IS NOT COMMITTED, AND IS NOT COMMITTING AT THIS TIME, TO EXTEND, MODIFY OR OTHERWISE RESTRUCTURE ANY LOAN, OR FORBEAR FROM EXERCISING ANY OF ITS RIGHTS OR REMEDIES UNDER THE NOTE, AS AMENDED BY THIS AGREEMENT. NO PRIOR COURSE OF DEALING, NO USAGE OF TRADE, AND NO ORAL STATEMENTS OR COMMENTS BY THE LENDER OR ITS OFFICERS, EMPLOYEES, ATTORNEYS OR OTHER AGENTS WILL BE DEEMED TO BE A COMMITMENT BY THE LENDER TO EXTEND, MODIFY, OR OTHERWISE RESTRUCTURE ANY LOAN OR FORBEAR FROM EXERCISING ANY OF ITS RIGHTS OR REMEDIES, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, OR UNLESS THE SAME SHALL BE REDUCED IN WRITING AND SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE LENDER.

17. **Borrower's Understanding**. THE BORROWER ACKNOWLEDGES THAT: (A) THIS AGREEMENT CONTAINS A COMPLETE RELEASE OF CLAIMS AND WAIVERS OF CERTAIN RIGHTS; (B) THE BORROWER HAS READ AND UNDERSTOOD THIS AGREEMENT IN ITS ENTIRETY PRIOR TO SIGNING AND FULLY AGREES TO EACH, ALL AND EVERY PROVISION OF THIS AGREEMENT; AND (C) THE BORROWER HAS RECEIVED A COPY OF THIS AGREEMENT.

18. **Jury Waiver, Judicial Reference**. For the purposes of this Section 18, Borrower and Lender may be individually referred to as a **"Party"** and collectively referred to as the **"Parties"**:

18.1. **TO THE EXTENT PERMITTED BY LAW, BORROWER AND LENDER HEREBY JOINTLY AND SEVERALLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, THE LOAN DOCUMENTS, THE OBLIGATIONS THEREUNDER, ANY COLLATERAL SECURING THE OBLIGATIONS, OR TRANSACTION ARISING THEREFROM OR CONNECTED THERETO. BORROWER AND LENDER EACH REPRESENTS TO THE OTHER THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY GIVEN.**

18.2. Any and all disputes, claims and controversies arising out of this Agreement, the Loan Documents or the transactions contemplated thereby (including, but not limited to, actions arising in contract or tort and any claims by a Party against Lender related in any way to the Loan) (individually, a **"Dispute"**) that are brought before a forum in which pre-dispute waivers of the right to trial by jury are invalid under applicable law shall be subject to the terms of this Section 18 in lieu of the jury trial waivers otherwise provided in this Agreement and/or the Loan Documents.

8

QB\56245407.2

EXHIBIT 4      PAGE 131

18.3.   Any and all Disputes shall be heard by a referee and resolved by judicial reference pursuant to California Code of Civil Procedure Sections 638, et seq.

18.4.   The referee shall be a retired California state court judge or an attorney licensed to practice law in the State of California with at least ten (10) years experience practicing commercial law. The Parties shall not seek to appoint a referee that may be disqualified pursuant to California Code of Civil Procedure Section 641 or 641.2 without the prior written consent of all Parties.

18.5.   If the Parties are unable to agree upon a referee within ten (10) calendar days after one Party serves a written notice of intent for judicial reference upon the other Party or Parties, then the referee will be selected by the court in accordance with California Code of Civil Procedure Section 640(b).

18.6.   The referee shall render a written statement of decision and shall conduct the proceedings in accordance with the California Code of Civil Procedure, the Rules of Court, and California Evidence Code, except as otherwise specifically agreed by the parties and approved by the referee. The referee's statement of decision shall set forth findings of fact and conclusions of law. The decision of the referee shall be entered as a judgment in the court in accordance with the provisions of California Code of Civil Procedure Sections 644 and 645. The decision of the referee shall be appealable to the same extent and in the same manner that such decision would be appealable if rendered by a judge of the superior court.

18.7.   Nothing in this Section 18 shall be deemed to apply to or limit right of Lender (a) to exercise self help remedies such as (but not limited to) setoff, or (b) to foreclose judicially or non-judicially against any real or personal property collateral, or to exercise judicial or non-judicial power of sale rights, (c) to obtain from a court provisional or ancillary remedies (including, but not limited to, injunctive relief, a writ of possession, prejudgment attachment, a protective order or the appointment of a receiver), or (d) to pursue rights against a Party in a third-party proceeding in any action brought against Lender (including actions in bankruptcy court). Lender may exercise the rights set forth in the foregoing clauses (a) through (d), inclusive, before, during or after the pendency of any judicial reference proceeding. Neither the exercise of self help remedies nor the institution or maintenance of an action for foreclosure or provisional or ancillary remedies or the opposition to any such provisional remedies shall constitute a waiver of the right of any Party, including, but not limited to, the claimant in any such action, to require submission to judicial reference the merits of the Dispute occasioning resort to such remedies. No provision in this Agreement and/or the Loan Documents regarding submission to jurisdiction and/or venue in any court is intended or shall be construed to be in derogation of the provisions in this Agreement and/or any Loan Document for judicial reference of any of Dispute.

18.8.   If a Dispute includes multiple claims, some of which are found not subject to this Section 18, the Parties shall stay the proceedings of the Disputes or part or parts thereof not subject to this Section 18 until all other Disputes or parts thereof are resolved in

9

EXHIBIT 4     PAGE 132

accordance with this Section 18. If there are Disputes by or against multiple parties, some of which are not subject to this Section 18, the Parties shall sever the Disputes subject to this Section 18 and resolve them in accordance with this Section 18.

18.9.   During the pendency of any Dispute which is submitted to judicial reference in accordance with this Section 18, each of the Parties to such Dispute shall bear equal shares of the fees charged and costs incurred by the referee in performing the services described in this Section 18. The compensation of the referee shall not exceed the prevailing rate for like services. The prevailing party shall be entitled to reasonable court costs and legal fees, including customary attorney fees, expert witness fees, paralegal fees, the fees of the referee and other reasonable costs and disbursements charged to the party by its counsel, in such amount as is determined by the Referee.

18.10.  In the event of any challenge to the legality or enforceability of this Section 18, the prevailing Party shall be entitled to recover the costs and expenses from the non-prevailing Party, including reasonable attorneys' fees, incurred by it in connection therewith.

18.11.  THE AGREEMENTS IN THIS SECTION 18 CONSTITUTE A "REFERENCE AGREEMENT" BETWEEN OR AMONG THE PARTIES WITHIN THE MEANING OF AND FOR PURPOSES OF CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 638.

19.   **IMPORTANT:   READ BEFORE SIGNING.   THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING AND SIGNED BY THE PARTIES ARE ENFORCEABLE.  NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. THE TERMS OF THIS AGREEMENT MAY ONLY BE CHANGED BY ANOTHER WRITTEN AGREEMENT.  THIS NOTICE SHALL ALSO BE EFFECTIVE WITH RESPECT TO ALL OTHER CREDIT AGREEMENTS NOW IN EFFECT BETWEEN THE BORROWER AND THE LENDER.   A MODIFICATION OF ANY OTHER CREDIT AGREEMENTS NOW IN EFFECT BETWEEN THE BORROWER AND THE LENDER, WHICH OCCURS AFTER RECEIPT BY THE BORROWER OF THIS NOTICE, MAY BE MADE ONLY BY ANOTHER WRITTEN INSTRUMENT.  ORAL OR IMPLIED MODIFICATIONS TO SUCH CREDIT AGREEMENTS ARE NOT ENFORCEABLE AND SHOULD NOT BE RELIED UPON.**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

QB\56245407.2

10

EXHIBIT 4     PAGE 133

SIGNATURE PAGE
TO
LOAN MODIFICATION AGREEMENT

IN WITNESS WHEREOF, the parties to this Agreement have caused it to be duly executed as of the date set forth below.

**BORROWER:**

DATE: __3 / 7__, 2019

**HERO NUTRITIONALS, LLC**, a California
limited liability company

By: _____
Name: Jennifer L. Hodges
Title:   Managing Member

**LENDER:**

DATE: __3|8|2019__, 2019

**MCCORMICK 107, LLC,**
a Maryland limited liability company

By: _____
Name: Jean Schroedter
Title: Vice President

S-1

QB\56245407.2

EXHIBIT 4    PAGE 134

[INSERT: CALIFORNIA ALL-PURPOSE
CERTIFICATE OF ACKNOWLEDGMENT FOR BORROWER]

QB\56245407.2

EXHIBIT 4    PAGE 135

# EXHIBIT 2

EXHIBIT 4    PAGE 136



## BANK *of* MANHATTAN

### COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,000,000.00 | 10-15-2013 | 10-15-2014 | ▓1239 | | | DW | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

Grantor:   Hero Nutritionals, LLC
           991 Calle Negocio
           San Clemente, CA 92673

Lender:   Bank of Manhattan, N.A.
          Pasadena Office
          199 South Los Robles Avenue
          Suite 130
          Pasadena, CA 91101

THIS COMMERCIAL SECURITY AGREEMENT dated October 15, 2013, is made and executed between Hero Nutritionals, LLC ("Grantor") and Bank of Manhattan, N.A. ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A)  All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B)  All products and produce of any of the property described in this Collateral section.

(C)  All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D)  All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E)  All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**FUTURE ADVANCES.** In addition to the Note, this Agreement secures all future advances made by Lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full

EXHIBIT 4    PAGE 137

.

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: ██1239                                                                                     Page 2

and even though for a period of time Grantor may not be indebted to Lender.

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management or in the members or managers of the limited liability company Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its membership agreement does not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sale of Inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of California, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell Inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any

EXHIBIT 4    PAGE 138

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: ⬤1239                                                                                     Page 3

Environmental Laws, and  (2)  agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement.  This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.**  Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender.  Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least twenty-one (21) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice.  Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person.  In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require.  If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.**  Grantor shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $25,000.00, whether or not such casualty or loss is covered by insurance.  Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty.  All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral.  If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration.  If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor.  Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.**  Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid.  If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender.  The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due.  Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor.  The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.**  Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following:  (1)  the name of the insurer;  (2)  the risks insured;  (3)  the amount of the policy;  (4)  the property insured;  (5)  the then current value on the basis of which insurance has been obtained and the manner of determining that value; and  (6)  the expiration date of the policy.  In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.**  Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest.  At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property.  Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs.  Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default.  Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.**  Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral.  Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts.  At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness.  If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care.  Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.**  If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral.  All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor.  All such expenses will become a part of the Indebtedness and, at Lender's option, will  (A)  be payable on demand;  (B)  be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either  (1)  the term of any applicable insurance policy; or  (2)  the remaining term of the Note; or  (C)  be treated as a balloon payment which will be due and payable at the Note's maturity.  The Agreement also will secure payment of these amounts.  Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.**  Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.**  Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.**  Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.**  Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or

EXHIBIT 4      PAGE 139

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: ▓1239

Page 4

Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution of Grantor (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the California Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election

EXHIBIT 4   PAGE 140

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: ⬤1239                                                                                          Page 5

by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**Preference Payments.** Any monies Lender pays because of an asserted preference claim in Grantor's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Grantor as provided in this Agreement

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Waiver of Co-Obligor's Rights.** If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Hero Nutritionals, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

EXHIBIT 4    PAGE 141

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: 1239                                                                                                          Page 6

---

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Hero Nutritionals, LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means Bank of Manhattan, N.A., its successors and assigns.

**Note.** The word "Note" means the Note dated October 15, 2013 and executed by Hero Nutritionals, LLC in the principal amount of $2,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED OCTOBER 15, 2013.

GRANTOR:

HERO NUTRITIONALS, LLC

By: _____
Jennifer L. Hodges, Manager/Member of Hero
Nutritionals, LLC

LASER PRO Lending, Ver. 12.2.20.010  Copr. Harland Financial Solutions, Inc. 1997, 2013.  All Rights Reserved.  - CA  C:\APPLICATIONS\LANDECH\LPL\E40.FC  TR-2109  PR-62

EXHIBIT 4      PAGE 142

# EXHIBIT 3

EXHIBIT 4      PAGE 143

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Gisella Melendez
800-331-3282

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)
CT LIEN SOLUTIONS
2727 ALLEN PARKWAY
HOUSTON, TX 77019
USA

DOCUMENT NUMBER: 47529650002
FILING NUMBER: 15-7452858378
FILING DATE: 03/03/2015 08:57

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Hero Nutritionals, LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 991 Calle Negocio | San Clemente | CA | 92673 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Bank of Manhattan | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2700 East Foothill Boulevard, Suite 200 | Pasadena | CA | 91107 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

See Attachment(s)

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
CA-0-47012362-49600775

FILING OFFICE COPY

EXHIBIT 4    PAGE 144

Collateral as described per Exhibit A; whether any of the foregoing is owned
now or acquired later; all accessions, additions, replacements, and
substitution relating to any of the foregoing; all records of any kind relating
to any of the foregoing.

This page and any following pages include and merge any text received for the collateral description with any attachments.

EXHIBIT 4    PAGE 145

HERO NUTRITIONALS, LLC
February 19, 2015

EXHIBIT A

| Quantity | Description |
|---|---|
| 2 | Tightening roller #W173930 |
| 1 | Air Cooled Chiller Model #CGAM070F2 |
| 26 | 18 Gage Galv 48x90 WO#41837 |
| 1 | Hyster - W40Z - 4,000 LBS Class 5N#B218N3119BM |
| 1 | Additional Electical Work Quote #HNU-6360-P1 |
| 1 | Proposal #HNU-6337-P1 |
| 1 | Tank 120 Gallon Stainless Steel Crepaco Jacketed, Agitation #S573873 |
| 1 | Indoor Conditioning Unit |
| 1 | Indoor Stacked Process Unit |
| 1 | Indoor Stacked Process Unit |
| 4.1 | 40' High Cube #DFSU6452470 |
| 4.1 | 40' High Cube #TCNU5766761 |
| 1 | Frequency Converter Model #50INDVC6050 |
| 1 | Steam Heated DI Water Loop #9065-9500 |
| 1 | Temperature Control Equipment #9065-9500 |
| 1 | Sartorius Entris 6202-1S |
| 1 | Ohaus D71P100QL |
| 5 | Adjusting Ring for tightening shaft #W108725 |
| 1 | Sprocket for shaft #W159444 |
| 1 | Threaded Pin for shaft #W107986 |
| 1 | Parallel Key for shaft #W109158 |
| 1 | Spocket #W159841 |
| 1 | Treaded pin #W108047 |
| 1 | Parallel Key #W109165 |
| 2 | Sprocket #W253359 |
| 2 | Sprocket #W159876 |
| 1 | Sprocket #W159503 |
| 2 | Chain carrying bar for trasport below the depositor #W579384 |
| 2 | Conveyor Chain depositing chain #W139813 |
| 1 | Chain tightener #W154777 |
| 1 | Chain tightener #W579289 |
| 1 | Chain tightener #579384 |
| 1 | Spoket #W579287 |
| 1.283M | Roller chain #W235082 |
| 1 | Chain Connector #W235083 |
| 2.648m | roller chain #W235097 |
| 1 | Chain Connector #W235098 |
| 2 | Chain Carring bar #174045 |
| 2 | Chain carrying bar #W579275 |
| 2 | V-Belt disc #W174149 |
| 2 | V-belt #W114647 |

EXHIBIT 4    PAGE 146

| | |
|---|---|
| 4 | adjusting ring #W108750 |
| 2 | sprocket #W579284 |
| 2 | threaded pin #W108048 |
| 2 | Parallel key #W109167 |
| 4 | Sprocket #W579283 |
| 2 | adjusting ring #W108751 |
| 2 | sprocket #W579286 |
| 2 | parallel key #W109288 |
| 2 | threaded pin #W107947 |
| 2 | sprocket #W159910 |
| 2 | Flange for driving shaft #W173559 |
| 2 | parallel key #W109294 |
| 2 | thraded pin #W108047 |
| 2 | sprocket #W159905 |
| 4 | adjusting ring #W108751 |
| 2 | sprocket #W159913 |
| 2 | Return wheel for turning shaft #W173743 |
| 8 | adjusting ring #W108751 |
| 2 | chain carrying bar #W375639 |
| 2 | Chain Carring bar #W375640 |
| 1 | Transport Chain #W139737 |
| 1 | Transport Chain #W139739 |
| 4 | chain carrying bar #W375643 |
| 4 | chain carrying bar #W375644 |
| 2 | chain carrying bar #W375645 |
| 2.800m | Roller chain #W234667 |
| 1 | chain connector #W234668 |
| 1 | chain connector #W234669 |
| 3 | sprocket #W159891 |
| 3 | threaded pin #W107945 |
| 2 | parallel key #W109166 |
| 1 | Idler for driving shaft #W173583 |
| 2 | adjusting ring #W108751 |
| 1 | parallel key #W109294 |
| 2 | Sprocket #W579282 |
| 2 | adjusting ring #W108751 |
| 2 | flange #W173559 |
| 2 | sprocket #W159910 |
| 2 | threaded pin #W107947 |
| 2 | parallel key #W109296 |
| 1 | chain tightener #W154790 |
| 2 | chain carrying bar #W350436 |
| 2 | chain carrying bar #W275642 |
| 4 | chain carrying bar #W350419 |
| 4 | chain carrying bar #W350442 |
| 2 | conveyor chain #W139736 |
| 2 | idler #W173583 |

EXHIBIT 4    PAGE 147

| | |
|---|---|
| 4 | adjusting ring #W108751 |
| 2 | chain carrying bar #W350509 |
| 4 | Chain guide #W579274 |
| 12 | Flexible bushing for sieving section #W115235 |
| 2 | conveyor chain #W139734 |
| 378 | O-Ring for pump pistons of your pump #W501436 |
| 378 | Piston ring for pump pistons #W113522 |
| 0.25 | felt #W308107 |
| 38.64 | v-belt #W114659 |
| 4 | connector #W234387 |
| 1 | welding tongs for v belt #W120433 |
| 1 | mitre tongs #W120434 |
| 1 | wellding head #W120436 |
| 2 | v-belt #W114637 |
| 30.000m | v-belt #W114658 |
| 8200 | Starch Trays (ST1099) |

EXHIBIT 4      PAGE 148

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional)<br>UCC Administrator<br>916-564-7800 | |
| B. E-MAIL CONTACT AT FILER (optional) | |

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

CLAS INFORMATION SERVICES
2020 HURLEY WAY STE 350
SACRAMENTO, CA 95825
USA

**DOCUMENT NUMBER:** 83161690003
**FILING NUMBER:** 19-77433433
**FILING DATE:** 10/29/2019 13:38

IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
15-7452858378

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☑ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:      AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record      ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c      ☐ ADD name: Complete item 7a or 7b, and item 7c      ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME<br>McCormick 107, LLC | | | |
|---|---|---|---|
| 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS<br>11350 McCormick Road, Suite 902 | CITY<br>Hunt Valley | STATE<br>MD | POSTAL CODE<br>21031 | COUNTRY<br>USA |
|---|---|---|---|---|

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| a. ORGANIZATION'S NAME<br>Bank of Manhattan | | | |
|---|---|---|---|
| b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
154319.24; CA SOS

FILING OFFICE COPY

EXHIBIT 4     PAGE 149

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
UCC Administrator
916-564-7800

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

CLAS INFORMATION SERVICES
2020 HURLEY WAY STE 350
SACRAMENTO, CA 95825
USA

DOCUMENT NUMBER: 83161690004
FILING NUMBER: 19-77433437
FILING DATE: 10/29/2019 13:40

IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |
|---|---|
| 15-7452858378 | |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☑ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:
Check one of these two boxes:    AND Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR McCormick 107, LLC | | | |
| b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
154319.24; CA SOS

FILING OFFICE COPY

EXHIBIT 4    PAGE 150

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Laura Lightholder
4142775387

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)
Quarles & Brady LLP
411 E Wisconsin Ave
Suite 2400
Milwaukee, WI 53202-53203
USA

DOCUMENT NUMBER: 83486720002
FILING NUMBER: 19-7745365663
FILING DATE: 11/06/2019 14:50

IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Hero Nutritionals, LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1900 Carnegie Avenue | Santa Ana | CA | 92705 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| McCormick 107, LLC | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 11350 McCormick Road, Building 2, Suite 902 | Hunt Valley | MD | 21031 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

See Attachment(s)

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
CA SOS

FILING OFFICE COPY

EXHIBIT 4    PAGE 151

**EXHIBIT A**
**TO**
**FINANCING STATEMENT**

Debtor:        **Hero Nutritionals, LLC**

Secured Party:        **McCormick 107, LLC**

This financing statement covers the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

All Inventory, equipment, accounts (Including but not limited to all health-care-Insurance receivables), chattel paper, Instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, Investment property, money, other rights to payment and performance, and general Intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all Insurance payments) of or relating to the foregoing property.

Including all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A)      All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.
(B)      All products and produce of any of the property described herein.
(C)      All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described herein.
(D)      All proceeds (including Insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described herein, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to Judgment, settlement or other process.
(E)      All records and data relating to any of the property described herein, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Debtor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

EXHIBIT 4    PAGE 152

# EXHIBIT 4

EXHIBIT 4    PAGE 153



## BANK of MANHATTAN

### PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $463,009.10 | 02-25-2014 | 02-25-2021 | ▉1306 | | | DW | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Hero Nutritionals, LLC
991 Calle Negocio
San Clemente, CA  92673

**Lender:** Bank of Manhattan, N.A.
Pasadena Office
199 South Los Robles Avenue
Suite 130
Pasadena, CA  91101

---

**Principal Amount: $463,009.10**                                **Date of Note: February 25, 2014**

**PROMISE TO PAY.** Hero Nutritionals, LLC ("Borrower") promises to pay to Bank of Manhattan, N.A. ("Lender"), or order, in lawful money of the United States of America, the principal amount of Four Hundred Sixty-three Thousand Nine & 10/100 Dollars ($463,009.10), together with interest on the unpaid principal balance from February 25, 2014, calculated as described in the "INTEREST CALCULATION METHOD" paragraph using an interest rate of 5.690%, until paid in full.  The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.

**PAYMENT.** Borrower will pay this loan in 84 payments of $6,712.11 each payment.  Borrower's first payment is due March 25, 2014, and all subsequent payments are due on the same day of each month after that.  Borrower's final payment will be due on February 25, 2021, and will be for all principal and all accrued interest not yet paid.  Payments include principal and interest.  Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; then to any unpaid collection costs; and then to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note.  Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.  All interest payable under this Note is computed using this method.  This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $100.00.  Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due.  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule.  Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender.  All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:  Bank of Manhattan, N.A., 2700 East Foothill Boulevard, Suite 100 Pasadena, CA  91107.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 6.000% of the unpaid portion of the regularly scheduled payment or $25.00, whichever is greater.

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by 5.000 percentage points.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan.  This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.  However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or

EXHIBIT 4      PAGE 154

**PROMISSORY NOTE**
(Continued)

Loan No: ⬤1306                                                Page 2

disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** To the extent permitted by applicable law, Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $20.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein: equipment described in a Commercial Security Agreement dated February 25, 2014.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Bank of Manhattan, N.A. 2700 East Foothill Boulevard, Suite 100 Pasadena, CA 91107.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

BORROWER:

HERO NUTRITIONALS, LLC

By: _____
Jennifer L. Hodges, Manager/Member of Hero
Nutritionals, LLC

LASER PRO Lending, Ver. 14.3.0.009  Copr. Harland Financial Solutions, Inc. 1997, 2014.  All Rights Reserved.  - CA  C:\APPLICATIONS\HARLAND\CFI\PL\D20.FC  TR-7201  PR-77

EXHIBIT 4    PAGE 155

## ALLONGE

ALLONGE to be attached to and made a part of that certain Promissory Note in the original principal amount of Four Hundred Sixty-three Thousand Nine and 10/100 Dollars ($463,009.10) dated February 25, 2014, (Loan Number █████6001) made by Hero Nutritionals, LLC, and in favor of Pacific Premier Bank, successor-by-merger to Plaza Bank, successor-by-merger to Bank of Manhattan N.A., as renewed, amended, or modified.

Pay to the order of McCormick 107, LLC, a Maryland limited liability company, without representations, warranties or recourse.

PACIFIC PREMIER BANK

By: _____
Name: Dona Jakosky
Title: Sr EVP/CCO
Date: March 1, 2019

QB\55526303.3

EXHIBIT 4    PAGE 156

# EXHIBIT 5

EXHIBIT 4    PAGE 157



BANK *of* MANHATTAN

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $463,009.10 | 02-25-2014 | 02-25-2021 | [redacted]1306 | | | DW | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Grantor:** Hero Nutritionals, LLC
991 Calle Negocio
San Clemente, CA 92673

**Lender:** Bank of Manhattan, N.A.
Pasadena Office
199 South Los Robles Avenue
Suite 130
Pasadena, CA 91101

THIS COMMERCIAL SECURITY AGREEMENT dated February 25, 2014, is made and executed between Hero Nutritionals, LLC ("Grantor") and Bank of Manhattan, N.A. ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

Collateral as described per Exhibt A

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management or in the members or managers of the limited liability company Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its membership agreement does not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: ▓▓1306    Page 2

and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of California, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least twenty-one (21) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $25,000.00, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the

EXHIBIT 4    PAGE 159

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Loan No: ██1306                                                                                    Page 3

proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION.** Until default, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or ability to perform Grantor's obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution of Grantor (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or guarantor, endorser, surety, or accommodation party dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or

EXHIBIT 4    PAGE 160

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Loan No: ██1306                                                        Page 4

performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the California Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

EXHIBIT 4     PAGE 161

<div align="center">

**COMMERCIAL SECURITY AGREEMENT**
**(Continued)**

</div>

Loan No: 1306                                                                          Page 5

**Preference Payments.** Any monies Lender pays because of an asserted preference claim in Grantor's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Grantor as provided in this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Waiver of Co-Obligor's Rights.** If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Hero Nutritionals, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Hero Nutritionals, LLC.

**Guaranty.** The word "Guaranty" means the guaranty from guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

<div align="center">

EXHIBIT 4    PAGE 162

</div>

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: ●1306                                                                    Page 6

---

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents.    Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means Bank of Manhattan, N.A., its successors and assigns.

**Note.** The word "Note" means the Note dated February 25, 2014 and executed by Hero Nutritionals, LLC in the principal amount of $463,009.10, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED FEBRUARY 25, 2014.

GRANTOR:

HERO NUTRITIONALS, LLC

By: _____
Jennifer L. Hodges, Manager/Member of Hero
Nutritionals, LLC

LASER PRO Lending, Ver. 14.1.0.009  Copr. Harland Financial Solutions, Inc. 1997, 2014.  All Rights Reserved.  - CA  C:\APPLICATION\5\HARLAND\CFI\LPL\E40.FC  TR-3261  PR-14

EXHIBIT 4    PAGE 163

# EXHIBIT 6

EXHIBIT 4      PAGE 164

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
UCC Division
800-932-9966

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**
First American Title Insurance Company
901 S. 2nd Street
Suite 201
Springfield, IL 62704
USA

DOCUMENT NUMBER: 42038630002
FILING NUMBER: 14-7402568653
FILING DATE: 03/11/2014 11:16
IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME Hero Nutritionals, LLC | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 1c. MAILING ADDRESS 991 Calle Negocio | CITY San Clemente | STATE CA | POSTAL CODE 92673 | COUNTRY USA |
|---|---|---|---|---|

| 1d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 1e. TYPE OF ORGANIZATION LimitedLiabilityCompany | 1f. JURISDICTION OF ORGANIZATION CA | 1g. ORGANIZATIONAL ID#, if any ☐ NONE  199507310020 |
|---|---|---|---|---|

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names**

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any ☐ NONE |
|---|---|---|---|---|

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)**

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME Bank of Manhattan, N.A. | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 3c. MAILING ADDRESS 199 South Los Robles Avenue Suite 130 | CITY Pasadena | STATE CA | POSTAL CODE 91101 | COUNTRY USA |
|---|---|---|---|---|

**4. This FINANCING STATEMENT covers the following collateral:**
Collateral as described per Exhibit A; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing.

**5. ALT DESIGNATION:** ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

**6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Attach Addendum [if applicable]**

**7. Check to REQUEST SEARCH REPORT(S) on Debtor(s)** [ADDITIONAL FEE]    [optional]    ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

**8. OPTIONAL FILER REFERENCE DATA**
Loan No. Debtor: Hero Nutritionals, LLC

FILING OFFICE COPY

EXHIBIT 4    PAGE 165

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
UCC Administrator
916-564-7800

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)
CLAS INFORMATION SERVICES
2020 HURLEY WAY STE 350
SACRAMENTO, CA 95825
USA

DOCUMENT NUMBER: 83181690002
FILING NUMBER: 19-77433432
FILING DATE: 10/29/2019 13:35

IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
14-7402568653

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☑ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:
Check one of these two boxes:                    AND   Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete    ☐ ADD name: Complete item    ☐ DELETE name: Give record name
item 6a or 6b; and item 7a and item 7c    7a or 7b; and item 7c    to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | McCormick 107, LLC | | | |
| | 7b. INDIVIDUAL'S SURNAME | | | |
| OR | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 11350 McCormick Road, Suite 902 | Hunt Valley | MD | 21031 | USA |

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes:   ☐ ADD collateral   ☐ DELETE collateral   ☐ RESTATE covered collateral   ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | Bank of Manhattan, N.A. | | | |
| OR | b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

10. OPTIONAL FILER REFERENCE DATA:
▆▆▆▆ CA SOS

FILING OFFICE COPY

EXHIBIT 4    PAGE 166

# EXHIBIT 7

EXHIBIT 4      PAGE 167



**BANK** *of* **MANHATTAN**

### PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $303,040.63 | 08-22-2014 | 08-22-2021 | **1364 | | | DW | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Hero Nutritionals, LLC
991 Calle Negocio
San Clemente, CA 92673

**Lender:** Bank of Manhattan, N.A.
Pasadena Office
199 South Los Robles Avenue
Suite 130
Pasadena, CA 91101

Principal Amount: $303,040.63                    Date of Note: August 22, 2014

**PROMISE TO PAY.** Hero Nutritionals, LLC ("Borrower") promises to pay to Bank of Manhattan, N.A. ("Lender"), or order, in lawful money of the United States of America, the principal amount of Three Hundred Three Thousand Forty & 63/100 Dollars ($303,040.63), together with interest on the unpaid principal balance from August 22, 2014, calculated as described in the "INTEREST CALCULATION METHOD" paragraph using an interest rate of 5.590%, until paid in full. The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.

**PAYMENT.** Borrower will pay this loan in 84 payments of $4,379.58 each payment. Borrower's first payment is due September 22, 2014, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on August 22, 2021, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; then to any unpaid collection costs; and then to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $100.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Bank of Manhattan, N.A.; Pasadena Office; 199 South Los Robles Avenue; Suite 130; Pasadena, CA 91101.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 6.000% of the unpaid portion of the regularly scheduled payment or $25.00, whichever is greater.

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by 5.000 percentage points.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness

EXHIBIT 4      PAGE 168

Loan No: ███1364

**PROMISSORY NOTE**
**(Continued)**

Page 2

evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** To the extent permitted by applicable law, Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $20.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other accounts). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein: collateral described in a Commercial Security Agreement dated August 22, 2014.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Bank of Manhattan, N.A., Pasadena Office, 199 South Los Robles Avenue, Suite 130, Pasadena, CA 91101.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE NOTE.**

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

HERO NUTRITIONALS, LLC

By: _____
Jennifer L. Hodges, Manager/Member of Hero
Nutritionals, LLC

EXHIBIT 4    PAGE 169

## ALLONGE

ALLONGE to be attached to and made a part of that certain Promissory Note in the original principal amount of Three Hundred Three Thousand Forty and 63/100 Dollars ($303,040.63) dated August 22, 2014, (Loan Number ████4001) made by Hero Nutritionals, LLC, and in favor of Pacific Premier Bank, successor-by-merger to Plaza Bank, successor-by-merger to Bank of Manhattan N.A., as renewed, amended, or modified.

Pay to the order of McCormick 107, LLC, a Maryland limited liability company, without representations, warranties or recourse.

**PACIFIC PREMIER BANK**

By: _____
Name: _Dawn Jakosky_
Title: _SrEVP/CCO_
Date: _March 1_, 2019

EXHIBIT 4    PAGE 170

Exhibit 21

EXHIBIT 4    PAGE 171

# EXHIBIT 8

EXHIBIT 4    PAGE 172

BANK *of* MANHATTAN

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $303,040.63 | 08-22-2014 | 08-22-2021 | [redacted]1364 | | | DW | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Grantor:** Hero Nutritionals, LLC
991 Calle Negocio
San Clemente, CA 92673

**Lender:** Bank of Manhattan, N.A.
Pasadena Office
199 South Los Robles Avenue
Suite 130
Pasadena, CA 91101

**THIS COMMERCIAL SECURITY AGREEMENT dated August 22, 2014, is made and executed between Hero Nutritionals, LLC ("Grantor") and Bank of Manhattan, N.A. ("Lender").**

**GRANT OF SECURITY INTEREST. For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.**

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

**Collateral as described per Exhibit A**

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**FUTURE ADVANCES.** In addition to the Note, this Agreement secures all future advances made by Lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management or in the members or managers of the limited liability company Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its membership agreement does not prohibit any term or condition of this Agreement.

Loan No: ███1364

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Page 2

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least twenty-one (21) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $25,000.00, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the

EXHIBIT 4    PAGE 174

**COMMERCIAL SECURITY AGREEMENT**
**(Continued)**

Loan No: 1364

Page 3

proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured, (3) the amount of the policy, (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION.** Until default, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution of Grantor (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

EXHIBIT 4    PAGE 175

## COMMERCIAL SECURITY AGREEMENT
(Continued)

Loan No: 1364

Page 4

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the California Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**Preference Payments.** Any monies Lender pays because of an asserted preference claim in Grantor's bankruptcy will become a part of the

EXHIBIT 4    PAGE 176

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: 1384                                                                                           Page 5

Indebtedness and, at Lender's option, shall be payable by Grantor as provided in this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required, and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Waiver of Co-Obligor's Rights.** If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inures to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Hero Nutritionals, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq., ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Hero Nutritionals, LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by law or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum

EXHIBIT 4    PAGE 177

| Loan No: ▓1364 | **COMMERCIAL SECURITY AGREEMENT**<br>(Continued) | Page 6 |
|---|---|---|

and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means Bank of Manhattan, N.A., its successors and assigns.

**Note.** The word "Note" means the Note dated August 22, 2014 and executed by Hero Nutritionals, LLC in the principal amount of $303,040.63, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED AUGUST 22, 2014.

GRANTOR:

HERO NUTRITIONALS, LLC

By: _____
Jennifer L. Hodges, Manager/Member of Hero
Nutritionals, LLC

LaserPro, Ver. 14.3.10.002  Copr. D+H USA Corporation 1997, 2014.  All Rights Reserved.  - CA  C:\LALPLANDACPR\PL\E40.FC  TR-2290

EXHIBIT 4    PAGE 178

# EXHIBIT 9

EXHIBIT 4    PAGE 179

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

CT Lien Solutions
Representation of filing

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Phone: 217-547-6635 Fax: 217-522-3570

**B. E-MAIL CONTACT AT FILER (optional)**
cokeefe@firstam.com

**This filing is Completed**
File Number : 147425980515
File Date : 27-Aug-2014

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**    18436 - FIRST

First American Title Insurance    44664368
901 S. 2nd Street
Suite 201    CALI
Springfield, IL 62704

File with: Secretary of State, CA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Hero Nutritionals, LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 991 Calle Negocio | San Clemente | CA | 92673 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Bank of Manhattan | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2700 East Foothill Boulevard, Suite 200 | Pasadena | CA | 91107 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
Collateral as described per Exhibit A; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA
████ ████1364 - Hero Nutritionals

Prepared by CT Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

EXHIBIT 4      PAGE 180

HERO NUTRITIONALS, LLC
August 22, 2014

## EXHIBIT A

| Quantity | Description |
| --- | --- |
| 220 | 2" OD x .065" B/A Tubing 304L PRO#3153412 |
| 10 | 2"OD  Wall Flange 304 |
| 12 | 2"OD 90 Elbow 2WCL 304 |
| 6 | 2"Ball Valve T/C 316 |
| 4 | 2"OD B7W TEE 304 |
| 12 | 2" Ferrule Short 14WMP T/C 304 |
| 12 | 2" Clamp 13MHHM Heavy Duty 304 |
| 12 | 2" Gasket Buna T/C 40MPU |
| 160 | 1"OD x 065" B/A Tubing 304L |
| 14 | 1"OD 90 Elbow 2WCL 304 |
| 4 | 1"OD 82WK 45 Elbow 304 |
| 8 | 1"Ferrule Short 14WMP T/C 304 |
| 3 | 1"Ball Valve T/C 316 |
| 6 | 1" & 1-1/2 Clamp 13MHHM Heavy Duty 304 |
| 6 | 1" Gasket EPDM T/C 40MPE |
| 6 | 1"OD Hex Hanger 304 W/ Poly Collar |
| 2 | 2" x 1"OD B31W Concentric Reducer 304 |
| 4 | 2"OD 90 Elbow 2WCL 304 |
| 3 | 2"150# Hex Plug 304 |
| 1 | 1"150# Hex Plug 304 |
| 1 | 1/2" 150# Hex Plug 304 |
| 1 | 1/4" 150# Hex Plug 304 |
| 1 | 2"T/C x 2"MPT 21MP Male Adapter 304 |
| 1 | 2"T/C x 1-1/2"FNPT 22MP Female Adapter 304 |
| 4 | 1"T/C x MPT 21MP Male Adapter 304 |
| 1 | 501NDVC6050 Freq. Converter:  Input: 480V 3phase 60Hz Output 400V 3phase 50Hz Standard Premium P/N 501NDVC6050 (50k VA, Input:  480V 3-phase 60Hz, Output:  400V 3-phase 50HZ |
| 1 | Curing Room Control System |
| 4 | INT96002404 "Int S/S 24"" X 4.50"" A-INT S/S 24" x 4.50" (1.00) 9600-04-24-511-STD 9600#4 4.5 24 MDL (1.00) 0009-03-04-010A-STD  Wearpan 3&4 RTN (1.00) 0090-04-00-010-STD MDL-STD MDL S/S 4.50 SPLC (1.00) 3600-04-24-010-STD 3600 S/S 4.5 24 W/S |
| 4 | INT96002404 Series 9600-24" Module Assy |
| 20 | 01-0408-070 LF880 k-4 5" Sidflexing Table Chain |
| 20 | 01-2350-098 Formed Stainless Rail w/UHMWPE Insert |
| 8 | Brackets - Standard Adjustable Guide Brackets |
| 1 | Legs - 9600 Standard Sheet Metal Support |

EXHIBIT 4    PAGE 181

|    |    |
|----|----|
| 18 | 109418 Herman Miller A02 Workstations 8' x 8' with (1) BBF Pedestal (1) Lateral File, (1) Tasklight (1) Storage Overhead all Powered grey fabric |
| 1 | Verde Series, Reception Desk Unit, Reception Desk Shell, Reception Return Shell, BBF Pedestal, FF Pedestal with Espresso finish |
| 18 | Cubes Default Code M |
| 1 | Reception Desk Defualt Code M |
| 1 | Renee Cube Default Code M |

EXHIBIT 4    PAGE 182

**2077591330**

**01/23/2020 15:18**

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

**FILED**
CALIFORNIA
SECRETARY OF STATE

SOS

85592010002    UCC 3 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| Laura Lightholder |
| B. E-MAIL CONTACT AT FILER (optional) |
| C. SEND ACKNOWLEDGMENT TO:  (Name and Address) |
| ┌ Quarles & Brady LLP |
| 411 E. Wisconsin Ave |
| Suite 2400 |
| Milwaukee, WI 53202-53202 |
| USA ┘ |

1a. INITIAL FINANCING STATEMENT FILE NUMBER
14-7425980515

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☑ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:
Check one of these two boxes:    AND    Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)
| 6a. ORGANIZATION'S NAME |
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)
| 7a. ORGANIZATION'S NAME |
| McCormick 107, LLC |
| OR 7b. INDIVIDUAL'S SURNAME |
| INDIVIDUAL'S FIRST PERSONAL NAME |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 11350 McCormick Road, Suite 902 | Hunt Valley | MD | 21031 | USA |

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes:  ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor
| 9a. ORGANIZATION'S NAME |
| Bank of Manhattan |
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
████████ CA SOS

UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

**EXHIBIT 4    PAGE 183**

# EXHIBIT 10

EXHIBIT 4    PAGE 184



# BANK of MANHATTAN

## PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $833,950.27 | 10-29-2014 | 10-29-2021 | ●●1396 | | | DW | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Hero Nutritionals, LLC
991 Calle Negocio
San Clemente, CA  92673

**Lender:** Bank of Manhattan, N.A.
Pasadena Office
199 South Los Robles Avenue
Suite 130
Pasadena, CA  91101

---

**Principal Amount: $833,950.27**                                         **Date of Note: October 29, 2014**

**PROMISE TO PAY.** Hero Nutritionals, LLC ("Borrower") promises to pay to Bank of Manhattan, N.A. ("Lender"), or order, in lawful money of the United States of America, the principal amount of Eight Hundred Thirty-three Thousand Nine Hundred Fifty & 27/100 Dollars ($833,950.27), together with interest on the unpaid principal balance from October 29, 2014, calculated as described in the "INTEREST CALCULATION METHOD" paragraph using an interest rate of 5.460%, until paid in full.  The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.

**PAYMENT.** Borrower will pay this loan in 84 payments of $11,999.69 each payment.  Borrower's first payment is due November 29, 2014, and all subsequent payments are due on the same day of each month after that.  Borrower's final payment will be due on October 29, 2021, and will be for all principal and all accrued interest not yet paid.  Payments include principal and interest.  Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; then to any unpaid collection costs; and then to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note.  Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.  All interest payable under this Note is computed using this method.  This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $100.00.  Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due.  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule.  Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender.  All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:  Bank of Manhattan, N.A.; Pasadena Office; 199 South Los Robles Avenue; Suite 130; Pasadena, CA  91101.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 6.000% of the unpaid portion of the regularly scheduled payment or $25.00, whichever is greater.

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by 5.000 percentage points.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan.  This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.  However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness

EXHIBIT 4      PAGE 185

**PROMISSORY NOTE**
(Continued)

Loan No: ████1396                                                                                                                    Page 2

---

evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** To the extent permitted by applicable law, Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $20.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein: collateral described in a Commercial Security Agreement dated October 29, 2014.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Bank of Manhattan, N.A., Pasadena Office, 199 South Los Robles Avenue, Suite 130, Pasadena, CA 91101.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE NOTE.**

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

HERO NUTRITIONALS, LLC

By: _____
Jennifer L. Hodges, Manager/Member of Hero
Nutritionals, LLC

---

LaserPro, Ver. 14.3.19.093  Copr. D+H USA Corporation 1997, 2014.  All Rights Reserved.  - CA  C:\HARLAND\CFI\LPL\D20.FC  TR-2333

EXHIBIT 4    PAGE 186

## ALLONGE

ALLONGE to be attached to and made a part of that certain Promissory Note in the original principal amount of Eight Hundred Thirty-three Thousand Nine Hundred Fifty and 27/100 Dollars ($833,950.27) dated October 29, 2014, (Loan Number ████6001) made by Hero Nutritionals, LLC, and in favor of Pacific Premier Bank, successor-by-merger to Plaza Bank, successor-by-merger to Bank of Manhattan N.A., as renewed, amended, or modified.

Pay to the order of McCormick 107, LLC, a Maryland limited liability company, without representations, warranties or recourse.

PACIFIC PREMIER BANK

By: _____
Name: _____
Title: _____
Date: _____, 2019

EXHIBIT 4    PAGE 187

# EXHIBIT 11

EXHIBIT 4    PAGE 188

## COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $833,950.27 | 10-29-2014 | 10-29-2021 | ■1396 | | | DW | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Grantor:** Hero Nutritionals, LLC
991 Calle Negocio
San Clemente, CA  92673

**Lender:** Bank of Manhattan, N.A.
Pasadena Office
199 South Los Robles Avenue
Suite 130
Pasadena, CA  91101

THIS COMMERCIAL SECURITY AGREEMENT dated October 29, 2014, is made and executed between Hero Nutritionals, LLC ("Grantor") and Bank of Manhattan, N.A. ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

    Collateral as described per Exhibit A

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

    (A)  All accessions, attachments, accessories, replacements of and additions to any of the collateral described herein, whether added now or later.

    (B)  All products and produce of any of the property described in this Collateral section.

    (C)  All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

    (D)  All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

    (E)  All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**FUTURE ADVANCES.** In addition to the Note, this Agreement secures all future advances made by Lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

    **Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.

    **Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management or in the members or managers of the limited liability company Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

    **No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its membership agreement does not prohibit any term or condition of this Agreement.

    **Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. There shall be no setoffs

EXHIBIT 4    PAGE 189

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: ▇1396                                                                              Page 2

or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least twenty-one (21) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $25,000.00, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

EXHIBIT 4    PAGE 190

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Loan No: 1396                                                                                         Page 3

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION.** Until default, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution of Grantor (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the

EXHIBIT 4    PAGE 191

**COMMERCIAL SECURITY AGREEMENT**
**(Continued)**

Loan No: ⬤1396                                                                                          Page 4

---

same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the California Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California

**Preference Payments.** Any monies Lender pays because of an asserted preference claim in Grantor's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Grantor as provided in this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing

EXHIBIT 4      PAGE 192

**COMMERCIAL SECURITY AGREEMENT**
**(Continued)**

Loan No: ●1396                                                                                   Page 5

and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Waiver of Co-Obligor's Rights.** If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Hero Nutritionals, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Hero Nutritionals, LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and

EXHIBIT 4    PAGE 193

**COMMERCIAL SECURITY AGREEMENT**
**(Continued)**

Loan No: ▓1396                                                                                          Page 6

interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means Bank of Manhattan, N.A., its successors and assigns.

**Note.** The word "Note" means the Note dated October 29, 2014 and executed by Hero Nutritionals, LLC in the principal amount of $833,950.27, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED OCTOBER 29, 2014.

GRANTOR:

HERO NUTRITIONALS, LLC

By: _____
Jennifer V. Hodges, Manager/Member of Hero
Nutritionals, LLC

LaserPro, Ver. 14.3.10.003 Copr. D+H USA Corporation 1997, 2014. All Rights Reserved. - CA  C:\HARLAN\CFI\LPL\E40.FC  TR-2333

EXHIBIT 4    PAGE 194

# EXHIBIT 12

EXHIBIT 4    PAGE 195

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Phone: (800) 331-3282 Fax: (818) 662-4141

B. E-MAIL CONTACT AT FILER (optional)
CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)   18436 - FIRST

CT Lien Solutions          45493268
P.O. Box 29071
Glendale, CA 81209-0071         CALI

File with: Secretary of State, CA          THE           ILY

14-7434950926
10/31/2014 17:00

FILED
CALIFORNIA
SECRETARY OF STATE

SOS

45589400002   UCC 1 FILING

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Hero Nutritionals, LLC | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 991 Calle Negocio | San Clemente | CA | 92673 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Bank of Manhattan | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2700 East Foothill Boulevard, Suite 200 | Pasadena | CA | 91107 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
Collateral as described per Exhibit A; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:   6b. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility   ☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA
1396

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by CT Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

EXHIBIT 4      PAGE 196

Exhibit "A"

Remit to:
Bosch Packaging Technology, Inc.
36816 Treasury Center
Chicago, IL 60694-6800

 BOSCH

Invoice

**Billing Address**

Hero Nutritionals, LLC
Building A
1900 Carnegie Avenue
Santa Ana CA 92705

**Information**

Invoice Number    90359139
Invoice Date    27-Aug-2014
Customer Number
Purchase Order No.    0001510
Purchase Order Date    22-Jan-2014
Incoterms 2010    CPT Bosch Dock
Shipping Conditions    Ocean Prepaid
Sales Order Number    255040
Payment Terms    Net due in 30 days
Current Date    27-Aug-2014
Currency    USD
Agency Sold to:    5000    BOSCH PACKAGING

TECHNOLOGY, INC.

1 of 1

**Invoice Details**

| Item | Material Description | Quantity | Unit Price | Amount |
|---|---|---|---|---|
| 0010 | M674 Pipings/fitting for connection to IBC | 1 EA | | |
| 0040 | M674 Gelatin/Pectin dissolving Line PLS | 1 EA | | |
| 0070 | M674 Gravomat BDS 0116A | 1 EA | | |
| 0100 | M674 Vitamin Premix Dosing | 1 EA | | |
| 0130 | M674 Gravimetric Dosing and Mixing Line BMG | 1 EA | | |
| 0160 | 9050 Service Installation and Training | | | |
| 0190 | FRT9 Fumigated Wooden cases for Seafreight | | 15,150.00 | 15,150.00 |

Gross Value    696,740.80
Net Value    696,740.80
Total Tax    54,492.50

Total Amount    $ 751,233.30
Less Down Payment Billed    $ 627,000.00
Net Due    $ 124,133.30

Please reference invoice number on your payment.

Correspondence: Bosch Packaging Technology, Inc. 869 South Knowles Avenue New Richmond WI 64017 USA
Phone: +1 (715) 246-6611 Fax: +1 (715) 246-6539 Internet: www.BoschPackaging.com

PAGE 1 OF 64 PAGES

EXHIBIT 4    PAGE 197

PURCHASE ORDER

Page:    1

**Hero NutriSonals**

1900 E. Carnegie Avenue
Suite A
Santa Ana, CA 93264
Ph: (949) 418-3140

| | | |
|---|---|---|
| P.O. NUMBER | 0001879 | |
| ORDER DATE | 6/12/2014 | |
| REQUESTED BY | WINKLER | |

VENDOR:

WINKLER & DÜNNEBIER
SÜẞWARENMASCHINEN GMBH
RINGSTRAẞE 1
RENGSDORF, 56579
Germ Tax

SHIP TO:

Hero NutriSonals LLC
1900 E. Carnegie Avenue, Suite A
Santa Ana, CA 93705

| Required Date | Ship VIA | F.O.B. | Terms |
|---|---|---|---|
| 6/24/2014 | BY AIRFREIGHT | FCA Invoterms 2010 | SEE BELOW |

| Item Code | Unit | Ordered | Received | Backordered | Unit Cost | Amount |
|---|---|---|---|---|---|---|
| All | | | | | | 17,373.80 |
| Default Item Code All | | | | | | |
| USD | | | | | | |

TERMS AND CONDITIONS OF OFFER: This Purchase Order is an offer to buy goods and/or services and is expressly subject to the terms and conditions of Hero NutriSonals, LLC Purchase Order/Contract Terms & Conditions, which supersede any conflicting terms or conditions, and which are incorporated herein by reference. Delivery of the subject goods and/or commencement of performance of the subject services constitutes acceptance of the terms and conditions of this Purchase Order. This Purchase Order expressly limits acceptance to the terms of this offer, and Hero NutriSonals, LLC hereby objects to any different or additional terms contained in any response to this Purchase Order. In addition to the other terms in this Purchase Order, this Purchase Order expressly includes all implied warranties and all of the buyer's remedies set forth in the Uniform Commercial Code. In the event of any dispute between the parties, such dispute will be settled exclusively in a court of law. The terms of this Purchase Order are the sole and exclusive terms on which Hero NutriSonals, LLC agrees to be bound.

Payment Terms Prepay after receipt of purchase order
Please see detail on quote number 1108569

| | |
|---|---|
| Net Order: | 17,373.80 |
| Sales Tax: | 0.00 |
| Freight: | 0.00 |
| TOTAL | 17,373.80 |

Manager Signature _____

4558946000002

EXHIBIT 4    PAGE 198



**WDS**
WINKLER und DÖNNEBIER
Söllverarbeitungsmaschinen

WINKLER und DÖNNEBIER
Söllverarbeitungsmaschinen GmbH
Magtraße 1
56579 Rengsdorf · Germany

Hero Nutritionals, LLC
Mr. David Gallardo
991 Calle Negocio
USA San Clemente, CA 92673

Tel. +49 2634 9676-200
Fax +49 2634 9676-269

sales@w-u-d.com
www.w-u-d.com

## Quotation

| | |
|---|---|
| Quotation no. | 1106689 |
| Quotation date | |
| valid until | 24.06.2014 |
| Customer no. | |
| Your inquiry | Mail of Jens and Totti |
| dated | 26.03.2014 |
| Contact | Christian Greindl |
| Tel. | +49 2634/9676-232 |
| Fax | +49 2634/9676-269 |
| E-Mail | christian.greindl@w-u-d.com |

Mode of shipment    by airfreight
Terms of delivery    FCA (Incoterms 2010)
Terms of payment    advance payment

| Item | Part | Delivery time | | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|---|---|
| 1.0 | W149148 TRANSPORT ROLL for palette transport L381_04_2355_0 | 8 | week(s) | 4 pcs | 320,00 | 1,280.00 |
| 2.0 | W181768 v-belt disc for palette transport S182_02_0224_0 | 6 | week(s) | 2 pcs | 246,00 | 492.00 |
| 3.0 | W182803 bolt for palette transport S282_04_0143_0 | 8 | week(s) | 2 pcs | 24,00 | 48.00 |
| 4.0 | W234616 roller chain for palette transport (drive) X4_271_01 | 8 | week(s) | 1.055 m | 13,80 | 14.58 |
| 5.0 | W234619 chain connector for palette transport (drive) X4_271_11 | 8 | week(s) | 1 pcs | 1,10 | 1.10 |

Geschäftsführer Rainer Bunkel
Amtsgericht Neuwied
HRB 12210
USt. ID Nr. DE 152760920

Commerzbank
BLZ 570 400 41 · Kto. 2860021
IBAN DE67 5704 0044 0186 0021 00
BIC Code COBA DE FF

Westerwald Bank eG
BLZ 573 918 00 · Kto. 7000397
IBAN DE47 5739 1800 0026 0050 01
BIC Code GENO DE 51 WW1

28.03.2014

45589460082

EXHIBIT 4    PAGE 199

Quotation    1108560 / 26.03.2014                                          Page    2

| Item | Part | Delivery time | | Quantity/Unit | Unit price EUR | Total price EUR |
|------|------|---------------|---|---------------|----------------|-----------------|
| 6.0 | W234520 chain link for palette transport (drive) X4_271_12 | 8 | week(s) | 1 pcs | 1.80 | 1.80 |
| 7.0 | W163116 sprocket for palette transport (drive) S351_04_0140_0 | 8 | week(s) | 2 pcs | 197.00 | 394.00 |
| 8.0 | W306017 8XT-screw for palette transport (drive) | 8 | week(s) | 4 pcs | 0.35 | 1.40 |
| 9.0 | W285102 IN-8XT-screw for palette transport (drive) | 8 | week(s) | 3 pcs | 0.60 | 1.80 |
| 10.0 | W114850 v-belt as spare for palette transport K1_769_89 | 8 | week(s) | 30.000 m | 36.00 | 1,080.00 |
| 11.0 | W234387 v-belt connector as spare for palette transport X4_132_10 | 8 | week(s) | 2 pcs | 1.80 | 3.60 |
| 12.0 | W234516 roller chain for stacking unit (drive) X4_271_01 | 8 | week(s) | 1.105 m | 13.80 | 15.25 |
| 13.0 | W234519 chain connector for stacking unit (drive) X4_271_11 | 8 | week(s) | 1 pcs | 1.10 | 1.10 |
| 14.0 | W153407 sprocket for stacking unit (drive) R6_12_030_022 | 8 | week(s) | 1 pcs | 158.00 | 158.00 |
| 15.0 | W109287 parallel key for stacking unit (drive) D6.401.558 | 8 | week(s) | 1 pcs | 2.54 | 2.54 |
| 16.0 | W107946 | 8 | week(s) | 1 pcs | 0.90 | 0.90 |

45589460082

EXHIBIT 4    PAGE 200

**Final Invoice**     1709030/28.08.2014                          Page:   8

| Pos. | Part | | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|---|
| 45.0 | W119453 T-plug connector (pneumatic) | | 10 pcs | 5.90 | 59.00 |
| | customs tariff no. Country of origin | 8438 90 00 J Japan | | | |
| 46.0 | W119467 Y plug screwing (pneumatic) | | 5 pcs | 8.90 | 44.50 |
| | customs tariff no. Country of origin | 8438 90 00 J Japan | | | |
| 47.0 | W119422 plug connection (pneumatic) | | 20 pcs | 5.70 | 114.00 |
| | customs tariff no. Country of origin | 8438 90 00 J Japan | | | |
| 48.0 | W119411 plug connection (pneumatic) | | 20 pcs | 7.10 | 142.00 |
| | customs tariff no. Country of origin | 8438 90 00 RC Taiwan | | | |
| 49.0 | W119434 L-connection (pneumatic) | | 20 pcs | 3.07 | 61.40 |
| | customs tariff no. Country of origin | 8438 90 00 J Japan | | | |
| 50.0 | W119432 L-connection (pneumatic) | | 20 pcs | 5.15 | 103.00 |
| | customs tariff no. Country of origin | 8438 90 00 J Japan | | | |
| 51.0 | W569801 geared engine | | 1 pcs | 514.00 | 514.00 |
| | customs tariff no. Country of origin | 8438 90 00 D Germany | | | |

4558946003

EXHIBIT 4     PAGE 201

Final Invoice      1709030/26.08.2014                          Page:  9

| Pos | Part | | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|---|
| 51.5 | W666806<br>supporting plates<br>for gear motor Item 61.0 | | 1 pcs | | |
| | price is incl. in item 51.0<br>customs tariff no.<br>Country of origin | 8438 90 00<br>D Germany | | | |
| 52.0 | W124950<br>LIMIT SWITCH<br>customs tariff no.<br>Country of origin | 8438 90 00<br>GB Great Britain | 2 pcs | 165.00 | 330.00 |
| 53.0 | W127204<br>INITIATOR<br>customs tariff no.<br>Country of origin | 8438 90 00<br>EU European Union | 2 pcs | 94.80 | 189.60 |
| 54.0 | W127260<br>INITIATOR<br>customs tariff no.<br>Country of origin | 8438 90 00<br>EU European Union | 4 pcs | 109.00 | 436.00 |
| 55.0 | W127255<br>Inductive sensor<br>customs tariff no.<br>Country of origin | 8438 90 00<br>D Germany | 2 pcs | 85.80 | 171.60 |
| 56.0 | TZ01<br>down payment<br>Invoice 1708554 / 1 / 18.08.2014 | | 1 pcs | - 3,845.99 | - 3,845.99 |

4558946D002

EXHIBIT 4      PAGE 202

Final Invoice    1709030/26.08.2014    Page: 10

| Pos. | Part | Quantity/Unit | Unit price EUR | Total price EUR |
|------|------|---------------|----------------|-----------------|
|      | packaging | | | 200,00 |
|      | freight | | | 890,00 |
|      | total price | | | 13,915,98 |
|      | less down payments | | - | 3,845,99 |
|      | Total value: | | | 10,069,99 |

Kind regards

WINKLER und DÜNNEBIER
Süßwarenmaschinen

ppa. Elke Runkel

45585460002

EXHIBIT 4    PAGE 203

**Quotation**    1108569 / 26.03.2014    Page    3

| Item | Part | Delivery time | | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|---|---|
| | threaded pin for stacking unit (drive) DO_090_158 | | | | | |
| 17.0 | W159451 sprocket for stacking unit (drive) RS_12_035_003 | 8 | week(s) | 1 pcs | 181,00 | 181,00 |
| 18.0 | W109142 parallel key for stacking unit (drive) DO_400_162 | 8 | week(s) | 1 pcs | 0,97 | 0,97 |
| 19.0 | W107920 threaded pin for stacking unit (drive) DO_090_107 | 8 | week(s) | 1 pcs | 0,49 | 0,49 |
| 20.0 | W114619 v-belt for feeder drive K1_787_85 | 8 | week(s) | 2 pcs | 23,60 | 47,20 |
| 21.0 | W114607 v-belt for feeder drive K1_787_36 | 8 | week(s) | 2 pcs | 11,00 | 22,00 |
| 22.0 | W113317 O-ring for gear boxes L261_22_4103_0 and L261_22_4104_2 below the depositor | 8 | week(s) | 2 pcs | 1,22 | 2,44 |
| 23.0 | W113314 O-ring for gear boxes L261_22_4103_0 and L261_22_4104_2 below the depositor | 8 | week(s) | 3 pcs | 1,22 | 3,66 |
| 24.0 | W113140 sealing ring for gear boxes L261_22_4103_0 and L261_22_4104_2 below the depositor | 8 | week(s) | 4 pcs | 4,60 | 18,40 |
| 25.0 | W113113 sealing ring for gear box L261_22_4104_2 below the depositor | 8 | week(s) | 2 pcs | 3,50 | 7,00 |

4558546000/2

EXHIBIT 4    PAGE 204

Quotation          1108569 / 20.03.2014                                    Page    4

| Item Part | | Delivery time | | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|---|---|
| 26.0 | W173853 BRUSH V281_06_7602_1 | 8 | week(s) | 4 pcs | 60.90 | 235.60 |
| 27.0 | W139770 SCRAPING BRUSH L281_06_7003_0 | 8 | week(s) | 2 pcs | 378.00 | 768.00 |
| 28.0 | W173854 brush V281_06_7606_0 | 8 | week(s) | 2 pcs | 192.00 | 384.00 |
| 29.0 | W173851 BRUSH V281_06_7601_1 | 8 | week(s) | 4 pcs | 321.00 | 1,284.00 |
| 30.0 | W251681 brush | 8 | week(s) | 2 pcs | 115.00 | 230.00 |
| 31.0 | W234518 roller chain X4_271_01 | 8 | week(s) | 3.087 m | 13.80 | 42.60 |
| 32.0 | W234519 chain connector X4_271_11 | 6 | week(s) | 1 pce | 1.10 | 1.10 |
| 33.0 | W234520 chain link X4_271_12 | 6 | week(s) | 1 pcs | 1.80 | 1.80 |
| 34.0 | W158372 sprocket R5_12_026_004 | 8 | week(s) | 1 pcs | 170.00 | 170.00 |
| 35.0 | W139835 chain tightener L262_06_2604_0 | 8 | week(s) | 1 pcs | 57.00 | 57.00 |
| 36.0 | W173712 pressure screw V261_06_0256_0 | 8 | week(s) | 1 pcs | 5.00 | 5.00 |
| 37.0 | S000002 protein slider for the existing pump system W144956 (with 9 x 42 platens, D12mm) This plate is the washing plate, e.g. all | 8 | week(s) | 1 pcs | 3,203.00 | 3,203.00 |

4558945XXXX

EXHIBIT 4     PAGE 205

Quotation    1108569 / 26.03.2014                                    Page    5

| Item Part | | Delivery time | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|---|
| | pistons in works. | | | | |
| 38.0 | W654548 starting valve (pneumatik, for stacking unit) | 8    week(s) | 1 pcs | 68.50 | 68.50 |
| 39.0 | W119220 sound absorber 1/4" (pneumatik, for stacking unit) K2_431_02 | 8    week(s) | 1 pcs | 7.10 | 7.10 |
| 40.0 | W320452 filter regulating valve (pneumatik, for stacking unit) | 8    week(s) | 1 pcs | 136.00 | 136.00 |
| 41.0 | W320453 distributor (pneumatik, for stacking unit) | 8    week(s) | 1 pcs | 28.80 | 28.80 |
| 42.0 | W119327 double nipple (pneumatik, for stacking unit) K2_432_53 | 8    week(s) | 1 pcs | 1.57 | 1.57 |
| 43.0 | W502543 magnetic valve (pneumatic) | 8    week(s) | 1 pcs | 118.00 | 118.00 |
| 44.0 | W119037 magnetic valve (pneumatik) K2_426_04_95 | 8    week(s) | 1 pcs | 148.00 | 148.00 |
| 45.0 | W119453 T-plug connector (pneumatic) K2_434_28_03 | 8    week(s) | 10 pcs | 5.90 | 59.00 |
| 46.0 | W119467 Y plug screwing (pneumatic) K2_434_30_03 | 8    week(s) | 5 pcs | 8.90 | 44.50 |
| 47.0 | W119422 plug connection (pneumatic) K2_434_11_35 | 8    week(s) | 20 pcs | 5.70 | 114.00 |
| 48.0 | W119411 | 8    week(s) | 20 pcs | 7.10 | 142.00 |

45589460002

EXHIBIT 4    PAGE 206

**Quotation**   1108569 / 26.03.2014                                      Page    6

| Item Part | Delivery time | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|
| plug connection (pneumatic) K2_434_11_03 | | | | |
| 49.0  W119434 L-connection (pneumatic) K2_434_19_06 | 8    week(s) | 20 pcs | 3.07 | 61.40 |
| 50.0  W119432 L-connection (pneumatic) K2_434_19_03 | 8    week(s) | 20 pcs | 5.15 | 103.00 |
| 51.0  W129258 geared engine K0_169_31_00 | 8    week(s) | 1 pcs | 514.00 | 514.00 |
| 52.0  W124950 LIMIT SWITCH K4_259_14 | 8    week(s) | 2 pcs | 165.00 | 330.00 |
| 53.0  W127204 INITIATOR K4_718_10 | 8    week(s) | 2 pcs | 94.80 | 189.60 |
| 54.0  W127268 INITIATOR K4_718_82 | 8    week(s) | 4 pcs | 109.00 | 436.00 |
| 55.0  W127255 inductive sensor | 8    week(s) | 2 pcs | 85.80 | 171.60 |

Net value:                                               12,619.08

Total amount:                                            12,619.08

The minimum order value is 150 Euro.

45569460002

EXHIBIT 4     PAGE 207

| Quotation | 1108569 / 26.03.2014 | | | Page | 7 |
|---|---|---|---|---|---|
| Item Part | | Delivery time | Quantity/Unit | Unit price EUR | Total price EUR |

Please note that your order will be carried out subject to the general WDS terms of delivery. We cannot accept any different terms of trade that might appear on your order form and would ask for your comprehension.

Note concerning delivery date: The definite delivery time depends on the order situation and the goods on stock at receipt of order. A binding information concerning delivery time will be given with the order confirmation.

Delays in order procedure, e.g. the agreed payment conditions, entitle the supplier to prolong the delivery time accordingly.

Service visits will be effected according to our actual conditions for working outside the plant, status 2013. During a service visit the customer has to support our fitters by technical experts as well as provide the necessary installation and security devices.

We would be pleased to receive your order.

Kind regards

WINKLER und DÜNNEBIER
süßwarenmaschinen

i.A. Christian Greindl

EXHIBIT 4      PAGE 208

BOSCH PACKAGING TECHNOLOGY, INC.
TERMS AND CONDITIONS
January 1, 2014

BOSCH

Unless otherwise set forth in writing on our proposal to you, the following terms and conditions shall apply: [illegible]

1. ORDERS: [illegible]

2. CHANGES: [illegible]

3. SOFTWARE: [illegible]

4. DELIVERY AND INSTALLATION: [illegible]

5. AGENTS AUTHORITY: [illegible]

6. WARRANTY; DISCLAIMER: [illegible]

7. LIMITATION OF DAMAGES AND LIABILITY: [illegible]

8. CHARGES; TITLE AND SECURITY INTEREST: [illegible]

9. PACKAGING; SHIPMENT; RISK OF LOSS: [illegible]

10. [illegible]

11. INVOICES AND PAYMENT: [illegible]

12. INFRINGEMENT: [illegible]

13. FORCE MAJEURE; ALLOCATIONS: [illegible]

14. CANCELLATION: [illegible]

15. SEVERABILITY: [illegible]

16. TECHNICAL ASSISTANCE: [illegible]

17. GENERAL: [illegible]

45589460002

Page:    2

## PURCHASE ORDER



| | 0001510 |
| ORDER DATE | 12/5/2013 |

| Vendor Number | BOSCHPA |

1100 E. Carnegie Avenue
Suite A
Santa Ana, CA 92705
Ph: (949) 418-2320

**Vendor:** BOSCH PACKAGING TECHNOLOGY INC
36516 TREASURY CENTER
Chicago, IL 60694-6500
Confirm To:
Ryan@herbalifekorea.com

**Ship To:** Herb Nutritionals LLC
1100 E. Carnegie Avenue, Suite A
Santa Ana, CA 92705

| Required Date | Ship VIA | F.O.B. | Terms |
|---|---|---|---|
| 4/6/2014 | | | Net 30 |

| Item Code | Unit | Ordered | Received | Backordered | Unit Cost | Amount |
|---|---|---|---|---|---|---|
| 710120-Technical Documentation | | | | | | 0.00 |
| /M | | | | | | |
| Default Item Code /M | | | | | | |
| 710130s-Spare Parts Catalogue in English | | | | | | 2,650.00 |
| /M | | | | | | |
| Default Item Code /M | | | | | | |
| 990000 | | | | | | |
| Wrapping in fumigated wooden cases for seafreight | | | | | | 8,200.00 |
| /M | | | | | | |
| Default Item Code /M | | | | | | |
| 990000 | | | | | | |
| Piping DN56, from IBCs to corn syrup dosing pumps, double walled, heat-able by hot water | | | | | | 11,000.0 |
| /M | | | | | | |
| Default Item Code /M | | | | | | |
| 300400 | | | | | | |
| Eccentric auger pump | | | | | | 2,600.00 |
| /M | | | | | | |
| Default Item Code /M | | | | | | |
| 300160 | | | | | | |
| Connection parts DN 60, suction side to eccentric auger pump, with protection against dry running | | | | | | 6,180.00 |
| /M | | | | | | |
| Default Item Code /M | | | | | | |
| 990004 | | | | | | |
| Pipe DN 65, from corn syrup feeding pump to GraVomat | | | | | | 103,100.00 |
| /M | | | | | | |
| Default Item Code /M | | | | | | |
| 990000 | | | | | | |
| Pectin or Gelatin dissolving line BLS 0300 CA, | | | | | | 5,950.00 |
| /M | | | | | | |
| Default Item Code /M | | | | | | |
| 990001 | | | | | | |
| Pipe DN 40, from BLS to Gravomat weighing vessel | | | | | | 36,650.00 |
| /M | | | | | | |
| Default Item Code /M | | | | | | |
| 100200 | | | | | | |
| Gravomat BGS 0130 A | | | | | | 79,300.00 |
| /M | | | | | | |
| | | | | | | Continued |

4559460002

EXHIBIT 4    PAGE 210

PURCHASE ORDER

Page    3

1900 E. Carnegie Avenue
Suite A
Santa Ana, CA 92705
Ph: (949) 484-2210

| | ORDER NUMBER | 10001510 |
| | ORDER DATE | 12/9/2013 |
| | Vendor Number | BOSCHPA |

**Vendor:**
BOSCH PACKAGING TECHNOLOGY INC
34818 TREASURY CENTER
Chicago, IL 60694-5800
Confirm To:
Bijen@herooutrikools.com

**SHIP TO:**
Hero Nutritionals LLC
1900 E. Carnegie Avenue, Suite A
Santa Ana, CA 92705

| Required Date | SHIP VIA | F.O.B. | Terms |
| --- | --- | --- | --- |
| 4/3/2014 | | | Net 30 |

| Item Code | Unit | Ordered | Received | Backordered | Unit Cost | Amount |
| --- | --- | --- | --- | --- | --- | --- |
| Default Item Code /M | | | | | | |
| 900006 | | | | | | |
| Big bag rigid auger conveyor plate for crystal auger | | | | | | 3,750.00 |
| Default Item Code /M | | | | | | |
| 100311x | | | | | | |
| Disc valve DN 65 for Glucose/Corn sirup, Telcol sirup  Qty 3 | | | | | | 1,200.00 |
| Default Item Code /M | | | | | | |
| 100312x | | | | | | |
| Disc valve DN 60 for receive | | | | | | 990.00 |
| Default Item Code /M | | | | | | |
| 900323 | | | | | | |
| Pinch valve DN 40 | | | | | | 23,200.00 |
| Default Item Code /M | | | | | | |
| 100380 | | | | | | |
| Heat-able weighing hopper | | | | | | 26,850.00 |
| Default Item Code /M | | | | | | |
| 100420 | | | | | | |
| Heat-able supply container | | | | | | 10,650.00 |
| Default Item Code /M | | | | | | |
| 100490 | | | | | | |
| Stainless steel pneumatics cabinet | | | | | | 36,650.00 |
| Default Item Code /M | | | | | | |
| 100510 | | | | | | |
| Control cabinet BDB 0119 | | | | | | 22,450.00 |
| Default Item Code /M | | | | | | |
| 200105 | | | | | | |
| Supply tank with net capacity 800 l | | | | | | 15,150.00 |
| Default Item Code /M | | | | | | |
| | | | | | | Continued |

4568460002

EXHIBIT 4    PAGE 211



PURCHASE ORDER

Page:    4

1900 E. Carnegie Avenue
Suite A
Santa Ana, CA 92705
Pho (949) 498-3280

BOSCH PACKAGING TECHNOLOGY INC
36416 TREASURY CENTER
Chicago, IL 60694-6500
Confirm To:
hilke@hercsolutions.com

Hero Nutritionals LLC
1900 E. Carnegie Avenue, Suite A
Santa Ana, CA 92705

| Required Date | Ship VIA | F.O.B. | Terms |
| --- | --- | --- | --- |
| 4/5/2014 | | | Net 60 |

| Item Code | | Unit | Ordered | Received | Backordered | Unit Cost | Amount |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 200150 | | | | | | | |
| Pump for mass discharge from the supply tank | | | | | | | |
| /M | | | | | | | 6,000.00 |
| Default Item Code /M | | | | | | | |
| 600150x | | | | | | | |
| Pipe line DN 50 from BLK to supply tank | | | | | | | |
| /M | | | | | | | 10,000.00 |
| Default Item Code /M | | | | | | | |
| 600150x | | | | | | | |
| Pipe line DN 50 from supply tank to BMG | | | | | | | |
| Qty. 2 | | | | | | | |
| /M | | | | | | | 10,200.00 |
| Default Item Code /M | | | | | | | |
| 990003 | | | | | | | |
| Pipe line DN 50 from BMG back to supply tank | | | | | | | |
| Qty. 2 | | | | | | | |
| /M | | | | | | | 14,400.00 |
| Default Item Code /M | | | | | | | |
| 990006 | | | | | | | |
| CIP connections | | | | | | | |
| /M | | | | | | | 0.00 |
| Default Item Code /M | | | | | | | |
| 710110x-Operation Manual | | | | | | | |
| /M | | | | | | | 0.00 |
| Default Item Code /M | | | | | | | |
| 710120x Technical Documentation | | | | | | | |
| /M | | | | | | | 0.00 |
| Default Item Code /M | | | | | | | |
| 710130x-Spare parts catalogue in English | | | | | | | |
| /M | | | | | | | 12,300.00 |
| Default Item Code /M | | | | | | | |
| 990000 | | | | | | | |
| Wrapping in fumigated wooden cases for sea freight | | | | | | | |

Please refer to Bosch quotes #PRJ-2013-027P4-Q02 dated November 26, 2013 and
Bosch  quote #PRJ-2013-077585-Q02 and Hero
User Requirement Specification URS-0001 (Attached)

Continued

EXHIBIT 4      PAGE 212

Page:    5

## PURCHASE ORDER

1900 E. Carnegie Avenue
Suite A
Santa Ana, CA 92705
Ph: (949) 493-3200

P. O. NUMBER  0001810
ORDER DATE  12/5/2013

Vendor ID  BOSCHPA

VENDOR  
BOSCH PACKAGING TECHNOLOGY INC
38815 TREASURY CENTER
Chicago, IL 60694-8800
Confirm To:
julian@heronutritionals.com

SHIP TO:  
Hero Nutritionals LLC
1900 E. Carnegie Avenue, Bldg A
Santa Ana, CA 92705

| Required Date | Ship VIA | F.O.B. | Terms |
|---|---|---|---|
| 4/5/2014 | | | Net 30 |

| Item Code | Unit | Ordered | Received | Backordered | Unit Cost | Amount |
|---|---|---|---|---|---|---|

Lead Time: 4 months after receipt of written order and clarification of technical details
Terms: 30% down payment, 60% prior to shipment, 10% after successful SAT.
Warranty: Begins after acceptable SAT

4568946D0002

| | | |
|---|---|---|
| Net Order: | 658,740.00 |
| Sales Tax: | 0.00 |
| Freight: | 0.00 |
| Amount Received | $58,740.00 |

Manager Signature _____ 12/31/13

ACKNOWLEDGMENT
acknowledges as agrees: This Purchase Order is an order to buy goods and/or services and is expressly subject to the terms and conditions of Hero Nutritionals,
and the conditions set forth. This Purchase Order / Contract Terms & Conditions, which supersede any conflicting terms or conditions, and which are incorporated herein by reference. Delivery of the
first goods and/or commencement of performance of the subject services constitutes acceptance of the terms and conditions of this Purchase Order. This Purchase Order
hereby States acceptance as the terms of this offer, and Hero Nutritionals, LLC hereby objects to any different or additional terms contained in any respect to this
chase Order. In addition to the other terms in this Purchase Order, this Purchase Order expressly includes all implied warranties and all of the buyer's remedies set
th in the Uniform Commercial Code. In the event of any dispute between the parties, such dispute will be settled exclusively in a court of law. The terms of this
chase Order are the sole and exclusive terms on which Hero Nutritionals, LLC agrees to be bound.

EXHIBIT 4    PAGE 213

Shipper
Robert Bosch GmbH
Packaging Technology (Viersen)

D - 39003 Magdeburg

JCT

Telefon +49-2131-0349-0 · Telefax 92 40 500
Uperbenweg 8 a · D-41468 Neuss
www.jct-germany.de

Consigned to (order of)

Hero Nutritionals, LLC

1900 E Carnegie Ave. Building 'A'
USA - Santa Ana, CA 92705

**BILL OF LADING**
FOR COMBINED TRANSPORT OR PORT TO PORT SHIPMENT

**Express**

Notify Party and address

S A M E   A S   C O N S I G N E E

| No. of B/Ls of Lading | B/L No. |
| | 409/USCY/27287 |

also Notify

| Voyage no | place of acceptance |
| QOSW | LANGENFELD |
| Ocean vessel | port of loading |
| ATLANTA EXPRESS | ANTWERPEN |
| port of discharge | place of delivery |
| LOS ANGELES | SANTA ANA |

| Container Number Marks and Numbers | Number of packages or units; description of goods | Gross weight | Measurement |
|---|---|---|---|
| HLXU 816 460-9/SEAL:A0561948 | 1 x 40' HC CONTAINER | S.T.C. | |
| HLBU 108 434-0/SEAL:A0561947 | 1 x 40' HC CONTAINER | S.T.C. | |
| HLBU 118 013-4/SEAL:A0561948 | 1 x 20' BOX CONTAINER | S.T.C. | |
| | 7 packages MACHINERY HS-NO 84382000 | 4650,00 KG | |
| | 4 packages MACHINERY HS-NO 84382000 | 2970,00 KG | |
| | 1 package MACHINERY HS-NO 84382000 | 1330,00 KG | |

ONCARRIAGE UPTO DOOR SANTA ANA THROUGH CARRIER
FREIGHT PREPAID     SHIPPERS LOAD STOW AND COUNT     SHIPPED ON BOARD

Temperature Control
Instructions

All particulars above declared by Merchant

| Loaded into Container(s) by | BOX | FCL/FCL | RECEIVED the goods... |
| (qty) 2 | HC | FCL/FCL | |

For delivery of cargo please apply to

ICT International Cargo Transport
(USA) Inc.
28922 Lorain Road/Suite 102
USA-North Olmsted OH 44070

contact: +1 440360-7850

Freight and charges

Declared value of the goods (see clause 12)
US$
Ad valorem freight paid:

Note:
The merchant has not declared to the carrier a good or its value...

| Place and date of issue |
| Neuss |
| Signed for the carrier |
| I C T   Internationale Container Transport GmbH |
| by as per the order given |

4558946000

Terms and conditions of this Bill of Lading continued on reverse side or on addition's hereof

EXHIBIT 4     PAGE 214

Case 8:22-bk-11383-SC Claim 9-1 Filed 09/27/22 Desc Main Document Page 147 of 225

[illegible]

4558946002

EXHIBIT 4 PAGE 215



EXHIBIT 4    PAGE 216

PURCHASE ORDER

Page    1

1940 E. DeMagie Avenue
Suite A
Santa Ana, CA 92705
Ph: (949) 481-3319

TRANS U.S. INC.
17750 ROWLAND STREET
Rowland Heights, CA 91748

Hero Nutritionals LLC
1940 E. Carnegie Avenue, Suite A
Santa Ana, CA 92705

| Required Date | Ship VIA | F.O.B. | Terms |
|---|---|---|---|
| 3/26/2014 | | Factory | SEE BELOW |

| Item Code | Unit | Ordered | Received | Backordered | Unit Cost | Amount |
|---|---|---|---|---|---|---|
| AL | | | | | | 60,232.00 |

Default Item Code AL
All Coated Caplet Model # COAL010
See Proposal # W2-112815-2 Dated March 24, 2014

TERMS AND CONDITIONS OF OFFER: This Purchase Order is an offer to buy goods and/or services and is expressly subject to the terms and conditions of Hero Nutritionals, LLC Purchase Order/General Terms & Conditions, which supersede any conflicting terms or conditions, and which are incorporated herein by reference. Delivery of the subject goods and/or commencement of performance of the subject services constitutes acceptance of the terms and conditions of this Purchase Order. This Purchase Order expressly limits acceptance to the terms of this offer, and Hero Nutritionals, LLC hereby objects to any different or additional terms contained in any response to this Purchase Order. In addition to the other terms in this Purchase Order, this Purchase Order expressly includes all implied warranties and all of the buyer's remedies set forth in the Uniform Commercial Code. In the event of any dispute between the parties, such dispute will be settled exclusively in a court of law. The terms of this Purchase Order are the sole and exclusive terms on which Hero Nutritionals, LLC agrees to be bound.

* Payment Terms: Net 30 Days after receipt
* For freight payment please attach a copy
of freight bill with product invoice.

| | |
|---|---|
| Net Order | 60,232.00 |
| Sales Tax | 0.00 |
| Freight | 0.00 |
| | 60,232.00 |

Manager Signature

EXHIBIT 4    PAGE 217

05/07

| Date: 5/7/2014 | | | | BILL OF LADING | | BL00334468 | | | | Page 1 / 2 |
|---|---|---|---|---|---|---|---|---|---|---|

TRANE PUEBLO,  101 Wm White Blvd , PUEBLO, CO  81001

**Bill of Lading Number:** BL00334468

HERO NUTRITIONALS LLC,  1900 E. Carnegie Ave. Suite A , SANTA ANA, CA 92705

**SYSTEM TRANSPORT INC**   SYTP

Pro Number:

TRANE TCS, C/O Cass Information Systems ,PO Box 182036 , COLUMBUS, OH 43218

| CUST ORD NO | TRANE ORD NO | BOL ORDER NOTES |
|---|---|---|
| 0001730 | W2D700A0514 | Call Dave Gabrino 48 hrs before delivery @ 949-493-2280. NO WEEKEND DELIVERIES |

Dave Gabrino (Jhones: 949-493-2360 48 hrs prior

**SPECIAL INSTRUCTIONS:**

TRAILER#: 24563 / FLAT

for : W2 · ) 468A
seal #: U14E #2511
CRAM 070 P

**Freight Charge Terms:**  Pre-Paid X
(freight charges are prepaid unless marked otherwise)   Collect
3rd Party

☐ Master Bill of Lading: with attached underlying Bills of Lading
(check box)

COD Amount: $

Fee Terms:   Collect ☐
Prepaid ☐
Customer check acceptable: ☐

**EMERGENCY CONTACT :** 1-800-424-0300 *** BID NO: 082113.651.016V.

| PACKAGE | | DIMENSIONS | | | Gross Wgt | L.M. | COMMODITY DESCRIPTION | LTL ONLY | | DATES |
|---|---|---|---|---|---|---|---|---|---|---|
| QTY | TYPE | Length | Width | Height | Net Wgt | (X) | | NMFC # | Class | Early/Late Dlvry |
| 1 | PC(s) | 154 | 69 | 85 | 5861 | X | UN2857, Refrigerating Machines, 2,2, nonflammable gas, containing more than 28.3# and less than 1000#, placard-exempt, | 11412691H | 110 | 5/8/14 |
| | | | | | 5861 | | NMFC 114125 S 1 | | | 5/15/14 |

TG/SN No:   TRUE 70 tot U14E#2511

TG/SN No:

| | | | | | 5861 | | GROSS WEIGHT INCLUDES PALLET WEIGHT | | | |
| | | | | | 5861 | | NET WEIGHT | | | |

4559460002

System transport
C Kevin Yate 5/7/14

RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and is available to the shipper, on request, and to all applicable state and federal regulations.

NOTE Liability Limitation for loss or damage in this shipment may be applicable. See 49 U.S.C. - 14706(c)(1)(A) and (B).

Subject to Section 7 of Conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement. The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

Cindy Luk _____ Shipper Signature

SHIPPER SIGNATURE/DATE
This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the DOT.

CARRIER SIGNATURE/PICKUP DATE

05/07.

EXHIBIT 4     PAGE 218



**WDS**
WINKLER und DÜNNEBIER
Süßwarenmaschinen

WINKLER and DÜNNEBIER
Süßwarenmaschinen GmbH
Ringstr.
56564 Neuwied Germany

Hero Nutritionals, LLC
1900 E Carnegie Ave, Building 'A'
USA Santa Ana, CA 92705

**Final Invoice**

Ship to:
Hero Nutritionals, LLC
1900 E Carnegie Ave, Building 'A'
USA Santa Ana, CA 92705

address of customer
Hero Nutritionals, LLC
1900 E Carnegie Ave, Building 'A'
USA Santa Ana, CA 92705

**Original**

| | |
|---|---|
| Invoice No. | 1706892 |
| Invoice Date | 03.03.2014 |
| Customer No. | EM |
| Order no. | 1322592    19.03.2014 |
| Your order No. | 1880 |
| Order date | 19.03.2014 |
| Contact | Helen Wohlfarth |
| Tel. | +49 2634/9878-171 |
| Fax | +49 2634/9878-210 |
| e-mail | Helen.Wohlfarth@w-u-d.com |

Mode of shipment    seafreight
Terms of shipment CPT
Destination    Santa Ana, CA 92705
Terms of delivery    CPT (Incoterms 2010) ←

Terms of payment:
30% downpayment together with the order
70% on delivery, latest 30 days after date of invoice

machine no.: 2847
machine type: 281/282

Delivery is free of VAT as export delivery in accordance with § 4 no. 1a) in connection with § 6 German
Value Added Tax Act (UStG).

| Pos | Part | | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|---|
| 2.0 | W17393D<br>tightening roller<br>for tightening shaft L281.20.0011.0<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | | 2 pcs | 373.00 | 746.00 |

Registration Office Neuwied

Commerzbank
BIC 570 402 14-305 Btz0.71
IBAN DE57 5704 0014 0284 6634 00
BIC-Code COBA DE 33

Westerwald Bank eG
BLZ
IBAN
BIC

4558946D0002



**WDS**
WINKLER und DÜNNEBIER

Final Invoice      1703892/09.08.2014                              Page:    2

| Pos | Part | | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|---|
| 3.0 | W108725 adjusting ring for tightening shaft L261.20.0011.0 customs tariff no.    8438 90 00 Country of origin    D Germany | | 5 pcs | 12.90 | 64.50 |
| 4.0 | W159444 sprocket for shaft L282.20.0002.1 (main gear box of depositor) customs tariff no.    8438 90 00 Country of origin    D Germany | | 1 pcs | 311.00 | 311.00 |
| 5.0 | W107985 threaded pin for shaft L282.20.0002.1 (main gear box of depositor) customs tariff no.    8438 90 00 Country of origin    D Germany | | 1 pcs | 0.71 | 0.71 |
| 6.0 | W108158 parallel key for shaft L282.20.0002.1 (main gear box of depositor) customs tariff no.    8438 90 00 Country of origin    D Germany | | 1 pcs | 1.72 | 1.72 |
| 7.0 | W159841 sprocket for shaft L282.20.0002.1 (main gear box of depositor) customs tariff no.    8438 90 00 Country of origin    D Germany | | 1 pcs | 278.00 | 278.00 |
| 8.0 | W108047 threaded pin for shaft L282.20.0002.1 (main gear box of depositor) customs tariff no.    8438 90 00 Country of origin    D Germany | | 1 pcs | 1.00 | 1.00 |

45589468092

EXHIBIT 4    PAGE 220



WINKLER und DÜNNEBIER
Süßwarenmaschinen

Final Invoice    1706892/06.08.2014    Page:    3

| Pos | Part | | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|---|
| 9.0 | W109166 parallel key for shaft L262.20.0002.1 (main gear box of depositor) customs tariff no. Country of origin | 8438 90 00 D Germany | 1 pcs | 2.68 | 2.68 |
| 10.0 | W253359 sprocket customs tariff no. Country of origin | 8438 90 00 D Germany | 2 pcs | 541.00 | 1,082.00 |
| 11.0 | W159676 sprocket customs tariff no. Country of origin | 8438 90 00 D Germany | 2 pcs | 329.00 | 658.00 |
| 12.0 | W159503 sprocket customs tariff no. Country of origin | 8438 90 00 D Germany | 1 pcs | 319.00 | 319.00 |
| 13.0 | W679364 chain carrying bar for transport below the depositor customs tariff no. Country of origin | 8438 90 00 D Germany | 2 pcs | 124.00 | 248.00 |
| 14.0 | W139813 conveyor chain depositing chain customs tariff no. Country of origin | 8438 90 00 D Germany | 2 pcs | 2,900.00 | 5,800.00 |
| 15.0 | W164777 chain tightener for transport below the depositor customs tariff no. Country of origin | 8438 90 00 D Germany | 1 pcs | 440.00 | 440.00 |

4558945000 2

EXHIBIT 4    PAGE 221



Final Invoice        1708692 / 06.08.2014                              Page:    4

| Pos | Part | | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|---|
| 16.0 | W576209 chain tightener for transport below the depositor customs tariff no.    8438 90 00 Country of origin    D Germany | | 1 pcs | 440,00 | 440,00 |
| 17.0 | W576394 chain tightener for transport below the depositor customs tariff no.    8438 90 00 Country of origin    D Germany | | 1 pcs | 67,00 | 67,00 |
| 18.0 | W579287 sproket for transport below the depositor customs tariff no.    8438 90 00 Country of origin    D Germany | | 1 pcs | 477,00 | 477,00 |
| 19.0 | W235082 roller chain for transport below the depositor customs tariff no.    8438 90 00 Country of origin    PRC China | | 1.283 m | 12,40 | 15,91 |
| 20.0 | W235083 chain connector for transport below the depositor customs tariff no.    8438 90 00 Country of origin    PRC China | | 1 pcs | 1,40 | 1,40 |
| 21.0 | W235097 roller chain for transport below the depositor customs tariff no.    8438 90 00 Country of origin    PRC China | | 2.648 m | 23,50 | 62,23 |
| 22.0 | W235098 chain connector for transport below the depositor customs tariff no.    8438 90 00 Country of origin    PRC China | | 1 pcs | 3,20 | 3,20 |

EXHIBIT 4    PAGE 222



**WDS**
WINKLER und DÜNNEBIER
Süßwarenmaschinen

Final Invoice      1708892/06.08.2014                    Page:    5

| Pos | Part | Quantity/Unit | Unit price EUR | Total price EUR |
|-----|------|---------------|----------------|-----------------|
| 23,0 | W174045<br>chain carrying bar<br>for transport below the depositor<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 2 pcs | 116,00 | 232,00 |
| 24,0 | W579275<br>chain carrying bar<br>for transport below the depositor<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 2 pcs | 90,00 | 180,00 |
| 25,0 | W174149<br>v-belt disc<br>for transport after depositor<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 2 pcs | 250,00 | 500,00 |
| 26,0 | W114647<br>v-belt<br>for transport after depositor<br>customs tariff no.    8438 90 00<br>Country of origin    KOR North Korea | 2 pcs | 58,00 | 116,00 |
| 27,0 | W108750<br>adjusting ring<br>for transport after depositor<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 4 pcs | 3,50 | 14,00 |
| 29,0 | W579284<br>sprocket<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 2 pcs | 350,00 | 700,00 |
| 30,0 | W108048<br>threaded pin<br>for shaft L261.06.0048.2<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 2 pcs | 1,00 | 2,00 |

4558346080 02

EXHIBIT 4    PAGE 223



**WDS**
WINKLER und DÜNNEBIER
Süsswarenmaschinen

Final Invoice        1708892/06.08.2014                    Page:    6

| Pos | Part | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|
| 31.0 | W109167<br>parallel key<br>for shaft L281.06.0048.2<br>customs tariff no.     8438 90 00<br>Country of origin     D Germany | 2 pcs | 1.50 | 3.00 |
| 32.0 | W579263<br>sprocket<br>customs tariff no.     8438 90 00<br>Country of origin     D Germany | 4 pcs | 352.00 | 1,408.00 |
| 33.0 | W108761<br>adjusting ring<br>for tightening shaft L281.06.0050.1<br>customs tariff no.     8438 90 00<br>Country of origin     D Germany | 2 pcs | 3.07 | 6.14 |
| 34.0 | W579268<br>sprocket<br>customs tariff no.     8438 90 00<br>Country of origin     D Germany | 2 pcs | 335.00 | 670.00 |
| 35.0 | W109209<br>parallel key<br>for driving shaft L281.06.0051.2<br>customs tariff no.     8438 90 00<br>Country of origin     D Germany | 2 pcs | 2.00 | 4.00 |
| 36.0 | W107947<br>threaded pin<br>for driving shaft L281.06.0051.2<br>customs tariff no.     8438 90 00<br>Country of origin     D Germany | 2 pcs | 1.00 | 2.00 |
| 37.0 | W159910<br>sprocket<br>for driving shaft L281.06.0056.1<br>customs tariff no.     8438 90 00<br>Country of origin     D Germany | 2 pcs | 345.00 | 690.00 |

4558946S002

EXHIBIT 4    PAGE 224



Final invoice        1708892/09.08.2014                              Page:   7

| Pos | Part | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|
| 38.0 | W173559<br>flange<br>for driving shaft L281.06.0058.1<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 2 pcs | 182.00 | 364.00 |
| 39.0 | W100294<br>parallel key<br>for driving shaft L281.06.0058.1<br>customs tariff no.    8438 00 00<br>Country of origin    D Germany | 2 pcs | 3.00 | 6.00 |
| 40.0 | W109047<br>threaded pin<br>for driving shaft L281.06.0058.1<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 2 pcs | 1.00 | 2.00 |
| 41.0 | W169905<br>sprocket<br>for turning shaft L281.06.0058.0<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 2 pcs | 299.00 | 598.00 |
| 42.0 | W109751<br>adjusting ring<br>for turning shaft L281.06.0058.0<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 4 pcs | 3.07 | 12.28 |
| 43.0 | W169913<br>sprocket<br>for turning shaft L281.06.0080.0<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 2 pcs | 417.00 | 834.00 |
| 44.0 | W173743<br>return wheel<br>for turning shaft L281.06.0080.0<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 2 pcs | 350.00 | 700.00 |

4558945080 2

EXHIBIT 4     PAGE 225



WINKLER und DÜNNEBIER
Süßwarenmaschinen

Final Invoice     1708892/00.09.2014                                        Page:   8

| Pos | Part | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|
| 45.0 | W108751<br>adjusting ring<br>for turning shaft L281.08.0060.0<br>customs tariff no.   8438 90 00<br>Country of origin   D Germany | 8 pcs | 3.07 | 24.58 |
| 46.0 | W375639<br>chain carrying bar<br>customs tariff no.   8438 90 00<br>Country of origin   D Germany | 2 pcs | 132.00 | 264.00 |
| 48.0 | W375640<br>chain carrying bar<br>customs tariff no.   8438 90 00<br>Country of origin   D Germany | 2 pcs | 122.00 | 244.00 |
| 49.0 | W139737<br>transport chain<br>customs tariff no.   8438 90 00<br>Country of origin   D Germany | 1 pcs | 1,740.00 | 1,740.00 |
| 50.0 | W139739<br>transport chain<br>customs tariff no.   8438 90 00<br>Country of origin   D Germany | 1 pcs | 1,740.00 | 1,740.00 |
| 51.0 | W375643<br>chain carrying bar<br>customs tariff no.   8438 90 00<br>Country of origin   D Germany | 4 pcs | 138.00 | 552.00 |
| 52.0 | W375644<br>chain carrying bar<br>customs tariff no.   8438 90 00<br>Country of origin   D Germany | 4 pcs | 170.00 | 680.00 |
| 53.0 | W375645<br>chain carrying bar<br>customs tariff no.   8438 90 00<br>Country of origin   D Germany | 2 pcs | 133.00 | 266.00 |

4558546600 2

EXHIBIT 4     PAGE 226



Final Invoice        1708892/06.08 2014                          Page:    9

| Pos | Part | | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|---|
| 54.0 | W234567 roller chain | | 2.800 m | 23.80 | 66.64 |
| | customs tariff no. | 8438 90 00 | | | |
| | Country of origin | PRC China | | | |
| 55.0 | W234568 chain connector | | 1 pcs | 1.96 | 1.96 |
| | customs tariff no. | 8438 90 00 | | | |
| | Country of origin | PRC China | | | |
| 56.0 | W234569 chain connector | | 1 pcs | 3.81 | 3.81 |
| | customs tariff no. | 8438 90 00 | | | |
| | Country of origin | PRC China | | | |
| 57.0 | W169891 sprocket for driving shaft L261_06_0035_1 and driving shaft L261_06_0037_2 | | 3 pcs | 160.00 | 480.00 |
| | customs tariff no. | 8438 90 00 | | | |
| | Country of origin | D Germany | | | |
| 58.0 | W107945 threaded pin for driving shaft L261_06_0035_1 and driving shaft L261_06_0037_2 | | 3 pcs | 1.00 | 3.00 |
| | customs tariff no. | 8438 90 00 | | | |
| | Country of origin | D Germany | | | |
| 59.0 | W109166 parallel key for driving shaft L261_06_0035_1 | | 2 pcs | 7.00 | 14.00 |
| | customs tariff no. | 8438 90 00 | | | |
| | Country of origin | D Germany | | | |
| 60.0 | W173583 idler for driving shaft L261_06_0037_2 | | 1 pcs | 240.00 | 240.00 |
| | customs tariff no. | 8438 90 00 | | | |
| | Country of origin | D Germany | | | |

4558946000Z

EXHIBIT 4    PAGE 227



Final Invoice          1708902/08.08.2014                                      Page:  10

| Pos | Part | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|
| 61.0 | W108751<br>adjusting ring<br>for driving shaft L281_08_0037_2<br>customs tariff no.      8438 90 00<br>Country of origin      D Germany | 2 pcs | 3.07 | 6.14 |
| 62.0 | W109294<br>parallel key<br>for driving shaft L281_08_0037_2<br>customs tariff no.      8438 90 00<br>Country of origin      D Germany | 1 pcs | 3.00 | 3.00 |
| 63.0 | W578282<br>sprocket<br>customs tariff no.      8438 90 00<br>Country of origin      D Germany | 2 pcs | 378.00 | 756.00 |
| 64.0 | W108751<br>adjusting ring<br>for tightening shaft L281_08_0038_1<br>(scraping chain)<br>customs tariff no.      8438 90 00<br>Country of origin      D Germany | 2 pcs | 3.07 | 6.14 |
| 65.0 | W173559<br>flange<br>for driving shaft L281_08_0069_2<br>customs tariff no.      8438 90 00<br>Country of origin      D Germany | 2 pcs | 182.00 | 364.00 |
| 66.0 | W159910<br>sprocket<br>for driving shaft L281_08_0069_2<br>customs tariff no.      8438 90 00<br>Country of origin      D Germany | 2 pcs | 345.00 | 690.00 |
| 67.0 | W107947<br>threaded pin<br>for driving shaft L281_08_0069_2<br>customs tariff no.      8438 90 00<br>Country of origin      D Germany | 2 pcs | 1.00 | 2.00 |

4558946B002

EXHIBIT 4      PAGE 228



Final invoice        1705802/09.08.2014                                    Page:  11

| Pos | Part | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|
| 68.0 | W109296<br>parallel key<br>for driving shaft L261_06_0089_2<br>customs tariff no.    8438 90 00<br>Country of origin      D Germany | 2 pcs | 5.70 | 11.40 |
| 69.0 | W154790<br>chain lightener<br>customs tariff no.    8438 90 00<br>Country of origin      D Germany | 1 pcs | 342.00 | 342.00 |
| 70.0 | W350436<br>chain carrying bar<br>customs tariff no.    8438 90 00<br>Country of origin      D Germany | 2 pcs | 131.00 | 262.00 |
| 71.0 | W375642<br>chain carrying bar<br>customs tariff no.    8438 90 00<br>Country of origin      D Germany | 2 pcs | 163.00 | 326.00 |
| 72.0 | W350419<br>chain carrying bar<br>customs tariff no.    8438 90 00<br>Country of origin      D Germany | 4 pcs | 156.00 | 624.00 |
| 73.0 | W350442<br>chain carrying bar<br>customs tariff no.    8438 90 00<br>Country of origin      D Germany | 4 pcs | 156.00 | 624.00 |
| 74.0 | W109736<br>conveyor chain<br>customs tariff no.    8438 90 00<br>Country of origin      D Germany | 2 pcs | 623.00 | 1,246.00 |
| 75.0 | W173563<br>idler<br>for tightening traverse<br>L261_06_0062_1<br>customs tariff no.    8438 90 00<br>Country of origin      D Germany | 2 pcs | 240.00 | 480.00 |

EXHIBIT 4    PAGE 229



WINKLER und DÜNNEBIER

**Final Invoice**    1708892 / 06.08.2014    Page: 12

| Pos. | Part | | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|---|
| 76.0 | W108751 adjusting ring for tightening traverse L281_00_0082_1 customs tariff no. Country of origin | 8438 90 00 D Germany | 4 pcs | 3.07 | 12.28 |
| 77.0 | W350509 chain carrying bar customs tariff no. Country of origin | 8438 90 00 D Germany | 2 pcs | 144.00 | 288.00 |
| 78.0 | W579274 chain guide customs tariff no. Country of origin | 8438 90 00 D Germany | 4 pcs | 112.00 | 448.00 |
| 79.0 | W115235 flexible bushing for slewing section customs tariff no. Country of origin | 8438 90 00 D Germany | 12 pcs | 4.50 | 54.00 |
| 80.0 | W139734 conveyor chain for starch unit customs tariff no. Country of origin | 8438 90 00 D Germany | 2 pcs | 1,250.00 | 2,500.00 |
| 81.0 | W501438 o-ring for pump pistons of your pump system W144056 customs tariff no. Country of origin | 8438 90 00 D Germany | 378 pcs | 1.40 | 529.20 |
| 82.0 | W113522 piston ring for pump pistons of your pump system W144056 customs tariff no. Country of origin | 8438 90 00 A Austria | 378 pcs | 1.14 | 430.92 |

4558946002

EXHIBIT 4    PAGE 230



Final Invoice    1708892/06.08.2014                     Page:  13

| Pos | Part | | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|---|
| 83.0 | W308107 felt | | 0,250 m² | 169,00 | 42,25 |
| | customs tariff no. | 8438 90 00 | | | |
| | Country of origin | D Germany | | | |
| 85.0 | W114659 v-belt | | 38,640 m | 36,00 | 1,391,04 |
| | delivered in 2 x 19,320m | | | | |
| | customs tariff no. | 8438 90 00 | | | |
| | Country of origin | D Germany | | | |
| 86.0 | W234367 connector | | 4 pcs | 5,00 | 20,00 |
| | customs tariff no. | 8438 90 00 | | | |
| | Country of origin | D Germany | | | |
| 87.0 | W120433 welding tongs for v-belt | | 1 pcs | 239,00 | 239,00 |
| | customs tariff no. | 8438 90 00 | | | |
| | Country of origin | D Germany | | | |
| 88.0 | W120434 mitre tongs | | 1 pcs | 45,10 | 45,10 |
| | customs tariff no. | 8438 90 00 | | | |
| | Country of origin | D Germany | | | |
| 89.0 | W120436 welding head | | 1 pcs | 313,00 | 313,00 |
| | customs tariff no. | 8438 90 00 | | | |
| | Country of origin | D Germany | | | |
| 90.0 | W514637 v-belt | | 2 pcs | 42,00 | 84,00 |
| | customs tariff no. | 8438 90 00 | | | |
| | Country of origin | D Germany | | | |
| 91.0 | W114656 v-belt | | 30,000 m | 11,60 | 348,00 |
| | customs tariff no. | 8438 90 00 | | | |
| | Country of origin | D Germany | | | |
| 92.0 | TZ01 down payment | | 1 pcs | -  11,066.16 | -  11,066.16 |
| | invoice 1708065 / 1 / 27.03.2014 | | | | |

4558490082

EXHIBIT 4    PAGE 231



Final Invoice    1708892/06.08.2014                    Page:  14

Pos   Part                  Quantity/Unit        Unit price EUR    Total price EUR
                            packaging                                      330.00
                            freight                                        635.00
                            total price                             37,782.21
                            less down payments                   ·   11,066.16
                            Total value:                            28,685.05

Kind regards

WINKLER und DÖNNEBIER
Sdüwerenmaschinen

ppa. Elke Runkel

4558946000Q2

EXHIBIT 4    PAGE 232

Page: 1

## PURCHASE ORDER



1900 E. Carnegie Avenue
Suite A
Santa Ana, CA 83705
Ph: (811) 418-5110

WINKLER & DÜNNEBIER
BUHWARENMASCHINEN GMBH
RHEOSTRASSE 1
REMSDORF, 54519
Confirm To:

Hero Nutritionals LLC
1900 E. Carnegie Avenue, Suite A
Santa Ana, CA 92705

| Required Date | Ship VIA | F.O.B. | Terms SEE BELOW | | | |
|---|---|---|---|---|---|---|
| 3/10/2014 | | | | | | |
| Item Code | | Unit | Ordered | Received | Backordered | Unit Cost | Amount |
| A4 | | | | | | | 63,013.68 |
| Default Item Code A4 | | | | | | | |
| Please see attached Quote 81106427 | | | | | | | |
| Paid for NoopA | | | | | | | |

Payment Terms: 30% down payment together with the order, 70% on delivery within 30 days after date of invoice

TERMS AND CONDITIONS OF OFFER: This Purchase Order is an offer to buy goods and/or services and is expressly subject to the terms and conditions of Hero Nutritionals, LLC Purchase Order/Contract Terms & Conditions, which supersede any conflicting terms or conditions, and which are incorporated herein by reference. Delivery of the subject goods and/or commencement of performance of the subject services constitutes acceptance of the terms and conditions of this Purchase Order. This Purchase Order expressly limits acceptance to the terms of this offer, and Hero Nutritionals, LLC hereby objects to any different or additional terms contained in any response to this Purchase Order. In addition to the other terms in this Purchase Order, this Purchase Order expressly includes all implied warranties and all of the buyer's remedies set forth in the Uniform Commercial Code. In the event of any dispute between the parties, such dispute will be settled exclusively in a court of law. The terms of this Purchase Order are the sole and exclusive terms on which Hero Nutritionals, LLC agrees to be bound.

| | Net Order | 63,013.68 |
|---|---|---|
| | Sales Tax | 0.00 |
| | Freight | 0.00 |
| | Order Total | 63,013.68 |

Manager Signature _____ 3/11/2014

EXHIBIT 4    PAGE 233



**WDS**
WINKLER und DÜNNEBIER
BONWprenmaschinen

Knoll und DÜNNEBIER Baumachinen GmbH Ligrnice 1 MHz Region

Hero Nutritionals, LLC
Mr. David Gallardo
991 Calle Negocio
USA San Clemente, CA 92673

WINKLER und DÜNNEBIER
BONwprenmaschinen GmbH
Ringstraße 1
54578 Rengsdorf - Germany

Tel. +49 2634 9278-000
Fax +49 2634 9278-265

info@w-u-d.com
www.w-u-d.com

Quotation

| Quotation no. | 1108427 |
| Quotation date | 06.03.2014 |
| valid until | 04.06.2014 |
| Customer no. | |
| Your Inquiry dated | parts from first visit 08.03.2014 |
| Contact | Christian Greindl |
| Tel. | +49 2634/9876-232 |
| Fax | +49 2634/9876-239 |
| E-Mail | christian.greindl@w-u-d.com |

PD1689

Mode of shipment     by airfreight
Terms of delivery    FCA [Incoterms 2010]
Destination          Rengsdorf
Terms of payment     according payment plan

30% downpayment together with the order
70% on delivery, latest 30 days after date of invoice

machine no.: 2047
machine type: 261/262

| Item Part | | Delivery time | | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|---|---|
| 1.0 | parts for depositing section | | | | | |
| 2,0 | W173930 lightening roller for lightening shaft L261,20,0011,0 V261_20_1601_0 | 12 | week(s) | 2 pcs | 373,00 | 746.00 |
| 3,0 | W106725 adjusting ring for lightening shaft L261,20,0011,0 D0_306_034 | 12 | week(s) | 5 pcs | 12.90 | 64.50 |
| 4,0 | W169444 sprocket for shaft L262,20,0002.1 (main gear box of depositor) R5_12_034_006 | 12 | week(s) | 1 pcs | 311.00 | 311.00 |

4558946D0002

Geschäftsführer Rainer Winkler
Amtsgericht Montabaur
HRB 12710
USt-ID-Nr. DE 132760920

Commerzbank
BLZ 570 400 44 • Kto. 2860021
IBAN DE67 5704 0044 0286 0021 00
BIC-Code COBA DE FF

Westerwald Bank eG
BLZ 573 918 00 • Kto. 74005703
IBAN DE17 5739 1800 0074 0057 02
BIC-Code GENO DE 51 WW1

EXHIBIT 4    PAGE 234

Quotation    1108427 / 08.03.2014                                    Page    2

| Item | Part | Delivery time | | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|---|---|
| 5.0 | W107880<br>threaded pin<br>for shaft L282.20.0002.1 (main gear<br>box of depositor)<br>D0.094,142 | 12 | week(s) | 1 pcs | 0.71 | 0.71 |
| 6.0 | W109155<br>parallel key<br>for shaft L282.20.0002.1 (main gear<br>box of depositor)<br>D0.400.237 | 12 | week(s) | 1 pcs | 1.72 | 1.72 |
| 7.0 | W158841<br>sprocket<br>for shaft L282.20.0002.1 (main gear<br>box of depositor)<br>R5_18_036_019 | 12 | week(s) | 1 pcs | 278.00 | 278.00 |
| 8.0 | W108047<br>threaded pin<br>for shaft L282.20.0002.1 (main gear<br>box of depositor)<br>D0_103_131 | 12 | week(s) | 1 pcs | 1.00 | 1.00 |
| 9.0 | W109185<br>parallel key<br>for shaft L282.20.0002.1 (main gear<br>box of depositor)<br>D0.400.273 | 12 | week(s) | 1 pcs | 2.68 | 2.68 |
| 10.0 | W203359<br>sprocket<br>R5_20_044_008 | 12 | week(s) | 2 pcs | 541.00 | 1,082.00 |
| 11.0 | W158876<br>sprocket<br>R5_20_022_003 | 12 | week(s) | 2 pcs | 329.00 | 658.00 |
| 12.0 | W169503<br>sprocket<br>R5_12_041_002 | 12 | week(s) | 1 pcs | 319.00 | 319.00 |
| 13.0 | S000002<br>chain carrying bar V261_20_6516_0<br>for transport below the depositor | 12 | week(s) | 2 pcs | 124.00 | 248.00 |
| 14.0 | W439813<br>conveyor chain<br>depositing chain | 12 | week(s) | 2 pcs | 2,800.00 | 5,600.00 |

45589460002

EXHIBIT 4    PAGE 235

Quotation          1108427 / 08.03.2014                                    Page    3
Item Part                    Delivery time       Quantity/Unit   Unit price EUR   Total price EUR
         L261_20_2803_1

| Item | Part | Delivery time | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|---|
| 15.0 | W154777<br>CHAIN TIGHTENER<br>for transport below the depositor<br>N920_856 | 12    week(s) | 1 pcs | 440.00 | 440.00 |
| 16.0 | S000002<br>CHAIN TIGHTENER<br>N920_854<br>for transport below the depositor | 12    week(s) | 1 pcs | 440.00 | 440.00 |
| 17.0 | S000002<br>CHAIN TIGHTENER<br>V281.20.4366.0<br>for transport below the depositor | 12    week(s) | 1 pcs | 87.00 | 87.00 |
| 18.0 | S000002<br>sproket<br>R3.18.018.052<br>for transport below the depositor | 12    week(s) | 1 pcs | 477.00 | 477.00 |
| 19.0 | W235082<br>roller chain<br>for transport below the depositor<br>X4_430_00 | 12    week(s) | 1.283 m | 12.40 | 16.91 |
| 20.0 | W235083<br>chain connector<br>for transport below the depositor<br>X4_430_11 | 12    week(s) | 1 pcs | 1.40 | 1.40 |
| 21.0 | W235087<br>roller chain<br>for transport below the depositor<br>X4_440_00 | 12    week(s) | 2.648 m | 23.50 | 62.23 |
| 22.0 | W235088<br>chain connector<br>for transport below the depositor<br>X4_440_11 | 12    week(s) | 1 pcs | 3.20 | 3.20 |
| 23.0 | W174046<br>chain carrying bar<br>for transport below the depositor<br>V281_22_6601_0 | 12    week(s) | 2 pcs | 118.00 | 232.00 |
| 24.0 | S000002<br>chain carrying bar | 12    week(s) | 2 pcs | 90.00 | 180.00 |

4558460902

EXHIBIT 4    PAGE 236

Quotation          110B427 / 06.03.2014                                    Page    4

| Item | Part | Delivery time | | Quantity/Unit | | Unit price EUR | Total price EUR |
|------|------|------|------|------|------|------|------|
| | V261.22.0502.0 for transport below the depositor | | | | | | |
| 25.0 | W174140 v-belt disc for transport after depositor V261_46_1502_0 | 12 | week(s) | 2 pcs | | 250.00 | 500.00 |
| 26.0 | W114647 v-belt for transport after depositor K1_780_72 | 12 | week(s) | 2 pcs | | 58.00 | 116.00 |
| 27.0 | W108750 adjusting ring for transport after depositor D0_306_029 | 12 | week(s) | 4 pcs | | 3.50 | 14.00 |
| 28.0 | Following parts for starch unit (printing section) | | | | | | |
| 29.0 | W538857 sprocket for shaft L261.06.0046.2 R6_40_016_004 | 12 | week(s) | 2 pcs | | 350.00 | 700.00 |
| 30.0 | W108046 threaded pin for shaft L261.06.0046.2 D0_105_132 | 12 | week(s) | 2 pcs | | 1.00 | 2.00 |
| 31.0 | W108187 parallel key for shaft L261.06.0046.2 D0.400.275 | 12 | week(s) | 2 pcs | | 1.50 | 3.00 |
| 32.0 | W180171 sprocket for shaft L261.06.0072.1 and tightening shaft L261.06.0050.1 R6_40_010_006 | 12 | week(s) | 6 pcs | | 352.00 | 2,112.00 |
| 33.0 | W108751 adjusting ring for tightening shaft L261.06.0050.1 D0_306_032 | 12 | week(s) | 2 pcs | | 3.07 | 6.14 |
| 34.0 | W180170 sprocket | 12 | week(s) | 2 pcs | | 335.00 | 670.00 |

4558946 0002

EXHIBIT 4    PAGE 237

| Quotation | t108427 / 06.03.2014 | | | | Page | 5 |
|---|---|---|---|---|---|---|
| Item Part | | Delivery time | Quantity/Unit | Unit price EUR | | Total price EUR |
| | for driving shaft L281.06.0051.2 R5_4Q_010_004 | | | | | |
| 35.0 W109288 | parallel key for driving shaft L281.06.0051.2 D0.401.692 | 12 week(s) | 2 pcs | 2.00 | | 4.00 |
| 36.0 W107947 | threaded pin for driving shaft L281.06.0051.2 D0.690.169 | 12 week(s) | 2 pcs | 1.00 | | 2.00 |
| 37.0 W169910 | sprocket for driving shaft L281.06.0056.1 R5_25_020_005 | 12 week(s) | 2 pcs | 345.00 | | 690.00 |
| 38.0 W173559 | flange for driving shaft L281.06.0056.1 V281_06_1260_0 | 12 week(s) | 2 pcs | 192.00 | | 384.00 |
| 39.0 W109284 | parallel key for driving shaft L281.06.0056.1 D0.401.575 | 12 week(s) | 2 pcs | 3.00 | | 6.00 |
| 40.0 W108047 | threaded pin for driving shaft L281.06.0056.1 D0_105_131 | 12 week(s) | 2 pcs | 1.00 | | 2.00 |
| 41.0 W169005 | sprocket for turning shaft L281.06.0058.0 R8_25_017_001 | 12 week(s) | 2 pcs | 299.00 | | 598.00 |
| 42.0 W108751 | adjusting ring for turning shaft L281.06.0058.0 D0_508_032 | 12 week(s) | 4 pcs | 3.07 | | 12.28 |
| 43.0 W169913 | sprocket for turning shaft L281.06.0060.0 R5_25_020_008 | 12 week(s) | 2 pcs | 417.00 | | 834.00 |
| 44.0 W173743 | | 12 week(s) | 2 pcs | 350.00 | | 700.00 |

455894660002

EXHIBIT 4    PAGE 238

**Quotation**  1108427 / 06.03.2014  Page 6

| Item Part | Delivery time | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|
| return wheel for turning shaft L281.06.0080.0 V281_06_6928_0 | | | | |
| 45.0  W108761 adjusting ring for turning shaft L281.06.0080.0 D0_308_032 | 12  week(s) | 8 pcs | 3.07 | 24.56 |
| 46.0  S000002 chain carrying bar V281_06_6922_1 | 12  week(s) | 2 pcs | 132.00 | 264.00 |
| 47.0  Following parts for starch unit (depowdering section) | | | | |
| 48.0  S000002 chain carrying bar V281_06_6923_2 | 12  week(s) | 2 pcs | 122.00 | 244.00 |
| 49.0  W139738 TRANSPORT CHAIN L281_06_2816_1 | 12  week(s) | 1 pcs | 2,410.00 | 2,410.00 |
| 50.0  W139740 TRANSPORT CHAIN L281_06_2816_1 | 12  week(s) | 1 pcs | 2,410.00 | 2,410.00 |
| 51.0  W375843 chain carrying bar V281_06_6558_0 | 12  week(s) | 4 pcs | 138.00 | 552.00 |
| 52.0  W375844 chain carrying bar V281_06_6564_0 | 12  week(s) | 4 pcs | 170.00 | 680.00 |
| 53.0  W375845 chain carrying bar | 12  week(s) | 2 pcs | 133.00 | 266.00 |
| 54.0  W234667 roller chain X4_280_00 | 12  week(s) | 2.800 m | 23.80 | 66.64 |
| 55.0  W234668 chain connector X4_280_11 | 12  week(s) | 1 pcs | 1.98 | 1.98 |
| 56.0  W234669 chain connector X4_280_12 | 12  week(s) | 1 pcs | 3.81 | 3.81 |

4558945***

EXHIBIT 4    PAGE 239

| Quotation | 1108427 / 06.03.2014 | | | | Page 7 |
|---|---|---|---|---|---|
| Item Part | | Delivery time | Quantity/Unit | Unit price EUR | Total price EUR |
| 57.0 W159891 sprocket for driving shaft L281_06_0035_1 and driving shaft L281_06_0037_2 R5_25_010_003 | | 12 week(s) | 3 pcs | 150,00 | 450,00 |
| 58.0 W107915 threaded pin for driving shaft L281_06_0035_1 and driving shaft L281_06_0037_2 D0.090.157 | | 12 week(s) | 3 pcs | 1,00 | 3,00 |
| 59.0 W109105 parallel key for driving shaft L281_06_0035_1 D0.400.274 | | 12 week(s) | 2 pcs | 7,00 | 14,00 |
| 60.0 W173563 star for driving shaft L281_06_0037_2 V281_06_1504_0 | | 12 week(s) | 1 pcs | 240,00 | 240,00 |
| 61.0 W108751 adjusting ring for driving shaft L281_06_0037_2 D0_306_032 | | 12 week(s) | 2 pcs | 3,07 | 6,14 |
| 62.0 W109204 parallel key for driving shaft L281_06_0037_2 D0.401.675 | | 12 week(s) | 1 pcs | 3,00 | 3,00 |
| 63.0 W160204 sprocket for tightening shaft L281_06_0036_1 (scraping chain) R5_40_018_003 | | 12 week(s) | 2 pcs | 379,00 | 758,00 |
| 64.0 W108751 adjusting ring for tightening shaft L281_06_0036_1 (scraping chain) D0_306_032 | | 12 week(s) | 2 pcs | 3,07 | 6,14 |
| 65.0 W173559 flange for driving shaft L281_06_0089_2 V281_06_1250_0 | | 12 week(s) | 2 pcs | 192,00 | 384,00 |

EXHIBIT 4    PAGE 240

Quotation    1108427 / 05.03.2014                                      Page    6

| Item | Part | Delivery time | | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|---|---|
| 66.0 | W169910 aprocket for driving shaft L281_08_0069_2 R6_26_020_005 | 12 | week(s) | 2 pcs | 345.00 | 690.00 |
| 67.0 | W107947 threaded pin for driving shaft L281_08_0069_2 D0.090.159 | 12 | week(s) | 2 pcs | 1.00 | 2.00 |
| 68.0 | W109296 parallel key for driving shaft L281_08_0069_2 D0.401.693 | 12 | week(s) | 2 pcs | 5.70 | 11.40 |
| 69.0 | W154790 CHAIN TIGHTENER N920_719 | 12 | week(s) | 1 pcs | 342.00 | 342.00 |
| 70.0 | W350438 chain carrying bar V281_08_6368_0 | 12 | week(s) | 2 pcs | 131.00 | 262.00 |
| 71.0 | W375842 chain carrying bar V281_08_6627_1 | 12 | week(s) | 2 pcs | 163.00 | 326.00 |
| 72.0 | W350419 chain carrying bar V281_08_6589_0 | 12 | week(s) | 2 pcs | 156.00 | 312.00 |
| 73.0 | W350442 chain carrying bar | 12 | week(s) | 2 pcs | 156.00 | 312.00 |
| 74.0 | W133736 conveyor chain L281_08_2814_0 | 12 | week(s) | 2 pcs | 623.00 | 1,246.00 |
| 75.0 | W173583 idler for tightening traverse L281_08_0002_1 V281_08_1504_0 | 12 | week(s) | 2 pcs | 240.00 | 480.00 |
| 76.0 | W108751 adjusting ring for tightening traverse L281_08_0002_1 D0_306_032 | 12 | week(s) | 4 pcs | 3.07 | 12.28 |

455894608002

EXHIBIT 4    PAGE 241

| Quotation | 1106427 / 06.03.2014 | | | | Page | 8 |
|---|---|---|---|---|---|---|
| Item Part | | Delivery time | Quantity/Unit | Unit price EUR | | Total price EUR |
| 77.0 W350509<br>chain carrying bar<br>V281_03_0569_0 | 12 | week(s) | 2 pcs | 144.00 | | 288.00 |
| 78.0 S000002<br>chain carrying bar<br>V281_06_6585_0 | 12 | week(s) | 4 pcs | 112.00 | | 448.00 |
| 79.0 W118235<br>flexible bushing<br>for sieving section<br>K1_866_31 | 12 | week(s) | 12 pcs | 4.50 | | 54.00 |
| 80.0 W130734<br>conveyer chain<br>for starch unit<br>L281_06_2308_1 | 12 | week(s) | 2 pcs | 1,250.00 | | 2,500.00 |
| 81.0 W601438<br>O-ring<br>for pump pistons of your pump system<br>W144856 | 12 | week(s) | 378 pcs | 1.40 | | 529.20 |
| 82.0 W113522<br>piston ring<br>for pump pistons of your pump system<br>W144856<br>K1_566_51 | 12 | week(s) | 378 pcs | 1.14 | | 430.92 |
| 83.0 W306107<br>FILZ 6MM H2 DIN 61200<br>X4_034_60 | 12 | week(s) | 0.260 m² | 159.00 | | 42.25 |
| 84.0  Following parts for palette transport | | | | | | |
| 85.0 W114869<br>v-belt<br>delivered in 2 x 19,320m<br>K1_769_99 | 12 | week(s) | 38.640 m | 36.00 | | 1,391.04 |
| 86.0 W234387<br>VERBINDUNGSKLEMME<br>X4_132_10 | 12 | week(s) | 4 pcs | 5.00 | | 20.00 |
| 87.0 W120433<br>welding tongs for v-belt<br>K2_900_64 | 12 | week(s) | 1 pcs | 238.00 | | 238.00 |
| 88.0 W120434 | 12 | week(s) | 1 pcs | 45.10 | | 45.10 |

4556346000**2**

EXHIBIT 4    PAGE 242

| Quotation | 1108427 / 06.03.2014 | | | | Page 10 |
|-----------|----------|---------------|--------------|----------------|---------------|
| Item Part | | Delivery time | Quantity/Unit | Unit price EUR | Total price EUR |
| | mitre longa K2_800_85 | | | | |
| 89.0 | W120436 welding head | 12 week(s) | 1 pcs | 313.00 | 319.00 |
| 90.0 | W114837 v-belt K1_789_44 | 12 week(s) | 2 pcs | 42.00 | 84.00 |
| 91.0 | W114858 v-belt K1_789_98 | 12 week(s) | 3,800 m | 11.60 | 44.08 |
| 92.0 | W114858 v-belt K1_789_98 | 12 week(s) | 4,100 m | 11.60 | 47.56 |
| 93.0 | W114858 v-belt K1_789_98 | 12 week(s) | 3,800 m | 11.60 | 44.08 |
| 94.0 | W114858 v-belt K1_789_98 | 12 week(s) | 11,700 m | 11.60 | 135.72 |

Net value: 38,230.86

Total amount: 38,230.86

The minimum order value is 150 Euro.

4559546000Z

EXHIBIT 4    PAGE 243

| Quotation | 1106427 / 06.03.2014 | | | Page | 11 |
|---|---|---|---|---|---|
| Item Part | | Delivery time | Quantity(Unit) | Unit price EUR | Total price EUR |

Please note that your order will be carried out subject to the general WDB terms of delivery. We cannot accept any different terms of trade that might appear on your order form and would ask for your comprehension.

Note concerning delivery date: The definite delivery time depends on the order situation and the goods on stock at receipt of order. A binding information concerning delivery time will be given with the order confirmation.

Delays in order procedure, e.g. the agreed payment conditions, entitle the supplier to prolong the delivery time accordingly.

Service visits will be effected according to our actual conditions for working outside the plant, status 2019. During a service visit the customer has to support our fitters by technical experts as well as provide the necessary installation and security devices.

We would be pleased to receive your order.

Kind regards

WINKLER und DÜNNEBIER
Süßwarenmaschinen

i.A. Christian Greindl

455854600002

EXHIBIT 4    PAGE 244



**WINKLER und DÖNNEBIER**
Goßwarenmaschinen

WINKLER und DÖNNEBIER
Goßwarenmaschinen GmbH
Kleglstraße 1
53579 Rengsdorf · Germany

tel. +49 2634 9576-200
fax +49 2634 9576-769

sales@w-u-d.com
www.w-u-d.com

Hero Nutritionals, LLC
1900 E Carnegie Ave, Building 'A'
USA Santa Ana, CA 92705

**Final Invoice**

Shipto:
Hero Nutritionals, LLC
1900 E Carnegie Ave, Building 'A'
USA Santa Ana, CA 92705

address of customer
Hero Nutritionals, LLC
1900 E Carnegie Ave, Building 'A'
USA Santa Ana, CA 92705

**Original**

| | |
|---|---|
| Invoice No. | 1708893 |
| Invoice Date | 09.09.2014 |
| Customer No. | EM |
| Order no. | 1322808   24.03.2014 |
| Your order No. | 1714 |
| Order date | 21.03.2014 |
| Contact | Helen Wohlfarth |
| Tel. | +49 2634/9576-171 |
| Fax | +49 2634/9576-210 |
| e-mail | Helen.Wohlfarth@w-u-d.com |

Mode of shipment   see freight
Terms of shipment  CPT
Destination        Santa Ana, CA 92705
Terms of delivery  CPT (Incoterms 2010)

Terms of payment:
30% downpayment together with the order, immediately after date of invoice net
70% on delivery, 30 days after date of invoice net

machine no.: 2847
machine type: 261/262

Delivery is free of VAT as export delivery in accordance with § 4 no. 1a) in connection with § 6 German
Value Added Tax Act (UStG).

| Pos   Part | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|

Geschäftsführer Rainer Renkel
Amtsgericht Montabaur
HRB 12740
USt-IdNr. DE 147760990

Commerzbank
BLZ 570 400 44 · Kto. 2860021
IBAN DE57 5704 0044 0286 0021 00
BIC Code COBA DE FF

Westerwald Bank rG
BLZ 573 918 00 · Kto. 71105702
IBAN DE57 5731 1800 0070 0057 02
BIC Code GENO DE 51 WW1

4558945008 2

Final Invoice        1708693/08.08.2014                                    Page:   2

| Pos | Part | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|
| 1.0 | W580180 program parts for the article bears | 1 pcs | 14,300.00 | 14,300.00 |

The parts will be executed according
to layout drawing U004497-R00-S01
468 products per tray, 3 colors, 2
strokes per tray

Scope of delivery:
- one new nozzle plate with 228
nozzles
- one new program slider

The mentioned price is incl. partial
costs for design.

Single weight per piece / kg   50,1420
customs tariff no.    8438 90 00
Country of origin      D Germany

| 2.0 | W580848 program parts for the article fruit slices | 1 pcs | 13,207.00 | 13,207.00 |

The parts will be executed according
to layout drawing U004498-R00-S01
360 products per tray, 3 colors, 2
strokes per tray

Scope of delivery:
- one new nozzle plate with 180
nozzles
- one new program slider

The mentioned price is incl. partial
costs for design.

Single weight per piece / kg   49,1840
customs tariff no.    8438 90 00
Country of origin      D Germany

455894560002

EXHIBIT 4     PAGE 246

Final Invoice      1708693/08.08.2014                          Page:   3

| Pos. | Part | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|
| 3,0 | W680326 hopper similar to the existing execution but completely made out of stainless steel and useable for 3 colors | 1 pcs | 19,800.00 | 19,800.00 |
| | The mentioned price is incl. partial costs for design. customs tariff no.    8438 90 00 Country of origin    D Germany | | | |
| 4,0 | YZ01 down payment invoice 1708053 / 1 / 26.03.2014 | 1 pcs | - 14,192.10 | - 14,192.10 |

|  | |
|---|---|
| packaging | 390.00 |
| freight | 800.00 |
| total price | 48,197.90 |
| less down payments | - 14,192.10 |
| Total value: | 34,004.90 |

Kind regards

WINKLER und DÜNNEBIER
Süßwarenmaschinen

pps. Elke Runkel

4558946002

EXHIBIT 4     PAGE 247

Page: 1

**PURCHASE ORDER**



Hero Nutritionals®

1506 B. Carnegie Avenue
Suite A
Santa Ana, CA 92101
Ph (941) 478-2760

| | |
|---|---|
| VENDOR | 0001714 |
| PO DATE | 2/20/2014 |
| CURRENCY/CODE | WINKLER |

WINKLER & DUENNBIER
GUENTHER/BASCHREN GMBH
RINGSTRAEBE 1
RENGSDORF, 66176
Contra Tec

**Sold To:**
Hero Nutritionals LLC
1600 E. Carnegie Avenue, Suite A
Santa Ana, CA 92706

| Required Date | Ship VIA | F.O.B. | Terms |
|---|---|---|---|
| 2/20/2014 | | | SEE BELOW |

| Item Code | Unit | Ordered | Received | Backordered | Unit Cost | Amount |
|---|---|---|---|---|---|---|
| A1 | | | | | | 18,822.24 |

Default Item Code A1
Set of program parts for the wrinkle beers
The parts will be created according to layout drawing U004487-R00-501 456 products per tray,
3 colors, 2 strokes per tray
Scope of delivery: one new nozzle plate with 716 nozzles, one new program sheet.
The mentioned price incl. partial costs for design

| A2 | | | | | | 18,507.61 |

Default Item Code A2
Set of program parts for the safety flat wires
The parts will be created according to layout drawing U004488-R00-501, 200 products per tray
3 colors, 2 strokes per tray
Scope of delivery: one new nozzle plate with 180 nozzles, one new program sheet
The mentioned price is incl. partial costs for design

| A3 | | | | | | 27,448.74 |

Default Item Code A3
New hopper
Similar to the existing execution but completely made out of lattice steel & usable for 3 colors
The mentioned price is incl. partial costs for design
See modified quote 11081355 Dated 07-Mar-2014

**TERMS AND CONDITIONS OF OFFER:** This Purchase Order is an offer to buy goods and/or services and is expressly subject to the terms and conditions of Hero Nutritionals, LLC Purchase Order/Contract Terms & Conditions, which supersede any conflicting terms or conditions, and which are incorporated herein by reference. Delivery of the subject goods and/or commencement of performance of the subject services constitutes acceptance of the terms and conditions of this Purchase Order. This Purchase Order expressly limits acceptance to the terms of this offer, and Hero Nutritionals, LLC hereby objects to any different or additional terms contained in any response to this Purchase Order. In addition to the other terms in this Purchase Order, this Purchase Order expressly includes all implied warranties and all of the buyer's remedies set forth in the Uniform Commercial Code. In the event of any dispute between the parties, such dispute will be settled exclusively in a court of law. The terms of this Purchase Order are the sole and exclusive terms on which Hero Nutritionals, LLC agrees to be bound.

Payment terms: 30% down payment with purchase order and 70% net 30 on completion and approval

| | | |
|---|---|---|
| | Net Order | 65,510.58 |
| | Sales Tax | 0.00 |
| | Freight | 0.00 |
| | **Order Total** | 65,578.58 |

Manager Signature

EXHIBIT 4    PAGE 248



**WDS**
WINKLER und DÜNNEBIER
Süßwarenmaschinen

Hero Nutritionals, LLC
Mr. David Gallardo
991 Calle Negocio
USA San Clemente, CA 92673

WINKLER und DÜNNEBIER
Süßwarenmaschinen GmbH
Ringstraße 1
51570 Rengsdorf · Germany

Tel. +49 2634/9676-202
Fax +49 2634/9676-203

info@w-u-d.com
www.w-u-d.com

Quotation

| | |
|---|---|
| Quotation no. | 1108138 |
| Quotation date | 30.01.2014 |
| valid until | 30.04.2014 |
| Customer no. | |
| Your inquiry | depositing equipment |
| dated | 30.01.2014 |
| Contact | Christian Greindl |
| Tel. | +49 2634/9676-232 |
| Fax | +49 2634/9676-238 |
| E-Mail | christian.greindl@w-u-d.com |

Mode of shipment    by airfreight
Terms of delivery    FCA (Incoterms 2010)
Destination    Rengsdorf
Terms of payment    according payment plan

30% downpayment together with the order
70% on delivery (net 10)

machine no.: 2847
machine type: 281/282

| Item | Part | Delivery time | Quantity/Unit | Unit price EUR | Total price EUR | |
|---|---|---|---|---|---|---|
| 1.0 | S000002 | 14 | week(s) | 1 pcs | 14,300.00 | 14,300.00 | EUR 19822.26 USA |

Set of program parts
for the article beans

The parts will be executed according
to layout drawing U004497-R00-S01
450 products per tray, 3 colors, 2
strokes per tray

Scope of delivery:
- one new nozzle plate with 225
nozzles
- one new program stirrer

The mentioned price is incl. partial
costs for design

| | | | | | | |
|---|---|---|---|---|---|---|
| 2.0 | S000002 | 14 | week(s) | 1 pcs | 13,207.00 | 13,207.00 |

Set of program parts
18307,54 USA

45589460002

Geschäftsführer: Robert Rockel
Amtsgericht Neuwied
HRB 12770
USt.-ID Nr.: 152/60970

Commerzbank
BLZ 570 400 49 · Kto. 2040022
IBAN DE37 5704 0049 0204 0022 00
BIC Code COBA DE FF

Westerwald Bank eG
BLZ 573 918 00 · Kto. 28405702
IBAN DE47 5739 1800 0028 4057 02
BIC Code GENO DE 51WW1

EXHIBIT 4    PAGE 249



EXHIBIT 4    PAGE 250

Quotation        1108138 / 30.01.2014                          Page    3

Item Part                    Delivery time        Quantity/Unit.    Unit price EUR    Total price EUR

Please note that your order will be carried out subject to the general WDS terms of delivery. We cannot
accept any different terms of trade that might appear on your order form and would ask for your
comprehension.
Note concerning delivery date: The definite delivery time depends on the order situation and the goods on
stock at receipt of order. A binding information concerning delivery time will be given with the order
confirmation.
Delays in order procedure, e.g. the agreed payment conditions, entitle the supplier to prolong the delivery
time accordingly.
Service visits will be effected according to our actual conditions for Working outside the plant, status 2013.
During a service visit the customer has to support our fitters by technical experts as well as provide the
necessary installation and security devices.
We would be pleased to receive your order.

Kind regards

WINKLER und DÜNNEBIER
S ü ß w a r e n m a s c h i n e n

I. A. Christian Greindl

EXHIBIT 4    PAGE 251



EXHIBIT 4    PAGE 252

EXHIBIT 4      PAGE 253



**WDS**
WINKLER und DÜNNEBIER
SÜSSwarenmaschinen

Winkler und Dünnebier
Süsswarenmaschinen GmbH
Ringstraße 1
56579 Rengsdorf, Germany

Tel. +49 2634 9876-000
Fax +49 2634 9876-200

sales@w-u-d.com
www.w-u-d.com

Hero Nutritionals, LLC
991 Calle Negocio
USA San Clemente, CA 92673

**Final Invoice**

Ship to:
Hero Nutritionals, LLC
1900 E Carnegie Ave, Building 'A'
USA Santa Ana, CA 92705

address of customer
Hero Nutritionals, LLC
1900 E Carnegie Ave, Building 'A'
USA Santa Ana, CA 92705

| | | |
|---|---|---|
| | | **Original** |
| Invoice No. | 1709030 | |
| Invoice Date | 26.08.2014 | |
| Customer No. | EM | |
| Order no. | 1322905 | 18.08.2014 |
| Your order No. | 1579 | |
| Order date | 18.08.2014 | |
| Contact | Helen Wohlfarth | |
| Tel. | +49 2634/9876-171 | |
| Fax | +49 2634/9876-210 | |
| e-mail | Helen.Wohlfarth@w-u-d.com | |

Mode of shipment  by airfreight
Terms of shipment CPT
Destination        Santa Ana, CA 92705
Terms of delivery  CPT (Incoterms 2010)

Terms of payment:
30 % downpayment together with the order, immediately after date of invoice net
70 % on delivery, 30 days after date of invoice net

Delivery note: 1508353 dated 18.08.2014

machine no.: 2847
machine type: 261/262

Delivery is free of VAT as export delivery in accordance with § 4 no. 1a) in connection with § 6 German
Value Added Tax Act (UStG).

| Pos | Part | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|
| 1.0 | W143148<br>TRANSPORT ROLL<br>for palette transport<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 4 pcs | 320.00 | 1,280.00 |

4558945800?

Geschäftsführer Rainer Kunkel
Amtsgericht Montabaur
HRB 12710
USt ID Nr. DE 192769120

Commerzbank
BLZ 570 400 44 · Kto 2860021
IBAN DE57 5704 0044 0286 0021 00
BIC Code COBA DE FF

Westerwald Bank eG
BLZ 573 918 00 · Kto 7005707
IBAN DE47 5739 1800 0074 005707
BIC Code GENO DE 51 WW1

EXHIBIT 4    PAGE 254

Final Invoice          1709030/26.08.2014                              Page:   2

| Pos | Part | Quantity/Unit | Unit price EUR | Total price EUR |
|-----|------|---------------|----------------|-----------------|
| 2.0 | W181766<br>v-belt disc<br>for palette transport<br>customs tariff no.  8438 90 00<br>Country of origin  D Germany | 2 pcs | 246.00 | 492,00 |
| 3.0 | W182893<br>bolt<br>for palette transport<br>customs tariff no.  8438 90 00<br>Country of origin  D Germany | 2 pcs | 24,00 | 48,00 |
| 4.0 | W234516<br>roller chain<br>for palette transport (drive)<br>customs tariff no.  8438 90 00<br>Country of origin  PRC China | 1.055 m | 13,80 | 14,56 |
| 5.0 | W234519<br>chain connector<br>for palette transport (drive)<br>customs tariff no.  8438 90 00<br>Country of origin  PRC China | 1 pcs | 1,10 | 1,10 |
| 6.0 | W234520<br>chain link<br>for palette transport (drive)<br>customs tariff no.  8438 90 00<br>Country of origin  PRC China | 1 pcs | 1,60 | 1,60 |
| 7.0 | W183116<br>sprocket<br>for palette transport (drive)<br>customs tariff no.  8438 90 00<br>Country of origin  D Germany | 2 pcs | 197,00 | 384,00 |
| 8.0 | W305017<br>6KT-screw<br>for palette transport (drive)<br>customs tariff no.  8438 90 00<br>Country of origin  D Germany | 4 pcs | 0.35 | 1,40 |

4558946002

EXHIBIT 4    PAGE 255

Final Invoice        1709030/28.08.2014                           Page:    3

| Pos | Part | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|
| 9.0 | W265192<br>IN-6KT-screw<br>for palette transport (drive)<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 3 pcs | 0.60 | 1.80 |
| 10.0 | W114659<br>v-belt<br>as spare for palette transport<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 30,000 m | 36.00 | 1,080.00 |
| 11.0 | W234387<br>v-belt connector<br>as spare for palette transport<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 2 pcs | 1.90 | 3.80 |
| 12.0 | W234519<br>roller chain<br>for stacking unit (drive)<br>customs tariff no.    8438 90 00<br>Country of origin    PRC China | 1.105 m | 13.80 | 15.25 |
| 13.0 | W234519<br>chain connector<br>for stacking unit (drive)<br>customs tariff no.    8438 90 00<br>Country of origin    PRC China | 1 pcs | 1.10 | 1.10 |
| 14.0 | W183407<br>sprocket<br>for stacking unit (drive)<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 1 pcs | 158.00 | 158.00 |
| 15.0 | W109287<br>parallel key<br>for stacking unit (drive)<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 1 pcs | 2.54 | 2.54 |

EXHIBIT 4    PAGE 256

Final Invoice          1709030/28.08.2014                              Page:    4

| Pos | Part | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|
| 16.0 | W107948<br>threaded pin<br>for stacking unit (drive)<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 1 pcs | 0,90 | 0,90 |
| 17.0 | W159451<br>sprocket<br>for stacking unit (drive)<br>customs tariff no.    8435 90 00<br>Country of origin    D Germany | 1 pcs | 181,00 | 181,00 |
| 18.0 | W109142<br>parallel key<br>for stacking unit (drive)<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 1 pcs | 0,97 | 0,97 |
| 19.0 | W107926<br>threaded pin<br>for stacking unit (drive)<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 1 pcs | 0,49 | 0,49 |
| 20.0 | W114619<br>v-belt<br>for feeder drive<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 2 pcs | 23,60 | 47,20 |
| 21.0 | W114607<br>v-belt<br>for feeder drive<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 2 pcs | 11,00 | 22,00 |
| 22.0 | W113317<br>O-ring<br>for gear boxes L261_22_4103_0 and<br>L261_22_4104_2 below the depositor<br>customs tariff no.    8438 90 00<br>Country of origin    I Italy | 2 pcs | 1,22 | 2,44 |

45589460002

EXHIBIT 4     PAGE 257

Final Invoice        1709030/25.08.2014                              Page:   5

| Pos. | Part | Quantity/Unit | Unit price EUR | Total price EUR |
|------|------|---------------|----------------|-----------------|
| 23.0 | W113314<br>O-ring<br>for gear boxes L281_22_4103_0 and<br>L281_22_4104_2 below the depositor<br>customs tariff no.  8438 90 00<br>Country of origin    I Italy | 3 pcs | 1.22 | 3.66 |
| 24.0 | W113140<br>sealing ring<br>for gear boxes L281_22_4103_0 and<br>L281_22_4104_2 below the depositor<br>customs tariff no.  8438 90 00<br>Country of origin    RC Taiwan | 4 pcs | 4.60 | 18.40 |
| 25.0 | W113113<br>sealing ring<br>for gear box L281_22_4104_2 below<br>the depositor<br>customs tariff no.  8438 90 00<br>Country of origin    RC Taiwan | 2 pcs | 3.50 | 7.00 |
| 26.0 | W173653<br>BRUSH<br>customs tariff no.  8438 90 00<br>Country of origin    D Germany | 4 pcs | 58.90 | 235.60 |
| 27.0 | W199770<br>SCRAPING BRUSH<br>customs tariff no.  8438 90 00<br>Country of origin    D Germany | 2 pcs | 378.00 | 756.00 |
| 28.0 | W173654<br>brush<br>customs tariff no.  8438 90 00<br>Country of origin    D Germany | 2 pcs | 192.00 | 384.00 |
| 29.0 | W173651<br>BRUSH<br>customs tariff no.  8438 90 00<br>Country of origin    D Germany | 4 pcs | 321.00 | 1,284.00 |

EXHIBIT 4     PAGE 258

Final Invoice      1709030/26.08.2014                    Page:   8

| Pos. Part | | Quantity/Unit | Unit price EUR | Total price EUR |
|---|---|---|---|---|
| 30,0 W251991 brush | | 2 pcs | 115,00 | 230,00 |
| customs tariff no. Country of origin | 8438 90 00 D Germany | | | |
| 31,0 W234518 roller chain | | 3,067 m | 13,90 | 42,60 |
| customs tariff no. Country of origin | 8438 90 00 PRC China | | | |
| 32,0 W234519 chain connector | | 1 pcs | 1,10 | 1,10 |
| customs tariff no. Country of origin | 8438 90 00 PRC China | | | |
| 33,0 W234520 chain link | | 1 pcs | 1,60 | 1,60 |
| customs tariff no. Country of origin | 8438 90 00 PRC China | | | |
| 34,0 W169372 sprocket | | 1 pcs | 170,00 | 170,00 |
| customs tariff no. Country of origin | 8438 90 00 D Germany | | | |
| 35,0 W139935 chain tightener | | 1 pcs | 57,00 | 57,00 |
| customs tariff no. Country of origin | 8438 90 00 D Germany | | | |
| 36,0 W173712 pressure screw | | 1 pcs | 5,00 | 5,00 |
| customs tariff no. Country of origin | 8438 90 00 D Germany | | | |
| 37,0 W583334 program bar for the existing pump system W144950 (with 9 x 42 pistons, D12mm) This plate is the washing plate, e.g. all pistons in works. | | 1 pcs | 3,203,00 | 3,203,00 |
| customs tariff no. Country of origin | 8438 90 00 D Germany | | | |

4558546000Z

EXHIBIT 4     PAGE 259

**Final Invoice**      1709030/26.08.2014                                    Page:   7

| Pos. | Part | Quantity/Unit | Unit price EUR | Total price EUR |
|------|------|---------------|----------------|-----------------|
| 38.0 | W554646<br>starting valve<br>(pneumatik, for stacking unit)<br>customs tariff no.    8438 90 00<br>Country of origin    H Hungary | 1 pce | 88.50 | 88.50 |
| 39.0 | W119220<br>sound absorber 1/4"<br>(pneumatik, for stacking unit)<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 1 pce | 7.10 | 7.10 |
| 40.0 | W320452<br>filer regulating valve<br>(pneumatik, for stacking unit)<br>customs tariff no.    8438 90 00<br>Country of origin    H Hungary | 1 pce | 138.00 | 138.00 |
| 41.0 | W320453<br>distributor<br>(pneumatik, for stacking unit)<br>customs tariff no.    8438 90 00<br>Country of origin    H Hungary | 1 pce | 28.60 | 28.60 |
| 42.0 | W119327<br>double nipple<br>(pneumatik, for stacking unit)<br>customs tariff no.    8438 90 00<br>Country of origin    I Italy | 1 pce | 1.57 | 1.57 |
| 43.0 | W502543<br>magnetic valve<br>(pneumatic)<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 1 pce | 116.00 | 116.00 |
| 44.0 | W119037<br>magnetic valve<br>(pneumatic)<br>customs tariff no.    8438 90 00<br>Country of origin    D Germany | 1 pce | 148.00 | 148.00 |

455894600002

EXHIBIT 4     PAGE 260

**UCC FINANCING STATEMENT AMENDMENT**
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER** (optional)
Laura Lightholder

**B. E-MAIL CONTACT AT FILER** (optional)

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Quarles & Brady LLP
411 E. Wisconsin Ave
Suite 2400
Milwaukee, WI 53202-53202
USA

2077591323
01/23/2020 15:15

FILED
CALIFORNIA
SECRETARY OF STATE
SOS

69591970002  UCC 3 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
14-7434950926

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☑ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**
Check one of these two boxes:   AND   Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record   ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c   ☐ ADD name: Complete item 7a or 7b, and item 7c   ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| McCormick 107, LLC | | | |
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 11350 McCormick Road, Suite 902 | Hunt Valley | MD | 21031 | MD |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes:   ☐ ADD collateral   ☐ DELETE collateral   ☐ RESTATE covered collateral   ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Bank of Manhattan | | | |
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
_____ CA SOS

UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

EXHIBIT 4    PAGE 261

# EXHIBIT 13

EXHIBIT 4    PAGE 262



## BANK *of* MANHATTAN

### PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $500,000.00 | 02-19-2015 | 02-19-2022 | ***1428 | | | DW | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Hero Nutritionals, LLC
1900 East Carnegie Avenue, Building A
Santa Ana, CA 92705

**Lender:** Bank of Manhattan, N.A.
Pasadena Office
199 South Los Robles Avenue
Suite 130
Pasadena, CA 91101

---

**Principal Amount: $500,000.00**            **Date of Note: February 19, 2015**

**PROMISE TO PAY.** Hero Nutritionals, LLC ("Borrower") promises to pay to Bank of Manhattan, N.A. ("Lender"), or order, in lawful money of the United States of America, the principal amount of Five Hundred Thousand & 00/100 Dollars ($500,000.00), together with interest on the unpaid principal balance from February 19, 2015, calculated as described in the "INTEREST CALCULATION METHOD" paragraph using an interest rate of 5.360%, until paid in full. The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.

**PAYMENT.** Borrower will pay this loan in 84 payments of $7,169.15 each payment. Borrower's first payment is due March 19, 2015, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on February 19, 2022, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; then to any unpaid collection costs; and then to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $100.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Bank of Manhattan, N.A.; Pasadena Office; 199 South Los Robles Avenue; Suite 130; Pasadena, CA 91101.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 6.000% of the unpaid portion of the regularly scheduled payment or $25.00, whichever is greater.

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by 5.000 percentage points.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

EXHIBIT 4     PAGE 263

Loan No: ████1428

**PROMISSORY NOTE**
**(Continued)**

Page 2

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** To the extent permitted by applicable law, Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $20.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein: collateral described in a Commercial Security Agreement dated February 19, 2015.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Bank of Manhattan, N.A., Pasadena Office, 199 South Los Robles Avenue, Suite 130, Pasadena, CA 91101.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORRDWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

**BORROWER:**

HERO NUTRITIONALS, LLC

By: _____
Jennifer U. Hodges, Manager/Member of Hero
Nutritionals, LLC

LaserPro, Ver. 15.1.0.023  Copr. D+H USA Corporation 1997, 2015.  All Rights Reserved.  - CA  C:\HARLIN\CFI\LPL\D20.FC  TR-2384

EXHIBIT 4    PAGE 264

## ALLONGE

    ALLONGE to be attached to and made a part of that certain Promissory Note in the original principal amount of Five Hundred Thousand and 00/100 Dollars ($500,000.00) dated February 19, 2015, (Loan Number ████████8001) made by Hero Nutritionals, LLC, and in favor of Pacific Premier Bank, successor-by-merger to Plaza Bank, successor-by-merger to Bank of Manhattan N.A., as renewed, amended, or modified.

    Pay to the order of McCormick 107, LLC, a Maryland limited liability company, without representations, warranties or recourse.

**PACIFIC PREMIER BANK**

By: _____
Name: Dona Jakosky
Title: Sr EVP/CCO
Date: March 1, 2019

EXHIBIT 4      PAGE 265

# EXHIBIT 14

EXHIBIT 4    PAGE 266

# BANK *of* MANHATTAN

## COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $500,000.00 | 02-19-2015 | 02-19-2022 | ▮1428 | | | DW | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Grantor:**  Hero Nutritionals, LLC
1900 East Carnegie Avenue, Building A
Santa Ana, CA  92705

**Lender:**  Bank of Manhattan, N.A.
Pasadena Office
199 South Los Robles Avenue
Suite 130
Pasadena, CA  91101

---

**THIS COMMERCIAL SECURITY AGREEMENT** dated February 19, 2015, is made and executed between Hero Nutritionals, LLC ("Grantor") and Bank of Manhattan, N.A. ("Lender").

**GRANT OF SECURITY INTEREST.**  For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.**  The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

   Collateral as described per Exhibit A

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

   (A)  All accessions, attachments, accessories, replacements of and additions to any of the collateral described herein, whether added now or later.

   (B)  All products and produce of any of the property described in this Collateral section.

   (C)  All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

   (D)  All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

   (E)  All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.**  In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**FUTURE ADVANCES.**  In addition to the Note, this Agreement secures all future advances made by Lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

**RIGHT OF SETOFF.**  To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account).  This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future.  However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law.  Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.**  With respect to the Collateral, Grantor represents and promises to Lender that:

   **Perfection of Security Interest.**  Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral.  Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender.  This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.

   **Notices to Lender.**  Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any  (1)  change in Grantor's name;  (2)  change in Grantor's assumed business name(s);  (3)  change in the management or in the members or managers of the limited liability company Grantor;  (4)  change in the authorized signer(s);  (5)  change in Grantor's principal office address;  (6)  change in Grantor's state of organization;  (7)  conversion of Grantor to a new or different type of business entity; or  (8)  change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender.  No change in Grantor's name or state of organization will take effect until after Lender has received notice.

   **No Violation.**  The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its membership agreement does not prohibit any term or condition of this Agreement.

EXHIBIT 4     PAGE 267

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: ●428                                                                                              Page 2

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Grantor and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least twenty-one (21) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person in connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $25,000.00, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the

EXHIBIT 4    PAGE 268

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: ●1428                                                                                                   Page 3

proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION.** Until default, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. Such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution of Grantor (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

EXHIBIT 4    PAGE 269

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: ⬤1428                                                                                                           Page 4

---

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the California Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**Preference Payments.** Any monies Lender pays because of an asserted preference claim in Grantor's bankruptcy will become a part of the

EXHIBIT 4     PAGE 270

Case 8:22-bk-11383-SC   Doc 43   Filed 10/05/22   Entered 10/05/22 18:29:04   Desc
Main Document     Page 280 of 358

Case 8:22-bk-11383-SC   Claim 9-1   Filed 09/27/22   Desc Main Document     Page 203
of 225

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: 1428                                                                                          Page 5

Indebtedness and, at Lender's option, shall be payable by Grantor as provided in this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Waiver of Co-Obligor's Rights.** If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Hero Nutritionals, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Hero Nutritionals, LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum

EXHIBIT 4     PAGE 271

Loan No: ●1428

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Page 6

and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means Bank of Manhattan, N.A., its successors and assigns.

**Note.** The word "Note" means the Note dated February 19, 2015 and executed by Hero Nutritionals, LLC in the principal amount of $500,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED FEBRUARY 19, 2015.

GRANTOR:

HERO NUTRITIONALS, LLC

By: _____

    Jennifer E. Hodges, Manager/Member of Hero
    Nutritionals, LLC

LaserPro, Ver. 15.1 © 025 Copr. D+H USA Corporation 1997, 2015   All Rights Reserved.  - CA  C:\HARLAND\CFI\LPL\E40.FC  TR-2384

EXHIBIT 4    PAGE 272

# EXHIBIT 15

EXHIBIT 4      PAGE 273

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER** (optional)
Phone: 217-547-6635 Fax: 217-522-3570

**B. E-MAIL CONTACT AT FILER** (optional)
cokeefe@firstam.com

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)    16435 - FIRST

First American Title Insurance
901 S. 2nd Street
Suite 201
Springfield, IL 62704

47012362

CALI

File with: Secretary of State, CA

CT Lien Solutions
Representation of filing

**This filing is Completed**
File Number : 157452858378
File Date : 03-Mar-2015

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Hero Nutritionals, LLC | | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 991 Calle Negocio | San Clemente | | CA | 92673 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Bank of Manhattan | | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 2700 East Foothill Boulevard, Suite 200 | Pasadena | | CA | 91107 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
Collateral as described per Exhibit A; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitution relating to any of the foregoing; all records of any kind relating to any of the foregoing.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION** (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
142B

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by CT Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

EXHIBIT 4    PAGE 274

HERO NUTRITIONALS, LLC
February 19, 2015

---

EXHIBIT A

---

| Quantity | Description |
|---|---|
| 2 | Tightening roller #W173930 |
| 1 | Air Cooled Chiller Model #CGAM070F2 |
| 26 | 18 Gage Galv 48x90 WO#41837 |
| 1 | Hyster - W40Z – 4,000 LBS Class SN#B218N31198M |
| 1 | Additional Electical Work Quote #HNU-6360-P1 |
| 1 | Proposal #HNU-6337-P1 |
| 1 | Tank 120 Gallon Stainless Steel Crepaco Jacketed, Agitation #S573873 |
| 1 | Indoor Conditioning Unit |
| 1 | Indoor Stacked Process Unit |
| 1 | Indoor Stacked Process Unit |
| 4.1 | 40" High Cube #DFSU6452470 |
| 4.1 | 40" High Cube #TCNU5766761 |
| 1 | Frequency Converter Model #50INDVC6050 |
| 1 | Steam Heated DI Water Loop #9065-9500 |
| 1 | Temperature Control Equipment #9065-9500 |
| 1 | Sartorius Entris 6202-1S |
| 1 | Ohaus D71P100QL |
| 5 | Adjusting Ring for tightening shaft  #W108725 |
| 1 | Sprocket for shaft  #W159444 |
| 1 | Threaded Pin for shaft #W107986 |
| 1 | Parallel Key for shaft #W109158 |
| 1 | Spocket #W159841 |
| 1 | Treaded pin #W108047 |
| 1 | Parallel Key #W109165 |
| 2 | Sprocket #W253359 |
| 2 | Sprocket #W159876 |
| 1 | Sprocket #W159503 |
| 2 | Chain carrying bar for trasport below the depositor #W579384 |
| 2 | Conveyor Chain depositing chain #W139813 |
| 1 | Chain tightener #W154777 |
| 1 | Chain tightener #W579289 |
| 1 | Chain tightener #579384 |
| 1 | Spoket #W579287 |
| 1.283M | Roller chain #W235082 |
| 1 | Chain Connector #W235083 |
| 2.648m | roller chain #W235097 |
| 1 | Chain Connector #W235098 |
| 2 | Chain Carring bar #174045 |
| 2 | Chain carrying bar #W579275 |
| 2 | V-Belt disc #W174149 |
| 2 | V-belt #W114647 |

EXHIBIT 4    PAGE 275

| | |
|---|---|
| 4 | adjusting ring #W108750 |
| 2 | sprocket #W579284 |
| 2 | threaded pin #W108048 |
| 2 | Parallel key #W109167 |
| 4 | Sprocket #W579283 |
| 2 | adjusting ring #W108751 |
| 2 | sprocket #W579286 |
| 2 | parallel key #W109288 |
| 2 | threaded pin #W107947 |
| 2 | sprocket #W159910 |
| 2 | Flange for driving shaft #W173559 |
| 2 | parallel key #W109294 |
| 2 | thraded pin #W108047 |
| 2 | sprocket #W159905 |
| 4 | adjusting ring #W108751 |
| 2 | sprocket #W159913 |
| 2 | Return wheel for turning shaft #W173743 |
| 8 | adjusting ring #W108751 |
| 2 | chain carrying bar #W375639 |
| 2 | Chain Carring bar #W375640 |
| 1 | Transport Chain #W139737 |
| 1 | Transport Chain #W139739 |
| 4 | chain carrying bar #W375643 |
| 4 | chain carrying bar #W375644 |
| 2 | chain carrying bar #W375645 |
| 2.800m | Roller chain #W234667 |
| 1 | chain connector #W234668 |
| 1 | chain connector #W234669 |
| 3 | sprocket #W159891 |
| 3 | threaded pin #W107945 |
| 2 | parallel key #W109166 |
| 1 | Idler for driving  shaft #W173583 |
| 2 | adjusting ring #W108751 |
| 1 | parallel key #W109294 |
| 2 | Sprocket #W579282 |
| 2 | adjusting ring #W108751 |
| 2 | flange #W173559 |
| 2 | sprocket #W159910 |
| 2 | threaded pin #W107947 |
| 2 | parallel key #W109296 |
| 1 | chain tightener #W154790 |
| 2 | chain carrying bar #W350436 |
| 2 | chain carrying bar  #W275642 |
| 4 | chain carrying bar #W350419 |
| 4 | chain carrying bar #W350442 |
| 2 | conveyor chain #W139736 |
| 2 | Idler #W173583 |

EXHIBIT 4    PAGE 276

| | |
|---|---|
| 4 | adjusting ring #W108751 |
| 2 | chain carrying bar #W350509 |
| 4 | Chain guide #W579274 |
| 12 | Flexible bushing for sieving section #W115235 |
| 2 | conveyor chain #W139734 |
| 378 | O-Ring for pump pistons of your pump #W501436 |
| 378 | Piston ring for pump pistons #W113522 |
| 0.25 | felt #W308107 |
| 38.64 | v-belt #W114659 |
| 4 | connector #W234387 |
| 1 | welding tongs for v belt #W120433 |
| 1 | mitre tongs #W120434 |
| 1 | welding head #W120436 |
| 2 | v-belt #W114637 |
| 30.000m | v-belt #W114658 |
| 8200 | Starch Trays (ST1099) |

EXHIBIT 4    PAGE 277

**UCC FINANCING STATEMENT AMENDMENT**

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
UCC Administrator
916-564-7800

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)
CLAS INFORMATION SERVICES
2020 HURLEY WAY STE 350
SACRAMENTO, CA 95825
USA

DOCUMENT NUMBER: 83181690003
FILING NUMBER: 19-77433433
FILING DATE: 10/29/2019 13:38

IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
15-7452858378

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☑ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:
Check one of these two boxes:       AND   Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b, and item 7a and 7b and item 7c   ☐ ADD name: Complete item 7a or 7b, and item 7c   ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

OR

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

OR

7a. ORGANIZATION'S NAME
McCormick 107, LLC

7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
|---|---|---|---|

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 11350 McCormick Road, Suite 902 | Hunt Valley | MD | 21031 | USA |

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

OR

a. ORGANIZATION'S NAME
Bank of Manhattan

| b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

10. OPTIONAL FILER REFERENCE DATA:
▬▬ CA SOS

FILING OFFICE COPY

EXHIBIT 4    PAGE 278

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
UCC Administrator
916-564-7800

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)
CLAS INFORMATION SERVICES
2020 HURLEY WAY STE 350
SACRAMENTO, CA 95825
USA

DOCUMENT NUMBER: 83181690004
FILING NUMBER: 19-77433437
FILING DATE: 10/29/2019 13:40

IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
15-7452858378

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☑ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:
Check one of these two boxes:       AND  Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6 CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

7 CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 7b. INDIVIDUAL'S SURNAME | | | |
|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
Indicate collateral

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|
| McCormick 107, LLC | | | |

OR

| b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

10. OPTIONAL FILER REFERENCE DATA:
████  CA SOS

FILING OFFICE COPY

EXHIBIT 4     PAGE 279

# EXHIBIT 16

EXHIBIT 4    PAGE 280

McCormick 107, LLC
11350 McCormick Rd
Bldg 2, Suite 902
Hunt Valley, MD 21031

## Payoff Notice

Date Printed: 09/14/2022

HERO NUTRITIONALS LLC
JENNIFER L HODGES
1900 CARNEGIE AVENUE
SANTA ANA CA  92705

| | |
|---|---|
| Account Number | 701 |
| Short Name | HERO NUTRITIONALS |
| Loan Group | DEFAULT |
| Interest Paid Through | 10/27/2019 |
| Principal Paid Through | 10/27/2019 |
| Loan Date | 10/29/2014 |
| Maturity Date | 10/01/2024 |
| Payoff Date | 09/14/2022 |
| Interest Rate | 10.46000% |
| Per Diem | 89.11785 |
| Principal Balance | 306,715.38 |
| Accrued Interest | 2,317.06 |
| Late Charges Due | 11,399.62 |
| Payoff Amount | 320,432.06 |

EXHIBIT 4    PAGE 281

HERO NUTRITIONALS LLC
JENNIFER L HODGES
1900 CARNEGIE AVENUE
SANTA ANA CA 92705

Contact Number: HERO NUTRITIONALS
Loan Number: ████701
Name: HERO NUTRITIONALS

| Transaction Date | Tran Code | Transaction Amount | Description/User Reference | R | Principal | Interest | Fees | Late Charges | Others | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| 03/18/2019 | 400 | 833,950.27 | Beg Bal Principal Advance | | 833,950.27 | | | | | 833,950.27 |
| 03/18/2019 | 410 | 477,612.29 | Beg Bal Principal Payment | | -477,612.29 | | | | | 356,337.98 |
| 04/08/2019 | 150 | 599.98 | Late Fee | | | | | 599.98 | | 356,337.98 |
| 04/18/2019 | 204 | 9,405.56 | P+I Principal Payment | | -9,405.56 | | | | | 346,932.42 |
| 04/18/2019 | 206 | 2,594.13 | P+I Interest Payment | | | -2,594.13 | | | | 346,932.42 |
| 05/10/2019 | 150 | 599.98 | Late Fee | | | | | 599.98 | | 346,932.42 |
| 05/21/2019 | 204 | 10,263.29 | P+I Principal Payment | | -10,263.29 | | | | | 336,669.13 |
| 05/21/2019 | 206 | 1,736.40 | P+I Interest Payment | | | -1,736.40 | | | | 336,669.13 |
| 05/21/2019 | 250 | 0.18 | Late Fee Payment | | | | | -0.18 | | 336,669.13 |
| 05/21/2019 | 250 | 599.98 | Late Fee Payment | | | | | -599.98 | | 336,669.13 |
| 06/10/2019 | 150 | 599.98 | Late Fee | | | | | 599.98 | | 336,669.13 |
| 06/28/2019 | 204 | 10,059.36 | P+I Principal Payment | | -10,059.36 | | | | | 326,609.77 |
| 06/28/2019 | 206 | 1,940.33 | P+I Interest Payment | | | -1,940.33 | | | | 326,609.77 |
| 06/28/2019 | 250 | 0.18 | Late Fee Payment | | | | | -0.18 | | 326,609.77 |
| 06/28/2019 | 250 | 599.80 | Late Fee Payment | | | | | -599.80 | | 326,609.77 |
| 08/13/2019 | 204 | 9,721.04 | P+I Principal Payment | | -9,721.04 | | | | | 316,888.73 |
| 08/13/2019 | 206 | 2,278.65 | P+I Interest Payment | | | -2,278.65 | | | | 316,888.73 |
| 09/03/2019 | 250 | 0.18 | Late Fee Payment | | | | | -0.18 | | 316,888.73 |
| 09/03/2019 | 250 | 599.80 | Late Fee Payment | | | | | -599.80 | | 316,888.73 |
| 09/23/2019 | 204 | 10,173.35 | P+I Principal Payment | | -10,173.35 | | | | | 306,715.38 |
| 09/23/2019 | 206 | 1,826.33 | P+I Interest Payment | | | -1,826.33 | | | | 306,715.38 |
| 10/02/2019 | 206 | 558.22 | P+I Interest Payment | | | -558.22 | | | | 306,715.38 |
| 10/02/2019 | 206 | 0.01 | P+I Interest Payment | | | -0.01 | | | | 306,715.38 |
| 02/07/2020 | 206 | 5,954.36 | P+I Interest Payment | | | -5,954.36 | | | | 306,715.38 |
| 02/17/2021 | 206 | 1,500.00 | P+I Interest Payment | | | -1,500.00 | | | | 306,715.38 |
| 03/08/2022 | 420 | 11,399.62 | Late Fee balance on settlement a | | | | | 11,399.62 | | 306,715.38 |
| 08/23/2022 | 222 | 84,128.91 | Interest Reduction | | | -84,128.91 | | | | 306,715.38 |
| | | | Totals | | 306,715.38 | -102,517.34 | 0.00 | 11,399.44 | 0.00 | |

EXHIBIT 4    PAGE 282

McCormick 107, LLC
11350 McCormick Rd
Bldg 2, Suite 902
Hunt Valley, MD 21031

## Payoff Notice

Date Printed: 09/14/2022

HERO NUTRITIONALS LLC
JENNIFER L HODGES
1900 CARNEGIE AVENUE
SANTA ANA CA  92705

| | |
|---|---|
| Account Number | ███703 |
| Short Name | HERO NUTRITIONALS |
| Loan Group | DEFAULT |
| Interest Paid Through | 08/31/2022 |
| Principal Paid Through | 08/31/2022 |
| Loan Date | 10/15/2013 |
| Maturity Date | 10/01/2024 |
| Payoff Date | 09/14/2022 |
| Interest Rate | 12.50000% |
| Per Diem | 576.89255 |
| Principal Balance | 1,661,450.56 |
| Accrued Interest | 14,999.21 |
| Late Charges Due | 8,404.29 |
| Payoff Amount | 1,684,854.06 |

EXHIBIT 4     PAGE 283

HERO NUTRITIONALS LLC
JENNIFER L HODGES
1900 CARNEGIE AVENUE
SANTA ANA CA 92705

Contact Number: HERO NUTRITIONALS
Loan Number: ███703
Name: HERO NUTRITIONALS

| Transaction Date | Tran Code | Transaction Amount | Description/User Reference | R | Principal | Interest | Fees | Late Charges | Others | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| 03/18/2019 | 400 | 2,000,000.00 | Beg Bal Principal Advance | | 2,000,000.00 | | | | | 2,000,000.00 |
| 03/18/2019 | 410 | 157,829.21 | Beg Bal Principal Payment | | -157,829.21 | | | | | 1,842,170.79 |
| 04/22/2019 | 202 | 12,626.54 | Interest Payment | | | -12,626.54 | | | | 1,842,170.79 |
| 04/22/2019 | 202 | 11,897.35 | Interest Payment | | | -11,897.35 | | | | 1,842,170.79 |
| 04/22/2019 | 202 | 10,746.00 | Interest Payment | | | -10,746.00 | | | | 1,842,170.79 |
| 05/13/2019 | 150 | 575.68 | Late Fee | | | | | 575.68 | | 1,842,170.79 |
| 05/28/2019 | 202 | 5,631.13 | Interest Payment | | | -5,631.13 | | | | 1,842,170.79 |
| 07/02/2019 | 202 | 6,590.89 | Interest Payment | | | -6,590.89 | | | | 1,842,170.79 |
| 07/02/2019 | 202 | 5,882.44 | Interest Payment | | | -5,882.44 | | | | 1,842,170.79 |
| 08/13/2019 | 202 | 6,207.11 | Interest Payment | | | -6,207.11 | | | | 1,842,170.79 |
| 08/13/2019 | 202 | 5,306.46 | Interest Payment | | | -5,306.46 | | | | 1,842,170.79 |
| 09/03/2019 | 250 | 19.19 | Late Fee Payment | | | | | -19.19 | | 1,842,170.79 |
| 09/03/2019 | 250 | 575.68 | Late Fee Payment | | | | | -575.68 | | 1,842,170.79 |
| 09/23/2019 | 202 | 6,590.89 | Interest Payment | | | -6,590.89 | | | | 1,842,170.79 |
| 09/23/2019 | 202 | 5,306.46 | Interest Payment | | | -5,306.46 | | | | 1,842,170.79 |
| 10/02/2019 | 202 | 10,963.47 | Interest Payment | | | -10,963.47 | | | | 1,842,170.79 |
| 10/02/2019 | 202 | 11,487.99 | Interest Payment | | | -11,487.99 | | | | 1,842,170.79 |
| 10/02/2019 | 202 | 5,306.46 | Interest Payment | | | -5,306.46 | | | | 1,842,170.79 |
| 02/07/2020 | 202 | 1,727.03 | Interest Payment | | | -1,727.03 | | | | 1,842,170.79 |
| 02/17/2021 | 202 | 1,500.00 | Interest Payment | | | -1,500.00 | | | | 1,842,170.79 |
| 03/11/2021 | 202 | 7,500.00 | Interest Payment | | | -7,500.00 | | | | 1,842,170.79 |
| 04/09/2021 | 202 | 7,122.83 | Interest Payment | | | -7,122.83 | | | | 1,842,170.79 |
| 04/09/2021 | 202 | 377.17 | Interest Payment | | | -377.17 | | | | 1,842,170.79 |
| 05/10/2021 | 202 | 3,213.79 | Interest Payment | | | -3,213.79 | | | | 1,842,170.79 |
| 05/10/2021 | 202 | 6,786.21 | Interest Payment | | | -6,786.21 | | | | 1,842,170.79 |
| 03/08/2022 | 420 | 8,404.29 | Billing late charges from settlemen | | | | | 8,404.29 | | 1,842,170.79 |
| 03/30/2022 | 206 | 10,000.00 | P+I Interest Payment | | | -10,000.00 | | | | 1,842,170.79 |
| 04/20/2022 | 206 | 10,000.00 | P+I Interest Payment | | | -10,000.00 | | | | 1,842,170.79 |
| 05/27/2022 | 206 | 10,000.00 | P+I Interest Payment | | | -10,000.00 | | | | 1,842,170.79 |
| 07/01/2022 | 206 | 10,000.00 | P+I Interest Payment | | | -10,000.00 | | | | 1,842,170.79 |
| 08/23/2022 | 206 | 10,000.00 | P+I Interest Payment | | | -10,000.00 | | | | 1,603,776.49 |
| 08/23/2022 | 206 | 25,000.00 | P+I Interest Payment | | | -25,000.00 | | | | 1,603,776.49 |
| 08/23/2022 | 206 | 10,000.00 | P+I Interest Payment | | | -10,000.00 | | | | 1,603,776.49 |
| 08/23/2022 | 220 | 180,720.23 | Principal Reduction | | -180,720.23 | | | | | 1,236,180.63 |
| 08/23/2022 | 222 | 418,132.46 | Interest Reduction | | | -418,132.46 | | | | 1,661,450.56 |
| | | | Totals | | 1,661,450.56 | -635,902.68 | 0.00 | 8,385.10 | 0.00 | |

EXHIBIT 4    PAGE 284

McCormick 107, LLC
11350 McCormick Rd
Bldg 2, Suite 902
Hunt Valley, MD 21031

## Payoff Notice

Date Printed: 09/14/2022

HERO NUTRITIONALS LLC
JENNIFER L HODGES
1900 CARNEGIE AVENUE
SANTA ANA CA  92705

| | |
|---|---|
| Account Number | ███705 |
| Short Name | HERO NUTRITIONALS |
| Loan Group | DEFAULT |
| Interest Paid Through | 10/19/2019 |
| Principal Paid Through | 10/19/2019 |
| Loan Date | 02/19/2015 |
| Maturity Date | 02/19/2022 |
| Payoff Date | 09/14/2022 |
| Interest Rate | 10.36000% |
| Per Diem | 58.05003 |
| Principal Balance | 201,718.27 |
| Accrued Interest | 1,509.30 |
| Late Charges Due | 6,810.74 |
| Payoff Amount | 210,038.31 |

EXHIBIT 4    PAGE 285

HERO NUTRITIONALS LLC
JENNIFER L HODGES
1900 CARNEGIE AVENUE
SANTA ANA CA 92705

Contact Number: HERO NUTRITIONALS
Loan Number: ▮▮▮▮705
Name: HERO NUTRITIONALS

| Transaction Date | Tran Code | Transaction Amount | Description/User Reference | R | Principal | Interest | Fees | Late Charges | Others | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| 03/18/2019 | 400 | 500,000.00 | Beg Bal Principal Advance | | 500,000.00 | | | | | 500,000.00 |
| 03/18/2019 | 410 | 268,845.85 | Beg Bal Principal Payment | | -268,845.85 | | | | | 231,154.15 |
| 04/01/2019 | 150 | 358.46 | Late Fee | | | | | 358.46 | | 231,154.15 |
| 04/05/2019 | 204 | 5,653.94 | P+I Principal Payment | | -5,653.94 | | | | | 225,500.21 |
| 04/05/2019 | 206 | 1,515.21 | P+I Interest Payment | | | -1,515.21 | | | | 225,500.21 |
| 05/01/2019 | 150 | 358.46 | Late Fee | | | | | 358.46 | | 225,500.21 |
| 05/14/2019 | 204 | 5,859.74 | P+I Principal Payment | | -5,859.74 | | | | | 219,640.47 |
| 05/14/2019 | 206 | 1,309.41 | P+I Interest Payment | | | -1,309.41 | | | | 219,640.47 |
| 05/14/2019 | 250 | 358.46 | Late Fee Payment | | | | | -358.46 | | 219,640.47 |
| 06/18/2019 | 204 | 6,024.58 | P+I Principal Payment | | -6,024.58 | | | | | 213,615.89 |
| 06/18/2019 | 206 | 1,144.57 | P+I Interest Payment | | | -1,144.57 | | | | 213,615.89 |
| 08/23/2019 | 204 | 5,070.02 | P+I Principal Payment | | -5,070.02 | | | | | 208,545.87 |
| 08/23/2019 | 206 | 2,099.13 | P+I Interest Payment | | | -2,099.13 | | | | 208,545.87 |
| 09/03/2019 | 204 | 6,827.60 | P+I Principal Payment | | -6,827.60 | | | | | 201,718.27 |
| 09/03/2019 | 206 | 341.55 | P+I Interest Payment | | | -341.55 | | | | 201,718.27 |
| 09/03/2019 | 250 | 358.46 | Late Fee Payment | | | | | -358.46 | | 201,718.27 |
| 10/02/2019 | 206 | 870.98 | P+I Interest Payment | | | -870.98 | | | | 201,718.27 |
| 02/07/2020 | 206 | 3,844.30 | P+I Interest Payment | | | -3,844.30 | | | | 201,718.27 |
| 02/17/2021 | 206 | 1,500.00 | P+I Interest Payment | | | -1,500.00 | | | | 201,718.27 |
| 03/08/2022 | 420 | 6,810.74 | Late Charges per Settlement Agre | | | | | 6,810.74 | | 201,718.27 |
| 08/23/2022 | 222 | 54,799.20 | Interest Reduction | | | -54,799.20 | | | | 201,718.27 |
| | | | Totals | | 201,718.27 | -67,424.35 | 0.00 | 6,810.74 | 0.00 | |

EXHIBIT 4     PAGE 286

McCormick 107, LLC
11350 McCormick Rd
Bldg 2, Suite 902
Hunt Valley, MD 21031

## Payoff Notice

Date Printed: 09/14/2022

HERO NUTRITIONALS LLC
JENNIFER L HODGES
1900 CARNEGIE AVENUE
SANTA ANA CA  92705

| | |
|---|---|
| Account Number | ████706 |
| Short Name | HERO NUTRITIONALS |
| Loan Group | DEFAULT |
| Interest Paid Through | 10/21/2019 |
| Principal Paid Through | 10/21/2019 |
| Loan Date | 08/22/2014 |
| Maturity Date | 10/01/2024 |
| Payoff Date | 09/14/2022 |
| Interest Rate | 10.59000% |
| Per Diem | 6.52336 |
| Principal Balance | 22,175.76 |
| Accrued Interest | 169.65 |
| Late Charges Due | 1,216.99 |
| Payoff Amount | 23,562.40 |

EXHIBIT 4     PAGE 287

HERO NUTRITIONALS LLC
JENNIFER L HODGES
1900 CARNEGIE AVENUE
SANTA ANA CA 92705

Contact Number: HERO NUTRITIONALS
Loan Number: ▓▓▓▓706
Name: HERO NUTRITIONALS

| Transaction Date | Tran Code | Transaction Amount | Description/User Reference | R | Principal | Interest | Fees | Late Charges | Others | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| 03/18/2019 | 400 | 303,040.63 | Beg Bal Principal Advance | | 303,040.63 | | | | | 303,040.63 |
| 03/18/2019 | 410 | 180,869.68 | Beg Bal Principal Payment | | -180,869.68 | | | | | 122,170.95 |
| 04/02/2019 | 150 | 218.98 | Late Fee | | | | | 218.98 | | 122,170.95 |
| 04/15/2019 | 204 | 3,413.82 | P+I Principal Payment | | -3,413.82 | | | | | 118,757.13 |
| 04/15/2019 | 206 | 965.76 | P+I Interest Payment | | | -965.76 | | | | 118,757.13 |
| 05/03/2019 | 150 | 218.98 | Late Fee | | | | | 218.98 | | 118,757.13 |
| 05/21/2019 | 204 | 3,716.92 | P+I Principal Payment | | -3,716.92 | | | | | 115,040.21 |
| 05/21/2019 | 206 | 662.66 | P+I Interest Payment | | | -662.66 | | | | 115,040.21 |
| 05/21/2019 | 250 | 50.00 | Late Fee Payment | | | | | -50.00 | | 115,040.21 |
| 05/21/2019 | 250 | 218.98 | Late Fee Payment | | | | | -218.98 | | 115,040.21 |
| 06/03/2019 | 150 | 218.98 | Late Fee | | | | | 218.98 | | 115,040.21 |
| 06/18/2019 | 204 | 3,880.31 | P+I Principal Payment | | -3,880.31 | | | | | 111,159.90 |
| 06/18/2019 | 206 | 499.27 | P+I Interest Payment | | | -499.27 | | | | 111,159.90 |
| 06/18/2019 | 250 | 50.00 | Late Fee Payment | | | | | -50.00 | | 111,159.90 |
| 06/18/2019 | 250 | 168.98 | Late Fee Payment | | | | | -168.98 | | 111,159.90 |
| 07/03/2019 | 150 | 218.98 | Late Fee | | | | | 218.98 | | 111,159.90 |
| 08/01/2019 | 150 | 218.98 | Late Fee | | | | | 218.98 | | 111,159.90 |
| 08/23/2019 | 204 | 3,242.41 | P+I Principal Payment | | -3,242.41 | | | | | 107,917.49 |
| 08/23/2019 | 206 | 1,137.17 | P+I Interest Payment | | | -1,137.17 | | | | 107,917.49 |
| 09/03/2019 | 150 | 218.98 | Late Fee | | | | | 218.98 | | 107,917.49 |
| 09/03/2019 | 204 | 217.26 | P+I Principal Payment | | -217.26 | | | | | 107,700.23 |
| 09/03/2019 | 204 | 4,195.58 | P+I Principal Payment | | -4,195.58 | | | | | 103,504.65 |
| 09/03/2019 | 206 | 184.00 | P+I Interest Payment | | | -184.00 | | | | 103,504.65 |
| 09/03/2019 | 250 | 50.08 | Late Fee Payment | | | | | -50.08 | | 103,504.65 |
| 09/03/2019 | 250 | 168.98 | Late Fee Payment | | | | | -168.98 | | 103,504.65 |
| 10/02/2019 | 204 | 3,697.07 | Paydown | | -3,697.07 | | | | | 99,807.58 |
| 10/02/2019 | 204 | 4,379.58 | Paydown | | -4,379.58 | | | | | 95,428.00 |
| 10/02/2019 | 206 | 465.25 | P+I Interest Payment | | | -465.25 | | | | 95,428.00 |
| 10/02/2019 | 220 | 73,056.08 | Paydown | | -73,056.08 | | | | | 22,371.92 |
| 10/02/2019 | 250 | 168.90 | Paydown | | | | | -168.90 | | 22,371.92 |
| 10/02/2019 | 250 | 218.98 | Paydown | | | | | -218.98 | | 22,371.92 |
| 10/02/2019 | 250 | 218.98 | Paydown | | | | | -218.98 | | 22,371.92 |
| 02/07/2020 | 206 | 443.86 | P+I Interest Payment | | | -443.86 | | | | 22,371.92 |
| 02/17/2021 | 204 | 196.16 | P+I Principal Payment | | -196.16 | | | | | 22,175.76 |
| 02/17/2021 | 206 | 1,303.84 | P+I Interest Payment | | | -1,303.84 | | | | 22,175.76 |
| 03/08/2022 | 420 | 1,216.99 | Late fees per settlemetn agreeme | | | | | 1,216.99 | | 22,175.76 |
| 08/23/2022 | 222 | 6,155.40 | Interest Reduction | | | -6,155.40 | | | | 22,175.76 |

EXHIBIT 4    PAGE 288

Case 8:22-bk-11383-SC    Claim 9-1    Filed 09/27/22    Desc Main Document      Page 221
of 225

| Transaction Date | Tran Code | Transaction Amount | Description/User Reference | R | Principal | Interest | Fees | Late Charges | Others | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Totals | | 22,175.76 | -11,817.21 | 0.00 | 1,216.99 | 0.00 | |

EXHIBIT 4     PAGE 289

McCormick 107, LLC
11350 McCormick Rd
Bldg 2, Suite 902
Hunt Valley, MD 21031

## Payoff Notice

Date Printed: 09/14/2022

HERO NUTRITIONALS LLC
JENNIFER L HODGES
1900 CARNEGIE AVENUE
SANTA ANA CA  92705

| | |
|---|---|
| Account Number | ███707 |
| Short Name | HERO NUTRITIONALS |
| Loan Group | DEFAULT |
| Interest Paid Through | 10/24/2019 |
| Principal Paid Through | 10/24/2019 |
| Loan Date | 02/25/2014 |
| Maturity Date | 10/01/2024 |
| Payoff Date | 09/14/2022 |
| Interest Rate | 10.69000% |
| Per Diem | 35.81364 |
| Principal Balance | 120,607.22 |
| Accrued Interest | 931.16 |
| Late Charges Due | 6,574.67 |
| Payoff Amount | 128,113.05 |

EXHIBIT 4      PAGE 290

HERO NUTRITIONALS LLC
JENNIFER L HODGES
1900 CARNEGIE AVENUE
SANTA ANA CA  92705

Contact Number:  HERO NUTRITIONALS
Loan Number: ████707
Name:  HERO NUTRITIONALS

| Transaction Date | Tran Code | Transaction Amount | Description/User Reference | R | Principal | Interest | Fees | Late Charges | Others | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| 03/18/2019 | 400 | 463,009.10 | Beg Bal Principal Advance | | 463,009.10 | | | | | 463,009.10 |
| 03/18/2019 | 410 | 312,690.73 | Beg Bal Principal Payment | | -312,690.73 | | | | | 150,318.37 |
| 04/05/2019 | 150 | 335.61 | Late Fee | | | | | 335.61 | | 150,318.37 |
| 04/15/2019 | 204 | 5,571.70 | P+I Principal Payment | | -5,571.70 | | | | | 144,746.67 |
| 04/15/2019 | 206 | 1,140.41 | P+I Interest Payment | | | -1,140.41 | | | | 144,746.67 |
| 05/06/2019 | 150 | 335.61 | Late Fee | | | | | 335.61 | | 144,746.67 |
| 05/21/2019 | 204 | 5,888.51 | P+I Principal Payment | | -5,888.51 | | | | | 138,858.16 |
| 05/21/2019 | 206 | 823.60 | P+I Interest Payment | | | -823.60 | | | | 138,858.16 |
| 05/21/2019 | 250 | 335.61 | Late Fee Payment | | | | | -335.61 | | 138,858.16 |
| 06/05/2019 | 150 | 335.61 | Late Fee | | | | | 335.61 | | 138,858.16 |
| 06/18/2019 | 204 | 6,097.58 | P+I Principal Payment | | -6,097.58 | | | | | 132,760.58 |
| 06/18/2019 | 206 | 614.53 | P+I Interest Payment | | | -614.53 | | | | 132,760.58 |
| 06/18/2019 | 250 | 335.61 | Late Fee Payment | | | | | -335.61 | | 132,760.58 |
| 08/23/2019 | 204 | 5,327.20 | P+I Principal Payment | | -5,327.20 | | | | | 127,433.38 |
| 08/23/2019 | 206 | 1,384.91 | P+I Interest Payment | | | -1,384.91 | | | | 127,433.38 |
| 09/03/2019 | 204 | 335.61 | P+I Principal Payment | | -335.61 | | | | | 127,097.77 |
| 09/03/2019 | 204 | 6,490.55 | P+I Principal Payment | | -6,490.55 | | | | | 120,607.22 |
| 09/03/2019 | 206 | 221.56 | P+I Interest Payment | | | -221.56 | | | | 120,607.22 |
| 09/03/2019 | 250 | 335.61 | Late Fee Payment | | | | | -335.61 | | 120,607.22 |
| 10/02/2019 | 206 | 552.82 | P+I Interest Payment | | | -552.82 | | | | 120,607.22 |
| 02/07/2020 | 206 | 1,430.45 | P+I Interest Payment | | | -1,430.45 | | | | 120,607.22 |
| 02/17/2021 | 206 | 1,500.00 | P+I Interest Payment | | | -1,500.00 | | | | 120,607.22 |
| 03/08/2022 | 420 | 6,574.67 | late charges as of settlement agre | | | | | 6,574.67 | | 120,607.22 |
| 08/23/2022 | 222 | 33,805.25 | Interest Reduction | | | -33,805.25 | | | | 120,607.22 |
| | | | Totals | | 120,607.22 | -41,473.53 | 0.00 | 6,574.67 | 0.00 | |

EXHIBIT 4    PAGE 291

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
15910 Ventura Blvd., 12th Floor, Encino, CA  91436

A true and correct copy of the foregoing document entitled (*specify*):  PROOF OF CLAIM

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) Sept. 27, 2022    , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that he following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

<div style="text-align:right">☒ Service information continued on attached page</div>

**2. SERVED BY UNITED STATES MAIL:**
On (*date*) Sept. 27, 2022    , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

<div style="text-align:right">☒ Service information continued on attached page</div>

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)_____ , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

<div style="text-align:right">☐ Service information continued on attached page</div>

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| Sept. 27, 2022 | MARY ANN GRANZOW | */s/ Mary Ann Granzow* |
| Date | Printed Name | Signature |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                        **F 9013-3.1.PROOF.SERVICE**

F901331

EXHIBIT 4    PAGE 292

## SERVICE LIST

### SERVED BY COURT VIA NEF:

- **Ron Bender**    rb@lnbyg.com
- **Michael W Brown**    mbrown@hrhlaw.com
- **Arturo Cisneros**    arturo@mclaw.org, CACD_ECF@mclaw.org
- **Jennifer Witherell Crastz**    jcrastz@hrhlaw.com
- **Nancy S Goldenberg**    nancy.goldenberg@usdoj.gov
- **David M Goodrich**    dgoodrich@go2.law,
  kadele@wgllp.com;lbracken@wgllp.com;wggllp@ecf.courtdrive.com;gestrada@wgllp.com
- **Paul M Kelley**    pkelley@kelleysemmel.com
- **Arvind Nath Rawal**    arawal@aisinfo.com
- **Donald W Reid**    don@donreidlaw.com, ecf@donreidlaw.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov

### SERVED BY U.S. MAIL:

**Debtor:**
Hero Nutritionals, LLC
1900 Carnegie Ave. Bldg. A
Santa Ana, CA 92705

EXHIBIT 4    PAGE 293

# EXHIBIT 5

1  ARTURO M. CISNEROS, #120494
   NATHAN F. SMITH, #264635
2  MALCOLM ♦ CISNEROS, A Law Corporation
3  2112 Business Center Drive
   Irvine, CA 92612
4  Phone: (949) 252-9400
   Fax: (949) 252-1032
5  Email: nathan@mclaw.org
6
7  *Attorneys for Chapter 7 Trustee, Mark M. Sharf*

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 8:21-bk-11662--SC |
| JENNIFER LEIGH HODGES, | Chapter 7 |
| Debtor. | **CHAPTER 7 TRUSTEE'S MOTION FOR ORDER: (1) AUTHORIZING SALE OF REAL PROPERTY FREE AND CLEAR OF LIENS PURSUANT TO 11 U.S.C. § 363(f); (2) APPROVING OVERBID PROCEDURES; (3) APPROVING BROKER COMPENSATION; (4) AUTHORIZING DISTRIBUTION OF SALE PROCEEDS; (5) DETERMINING THAT THE PROPOSED BUYER IS A "GOOD FAITH PURCHASER" UNDER 11 U.S.C. § 363(m); AND (6) WAIVING 14 DAY STAY IMPOSED BY FEDERAL RULE OF BANKRUPTCY PROCEDURE 6004(h); DECLARATIONS OF MARK M. SHARF, DAVID CRABTREE, DONALD T. FIFE AND PROPOSED BUYER IN SUPPORT HEREOF** |
| | **[77820 Vineyard Canyon Road, San Miguel, California 93451]** |
| | **Hearing:**<br>Date: August 2, 2022<br>Time: 11:00 a.m.<br>Place: Via Zoom Teleconference |

Motion to Sell

1

EXHIBIT 5    PAGE 294

**TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, DEBTOR, DEBTOR'S COUNSEL, AND OTHER INTERESTED PARTIES:**

Mark M. Sharf, in his capacity as chapter 7 Trustee ("Trustee") for the bankruptcy estate ("Estate") of Jennifer Leigh Hodges ("Debtor"), hereby moves the Court for an Order: (1) Authorizing the Sale of the Property Commonly Known as 77820 Vineyard Canyon Road, San Miguel, California 93451 [APN: 424-131-041,042,060,061] ("Property") Free And Clear Of Liens Pursuant To 11 U.S.C. § 363(f)[1]; (2) Approving Overbid Procedures; (3) Approving Broker Compensation; (4) Authorizing Distribution Of Sale Proceeds; (5) Determining that the Proposed Buyer is a "Good Faith Purchaser" Under § 363(m); and (6) Waiving the 14-day stay of Federal Rule of Bankruptcy Procedure ("FRBP") 6004(h)  ("Motion").  In support hereof, Trustee submits the following:

**I.    SUMMARY.**

Subject to Court approval and overbid, Trustee has accepted an offer from the Phillip and Tracy Cagliero Family Trust ("Buyer"), to purchase the Property for $2,375,000 ("Accepted Offer").

In Trustee's business judgment, the Property has a fair market value in the range of $2,375,000.  As such, Trustee respectfully requests an order: (1) Authorizing him to sell the Property free and clear of liens; (2) Approving overbid procedures; (3) Approving Broker compensation; (4) Authorizing distribution of sale proceeds; (5) Determining that the proposed Buyer is a "Good Faith Purchaser" under § 363(m); and (6) Waiving the 14-day stay of FRBP 6004(h).

The sale of the Property is in the best interest of creditors and the Estate.  Predicated on the granting of the Motion, and if no overbids are received, the Estate will receive net proceeds of approximately $445,000 following payment of costs of sale, including Broker's commission of 5%, payoff of a first priority deed of trust and based on the settlement between Trustee and McCormick 107, LLC ("McCormick").

///

---

[1] Unless otherwise indicated, all statutory references herein pertain to Title 11 of the United States Code and the Federal Rules of Bankruptcy Procedure.

2

Motion to Sell

EXHIBIT 5    PAGE 295

**II.    BACKGROUND.**

**A.    The Filing of the Chapter 11 Petition and Conversion to Chapter 7.**

1.    Debtor's bankruptcy case was commenced on July 2, 2021, four days prior to a foreclosure sale of the property commonly known as 77820 Vineyard Canyon Road, San Miguel, California 93451 ("Property"), with the filing of a Subchapter V petition under Chapter 11 of the Bankruptcy Code ("Petition"). *See* Docket Entry ("DE") 1.

2.    On July 6, 2021, Trustee was appointed as the Subchapter V Trustee. *See* DE 8.

3.    On November 23, 2021, McCormick, Debtor's largest creditor, filed a motion to convert the case to one under chapter 7 on the basis that Debtor's plan was patently unconfirmable. The motion was granted and the case was converted to Chapter 7 on December 27, 2021. *See* DE 73 and 96, respectively.

4.    Trustee is the appointed, qualified, and is the acting chapter 7 Trustee for Debtor's bankruptcy estate ("Estate"). *See* DE 97.

**B.    Debtor's Interest in, and the Liens Against, the Property.**

5.    On July 14, 2021, Debtor filed her Schedules. *See* DE 22.

6.    In her Schedules, Debtor identified her ownership interest in the Property and identified the following liens against it:

    a.    First priority deed of trust in favor of Community Bank of Santa Maria ("CBSM") in the amount of $1,159,748.25.

    b.    Second priority deed of trust in favor of McCormick in the amount of $2,804,672.84 ("McCormick Deed of Trust"). *See* DE 22.

7.    In her Schedules, Debtor valued the Property at $4,000,000. *See* DE 22.

8.    On November 16, 2021, CBSM filed a motion for relief from the automatic stay in connection with the Property.  Trustee has negotiated several continuances of the hearing on the motion, which is currently set for hearing on September 14, 2022. *See* DE 67 and 188, respectively.

9.    On February 9, 2022, Debtor filed an amended Schedule C, wherein she removed her claimed homestead exemption in the Property. *See* DE 113.

///

Motion to Sell

3

EXHIBIT 5    PAGE 296

**C.**     <u>The Status of CBSM and McCormick's Non-Judicial Foreclosure Proceedings Against the Property.</u>

10.     On October 28, 2020, a Notice of Default and Election to Sell Under Deed of Trust was recorded in connection with the McCormick Deed of Trust ("NOD").

11.     On June 15, 2021, a Notice of Default and Election to Sell Under Deed of Trust was recorded against the Property in connection the CBSM Deed of Trust.

12.     On June 8, 2021, a Notice of Trustee's Sale was recorded in connection with the McCormick Deed of Trust ("NTS").

13.     According to the NTS, Trustee's Sale was set for July 6, 2021. However, it was postponed based on the filing of Debtor's case on July 2, 2021.

**D.**     <u>Trustee's Settlement with McCormick.</u>

14.     In February, 2022, Trustee and McCormick entered into a settlement agreement whereby McCormick reduced its claim in this case from $3,036,899.12 to $2,800,000, subordinated 50% of its claim under 11 U.S.C. § 501(c)(1), and transferred the lien securing the subordinated portion of its claim to the Estate under 11 U.S.C. § 501(c)(2) ("McCormick Settlement"). The McCormick Settlement was approved by the Court on May 11, 2022. *See* DE 120 and 161, respectively.

**E.**     <u>Trustee's Employment of a Real Estate Broker and Marketing of the Property.</u>

15.     On June 3, 2022, Trustee filed an application to employ David Crabtree as his real estate broker. The application was approved on June 23, 2022. *See* DE 173 and 182, respectively.

16.     The Property was listed for sale for $2,695,000 on June 1, 2022.

**III.**     <u>THE OFFER TO PURCHASE.</u>

17.     Trustee received an offer to purchase the Property on June 22, 2022 and responded with a counter-offer, which was accepted on June 24, 2022. True and correct copies of the Residential Purchase Agreement and Counter-Offer ("Purchase Agreement") are attached to the accompanying Declaration of Mark M. Sharf ("Trustee Declaration") as Exhibit "1." Buyer has already tendered a $70,500 deposit to Trustee.

18.     In summary, the Purchase Agreement provides as follows:

4

Motion to Sell

EXHIBIT 5   PAGE 297

a.    <u>Purchase Price</u>:  Buyer has agreed to pay $2,375,000 for the Property.

b.    <u>Closing of Sale</u>:  The sale shall close as quickly as possible, but not later than 14 days after entry of a Bankruptcy Court order approving the sale.

c.    <u>"As Is" and "Where As"</u>:  The Property is being sold, "as is – where as," thus Trustee is not making any representations, warranties, either express or implied, as to the Property's condition, uses (prior, present or future), or otherwise.

d.    <u>Transfer of the Property</u>:  Trustee will convey title to Buyer via a Trustee Quitclaim Deed.

e.    <u>Acknowledgement of Trustee's Capacity</u>:  Buyer is expressly aware and fully informed that Trustee is selling the Property exclusively in his capacity as Chapter 7 Trustee of the Estate.  No personal liability for costs, fees or other charges on Trustee's part is intended, and any liability is strictly the liability of the Estate.

f.    <u>Approval of the Bankruptcy Court</u>:  Buyer is aware that the sale is expressly conditioned on approval by the Court and subject to overbid.

g.    <u>Bankruptcy Jurisdiction</u>:  Trustee is selling the Property in his capacity as Chapter 7 Trustee of the Estate.  As such, resolution of any and all disputes between Trustee and Buyer (or any over-bidders) shall be resolved by the Bankruptcy Court.

19.    Trustee shall approve, in writing, all disbursements of sale proceeds.  Escrow shall not be authorized to disburse any funds without Trustee's prior written approval.

20.    If Trustee is unable to close escrow because of unknown title defects, because the liens and encumbrances exceed the amount known to Trustee, by being divested of title by the Court, or because the tax consequences of the sale are excessive, Buyer's sole damages shall be limited to a refund of its deposit less escrow and bond charges.

**IV.    <u>SALE FREE AND CLEAR OF LIENS.</u>**

21.    Debtor's Schedule D lists the first priority secured claim of CBSM, in the amount of $1,159,748.25, and the second priority secured claim of McCormick, in the amount of $2,804,672.84.  Additionally, delinquent taxes owed to the Monterey County Treasurer-Tax Collector ("Monterey County") total approximately $17,825.53.  Trustee has not identified any other

5

Motion to Sell

EXHIBIT 5    PAGE 298

1  liens against the Property.  A true and correct copy of the Preliminary Title Report is attached to the

2  Trustee Declaration as Exhibit "2."

3      22.    Trustee seeks authority to sell the Property "free and clear of any interest in such

4  property of an entity..."  § 363(f) allows such a sale if any of the five following conditions are met:

5  "(1)    applicable non bankruptcy law permits sale of such property free
          and clear of such interest;

6  (2)    such entity consents;

7  (3)    such interest is a lien and the price at which such property is to be
          sold is greater than the aggregate value of all liens on such
          property;

8  (4)    such interest is in bona fide dispute; or

9  (5)    such entity could be compelled, in a legal or equitable proceeding,
          to accept a money satisfaction of such interest."

10  11 U.S.C. § 363(f).

11      Section 363(f) is written in the disjunctive, such that satisfaction of any one of the five

12  conditions is sufficient to allow Trustee to sell property of the estate free and clear of liens.  *In re*

13  *Gerwer,* 898 F.2d 730 (9th Cir. 1990).  Here, Trustee's sale of the Property satisfies § 363(f)(3)

14  because the Property is being sold for $2,375,000, which exceeds the amount owed to CBSM and

15  Monterey County, and § 363(f)(2) based on the McCormick Settlement.

16      23.    On August 10, 2021, CBSM filed a secured proof of claim in connection with the

17  Property in the amount of $1,176,229.79.  *See* Claims Register 2-1.

18      24.    On September 9, 2021, McCormick filed a secured proof of claim in connection with

19  the Property in the amount of $3,036,899.12.  *See* Claims Register 6-1.

20      25.    To the extent that any additional liens are discovered, Trustee proposes that the sale

21  be approved free and clear of said liens pursuant to § 363(f), with same to attach to the proceeds of

22  sale in the same order of priority, extent, and validity.

23      **V.    THE PROPOSED SALE IS FOR FAIR MARKET VALUE.**

24      26.    The Property was listed on the Multiple Listing Service ("MLS") as well as several

25  other real estate websites and was actively marketed by the Broker for $2,695,000.  The Broker's

26  marketing efforts resulted in the receipt the offer.

27      27.    Trustee received an offer to purchase the Property for $2,375,000 on June 22, 2022

28  and responded with a counter-offer, which was accepted on June 24, 2022.  Buyer has already

6

Motion to Sell

EXHIBIT 5    PAGE 299

1  tendered a $70,500 deposit to Trustee.

2  28.    As further evidence that the Property is being sold for fair market value, it continues

3  to be marketed for overbids and will be marketed up to the time of the hearing on this Motion.

4  **VI.    THE REQUESTED OVERBID PROCEDURES SHOULD BE APPROVED.**

5  29.    In order to obtain the highest and best offer for the benefit of creditors of the Estate,

6  Trustee proposes that the following overbid procedures be approved.  Notice is being provided of the

7  opportunity for overbidding to all interested parties in this matter.

8  a)   Only Qualified Bidders may submit an overbid.  A "Qualified Bidder" is one

9      who provides a financial statement, credit report, and such business and

10      banking references as are required in Trustee's reasonable discretion,

11      sufficient to assure Trustee of the bidder's ability (based on availability of

12      financing, experience or other conditions) to consummate the purchase of the

13      Property, and one who can consummate the purchase of the Property on the

14      same terms and conditions, other than price, as those proposed in the Offer.

15  b)   Each bid must be received by Trustee and his counsel no later than 2 business

16      days prior to the hearing.

17  c)   The initial overbid must exceed the Offer by a minimum $20,000.  Here, the

18      first overbid must be at least $2,395,000.  Each subsequent bid must then be in

19      increments of at least $5,000.  For instance, the first subsequent bid must be at

20      least $2,400,000.

21  d)   Each bid must be non-contingent, and on the same terms and conditions, other

22      than price, as those proposed in the Purchase Agreement.

23  e)   Each bidder must match all terms and conditions of the Offer.  Thus, an

24      "earnest money" deposit of at least $70,500 must be made.  Said deposit must

25      be received by Trustee at 221 Paseo De Gracia, Redondo Beach, California

26      90277 by no later than 2 business days prior to the hearing.  Said deposit must

27      be in the form of a cashier's check or certified check.

28

7

Motion to Sell

EXHIBIT 5   PAGE 300

f)     Should a bidder fail to qualify for financing or timely close escrow, the $70,500 deposit is non-refundable.  However, in the event that an overbidder becomes the successful purchaser, Buyer's deposit will be returned to Buyer.

g)     In the event there are no overbids received by Trustee, Buyer shall, subject to Court approval, be deemed the successful bidder, and the Estate's right, title and interest in the Property shall be sold to Buyer for the sum of $2,375,000, as is, where is, without representations or warranties.

30.     The foregoing procedures will provide for an orderly completion of the sale of the Property by permitting all bidders to compete on similar terms, and will allow interested parties and the Court to compare competing bids in order to realize the highest benefit for the Estate.

**VII.    THE COURT HAS AUTHORITY TO APPROVE THE OVERBID PROCEDURES.**

31.     Implementation of the bidding procedures is an action outside the ordinary course of business. A trustee "after notice and hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Furthermore, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Thus, pursuant to sections 363(b)(1) and 105(a), this Court may authorize the implementation of overbidding procedures.

32.     The Ninth Circuit, in a case under the Bankruptcy Act, recognized the power of a bankruptcy court to issue orders determining the terms and conditions for overbids with respect to a sale of estate assets. *In re Crown Corporation*, 679 F.2d 774 (9th Cir. 1982). The *Crown Corporation* court entered an order specifying the minimum consideration required for an overbid as well as the particular contractual terms required to be offered by overbidders. *Id* at 777. The *Crown Corporation* decision also approves of an order requiring and setting the amount of potential overbidders' deposits and authorized courts to determine the disposition of such deposits. *Id*. While the discussion is not extensive, the *Crown Corporation* decision recognizes the inherent authority of bankruptcy courts to order the implementation of bidding procedures such as those proposed in the present case.

///

Motion to Sell

8

EXHIBIT 5     PAGE 301

**A.** **The Proposed Procedures are Untainted by Self-Dealing.**

33.    The proposed overbid procedures have been presented in good faith and have been negotiated on an "arm's-length" basis. Therefore, the dealings between the Trustee and the Proposed Buyer (or any successful buyer) are not tainted.

**B.** **The Proposed Procedures Encourage Bidding and are Fair in Amount.**

34.    The overbid procedures are designed to encourage, not hamper, bidding and are reasonable under the circumstances. This Motion is intended to provide potential overbidders with adequate information to make an informed decision as to the amount of their bid.

**C.** **The Proposed Bidding Procedures are Fair, Reasonable and Serve the Best Interests of the Estate.**

35.    The proposed bidding procedures serve the Estate in several ways. First, the procedures themselves are fair, reasonable, and productive; they will permit the Trustee to conduct an orderly sale of the Property and obtain the best possible price on the best possible terms. Second, the bidding procedures are a necessary component of the Trustee's sale of the Property.  The bidding procedures will ensure that all bids will be comparable. If competing bids are received, the Trustee will determine which bid is the highest and best for the Estate. The comparability requirement of the bidding procedures will make it possible to accomplish this task.

36.    The bidding procedures will help the Trustee to obtain the highest and best price for the Property. The procedures institute minimum overbid increments that the Trustee believes are reasonable. Thus, if competing bids are received, the Trustee will be able to obtain substantial benefit for this Estate from the sale of the Property. The bidding procedures require potential bidders to deposit certified funds prior to the hearing. It would be a serious loss to the Estate if the Trustee surrendered the opportunity to sell the Property to the Proposed Buyer in favor a competing bidder, only to later discover that the bidder is incapable of consummating the transaction. Thus, requiring bidders to make a substantial deposit will protect the Estate from such a loss.

**VIII.**    **THE BROKER'S COMPENSATION SHOULD BE APPROVED.**

37.    On June 23, 2022, Trustee was authorized to employ Broker.

38.    Trustee and Broker have agreed that Broker will be compensated at a reduced

Motion to Sell

EXHIBIT 5    PAGE 302

commission of 5% of the purchase price or overbid.

39.    Due to the facts of this case, Trustee has determined that the commission of 5% is reasonable and appropriate.

### IX.    THE PROPOSED SALE SUBSTANTIALLY BENEFITS THE ESTATE.

40.    The sale of the Property would benefit the estate as follows:

| Estimated Equity Analysis | |
|---|---:|
| Offer Received | $2,375,000 |
| Monterey County | Estimated ($17,825.53) |
| First Priority Deed of Trust – CBSM | Estimated ($1,300,000) |
| Broker Commissions (5%) | ($118,750) |
| Estimated Costs of Sale (2%) | ($47,500) |
| Subtotal | ($990,924.47) |
| **Net Proceeds to McCormick** | ($445,462.24) |
| **Net Proceeds the Estate** | **$445,462.23** |

### X.    TAX CONSEQUENCES OF THE SALE.

41.    Based on the review of Trustee's accountant, Donald T. Fife, CPA, Debtor's net operating losses, which are property of her bankruptcy estate, are sufficient to offset any potential gain from Trustee's sale of the Ranch, even if the sale price is $3,000,000.  *See* Declaration of Donald T. Fife, filed concurrently herewith.

### XI.    PROPOSED DISTRIBUTION OF SALE PROCEEDS.

42.    Trustee seeks authority for distribution of sale proceeds as follows:

   a)    For normal/customary escrow and closing costs;

   b)    Estimated $1,300,000 to CBSM on account of its first priority deed of trust, subject to its demand placed in escrow and Trustee's approval;

   c)    To Broker, an amount not greater than 5% of the sale price, subject to Trustee's review and approval prior to distribution;

   d)    To McCormick, 50% of the remaining balance of the sale proceeds; and

   e)    To the Estate, 50% of the remaining balance of the sale proceeds.

### XII.    DETERMINATION OF GOOD FAITH PURCHASER.

37.    Trustee further seeks an Order determining that Buyer is a "good faith purchaser" under § 363(m), such that any appeal of the Order granting this Motion, even if successful, will not

10

Motion to Sell

EXHIBIT 5    PAGE 303

1  affect the validity of the sale unless a stay pending appeal is obtained.

2       38.    Buyer participated in the negotiation of the Purchase Agreement.  Buyer is not an

3  "insider" under § 101(31), in that neither Buyer nor its representative is a relative or general partner

4  of Debtor, nor is Debtor a partner, director, officer, or person in control of Buyer.

5       39.    There is no relationship between Trustee and Buyer.  Thus, the proposed sale is an

6  arms-length transaction and is in good faith.  *See* Buyer's Declarations filed herewith.

7  **XIII.   WAIVER OF THE STAY IS APPROPRIATE.**

8       41.    The waiver of the stay imposed by FRBP 6004(h) is appropriate.    Time is of the

9  essence because Buyer is able to close within 14 days of entry of the order approving this Motion.

10 Accordingly, Trustee requests that the Court waive the stay of FRBP 6004(h).

11      **WHEREFORE,** Trustee requests that the Court enter an order:

12      a)    Authorizing the sale of the Property to Buyer pursuant to §§ 363(b) and (f);

13      b)    Approving the overbid procedures;

14      c)    Approving the Broker's compensation;

15      d)    Authorizing the distributions as proposed herein;

16      e)    Determining that Buyer, or any overbidders, is a "good faith purchaser" under §

17            363(m);

18      f)    Waiving the 14-day stay of FRBP 6004(h);

19      g)    Authorizing Trustee to sign any and all documents necessary, and to undertake any

20            non-material amendments and modifications necessary, to complete the sale to the

21            highest, qualified bidder without further notice, hearing, or Court order; and

22      h)    For such other and further orders as the Court deems just and proper.

23 DATED: July _8_ , 2022            Respectfully Submitted,

24                                  MALCOLM CISNEROS, A Law Corporation

25

26                                  ARTURO M. CISNEROS, #120494
                                    *Attorneys for Chapter 7 Trustee, Mark M. Sharf*

27

28

Motion to Sell

11

EXHIBIT 5    PAGE 304

## **DECLARATION OF MARK M. SHARF**

I, Mark M. Sharf, declare as follows:

1.      I am the duly appointed and acting chapter 7 Trustee for the bankruptcy estate ("Estate") of Jennifer Leigh Hodges ("Debtor"), Case No. 8:21-bk-11662--SC.

2.      In this capacity, I have personal knowledge of the facts stated herein or believe them to be true based upon information and belief, and, if called upon to testify thereto, I could and would do so competently and truthfully.

3.      I make this declaration in support of the Motion for Order (1) Authorizing Trustee To Sell Real Property Free And Clear Of Liens Pursuant to § 363(f); (2) Approving Overbid Procedures; (3) Approving Broker Compensation; (4) Authorizing Distribution Of Sale Proceeds; (5) Determining that the Proposed Buyer is a "Good Faith Purchaser" Under § 363(m); and (6) Waiving 14-Day Stay of FRBP 6004(h) ("Motion").   Unless otherwise noted, capitalized terms in this Declaration have the meaning set forth in the Motion.  I have read and I am aware of the contents of the Motion and the accompanying Memorandum of Points and Authorities.  The facts stated in the Motion and the Memorandum of Points and Authorities are true and correct to the best of my knowledge.

4.      The Estate includes the real property commonly known as 77820 Vineyard Canyon Road, San Miguel, California 93451 [APN: 424-131-041,042,060,061] ("Property").

5.      On June 3, 2022, I filed an Application to Employ Real Estate Agent David Crabtree of Home & Ranch Sothebys International Realty("Broker").  The Application was granted on June 23, 2022.

6.      It is my understanding that Debtor sometimes visits the Property.  However, she is not paying mortgage payments, hazard insurance premiums, or real property taxes.

7.      Subject to Court approval and overbids, I have accepted an offer from the Phillip and Tracy Cagliero Family Trust to purchase the Property for $2,375,000.  A true and correct copy of the Residential Purchase Agreement and Counter-Offer ("Purchase Agreement") is attached hereto as Exhibit "1" and incorporated herein by reference.

8.      The sale is in the best interest of creditors and the Estate and should be approved.

12

Motion to Sell

EXHIBIT 5    PAGE 305

Assuming the Court approves the Motion and no overbids are received, the Estate will receive approximately $445,000 from the sale for the benefit of creditors of the Estate following payment of costs of sale, including Broker's commission, and the first priority deed of trust.

9.    Buyer has tendered a $70,500 deposit to me in the form of a cashier's check.

10.    In summary, the Purchase Agreement provides as follows:

a.    <u>Purchase Price</u>:  Buyer has agreed to pay $2,375,000 for the Property.

b.    <u>Closing of Sale</u>:  The sale shall close as quickly as possible, but not later than 14 days after Bankruptcy Court approval of the sale.

c.    "<u>As Is</u>" and "<u>Where As</u>":  The Property is being sold, "as is – where as," thus Trustee is not making any representations, warranties, either express or implied, as to the Property's condition, uses (prior, present or future), or otherwise.

d.    <u>Transfer of the Property:</u>  I will convey title to Buyer via a Trustee Quitclaim Deed.

e.    <u>Acknowledgement of Trustee's Capacity</u>:  Buyer is expressly aware and fully informed that I am selling the Property exclusively in my capacity as chapter 7 Trustee of the Estate. No personal liability for costs, fees or other charges on my part is intended, and any liability is strictly the liability of the Estate.

f.    <u>Approval of the Bankruptcy Court</u>:  Buyer is aware that the sale is expressly conditioned on approval by the Court and subject to overbid.

g.    <u>Bankruptcy Jurisdiction</u>:  I am selling the Property in my capacity as chapter 7 of the Estate.  As such, resolution of any and all disputes between Trustee and Buyer (or any over-bidders) shall be resolved by the Court.

11.    I shall approve in writing all disbursements to be made on the sale of the Property. Escrow shall not be authorized to disburse any funds to anyone without my prior written approval.

12.    If I am unable to close escrow because of unknown title defects, because the liens and encumbrances exceed the amount known to me, by being divested of title by the Court, or because the tax consequences of the sale are excessive, Buyer's sole damages shall be limited to a refund of her deposit less escrow and bond charges.

13

Motion to Sell

EXHIBIT 5    PAGE 306

13.   In my business judgment the sale of the Property should be approved.

14.   Pursuant to the Preliminary Title Report, the Property is encumbered by a first priority deed of trust in favor of CBSM and a second priority deed of trust in favor of McCormick. Additionally, delinquent taxes owed to the Monterey County Treasurer-Tax Collector total approximately $17,825.53.  A true and correct copy of a Preliminary Title Report for the Property is attached hereto as Exhibit "2."

15.   I do not believe the Property is subject to any further liens or encumbrances. However, in an abundance of caution and to provide assurances to Buyer, I seek authority to sell the Property "free and clear of any interest in such property of an entity..."

16.   Fair market value for the Property is being realized.  The Property was initially listed for $2,695,000 and the offer received is $2,375,000.  Additionally, the Property will continue to be marketed pending an order on the Motion to Sell and Buyer's offer is subject to overbid.

17.   In preparing to market the Property for sale, the Property was placed on the Multiple Listing Service ("MLS") as well as multiple other real estate websites.  The marketing efforts resulted in the receipt of the Buyer's offer, which I accepted (subject to overbid and court approval). As of the date of this Declaration, I have not received any other offers to purchase the Property.

18.   In order to obtain the highest and best offer for the benefit of creditors of the Estate, I propose that the foregoing Offer be approved along with the proposed overbid procedures.  Notice is being provided of the opportunity for overbidding to all interested parties in this matter.

19.   The proposed overbid procedures as set forth in the foregoing Motion will provide for an orderly completion of the sale of the Property by permitting all bidders to compete on similar terms, and will allow interested parties and the Court to compare competing bids in order to realize the highest benefit for the estate.

20.   I entered into an agreement with the Broker, whereby he will be compensated at a reduced commission of 5% of the approved purchase price or overbid.

21.   Due to the facts of this case, I have determined that the proposed commission is reasonable and appropriate, and I am requesting authorization to pay such commission.

22.   I am further seeking an Order determining that Buyer is a "good faith purchaser"

14

Motion to Sell

EXHIBIT 5    PAGE 307

1    under § 363(m), such that any appeal of the Order granting this Motion, even if successful, will not

2    affect the validity of the sale unless a stay pending appeal is obtained.

3         23.    Buyer participated in the negotiation of the Purchase Agreement.  I am informed and

4    believe that Buyer is not an "insider" as defined in § 101(31), in that Buyer is neither a relative nor a

5    general partner of Debtor, nor is Debtor her partner, director, officer, or person in control of Buyer.

6         24.    There is no relationship between Buyer and me and it is a non-"insider."  Thus, the

7    proposed sale is an arms-length transaction negotiated in good faith between the parties.

8         25.    The sale of the Property would benefit the estate as follows:

| Estimated Equity Analysis | |
|---|---|
| Offer Received | $2,375,000 |
| Monterey County | Estimated ($17,825.53) |
| First Priority Deed of Trust – CBSM | Estimated ($1,300,000) |
| Broker Commissions (5%) | ($118,750) |
| Estimated Costs of Sale (2%) | ($47,500) |
| Subtotal | ($990,924.47) |
| **Net Proceeds to McCormick** | ($445,462.24) |
| **Net Proceeds the Estate** | **$445,462.23** |

15        26.    My accountant, Donald T. Fife, CPA, has determined that the sale will not result in

16   any tax consequences to the Estate because Debtor's net operating losses, which are property of her

17   bankruptcy estate, are sufficient to offset any potential gain from Trustee's sale of the Ranch, even if

18   the sale price is $3,000,000.

19        27.    With respect to the waiver of the stay imposed by FRBP 6004(h), time is of the

20   essence because Buyer is able to close within 14 days of entry of the order approving this Motion.

21   Accordingly, I am requesting that the Court waive the stay imposed by FRBP 6004(h).

22        I declare under penalty of perjury according to the laws of the United States that the

23   foregoing is true and correct and that this declaration was executed on the 7th day of July, 2022, at

24   Los Angeles, California.

25

26                                    _____
                                      Mark M. Sharf

27

28

15

Motion to Sell

EXHIBIT 5    PAGE 308

DocuSign Envelope ID: 8EBAC6C4-1886-4579-B426-5623EB3A7CB

### DECLARATION OF DAVID CRABTREE

I, David Crabtree, declare as follows:

1.      I am a real estate agent employed by Home & Ranch Sothebys International Realty, the real estate broker for Mark M. Sharf, the Chapter 7 Trustee for the bankruptcy estate of Jennifer Leigh Hodges ("Debtor"), Case No. 8:21-bk-11662--SC.   In this capacity, I have personal knowledge of the facts stated herein, and, if called upon to testify thereto, I could and would do so competently and truthfully.

2.      I listed the property commonly known as 77820 Vineyard Canyon Road, San Miguel, California 93451 [APN: 424-131-041,042,060,061] ("Property") for $2,695,000 on June 1, 2022.

3.      On June 22, 2022, I received an offer to purchase the Property for $2,375,000 from Phillip and Tracy Cagliero Family Trust ("Buyer").

4.      Trustee responded with a counter-offer, which Buyer accepted on June 24, 2022.

5.      As of the date of this declaration, I have not received any other offers to purchase the Property but have received numerous inquiries expressing interest in the Property and expect to receive overbids.

6.      The Property was listed on the MLS as well as websites, including but not limited to Zillow.com, Redfin.com, and Truila.com.

7.      I posted an open house to the MLS as well as the aforementioned websites.

8.      The marketing of the Property has been complicated by the fact that Debtor has failed to provide an access code to access one of the living-quarters located at the Property.

9.      I have continued to market the Property since receipt of Buyer's offer and will continue to market the Property pending a ruling on Trustee's Motion to Sell the Property.   My marketing efforts will include continued showings to interested parties, communications via email and phone with interested parties, and continuing marketing efforts to attract interest in the Property and overbids.

///
///
///

16

Motion to Sell

EXHIBIT 5    PAGE 309

DocuSign Envelope ID: 8EBACEC4-188E-4579-B426-5633FE9A7CB

1        I declare under penalty of perjury according to the laws of the United States that the

2 foregoing is true and correct and that this declaration was executed on the __7__ day of July, 2022, at

3 Templeton, California.

4

5 David Crabtree

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Motion to Sell

17

EXHIBIT 5     PAGE 310

DocuSign Envelope ID: 8FBACEC4-188B-457C-B426-5633FFBA47CB

## DECLARATION OF PHILLIP CAGLIERO

I, Phillip Cagliero, declare as follows:

1.      I am one of the trustees of the Phillip and Tracy Cagliero Family Trust, the proposed buyer of the real property commonly known as 77820 Vineyard Canyon Road, San Miguel, California 93451 [APN: 424-131-041,042,060,061] ("Property").  In this capacity, I have personal knowledge of the facts stated herein, and, if called upon to testify thereto, I could and would do so competently and truthfully.

2.      I am not a relative or a general partner of Debtor, the Trustee, or the Trustee's Broker and Real Estate Agent.

3.      I am not a part of a partnership in which Debtor, the Trustee, or the Trustee's Broker and Real Estate Agent, are a general partner, director, officer, or person in control.

4.      I participated in the negotiation of the Residential Purchase Agreement and Joint Escrow Instructions and Counter Offer through my broker, David Crabtree of Home & Ranch Sothebys International Realty, who is also Trustee's Broker.  I have never met or spoken with Debtor or the Trustee.

5.      The proposed sale of the Property is an arms-length transaction and is in good faith.

I declare under penalty of perjury according to the laws of the United States that the foregoing is true and correct and that this declaration was executed on the _7_ day of July, 2022, at San Miguel _____, California.

DocuSigned by:

*Phil Cagliero*

—————————————————
7DA69FD79A24BD8...
Phillip Cagliero

Motion to Sell

EXHIBIT 5    PAGE 311

DocuSign Envelope ID: 8EBAC6C1-19B6-4579-B426-5633EB347CB

## **DECLARATION OF TRACY CAGLIERO**

I, Tracy Cagliero, declare as follows:

1.     I am one of the trustees of the Phillip and Tracy Cagliero Family Trust, the proposed buyer of the real property commonly known as 77820 Vineyard Canyon Road, San Miguel, California 93451 [APN: 424-131-041,042,060,061] ("Property").  In this capacity, I have personal knowledge of the facts stated herein, and, if called upon to testify thereto, I could and would do so competently and truthfully.

2.     I am not a relative or a general partner of Debtor, the Trustee, or the Trustee's Broker and Real Estate Agent.

3.     I am not a part of a partnership in which Debtor, the Trustee, or the Trustee's Broker and Real Estate Agent, are a general partner, director, officer, or person in control.

4.     I participated in the negotiation of the Residential Purchase Agreement and Joint Escrow Instructions and Counter Offer through my broker, David Crabtree of Home & Ranch Sothebys International Realty, who is also Trustee's Broker.  I have never met or spoken with Debtor or the Trustee.

5.     The proposed sale of the Property is an arms-length transaction and is in good faith.

I declare under penalty of perjury according to the laws of the United States that the foregoing is true and correct and that this declaration was executed on the  7  day of July, 2022, at Paso Robles _____, California.

DocuSigned by:

Tracy Cagliero
F9586FCE574B458...

Tracy Cagliero

Motion to Sell

EXHIBIT 5    PAGE 312

## <u>DECLARATION OF DONALD T. FIFE</u>

I, Donald T. Fife, declare as follows:

1.    I am a duly-licensed certified public accountant in the State of California and a partner in the accounting firm of Hahn Fife & Company, LLP ("Hahn Fife").

2.    Hahn Fife is employed as the accountants for Mark Sharf ("Trustee"), the chapter 7 trustee of the bankruptcy estate of Jennifer Leigh Hodges ("Debtor").

3.    I have personal knowledge of the facts set forth in this Declaration, and, if called upon to testify thereto, I could and would do so competently and truthfully.

4.    Debtor acquired the property commonly known as 77820 Vineyard Canyon Road, San Miguel, California 93451 ("Ranch") in 2010 for $1,800,000.

5.    I have reviewed Debtor's 2019 and 2020 federal and state income tax returns ("Tax Returns").

6.    Based on my review of Debtor's Tax Returns, Debtor's net operating losses, which are property of her bankruptcy estate, are sufficient to offset any potential gain from Trustee's sale of the Ranch, even if the sale price is $3,000,000.

I declare under penalty of perjury according to the laws of the United States that the foregoing is true and correct and that this declaration was executed on the 7th day of July, 2022, at Pasadena, California.

_____
Donald T. Fife, Hahn Fife & Co., LLP

20

Motion to Sell

EXHIBIT 5     PAGE 313

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**2112 Business Center Dr., Irvine, CA 92612**

A true and correct copy of the foregoing document entitled (*specify*): **CHAPTER 7 TRUSTEE'S MOTION FOR ORDER: (1) AUTHORIZING SALE OF REAL PROPERTY FREE AND CLEAR OF LIENS PURSUANT TO 11 U.S.C. § 363(f); (2) APPROVING OVERBID PROCEDURES; (3) APPROVING BROKER COMPENSATION; (4) AUTHORIZING DISTRIBUTION OF SALE PROCEEDS; (5) DETERMINING THAT THE PROPOSED BUYER IS A "GOOD FAITH PURCHASER" UNDER 11 U.S.C. § 363(m); AND (6) WAIVING 14 DAY STAY IMPOSED BY FEDERAL RULE OF BANKRUPTCY PROCEDURE 6004(h); DECLARATIONS OF MARK M. SHARF,  DAVID CRABTREE, DONALD T. FIFE AND PROPOSED BUYER IN SUPPORT HEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **July 8, 2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**OFFICE OF THE U.S. TRUSTEE: United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
CHAPTER 7 TRUSTEE: Mark M Sharf (TR)    mark@sharflaw.com, C188@ecfcbis.com;sharf1000@gmail.com
DEBTOR'S ATTORNEY: Thomas J Polis    tom@polis-law.com, paralegal@polis-law.com;
r59042@notify.bestcase.com**

.                                                                                   ☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **July 8, 2022**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**JUDGE'S COPY: Honorable Scott Clarkson, U.S. Bankruptcy Court, 411 West Fourth Street, Santa Ana, CA 92701
DEBTOR: Jennifer Leigh Hodges, 2312 Park Avenue #421, Tustin, CA 92782
DEBTOR: Jennifer Leigh Hodges, 77820 Vineyard Canyon, San Miguel, CA 93451**

                                                                                    ☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____ , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

                                                                                    ☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| **July 8, 2022** | Diep Quach | /s/ Diep Quach |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                        **F 9013-3.1.PROOF.SERVICE**

EXHIBIT 5     PAGE 314

**SECTION 1 CONT.**
NOTICE: Hagop T. Bedoyan    hagop.bedoyan@mccormickbarstow.com,
terry.douty@mccormickbarstow.com
NOTICE: Arturo Cisneros    arturo@mclaw.org, CACD_ECF@mclaw.org
NOTICE: Christopher D Crowell    ccrowell@hrhlaw.com
NOTICE: Casey Z Donoyan    cdonoyan@hrhlaw.com
NOTICE: Raffi Khatchadourian    raffi@hemar-rousso.com
NOTICE: David Levy    dlevy@rasflaw.com
NOTICE: Sandra McBeth    donna@mcbethlegal.com
NOTICE: Queenie K Ng    queenie.k.ng@usdoj.gov
NOTICE: Misty A Perry Isaacson    misty@ppilawyers.com, ecf@ppilawyers.com;
pagterandperryisaacson@jubileebk.net
NOTICE: Nathan F Smith    nathan@mclaw.org, CACD_ECF@mclaw.org;
mcecfnotices@ecf.courtdrive.com; cvalenzuela@mclaw.org
NOTICE: Tiffany Suzanne Yee    tiffany.yee@doj.ca.gov

**SECTION 2 CONT.**
Karl T. Anderson
340 S. Farrell Dr Ste A210
Palm Springs, CA 92262

David Crabtree
Home & Ranch Sotheby's International
412 S Main St
Templeton, CA 93465

Hahn Fife & Company LLP
790 E Colorado Blvd 9th Fl
Pasadena, CA 91101

~~William S. Jubb~~
~~148879 Showboat Rd~~
~~Havasu Landing, CA 92363~~
*07/05/2022 – Return to sender, no mail receptacle, unable
to forward*

EXHIBIT 5    PAGE 315

# EXHIBIT 6

**Fill in this information to identify the case:**

Debtor 1    Hero Nutritionals, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court    **Central District of California**

Case number:  **22–11383**

FILED

**U.S. Bankruptcy Court**
**Central District of California**

9/29/2022

**Kathleen J. Campbell, Clerk**

## Official Form 410
## Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

### Part 1:    Identify the Claim

| | |
|---|---|
| **1. Who is the current creditor?** | U.S. Small Business Administration<br><br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor |
| **2. Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? |

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| U.S. Small Business Administration | U.S. Small Business Administration |
| Name | Name |
| Office of General Counsel – LADO<br>312 N. Spring St., 5th Floor<br>721 19th St.<br>Los Angeles, CA 90012 | Denver Finance Center #7988<br>721 19th St.<br><br>Denver, CO 80202 |
| Contact phone        213–634–3875 | Contact phone        213–634–3875 |
| Contact email    anne.manalili@sba.gov | Contact email    anne.manalili@sba.gov |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

| | |
|---|---|
| **4. Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____<br>MM / DD / YYYY |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? |

Official Form 410                    Proof of Claim                    page 1

EXHIBIT 6    PAGE 316

**Part 2:** **Give Information About the Claim as of the Date the Case Was Filed**

| | | |
|---|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☐ No<br>☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: | 7810 |

7. **How much is the claim?**    $    525869.86

**Does this amount include interest or other charges?**
☐ No
☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as healthcare information.

Money loaned

9. **Is all or part of the claim secured?**

☐ No
☑ Yes. The claim is secured by a lien on property.

**Nature of property:**
☐ Real estate.    If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.*
☐ Motor vehicle
☑ Other. Describe:    All tangible & intangible personal prop.

**Basis for perfection:**    UCC–1 and Sec. Agreement

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $    525869.86

**Amount of the claim that is secured:**    $    525869.86

**Amount of the claim that is unsecured:**    $    0.00    (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $

**Annual Interest Rate** (when case was filed)    3.75    %

☑ Fixed
☐ Variable

10. **Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $

11. **Is this claim subject to a right of setoff?**

☐ No
☑ Yes. Identify the property:    Any and all Federal payments

EXHIBIT 6    PAGE 317

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No<br>☐ Yes. *Check all that apply:* | Amount entitled to priority |
|---|---|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $ _____

☐ Up to $3,350 * of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $ _____

☐ Wages, salaries, or commissions (up to $15,150 *) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies    $ _____

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:    Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date        9/29/2022
                        _____
                        MM / DD / YYYY

/s/  Anne C. Manalili
_____
Signature

Print the name of the person who is completing and signing this claim:

Name            Anne C. Manalili

                First name    Middle name    Last name
Title           General Attorney

Company         U.S. Small Business Administration

                Identify the corporate servicer as the company if the authorized agent is a servicer
Address         312 N. Spring St., 5th Floor

                Number    Street
                Los Angeles, CA 90012

                City    State    ZIP Code
Contact phone   213–634–3875              Email    Anne.Manalili@sba.gov

EXHIBIT 6    PAGE 318

In Re: Hero Nutritionals LLC

Bankruptcy Case Number: 8:22bk11383

**Addendum to Proof of Claim of the U.S. Small Business Administration**

Amount due:  $ 525,869.86

| | | |
|---|---|---|
| Unpaid Principal Balance as of 08/17/2022: | $ | 500,000.00 |
| Unpaid accrued interest to 08/17/2022: | $ | 25,869.86 |
| TOTAL | $ | 525,869.86 |

Interest Rate at Default:          3.750%
Per Diem Interest:               $ 51.37

*Plus all applicable post-petition accrued interest at the applicable interest rate provided for in the loan documents plus all other applicable charges and advances incurred as allowed under the Bankruptcy Code and the loan documents, less any funds received post-petition.

EXHIBIT 6    PAGE 319

Case 8:22-bk-11383-SC    Claim 10-1    Filed 09/29/22    Desc Attachment 1    Page 2 of 28

 **U. S. SMALL BUSINESS ADMINISTRATION** 

September 14, 2022

Hero Nutritionals, LLC
1900 Carnegie Ave., Bldg A
Santa Ana, CA 92705
Re: SBA Loan No. ███████7810

Hero Nutritionals, LLC

Please accept this letter in response to your recent request for payoff information on the above referenced loan.

As of August 17, 2022, the payoff balance on this loan is as follows:

**Principal Balance**    500,000.00
**Interest**                    19,366.44
**OutStanding Interest**  6,503.42
**Total Due**                525,869.86

**For each day after August 17, 2022, please add interest at a rate of $51.37 per day.**
*Please add at least 7 business days of interest to allow for mail transit and processing.

The figures provided are from SBA records and subject to verification by SBA's Denver Finance Office. Payments are posted with the effective date of receipt, and recent payments may not be reflected in this balance. Any overages will be refunded as appropriate.

EXHIBIT 6    PAGE 320

DocuSign Envelope ID: F55D252C-924A-46E0-81B8-5A69B890D495

Doc # L-01-1129731-01

SBA Loan #▮▮▮▮▮7810                                                Application #▮▮▮▮▮▮

## U.S. Small Business Administration

Economic Injury Disaster Loan

## LOAN AUTHORIZATION AND AGREEMENT

Date: 05.28.2020 (Effective Date)

On the above date, this Administration (SBA) authorized (under Section 7(b) of the Small Business Act, as amended) a Loan (SBA Loan #▮▮▮▮▮7810) to Hero Nutritionals, LLC (Borrower) of  1900 Carnegie Ave., Bldg A Santa Ana California 92705  in the amount of one hundred and fifty thousand  and 00/100 Dollars ($150,000.00), upon the following conditions:

PAYMENT

- Installment payments, including principal and interest, of $731.00 <u>Monthly</u>, will begin <u>Twelve (12) months</u> from the date of the promissory Note. The balance of principal and interest will be payable <u>Thirty (30) years</u> from the date of the promissory Note.

INTEREST

- Interest will accrue at the rate of <u>3.75</u>% per annum and will accrue only on funds actually advanced from the date(s) of each advance.

PAYMENT TERMS

- Each payment will be applied first to interest accrued to the date of receipt of each payment, and the balance, if any, will be applied to principal.

- Each payment will be made when due even if at that time the full amount of the Loan has not yet been advanced or the authorized amount of the Loan has been reduced.

COLLATERAL

- For loan amounts of greater than $25,000, Borrower hereby grants to SBA, the secured party hereunder, a continuing security interest in and to any and all "Collateral" as described herein to secure payment and performance of all debts, liabilities and obligations of Borrower to SBA hereunder without limitation, including but not limited to all interest, other fees and expenses (all hereinafter called "Obligations").  The Collateral includes the following property that Borrower now owns or shall acquire or create immediately upon the acquisition or creation thereof: all tangible and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software and (k) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code.  The security interest Borrower grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto.

- For loan amounts of $25,000 or less, SBA is not taking a security interest in any collateral.

Page 2 of 11

SBA Form 1391 (5-00)                                                            Ref 50 30

EXHIBIT 6    PAGE 321

DocuSign Envelope ID: F55D252C-924A-46E0-61B8-6A69B80D6485

Doc # L-013 129731-01

SBA Loan #▮▮▮▮7810                                                           Application #▮▮▮▮▮▮

REQUIREMENTS RELATIVE TO COLLATERAL

- Borrower will not sell or transfer any collateral (except normal inventory turnover in the ordinary course of business) described in the "Collateral" paragraph hereof without the prior written consent of SBA.

- Borrower will neither seek nor accept future advances under any superior liens on the collateral securing this Loan without the prior written consent of SBA.

USE OF LOAN PROCEEDS

- Borrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter and to pay Uniform Commercial Code (UCC) lien filing fees and a third-party UCC handling charge of $100 which will be deducted from the Loan amount stated above.

REQUIREMENTS FOR USE OF LOAN PROCEEDS AND RECEIPTS

- Borrower will obtain and itemize receipts (paid receipts, paid invoices or cancelled checks) and contracts for all Loan funds spent and retain these receipts for 3 years from the date of the final disbursement. Prior to each subsequent disbursement (if any) and whenever requested by SBA, Borrower will submit to SBA such itemization together with copies of the receipts.

- Borrower will not use, directly or indirectly, any portion of the proceeds of this Loan to relocate without the prior written permission of SBA. The law prohibits the use of any portion of the proceeds of this Loan for voluntary relocation from the business area in which the disaster occurred. To request SBA's prior written permission to relocate, Borrower will present to SBA the reasons therefore and a description or address of the relocation site. Determinations of (1) whether a relocation is voluntary or otherwise, and (2) whether any site other than the disaster-affected location is within the business area in which the disaster occurred, will be made solely by SBA.

- Borrower will, to the extent feasible, purchase only American-made equipment and products with the proceeds of this Loan.

- Borrower will make any request for a loan increase for additional disaster-related damages as soon as possible after the need for a loan increase is discovered. The SBA will not consider a request for a loan increase received more than **two (2)** years from the date of loan approval unless, in the sole discretion of the SBA, there are extraordinary and unforeseeable circumstances beyond the control of the borrower.

DEADLINE FOR RETURN OF LOAN CLOSING DOCUMENTS

- **Borrower will sign and return the loan closing documents to SBA within 2 months of the date of this Loan Authorization and Agreement**. By notifying the Borrower in writing, SBA may cancel this Loan if the Borrower fails to meet this requirement. The Borrower may submit and the SBA may, in its sole discretion, accept documents after 2 months of the date of this Loan Authorization and Agreement.

COMPENSATION FROM OTHER SOURCES

- Eligibility for this disaster Loan is limited to disaster losses that are not compensated by other sources. Other sources include but are not limited to: (1) proceeds of policies of insurance or other indemnifications, (2) grants or other reimbursement (including loans) from government agencies or private organizations, (3)

SBA Form 1391 (5-00)                                                                    Ref 50 30

EXHIBIT 6   PAGE 322

DocuSign Envelope ID: 5F5D252C-924A-46E0-81B8-6A69B800D4F5                    Doc # L-01-1129731-01

SBA Loan #▮▮▮▮7810                                                            Application #▮▮▮▮▮▮

claims for civil liability against other individuals, organizations or governmental entities, and (4) salvage (including any sale or re-use) of items of damaged property.

- Borrower will promptly notify SBA of the existence and status of any claim or application for such other compensation, and of the receipt of any such compensation, and Borrower will promptly submit the proceeds of same (not exceeding the outstanding balance of this Loan) to SBA.

- Borrower hereby assigns to SBA the proceeds of any such compensation from other sources and authorizes the payor of same to deliver said proceeds to SBA at such time and place as SBA shall designate.

- SBA will in its sole discretion determine whether any such compensation from other sources is a duplication of benefits. SBA will use the proceeds of any such duplication to reduce the outstanding balance of this Loan, and Borrower agrees that such proceeds will not be applied in lieu of scheduled payments.

DUTY TO MAINTAIN HAZARD INSURANCE

- Within 12 months from the date of this Loan Authorization and Agreement the Borrower will provide proof of an active and in effect hazard insurance policy including fire, lightning, and extended coverage on all items used to secure this loan to at least 80% of the insurable value. Borrower will not cancel such coverage and will maintain such coverage throughout the entire term of this Loan. **BORROWER MAY NOT BE ELIGIBLE FOR EITHER ANY FUTURE DISASTER ASSISTANCE OR SBA FINANCIAL ASSISTANCE IF THIS INSURANCE IS NOT MAINTAINED AS STIPULATED HEREIN THROUGHOUT THE ENTIRE TERM OF THIS LOAN.** Please submit proof of insurance to: U.S. Small Business Administration, Office of Disaster Assistance, 14925 Kingsport Rd, Fort Worth, TX. 76155.

BOOKS AND RECORDS

- Borrower will maintain current and proper books of account in a manner satisfactory to SBA for the most recent 5 years until 3 years after the date of maturity, including extensions, or the date this Loan is paid in full, whichever occurs first. Such books will include Borrower's financial and operating statements, insurance policies, tax returns and related filings, records of earnings distributed and dividends paid and records of compensation to officers, directors, holders of 10% or more of Borrower's capital stock, members, partners and proprietors.

- Borrower authorizes SBA to make or cause to be made, at Borrower's expense and in such a manner and at such times as SBA may require: (1) inspections and audits of any books, records and paper in the custody or control of Borrower or others relating to Borrower's financial or business conditions, including the making of copies thereof and extracts therefrom, and (2) inspections and appraisals of any of Borrower's assets.

- Borrower will furnish to SBA, not later than 3 months following the expiration of Borrower's fiscal year and in such form as SBA may require, Borrower's financial statements.

- Upon written request of SBA, Borrower will accompany such statements with an 'Accountant's Review Report' prepared by an independent public accountant at Borrower's expense.

- Borrower authorizes all Federal, State and municipal authorities to furnish reports of examination, records and other information relating to the conditions and affairs of Borrower and any desired information from such reports, returns, files, and records of such authorities upon request of SBA.

Page 4 of 11

DocuSign Envelope ID: 555D252C-934A-46E0-61B8-6A89B800D485

Doc # 1 129731-01

SBA Loan # ████7810                                                    Application # ████████

## LIMITS ON DISTRIBUTION OF ASSETS

- Borrower will not, without the prior written consent of SBA, make any distribution of Borrower's assets, or give any preferential treatment, make any advance, directly or indirectly, by way of loan, gift, bonus, or otherwise, to any owner or partner or any of its employees, or to any company directly or indirectly controlling or affiliated with or controlled by Borrower, or any other company.

## EQUAL OPPORTUNITY REQUIREMENT

- If Borrower has or intends to have employees, Borrower will post SBA Form 722, Equal Opportunity Poster (copy attached), in Borrower's place of business where it will be clearly visible to employees, applicants for employment, and the general public.

## DISCLOSURE OF LOBBYING ACTIVITIES

- Borrower agrees to the attached Certification Regarding Lobbying Activities

## BORROWER'S CERTIFICATIONS

Borrower certifies that:

- There has been no substantial adverse change in Borrower's financial condition (and organization, in case of a business borrower) since the date of the application for this Loan. (Adverse changes include, but are not limited to: judgment liens, tax liens, mechanic's liens, bankruptcy, financial reverses, arrest or conviction of felony, etc.)

- No fees have been paid, directly or indirectly, to any representative (attorney, accountant, etc.) for services provided or to be provided in connection with applying for or closing this Loan, other than those reported on SBA Form 5 Business Disaster Loan Application'; SBA Form 3501 COVID-19 Economic Injury Disaster Loan Application; or SBA Form 159, 'Compensation Agreement'. All fees not approved by SBA are prohibited.

- All representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete and are offered to induce SBA to make this Loan.

- No claim or application for any other compensation for disaster losses has been submitted to or requested of any source, and no such other compensation has been received, other than that which Borrower has fully disclosed to SBA.

- Neither the Borrower nor, if the Borrower is a business, any principal who owns at least 50% of the Borrower, is delinquent more than 60 days under the terms of any: (a) administrative order; (b) court order; or (c) repayment agreement that requires payment of child support.

- Borrower certifies that no fees have been paid, directly or indirectly, to any representative (attorney, accountant, etc.) for services provided or to be provided in connection with applying for or closing this Loan, other than those reported on the Loan Application. All fees not approved by SBA are prohibited. If an Applicant chooses to employ an Agent, the compensation an Agent charges to and that is paid by the Applicant must bear a necessary and reasonable relationship to the services actually performed and must be comparable to those charged by other Agents in the geographical area. Compensation cannot be contingent on loan approval. In addition, compensation must not include any expenses which are deemed by SBA to be unreasonable for services actually performed or expenses actually incurred. Compensation must not include

SBA Form 1391 (5-00)                                                              Ref 50 30

EXHIBIT 6    PAGE 324

SBA Loan #          7810                                                                Application #

charges prohibited in 13 CFR 103 or SOP 50-30, Appendix 1. **If the compensation exceeds $500 for a disaster home loan or $2,500 for a disaster business loan, Borrower must fill out the Compensation Agreement Form 159D which will be provided for Borrower upon request or can be found on the SBA website.**

- Borrower certifies, to the best of its, his or her knowledge and belief, that the certifications and representations in the attached Certification Regarding Lobbying are true, correct and complete and are offered to induce SBA to make this Loan.

CIVIL AND CRIMINAL PENALTIES

- Whoever wrongfully misapplies the proceeds of an SBA disaster loan shall be civilly liable to the Administrator in an amount equal to one-and-one half times the original principal amount of the loan under 15 U.S.C. 636(b). In addition, any false statement or misrepresentation to SBA may result in criminal, civil or administrative sanctions including, but not limited to: 1) fines, imprisonment or both, under 15 U.S.C. 645, 18 U.S.C. 1001, 18 U.S.C. 1014, 18 U.S.C. 1040, 18 U.S.C. 3571, and any other applicable laws; 2) treble damages and civil penalties under the False Claims Act, 31 U.S.C. 3729; 3) double damages and civil penalties under the Program Fraud Civil Remedies Act, 31 U.S.C. 3802; and 4) suspension and/or debarment from all Federal procurement and non-procurement transactions. Statutory fines may increase if amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.

RESULT OF VIOLATION OF THIS LOAN AUTHORIZATION AND AGREEMENT

- If Borrower violates any of the terms or conditions of this Loan Authorization and Agreement, the Loan will be in default and SBA may declare all or any part of the indebtedness immediately due and payable. SBA's failure to exercise its rights under this paragraph will not constitute a waiver.

- A default (or any violation of any of the terms and conditions) of any SBA Loan(s) to Borrower and/or its affiliates will be considered a default of all such Loan(s).

DISBURSEMENT OF THE LOAN

- Disbursements will be made by and at the discretion of SBA Counsel, in accordance with this Loan Authorization and Agreement and the general requirements of SBA.

- Disbursements may be made in increments as needed.

- Other conditions may be imposed by SBA pursuant to general requirements of SBA.

- Disbursement may be withheld if, in SBA's sole discretion, there has been an adverse change in Borrower's financial condition or in any other material fact represented in the Loan application, or if Borrower fails to meet any of the terms or conditions of this Loan Authorization and Agreement.

- **NO DISBURSEMENT WILL BE MADE LATER THAN 6 MONTHS FROM THE DATE OF THIS LOAN AUTHORIZATION AND AGREEMENT UNLESS SBA, IN ITS SOLE DISCRETION, EXTENDS THIS DISBURSEMENT PERIOD.**

SBA Form 1391 (5-00)                                                                Ref 50 30

EXHIBIT 6    PAGE 325

DocuSign Envelope ID: 555D252C-924A-45E9-81B8-6A89B9C05465                                                    Doc # 01-129731-01

SBA Loan #  ███7810                                                          Application # ████████

### PARTIES AFFECTED

- This Loan Authorization and Agreement will be binding upon Borrower and Borrower's successors and assigns and will inure to the benefit of SBA and its successors and assigns.

### RESOLUTION OF BOARD OF DIRECTORS

- Borrower shall, within 180 days of receiving any disbursement of this Loan, submit the appropriate SBA Certificate and/or Resolution to the U.S. Small Business Administration, Office of Disaster Assistance, 14925 Kingsport Rd, Fort Worth, TX. 76155.

### ENFORCEABILITY

- This Loan Authorization and Agreement is legally binding, enforceable and approved upon Borrower's signature, the SBA's approval and the Loan Proceeds being issued to Borrower by a government issued check or by electronic debit of the Loan Proceeds to Borrower' banking account provided by Borrower in application for this Loan.


*James E. Rivera*

James E. Rivera
Associate Administrator
U.S. Small Business Administration

The undersigned agree(s) to be bound by the terms and conditions herein during the term of this Loan, and further agree(s) that no provision stated herein will be waived without prior written consent of SBA.  **Under penalty of perjury of the United States of America, I hereby certify that I am authorized to apply for and obtain a disaster loan on behalf of Borrower, in connection with the effects of the COVID-19 emergency.**

**Hero Nutritionals, LLC**

DocuSigned by:

*Jennifer Hodges*

29869778F61A4B7...

Date:  ___05.28.2020___

Jennifer Hodges, Owner/Officer

Note: Corporate Borrowers must execute Loan Authorization and Agreement in corporate name, by a duly authorized officer. Partnership Borrowers must execute in firm name, together with signature of a general partner. Limited Liability entities must execute in the entity name by the signature of the authorized managing person.

SBA Form 1391 (5-00)                                                                                    Ref 50 30

EXHIBIT 6    PAGE 326

SBA Loan # ████7810                                                                 Application # ███████████

| | U.S. Small Business Administration | Date: 05.28.2020 |
|---|---|---|
| *(SBA logo)* | **NOTE** | Loan Amount: $150,000.00 |
| | (SECURED DISASTER LOANS) | Annual Interest Rate: 3.75% |

**SBA Loan #** ████**7810**                                              **Application #** ███████████

1. **PROMISE TO PAY:** In return for a loan, Borrower promises to pay to the order of SBA the amount of **one hundred and fifty thousand  and 00/100 Dollars ($150,000.00)**, interest on the unpaid principal balance, and all other amounts required by this Note.

2. **DEFINITIONS: A)** "Collateral" means any property taken as security for payment of this Note or any guarantee of this Note. **B)** "Guarantor" means each person or entity that signs a guarantee of payment of this Note. **C)** "Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

3. **PAYMENT TERMS:** Borrower must make all payments at the place SBA designates. Borrower may prepay this Note in part or in full at any time, without notice or penalty. Borrower must pay principal and interest payments of **$731.00** every **month** beginning **Twelve (12)** months from the date of the Note. SBA will apply each installment payment first to pay interest accrued to the day SBA receives the payment and will then apply any remaining balance to reduce principal. All remaining principal and accrued interest is due and payable **Thirty (30) years** from the date of the Note.

4. **DEFAULT:** Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower: **A)** Fails to comply with any provision of this Note, the Loan Authorization and Agreement, or other Loan Documents; **B)** Defaults on any other SBA loan; **C)** Sells or otherwise transfers, or does not preserve or account to SBA's satisfaction for, any of the Collateral or its proceeds; **D)** Does not disclose, or anyone acting on their behalf does not disclose, any material fact to SBA; **E)** Makes, or anyone acting on their behalf makes, a materially false or misleading representation to SBA; **F)** Defaults on any loan or agreement with another creditor, if SBA believes the default may materially affect Borrower's ability to pay this Note; **G)** Fails to pay any taxes when due; **H)** Becomes the subject of a proceeding under any bankruptcy or insolvency law; **I)** Has a receiver or liquidator appointed for any part of their business or property; **J)** Makes an assignment for the benefit of creditors; **K)** Has any adverse change in financial condition or business operation that SBA believes may materially affect Borrower's ability to pay this Note; **L)** Dies; **M)** Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without SBA's prior written consent; or **N)** Becomes the subject of a civil or criminal action that SBA believes may materially affect Borrower's ability to pay this Note.

5. **SBA'S RIGHTS IF THERE IS A DEFAULT:** Without notice or demand and without giving up any of its rights, SBA may: **A)** Require immediate payment of all amounts owing under this Note; **B)** Have recourse to collect all amounts owing from any Borrower or Guarantor (if any); **C)** File suit and obtain judgment; **D)** Take possession of any Collateral; or **E)** Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

6. **SBA'S GENERAL POWERS:** Without notice and without Borrower's consent, SBA may: **A)** Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses; **B)** Collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If SBA incurs such expenses, it may demand immediate reimbursement from Borrower or add the expenses to the principal balance; **C)** Release anyone obligated to pay this Note; **D)** Compromise, release, renew, extend or substitute any of the Collateral; and **E)** Take any action necessary to protect the Collateral or collect amounts owing on this Note.

SBA FORM 147 B (5-00)

EXHIBIT 6    PAGE 327

DocuSign Envelope ID: 5F5826DC-9244-48E8-84B8-5A89B8C0F405

SBA Loan # ████ 7810                                                Application # ████

7.  **FEDERAL LAW APPLIES:** When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8.  **GENERAL PROVISIONS: A)** All individuals and entities signing this Note are jointly and severally liable. **B)** Borrower waives all suretyship defenses. **C)** Borrower must sign all documents required at any time to comply with the Loan Documents and to enable SBA to acquire, perfect, or maintain SBA's liens on Collateral. **D)** SBA may exercise any of its rights separately or together, as many times and in any order it chooses. SBA may delay or forgo enforcing any of its rights without giving up any of them. **E)** Borrower may not use an oral statement of SBA to contradict or alter the written terms of this Note. **F)** If any part of this Note is unenforceable, all other parts remain in effect. **G)** To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that SBA did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale. **H)** SBA may sell or otherwise transfer this Note.

9.  **MISUSE OF LOAN FUNDS:** Anyone who wrongfully misapplies any proceeds of the loan will be civilly liable to SBA for one and one- half times the proceeds disbursed, in addition to other remedies allowed by law.

10. **BORROWER'S NAME(S) AND SIGNATURE(S):** By signing below, each individual or entity acknowledges and accepts personal obligation and full liability under the Note as Borrower.

**Hero Nutritionals, LLC**

DocuSigned by:

*Jennifer Hodges*

29869778F61A4B7...

Jennifer Hodges, Owner/Officer

Page 3 of 3

SBA FORM 147 B (5-00)

EXHIBIT 6    PAGE 328

Case 8:22-bk-11383-SC    Claim 10-1    Filed 09/29/22    Desc Attachment 1    Page 11 of
28

DocuSign Envelope ID: 5F5D262C-9244-46E3-84B8-5A69B8C0F405                                                     Doc#L-01-1129731-01

SBA Loan #: ███ 7810                                                            Application #: ███



U.S. Small Business Administration
# SECURITY AGREEMENT

| SBA Loan #: | ███ 7810 |
|---|---|
| Borrower: | Hero Nutritionals, LLC |
| Secured Party: | **The Small Business Administration, an Agency of the U.S. Government** |
| Date: | 05.28.2020 |
| Note Amount: | $150,000.00 |

1.    **DEFINITIONS.**

Unless otherwise specified, all terms used in this Agreement will have the meanings ascribed to them under the Official Text of the Uniform Commercial Code, as it may be amended from time to time, ("UCC"). "SBA" means the Small Business Administration, an Agency of the U.S. Government.

2.    **GRANT OF SECURITY INTEREST.**

For value received, the Borrower grants to the Secured Party a security interest in the property described below in paragraph 4 (the "Collateral").

3.    **OBLIGATIONS SECURED**.

This Agreement secures the payment and performance of: (a) all obligations under a Note dated 05.28.2020, made by Hero Nutritionals, LLC , made payable to Secured Lender, in the amount of $150,000.00 ("Note"), including all costs and expenses (including reasonable attorney's fees), incurred by Secured Party in the disbursement, administration and collection of the loan evidenced by the Note; (b) all costs and expenses (including reasonable attorney's fees), incurred by Secured Party in the protection, maintenance and enforcement of the security interest hereby granted; (c) all obligations of the Borrower in any other agreement relating to the Note; and (d) any modifications, renewals, refinancings, or extensions of the foregoing obligations.

4.    **COLLATERAL DESCRIPTION.**

The Collateral in which this security interest is granted includes the following property that Borrower now owns or shall acquire or create immediately upon the acquisition or creation thereof: all tangible

Page 2 of 5

DocuSign Envelope ID: 5F5B262C-9344-46E9-94B8-5A69B8C0FA05

Doc # L201-1129731-01

SBA Loan # ▬▬7810

Application # ▬▬▬▬

and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software and (k) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code.  The security interest Borrower grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto.

5.    **RESTRICTIONS ON COLLATERAL TRANSFER.**

Borrower will not sell, lease, license or otherwise transfer (including by granting security interests, liens, or other encumbrances in) all or any part of the Collateral or Borrower's interest in the Collateral without Secured Party's written or electronically communicated approval, except that Borrower may sell inventory in the ordinary course of business on customary terms. Borrower may collect and use amounts due on accounts and other rights to payment arising or created in the ordinary course of business, until notified otherwise by Secured Party in writing or by electronic communication.

6.    **MAINTENANCE AND LOCATION OF COLLATERAL; INSPECTION; INSURANCE.**

Borrower must promptly notify Secured Party by written or electronic communication of any change in location of the Collateral, specifying the new location. Borrower hereby grants to Secured Party the right to inspect the Collateral at all reasonable times and upon reasonable notice. Borrower must: (a) maintain the Collateral in good condition; (b) pay promptly all taxes, judgments, or charges of any kind levied or assessed thereon; (c) keep current all rent or mortgage payments due, if any, on premises where the Collateral is located; and (d) maintain hazard insurance on the Collateral, with an insurance company and in an amount approved by Secured Party (but in no event less than the replacement cost of that Collateral), and including such terms as Secured Party may require including a Lender's Loss Payable Clause in favor of Secured Party. Borrower hereby assigns to Secured Party any proceeds of such policies and all unearned premiums thereon and authorizes and empowers Secured Party to collect such sums and to execute and endorse in Borrower's name all proofs of loss, drafts, checks and any other documents necessary for Secured Party to obtain such payments.

7.    **CHANGES TO BORROWER'S LEGAL STRUCTURE, PLACE OF BUSINESS, JURISDICTION OF ORGANIZATION, OR NAME.**

Borrower must notify Secured Party by written or electronic communication not less than 30 days before taking any of the following actions: (a) changing or reorganizing the type of organization or form under which it does business; (b) moving, changing its place of business or adding a place of business; (c) changing its jurisdiction of organization; or (d) changing its name. Borrower will pay for the preparation and filing of all documents Secured Party deems necessary to maintain, perfect and continue the perfection of Secured Party's security interest in the event of any such change.

8.    **PERFECTION OF SECURITY INTEREST.**

Borrower consents, without further notice, to Secured Party's filing or recording of any documents necessary to perfect, continue, amend or terminate its security interest. Upon request of Secured Party, Borrower must sign or otherwise authenticate all documents that Secured Party deems necessary at any time to allow Secured Party to acquire, perfect, continue or amend its security interest in the Collateral. Borrower will pay the filing and recording costs of any documents relating to Secured Party's security interest. Borrower ratifies all previous filings and recordings, including financing statements and

SBA Form 1059 (09-19) Previous Editions are obsolete.

EXHIBIT 6    PAGE 330

DocuSign Envelope ID: 5F5D262C-9343-4EE0-84B8-5A69B8C0F405

Doc#l301r1129731-01

SBA Loan #████7810                                         Application #█████

notations on certificates of title. Borrower will cooperate with Secured Party in obtaining a Control Agreement satisfactory to Secured Party with respect to any Deposit Accounts or Investment Property, or in otherwise obtaining control or possession of that or any other Collateral.

9.    **DEFAULT.**

Borrower is in default under this Agreement if: (a) Borrower fails to pay, perform or otherwise comply with any provision of this Agreement; (b) Borrower makes any materially false representation, warranty or certification in, or in connection with, this Agreement, the Note, or any other agreement related to the Note or this Agreement; (c) another secured party or judgment creditor exercises its rights against the Collateral; or (d) an event defined as a "default" under the Obligations occurs. In the event of default and if Secured Party requests, Borrower must assemble and make available all Collateral at a place and time designated by Secured Party. Upon default and at any time thereafter, Secured Party may declare all Obligations secured hereby immediately due and payable, and, in its sole discretion, may proceed to enforce payment of same and exercise any of the rights and remedies available to a secured party by law including those available to it under Article 9 of the UCC that is in effect in the jurisdiction where Borrower or the Collateral is located. Unless otherwise required under applicable law, Secured Party has no obligation to clean or otherwise prepare the Collateral for sale or other disposition and Borrower waives any right it may have to require Secured Party to enforce the security interest or payment or performance of the Obligations against any other person.

10.    **FEDERAL RIGHTS.**

When SBA is the holder of the Note, this Agreement will be construed and enforced under federal law, including SBA regulations. Secured Party or SBA may use state or local procedures for filing papers, recording documents, giving notice, enforcing security interests or liens, and for any other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax or liability. As to this Agreement, Borrower may not claim or assert any local or state law against SBA to deny any obligation, defeat any claim of SBA, or preempt federal law.

11.    **GOVERNING LAW.**

Unless SBA is the holder of the Note, in which case federal law will govern, Borrower and Secured Party agree that this Agreement will be governed by the laws of the jurisdiction where the Borrower is located, including the UCC as in effect in such jurisdiction and without reference to its conflicts of laws principles.

12.    **SECURED PARTY RIGHTS.**

All rights conferred in this Agreement on Secured Party are in addition to those granted to it by law, and all rights are cumulative and may be exercised simultaneously. Failure of Secured Party to enforce any rights or remedies will not constitute an estoppel or waiver of Secured Party's ability to exercise such rights or remedies. Unless otherwise required under applicable law, Secured Party is not liable for any loss or damage to Collateral in its possession or under its control, nor will such loss or damage reduce or discharge the Obligations that are due, even if Secured Party's actions or inactions caused or in any way contributed to such loss or damage.

13.    **SEVERABILITY.**

If any provision of this Agreement is unenforceable, all other provisions remain in effect.

Page 4 of 5

SBA Form 1059 (09-19) Previous Editions are obsolete.

EXHIBIT 6    PAGE 331

DocuSign Envelope ID: 5F5B2E2C-9244-48E9-84B8-5A89B8C0F405

SBA Loan # ████ 7810                                    Application # ████████

14.     **BORROWER CERTIFICATIONS.**

Borrower certifies that: (a) its Name (or Names) as stated above is correct; (b) all Collateral is owned or titled in the Borrower's name and not in the name of any other organization or individual; (c) Borrower has the legal authority to grant the security interest in the Collateral; (d) Borrower's ownership in or title to the Collateral is free of all adverse claims, liens, or security interests (unless expressly permitted by Secured Party); (e) none of the Obligations are or will be primarily for personal, family or household purposes; (f) none of the Collateral is or will be used, or has been or will be bought primarily for personal, family or household purposes; (g) Borrower has read and understands the meaning and effect of all terms of this Agreement.

15.     **BORROWER NAME(S) AND SIGNATURE(S).**

By signing or otherwise authenticating below, each individual and each organization becomes jointly and severally obligated as a Borrower under this Agreement.

**Hero Nutritionals, LLC**

DocuSigned by:

*Jennifer Hodges*

29869778F61A4B7...                                Date:        05.28.2020

Jennifer Hodges, Owner/Officer

Page 5 of 5

SBA Form 1059 (09-19) Previous Editions are obsolete.

EXHIBIT 6     PAGE 332

DocuSign Envelope ID: 65B54358-323C-455C-9485-2F942694CA65

Doc # C-04-019072913-01

SBA Loan #██████7810                                                    Application #████████

## U.S. Small Business Administration

Economic Injury Disaster Loan

## AMENDED LOAN AUTHORIZATION AND AGREEMENT

Date: 05.28.2020, 07.29.2021 (Effective Date)

On the above date, this Administration (SBA) authorized (under Section 7(b) of the Small Business Act, as amended) a Loan or Loan Modification (SBA Loan #██████7810) to Hero Nutritionals, LLC (Borrower) of 1900 Carnegie Ave., Bldg A Santa Ana California 92705 in the amount of five hundred thousand and 00/100 Dollars ($500,000.00), upon the following conditions:

PAYMENT

- Installment payments, including principal and interest, of $2,517.00 Monthly, will begin Twenty-four (24) months from the date of the Original Note. The balance of principal and interest will be payable Thirty (30) years from the date of the Original Note.

INTEREST

- Interest will accrue at the rate of 3.75% per annum and will accrue only on funds actually advanced from the date(s) of each advance.

PAYMENT TERMS

- Each payment will be applied first to interest accrued to the date of receipt of each payment, and the balance, if any, will be applied to principal.

- Each payment will be made when due even if at that time the full amount of the Loan has not yet been advanced or the authorized amount of the Loan has been reduced.

COLLATERAL

- For loan amounts of greater than $25,000, Borrower hereby grants to SBA, the secured party hereunder, a continuing security interest in and to any and all "Collateral" as described herein to secure payment and performance of all debts, liabilities and obligations of Borrower to SBA hereunder without limitation, including but not limited to all interest, other fees and expenses (all hereinafter called "Obligations"). The Collateral includes the following property that Borrower now owns or shall acquire or create immediately upon the acquisition or creation thereof: all tangible and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software and (k) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest Borrower grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto.

- For loan amounts of $25,000 or less, SBA is not taking a security interest in any collateral.

GUARANTEE
Borrower will provide the following guarantee(s):

SBA Form 1391 (5-00)                                                    Ref 50 30

EXHIBIT 6    PAGE 333

DocuSign Envelope ID: 85B54358-323C-455C-9485-2B942694CA66                                    Doc # C-04-019072913-01

SBA Loan #████7810                                                                    Application #████

- Guarantee on SBA Form 2128 of: Jennifer Hodges (77820 Vineyard Canyon Rd., San Miguel, CA)

REQUIREMENTS RELATIVE TO COLLATERAL

- Borrower will not sell or transfer any collateral (except normal inventory turnover in the ordinary course of business) described in the "Collateral" paragraph hereof without the prior written consent of SBA.

USE OF LOAN PROCEEDS

- Borrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter and for loans of more than $25,000 to pay Uniform Commercial Code (UCC) lien filing fees and a third-party UCC handling charge of $100 which will be deducted from the Loan amount stated above.

REQUIREMENTS FOR USE OF LOAN PROCEEDS AND RECEIPTS

- Borrower will obtain and itemize receipts (paid receipts, paid invoices or cancelled checks) and contracts for all Loan funds spent and retain these receipts for 3 years from the date of the final disbursement. Prior to each subsequent disbursement (if any) and whenever requested by SBA, Borrower will submit to SBA such itemization together with copies of the receipts.

- Borrower will not use, directly or indirectly, any portion of the proceeds of this Loan to relocate without the prior written permission of SBA. The law prohibits the use of any portion of the proceeds of this Loan for voluntary relocation from the business area in which the disaster occurred. To request SBA's prior written permission to relocate, Borrower will present to SBA the reasons therefore and a description or address of the relocation site. Determinations of (1) whether a relocation is voluntary or otherwise, and (2) whether any site other than the disaster-affected location is within the business area in which the disaster occurred, will be made solely by SBA.

- Borrower will, to the extent feasible, purchase only American-made equipment and products with the proceeds of this Loan.

- Borrower will make any request for a loan increase for additional disaster-related damages as soon as possible after the need for a loan increase is discovered. The SBA will not consider a request for a loan increase received more than **two (2)** years from the date of loan approval unless, in the sole discretion of the SBA, there are extraordinary and unforeseeable circumstances beyond the control of the borrower.

DEADLINE FOR RETURN OF LOAN CLOSING DOCUMENTS

- **Borrower will sign and return the loan closing documents to SBA within 2 months of the date of this Loan Authorization and Agreement**. By notifying the Borrower in writing, SBA may cancel this Loan if the Borrower fails to meet this requirement. The Borrower may submit and the SBA may, in its sole discretion, accept documents after 2 months of the date of this Loan Authorization and Agreement.

COMPENSATION FROM OTHER SOURCES

- Eligibility for this disaster Loan is limited to disaster losses that are not compensated by other sources. Other sources include but are not limited to: (1) proceeds of policies of insurance or other indemnifications, (2) grants or other reimbursement (including loans) from government agencies or private organizations, (3)

Page 3 of 11

EXHIBIT 6    PAGE 334

DocuSign Envelope ID: 85B54358-323C-455C-9485-29942694CA66

SBA Loan #      7810                                                                      Application #

    claims for civil liability against other individuals, organizations or governmental entities, and (4) salvage (including any sale or re-use) of items of damaged property.

- Borrower will promptly notify SBA of the existence and status of any claim or application for such other compensation, and of the receipt of any such compensation, and Borrower will promptly submit the proceeds of same (not exceeding the outstanding balance of this Loan) to SBA.

- Borrower hereby assigns to SBA the proceeds of any such compensation from other sources and authorizes the payor of same to deliver said proceeds to SBA at such time and place as SBA shall designate.

- SBA will in its sole discretion determine whether any such compensation from other sources is a duplication of benefits. SBA will use the proceeds of any such duplication to reduce the outstanding balance of this Loan, and Borrower agrees that such proceeds will not be applied in lieu of scheduled payments.

DUTY TO MAINTAIN HAZARD INSURANCE

- For loan amounts of greater than $25,000, within 12 months from the date of this Loan Authorization and Agreement the Borrower will provide proof of an active and in effect hazard insurance policy including fire, lightning, and extended coverage on all items used to secure this loan to at least 80% of the insurable value. Borrower will not cancel such coverage and will maintain such coverage throughout the entire term of this Loan. **BORROWER MAY NOT BE ELIGIBLE FOR EITHER ANY FUTURE DISASTER ASSISTANCE OR SBA FINANCIAL ASSISTANCE IF THIS INSURANCE IS NOT MAINTAINED AS STIPULATED HEREIN THROUGHOUT THE ENTIRE TERM OF THIS LOAN.** Please submit proof of insurance to: U.S. Small Business Administration, Office of Disaster Assistance, 14925 Kingsport Rd, Fort Worth, TX. 76155.

BOOKS AND RECORDS

- Borrower will maintain current and proper books of account in a manner satisfactory to SBA for the most recent 5 years until 3 years after the date of maturity, including extensions, or the date this Loan is paid in full, whichever occurs first. Such books will include Borrower's financial and operating statements, insurance policies, tax returns and related filings, records of earnings distributed and dividends paid and records of compensation to officers, directors, holders of 10% or more of Borrower's capital stock, members, partners and proprietors.

- Borrower authorizes SBA to make or cause to be made, at Borrower's expense and in such a manner and at such times as SBA may require: (1) inspections and audits of any books, records and paper in the custody or control of Borrower or others relating to Borrower's financial or business conditions, including the making of copies thereof and extracts therefrom, and (2) inspections and appraisals of any of Borrower's assets.

- Borrower will furnish to SBA, not later than 3 months following the expiration of Borrower's fiscal year and in such form as SBA may require, Borrower's financial statements.

- Upon written request of SBA, Borrower will accompany such statements with an 'Accountant's Review Report' prepared by an independent public accountant at Borrower's expense.

- Borrower authorizes all Federal, State and municipal authorities to furnish reports of examination, records and other information relating to the conditions and affairs of Borrower and any desired information from such reports, returns, files, and records of such authorities upon request of SBA.

SBA Form 1391 (5-00)                                                                      Ref 50 30

EXHIBIT 6    PAGE 335

DocuSign Envelope ID: 85B54358-323C-455C-9485-2B942B94CA65

Doc # C-04-0190729 13-01

SBA Loan #███████7810                                                    Application #████████

## LIMITS ON DISTRIBUTION OF ASSETS

- Borrower will not, without the prior written consent of SBA, make any distribution of Borrower's assets, or give any preferential treatment, make any advance, directly or indirectly, by way of loan, gift, bonus, or otherwise, to any owner or partner or any of its employees, or to any company directly or indirectly controlling or affiliated with or controlled by Borrower, or any other company.

## EQUAL OPPORTUNITY REQUIREMENT

- If Borrower has or intends to have employees, Borrower will post SBA Form 722, Equal Opportunity Poster (copy attached), in Borrower's place of business where it will be clearly visible to employees, applicants for employment, and the general public.

## DISCLOSURE OF LOBBYING ACTIVITIES

- Borrower agrees to the attached Certification Regarding Lobbying Activities

## BORROWER'S CERTIFICATIONS

Borrower certifies that:

- There has been no substantial adverse change in Borrower's financial condition (and organization, in case of a business borrower) since the date of the application for this Loan. (Adverse changes include, but are not limited to: judgment liens, tax liens, mechanic's liens, bankruptcy, financial reverses, arrest or conviction of felony, etc.)

- No fees have been paid, directly or indirectly, to any representative (attorney, accountant, etc.) for services provided or to be provided in connection with applying for or closing this Loan, other than those reported on SBA Form 5 Business Disaster Loan Application'; SBA Form 3501 COVID-19 Economic Injury Disaster Loan Application; or SBA Form 159, 'Compensation Agreement'. All fees not approved by SBA are prohibited.

- All representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete and are offered to induce SBA to make this Loan.

- No claim or application for any other compensation for disaster losses has been submitted to or requested of any source, and no such other compensation has been received, other than that which Borrower has fully disclosed to SBA.

- Neither the Borrower nor, if the Borrower is a business, any principal who owns at least 50% of the Borrower, is delinquent more than 60 days under the terms of any: (a) administrative order; (b) court order; or (c) repayment agreement that requires payment of child support.

- Borrower certifies that no fees have been paid, directly or indirectly, to any representative (attorney, accountant, etc.) for services provided or to be provided in connection with applying for or closing this Loan, other than those reported on the Loan Application.
  All fees not approved by SBA are prohibited. If an Applicant chooses to employ an Agent, the compensation an Agent charges to and that is paid by the Applicant must bear a necessary and reasonable relationship to the services actually performed and must be comparable to those charged by other Agents in the geographical area. Compensation cannot be contingent on loan approval. In addition, compensation must not include  any expenses which are deemed by SBA to be unreasonable for services actually performed or expenses actually incurred. Compensation must not include

SBA Form 1391 (5-00)                                                      Ref 50 30

EXHIBIT 6    PAGE 336

DocuSign Envelope ID: 65D54358-323C-455C-9A85-29942694CA66

Doc # C-04-019072913-01

SBA Loan #▮▮▮▮▮7810

Application #▮▮▮▮▮▮

charges prohibited in 13 CFR 103 or SOP 50-30, Appendix 1. **If the compensation exceeds $500 for a disaster home loan or $2,500 for a disaster business loan, Borrower must fill out the Compensation Agreement Form 159D which will be provided for Borrower upon request or can be found on the SBA website.**

- Borrower certifies, to the best of its, his or her knowledge and belief, that the certifications and representations in the attached Certification Regarding Lobbying are true, correct and complete and are offered to induce SBA to make this Loan.

CIVIL AND CRIMINAL PENALTIES

- Whoever wrongfully misapplies the proceeds of an SBA disaster loan shall be civilly liable to the Administrator in an amount equal to one-and-one half times the original principal amount of the loan under 15 U.S.C. 636(b). In addition, any false statement or misrepresentation to SBA may result in criminal, civil or administrative sanctions including, but not limited to: 1) fines, imprisonment or both, under 15 U.S.C. 645, 18 U.S.C. 1001, 18 U.S.C. 1014, 18 U.S.C. 1040, 18 U.S.C. 3571, and any other applicable laws; 2) treble damages and civil penalties under the False Claims Act, 31 U.S.C. 3729; 3) double damages and civil penalties under the Program Fraud Civil Remedies Act, 31 U.S.C. 3802; and 4) suspension and/or debarment from all Federal procurement and non-procurement transactions. Statutory fines may increase if amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.

RESULT OF VIOLATION OF THIS LOAN AUTHORIZATION AND AGREEMENT

- If Borrower violates any of the terms or conditions of this Loan Authorization and Agreement, the Loan will be in default and SBA may declare all or any part of the indebtedness immediately due and payable. SBA's failure to exercise its rights under this paragraph will not constitute a waiver.

- A default (or any violation of any of the terms and conditions) of any SBA Loan(s) to Borrower and/or its affiliates will be considered a default of all such Loan(s).

DISBURSEMENT OF THE LOAN

- Disbursements will be made by and at the discretion of SBA Counsel, in accordance with this Loan Authorization and Agreement and the general requirements of SBA.

- Disbursements may be made in increments as needed.

- Other conditions may be imposed by SBA pursuant to general requirements of SBA.

- Disbursement may be withheld if, in SBA's sole discretion, there has been an adverse change in Borrower's financial condition or in any other material fact represented in the Loan application, or if Borrower fails to meet any of the terms or conditions of this Loan Authorization and Agreement.

- **NO DISBURSEMENT WILL BE MADE LATER THAN 6 MONTHS FROM THE DATE OF THIS LOAN AUTHORIZATION AND AGREEMENT UNLESS SBA, IN ITS SOLE DISCRETION, EXTENDS THIS DISBURSEMENT PERIOD.**

SBA Form 1391 (5-00)

Ref 50 30

EXHIBIT 6    PAGE 337

DocuSign Envelope ID: 85D54858-323C-45C6-9485-29D42684CA00                                    Doc # C-21-019072913-01

SBA Loan #_____7810                                                    Application #_____

## PARTIES AFFECTED

- This Loan Authorization and Agreement will be binding upon Borrower and Borrower's successors and assigns and will inure to the benefit of SBA and its successors and assigns.

## RESOLUTION OF BOARD OF DIRECTORS

- Borrower and any business entity guarantor shall, within 180 days of receiving any disbursement of this Loan, submit the appropriate SBA Certificate and/or Resolution to the U.S. Small Business Administration, Office of Disaster Assistance, 14925 Kingsport Rd, Fort Worth, TX. 76155.

## ENFORCEABILITY

- This Loan Authorization and Agreement is legally binding, enforceable and approved upon Borrower's signature, the SBA's approval and the Loan Proceeds being issued to Borrower by a government issued check or by electronic debit of the Loan Proceeds to Borrower' banking account provided by Borrower in application for this Loan.

*James E. Rivera*

James E. Rivera
Associate Administrator
U.S. Small Business Administration

The undersigned agree(s) to be bound by the terms and conditions herein during the term of this Loan, and further agree(s) that no provision stated herein will be waived without prior written consent of SBA.  **Under penalty of perjury of the United States of America, I hereby certify that I am authorized to apply for and obtain a disaster loan on behalf of Borrower, in connection with the effects of the COVID-19 emergency.**

**Hero Nutritionals, LLC**

DocuSigned by:

*Jennifer Hodges*

DC77B5198DF2426...

Date:  07.29.2021

Jennifer Hodges, Owner/Officer

Note: Corporate Borrowers must execute Loan Authorization and Agreement in corporate name, by a duly authorized officer. Partnership Borrowers must execute in firm name, together with signature of a general partner. Limited Liability entities must execute in the entity name by the signature of the authorized managing person.

SBA Form 1391 (5-00)                                                                    Ref 50 30

EXHIBIT 6     PAGE 338

DocuSign Envelope ID: 85B54358-323C-455C-9485-29042694CA66

Doc # C-91-019072913-01

| | | |
|---|---|---|
|  | U.S. Small Business Administration<br><br>**1st Modification of Note**<br><br>(SECURED DISASTER LOANS) | **Date: July 29, 2021**<br><br>**Loan Amount: $500,000.00**<br><br>**Annual Interest Rate: 3.750%** |

**Application #** ▉▉▉▉▉            **Loan #** ▉▉▉7810

1.  **NOTE:** The "Note" is the SBA note signed by Borrower, dated **May 28, 2020** in the amount of **one hundred and fifty thousand and 00/100 Dollars**, payable to SBA. This 1st Modification of Note modifies certain terms of the Note. The current modifications and any prior modifications to the Note, are disclosed below in Paragraphs 2 and 4.

2.  **CURRENT PAYMENT TERMS:** Including terms modified by this agreement, the current payment terms of the 1st Modified Note are: The loan amount is **five hundred thousand.** The interest rate is **3.750%** per year. Payments of **$2,517.00** are due every **MONTH** beginning **Twenty-four (24)** months from the date of the Original Note. All remaining principal and accrued interest is due and payable Thirty (30) years from the date of Original Note.

3.  **ADDITIONAL BORROWER: N/A**

4.  **PREVIOUS NOTE AND MODIFICATIONS, IF ANY, AND CURRENT MODIFICATION TERMS SUMMARY:** The chart attached hereto and incorporated by reference as Addendum A is a summary of your original Note terms, any previous modifications thereto and this current modification:

5.  **EFFECT OF THIS MODIFICATION:** All terms of the Note remain unchanged by this agreement except terms that are expressly modified. This Modification of Note becomes a part of the original Note and has the same effect as if its terms were in the original Note when it was signed.

6.  **DEFINITIONS: A)** "Collateral" means any property taken as security for payment of the Note or any guarantee of the Note. **B)** "Guarantor" means each person or entity that signs a guarantee of payment of the Note. **C)** "Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

7.  **DEFAULT:** Borrower is in default under the Note or any modification to the Note, if Borrower does not make a payment when due under the Note, or if Borrower: **A)** Fails to comply with any provision of the Note, the Loan Authorization and Agreement, or other Loan Documents; **B)** Defaults on any other SBA loan; **C)** Sells or otherwise transfers, or does not preserve or account to SBA's satisfaction for, any of the Collateral or its proceeds; **D)** Does not disclose, or anyone acting on their behalf does not disclose, any material fact to SBA; **E)** Makes, or anyone acting on their behalf makes, a materially false or misleading representation to SBA; **F)** Defaults on any loan or agreement with another creditor, if SBA believes the default may materially affect Borrower's ability to pay the Note; **G)** Fails to pay any taxes when due; **H)** Becomes the subject of a proceeding under any bankruptcy or insolvency law; **I)** Has a receiver or liquidator appointed for any part of their business or property; **J)** Makes an assignment for the benefit of creditors; **K)** Has any adverse change in financial condition or business operation that SBA believes may materially affect Borrower's ability to pay the Note; **L)** Dies; **M)** Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without SBA's prior written consent; or, **N)** Becomes the subject of a civil or criminal action that SBA believes may materially affect Borrower's ability to pay the Note.

Page 2 of 4

SBA FORM 2131 (5-00)

EXHIBIT 6    PAGE 339

8.    **SBA'S RIGHTS IF THERE IS A DEFAULT:** Without notice or demand and without giving up any of its rights, SBA may: **A)** Require immediate payment of all amounts owing under the Note; **B)** Collect all amounts owing from any Borrower or Guarantor; **C)** File suit and obtain judgment; **D)** Take possession of any Collateral; or, **E)** Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

9.    **SBA'S GENERAL POWERS:** Without notice and without Borrower's consent, SBA may: **A)** Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses; **B)** Incur expenses to collect amounts due under the Note, enforce the terms of the Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If SBA incurs such expenses, it may demand immediate reimbursement from Borrower or add the expenses to the principal balance; **C)** Release anyone obligated to pay the Note; **D)** Compromise, release, renew, extend or substitute any of the Collateral; and **E)** Take any action necessary to protect the Collateral or collect amounts owing on the Note.

10.    **WHEN FEDERAL LAW APPLIES:** When SBA is the holder, the Note will be interpreted and enforced under federal law, including SBA regulations. SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to the Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

11.    **GENERAL PROVISIONS: A)** All individuals and entities signing the Note, including this Modification, are jointly and severally liable. **B)** Borrower waives all suretyship defenses. **C)** Borrower must sign all documents required at any time to comply with the Loan Documents and to enable SBA to acquire, perfect, or maintain SBA's liens on Collateral. **D)** SBA may exercise any of its rights separately or together, as many times and in any order it chooses. SBA may delay or forgo enforcing any of its rights without giving up any of them. **E)** Borrower may not use an oral statement of SBA to contradict or alter the written terms of the Note. **F)** If any part of the Note is unenforceable, all other parts remain in effect. **G)** To the extent allowed by law, Borrower waives all demands and notices in connection with the Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that SBA did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale. **H)** SBA may sell or otherwise transfer the Note.

12.    **MISUSE OF LOAN FUNDS:** Anyone who wrongfully misapplies any proceeds of the loan will be civilly liable to SBA for one and one half times the proceeds disbursed, in addition to other remedies allowed by law.

13.    **BORROWER'S NAME(S) AND SIGNATURE(S):** By signing below, each individual or entity acknowledges and accepts personal obligation and full liability under the Note as Borrower.

**Hero Nutritionals, LLC**

DocuSigned by:

*Jennifer Hodges*

DC77B5198DF2426...

Jennifer Hodges, Owner/Officer

Page 3 of 4

SBA FORM 2131 (5-00)

EXHIBIT 6    PAGE 340

DocuSign Envelope ID: 85D54358-323C-455C-9485-29042694CA89

Doc # C-21-049072913-01

SBA Loan #          7810                                          Application #

# Addendum A

|              | Date           | Note Amount  | Interest Rate | Periodic Payment Amounts | Maturity Date |
|--------------|----------------|--------------|---------------|--------------------------|---------------|
| Original Note | April 19, 2020 | $150,000.00  | 3.750%        | $731.00                  | June 3, 2050  |
| 1st Modification | May 3, 2021 | $500,000.00  | 3.750%        | $2,517.00                | June 3, 2050  |

Page 4 of 4

EXHIBIT 6    PAGE 341

DocuSign Envelope ID: 85F54358-323C-455C-9485-2894269AC466

SBA Loan # ███ 7810                                               Application # ███

---



U.S. Small Business Administration

# AMENDED SECURITY AGREEMENT

---

| | |
|---|---|
| SBA Loan #: | ███ 7810 |
| Borrower: | Hero Nutritionals, LLC |
| Secured Party: | **The Small Business Administration, an Agency of the U.S. Government** |
| Date: | 07.29.2021 |
| Note Amount: | $500,000.00 |

1. **DEFINITIONS.**

   Unless otherwise specified, all terms used in this Agreement will have the meanings ascribed to them under the Official Text of the Uniform Commercial Code, as it may be amended from time to time, ("UCC"). "SBA" means the Small Business Administration, an Agency of the U.S. Government.

2. **GRANT OF SECURITY INTEREST.**

   For value received, the Borrower grants to the Secured Party a security interest in the property described below in paragraph 4 (the "Collateral").

3. **OBLIGATIONS SECURED**.

   This Agreement secures the payment and performance of: (a) all obligations under a Note dated 05.28.2020 and all amendments and modifications thereto, made by Hero Nutritionals, LLC , made payable to Secured Lender, in the total principal amount of  $500,000.00 ("Note"), including all costs and expenses (including reasonable attorney's fees), incurred by Secured Party in the disbursement, administration and collection of the loan evidenced by the Note; (b) all costs and expenses (including reasonable attorney's fees), incurred by Secured Party in the protection, maintenance and enforcement of the security interest hereby granted; (c) all obligations of the Borrower in any other agreement relating to the Note; and (d) any modifications, renewals, refinancings, or extensions of the foregoing obligations.

4. **COLLATERAL DESCRIPTION.**

   The Collateral in which this security interest is granted includes the following property that Borrower now owns or shall acquire or create immediately upon the acquisition or creation thereof: all tangible

SBA Form 1059 (09-19) Previous Editions are obsolete.

EXHIBIT 6    PAGE 342

DocuSign Envelope ID: 85954358-323C-455C-9485-29942694CA06

SBA Loan # ████ 7810                                                Application # ████████

and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software and (k) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code.  The security interest Borrower grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto.

5.    **RESTRICTIONS ON COLLATERAL TRANSFER.**

Borrower will not sell, lease, license or otherwise transfer (including by granting security interests, liens, or other encumbrances in) all or any part of the Collateral or Borrower's interest in the Collateral without Secured Party's written or electronically communicated approval, except that Borrower may sell inventory in the ordinary course of business on customary terms. Borrower may collect and use amounts due on accounts and other rights to payment arising or created in the ordinary course of business, until notified otherwise by Secured Party in writing or by electronic communication.

6.    **MAINTENANCE AND LOCATION OF COLLATERAL; INSPECTION; INSURANCE.**

Borrower must promptly notify Secured Party by written or electronic communication of any change in location of the Collateral, specifying the new location. Borrower hereby grants to Secured Party the right to inspect the Collateral at all reasonable times and upon reasonable notice. Borrower must: (a) maintain the Collateral in good condition; (b) pay promptly all taxes, judgments, or charges of any kind levied or assessed thereon; (c) keep current all rent or mortgage payments due, if any, on premises where the Collateral is located; and (d) maintain hazard insurance on the Collateral, with an insurance company and in an amount approved by Secured Party (but in no event less than the replacement cost of that Collateral), and including such terms as Secured Party may require including a Lender's Loss Payable Clause in favor of Secured Party. Borrower hereby assigns to Secured Party any proceeds of such policies and all unearned premiums thereon and authorizes and empowers Secured Party to collect such sums and to execute and endorse in Borrower's name all proofs of loss, drafts, checks and any other documents necessary for Secured Party to obtain such payments.

7.    **CHANGES TO BORROWER'S LEGAL STRUCTURE, PLACE OF BUSINESS, JURISDICTION OF ORGANIZATION, OR NAME.**

Borrower must notify Secured Party by written or electronic communication not less than 30 days before taking any of the following actions: (a) changing or reorganizing the type of organization or form under which it does business; (b) moving, changing its place of business or adding a place of business; (c) changing its jurisdiction of organization; or (d) changing its name. Borrower will pay for the preparation and filing of all documents Secured Party deems necessary to maintain, perfect and continue the perfection of Secured Party's security interest in the event of any such change.

8.    **PERFECTION OF SECURITY INTEREST.**

Borrower consents, without further notice, to Secured Party's filing or recording of any documents necessary to perfect, continue, amend or terminate its security interest. Upon request of Secured Party, Borrower must sign or otherwise authenticate all documents that Secured Party deems necessary at any time to allow Secured Party to acquire, perfect, continue or amend its security interest in the Collateral. Borrower will pay the filing and recording costs of any documents relating to Secured Party's security interest. Borrower ratifies all previous filings and recordings, including financing statements and

SBA Form 1059 (09-19) Previous Editions are obsolete.

EXHIBIT 6     PAGE 343

DocuSign Envelope ID: 85B54358-323C-455C-9485-2F942694C466

Doc # C-04-019072913-01

SBA Loan #██████7810                                                                    Application #████████

notations on certificates of title. Borrower will cooperate with Secured Party in obtaining a Control Agreement satisfactory to Secured Party with respect to any Deposit Accounts or Investment Property, or in otherwise obtaining control or possession of that or any other Collateral.

9.    **DEFAULT.**

Borrower is in default under this Agreement if: (a) Borrower fails to pay, perform or otherwise comply with any provision of this Agreement; (b) Borrower makes any materially false representation, warranty or certification in, or in connection with, this Agreement, the Note, or any other agreement related to the Note or this Agreement; (c) another secured party or judgment creditor exercises its rights against the Collateral; or (d) an event defined as a "default" under the Obligations occurs. In the event of default and if Secured Party requests, Borrower must assemble and make available all Collateral at a place and time designated by Secured Party. Upon default and at any time thereafter, Secured Party may declare all Obligations secured hereby immediately due and payable, and, in its sole discretion, may proceed to enforce payment of same and exercise any of the rights and remedies available to a secured party by law including those available to it under Article 9 of the UCC that is in effect in the jurisdiction where Borrower or the Collateral is located. Unless otherwise required under applicable law, Secured Party has no obligation to clean or otherwise prepare the Collateral for sale or other disposition and Borrower waives any right it may have to require Secured Party to enforce the security interest or payment or performance of the Obligations against any other person.

10.    **FEDERAL RIGHTS.**

When SBA is the holder of the Note, this Agreement will be construed and enforced under federal law, including SBA regulations. Secured Party or SBA may use state or local procedures for filing papers, recording documents, giving notice, enforcing security interests or liens, and for any other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax or liability. As to this Agreement, Borrower may not claim or assert any local or state law against SBA to deny any obligation, defeat any claim of SBA, or preempt federal law.

11.    **GOVERNING LAW.**

Unless SBA is the holder of the Note, in which case federal law will govern, Borrower and Secured Party agree that this Agreement will be governed by the laws of the jurisdiction where the Borrower is located, including the UCC as in effect in such jurisdiction and without reference to its conflicts of laws principles.

12.    **SECURED PARTY RIGHTS.**

All rights conferred in this Agreement on Secured Party are in addition to those granted to it by law, and all rights are cumulative and may be exercised simultaneously. Failure of Secured Party to enforce any rights or remedies will not constitute an estoppel or waiver of Secured Party's ability to exercise such rights or remedies. Unless otherwise required under applicable law, Secured Party is not liable for any loss or damage to Collateral in its possession or under its control, nor will such loss or damage reduce or discharge the Obligations that are due, even if Secured Party's actions or inactions caused or in any way contributed to such loss or damage.

13.    **SEVERABILITY.**

If any provision of this Agreement is unenforceable, all other provisions remain in effect.

Page 4 of 5

SBA Form 1059 (09-19) Previous Editions are obsolete.

EXHIBIT 6    PAGE 344

DocuSign Envelope ID: 85D54258-322C-455C-9485-20042694CA80

Loan # C-21-019072913-01

SBA Loan #████7810                                                                    Application #████

14.    **BORROWER CERTIFICATIONS.**

Borrower certifies that: (a) its Name (or Names) as stated above is correct; (b) all Collateral is owned or titled in
the Borrower's name and not in the name of any other organization or individual; (c) Borrower has the legal
authority to grant the security interest in the Collateral; (d) Borrower's ownership in or title to the Collateral is
free of all adverse claims, liens, or security interests (unless expressly permitted by Secured Party); (e) none of
the Obligations are or will be primarily for personal, family or household purposes; (f) none of the Collateral is
or will be used, or has been or will be bought primarily for personal, family or household purposes; (g)
Borrower has read and understands the meaning and effect of all terms of this Agreement.

15.    **BORROWER NAME(S) AND SIGNATURE(S).**

By signing or otherwise authenticating below, each individual and each organization becomes jointly and
severally obligated as a Borrower under this Agreement.

**Hero Nutritionals, LLC**

DocuSigned by:

*Jennifer Hodges*

DC77B5198DF2426...

Date:    07.29.2021

Jennifer Hodges, Owner/Officer

Page 5 of 5

SBA Form 1059 (09-19) Previous Editions are obsolete.

EXHIBIT 6    PAGE 345

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC   1-800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

1861 85281
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: California
(S.O.S.)

Initial Filing #: 207789660338
Initial Book #:
Initial Page #:
Initial Filing Date: 6/11/2020

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME Hero Nutritionals, LLC | | | |
|---|---|---|---|
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 1900 Carnegie Ave., Bldg A | CITY Santa Ana | STATE CA | POSTAL CODE 92705 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME U.S. Small Business Administration | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 10737 Gateway West, #300 | CITY El Paso | STATE TX | POSTAL CODE 79935 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
All tangible and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software and (k) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code.  The security interest Borrower grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto.
EXEMPT Per California Government Code Section 6103 PLEASE EXPEDITE ▆▆ 7810

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
1861 85281

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)
This document was auto-generated from data received from the California Department of State

EXHIBIT 6    PAGE 346

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**650 Town Center Drive, Suite 600**
**Costa Mesa, California 92626**

A true and correct copy of the foregoing document entitled (*specify*): <u>Motion For Order: (1) Approving Asset Purchase</u>
<u>Agreement And Authorizing Sale Of Debtor's Assets Free And Clear Of Liens, Claims And Interests Pursuant To 11</u>
<u>U.S.C. § 363(B) And (F); (2) Assuming And Assigning Certain Obligations; (3) Approving Buyer, Successful Bidder, And</u>
<u>Any Backup Bidder, As Good-Faith Purchaser Pursuant To 11 U.S.C. § 363(M); And (4) Authorizing Payment Of Liens</u>
<u>And Other Ordinary Costs Of Sale Memorandum Of Points And Authorities; Declarations Jennifer Hodges, David M.</u>
<u>Goodrich, Kenneth A. Miller In Support</u> will be served or was served **(a)** on the judge in chambers in the form and manner
required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
<u>October 5, 2022,</u> I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the
following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Ron Bender    rb@lnbyg.com
Michael W Brown    mbrown@hrhlaw.com
Arturo Cisneros    arturo@mclaw.org, CACD_ECF@mclaw.org
Jennifer Witherell Crastz    jcrastz@hrhlaw.com
Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
David M Goodrich    dgoodrich@go2.law, kadele@wgllp.com;lbracken@wgllp.com;wgllp@ecf.courtdrive.com;gestrada@wgllp.com
Paul M Kelley    pkelley@kelleysemmel.com
Arvind Nath Rawal    arawal@aisinfo.com
Donald W Reid    don@donreidlaw.com, ecf@donreidlaw.com
United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) <u>October 5, 2022,</u> I served the following persons and/or entities at the last known addresses in this bankruptcy
case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail,
first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the
judge <u>will be completed</u> no later than 24 hours after the document is filed.

Hero Nutritionals, LLC
1900 Carnegie Ave. Bldg. A
Santa Ana, CA 92705
**Debtor**

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) <u>October 5, 2022,</u> I served the
following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is
filed.

**SERVED BY OVERNIGHT MAIL:**
Honorable Scott C. Clarkson
United States Bankruptcy Court
Central District of California
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5130 / Courtroom 5C
Santa Ana, CA 92701-4593

**SERVED BY EMAIL:**
Donald Reid -  don@donreidlaw.com
Anne C. Manalili - anne.manalili@sba.gov

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 10/5/2022 | Gloria Estrada | *Gloria Estrada* |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                        **F 9013-3.1.PROOF.SERVICE**